**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| _____ | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| SOUTHCROSS ENERGY PARTNERS, L.P., | ) | Case No. 19-10702 (MFW) |
| *et al.*, | ) | |
| | ) | Jointly Administered |
| Debtors.[1] | ) | |
| _____ | ) | |

**DISCLOSURE STATEMENT FOR CHAPTER 11 PLAN FOR SOUTHCROSS ENERGY
PARTNERS L.P. AND ITS AFFILIATED DEBTORS**

---

**THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN.
ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE
STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE
STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE
BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO
CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS
NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

---

[1] The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective Employer Identification Numbers, are as follows: Southcross Energy Partners, L.P. (5230); Southcross Energy Partners GP, LLC (5141); Southcross Energy Finance Corp. (2225); Southcross Energy Operating, LLC (9605); Southcross Energy GP LLC (4246); Southcross Energy LP LLC (4304); Southcross Gathering Ltd. (7233); Southcross CCNG Gathering Ltd. (9553); Southcross CCNG Transmission Ltd. (4531); Southcross Marketing Company Ltd. (3313); Southcross NGL Pipeline Ltd. (3214); Southcross Midstream Services, L.P. (5932); Southcross Mississippi Industrial Gas Sales, L.P. (7519); Southcross Mississippi Pipeline, L.P. (7499); Southcross Gulf Coast Transmission Ltd. (0546); Southcross Mississippi Gathering, L.P. (2994); Southcross Delta Pipeline LLC (6804); Southcross Alabama Pipeline LLC (7180); Southcross Nueces Pipelines LLC (7034); Southcross Processing LLC (0672); FL Rich Gas Services GP, LLC (5172); FL Rich Gas Services, LP (0219); FL Rich Gas Utility GP, LLC (3280); FL Rich Gas Utility, LP (3644); Southcross Transmission, LP (6432); T2 EF Cogeneration Holdings LLC (0613); and T2 EF Cogeneration LLC (4976). The debtors' mailing address is 1717 Main Street, Suite 5300, Dallas, TX 75201.

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile:  (212) 701-5800
Marshall S. Huebner
Darren S. Klein
Steven Z. Szanzer
(each admitted *pro hac vice*)

*Counsel to the Debtors and Debtors in Possession*

MORRIS, NICHOLS, ARSHT &
TUNNELL LLP
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
Robert J. Dehney (No. 3578)
Andrew R. Remming (No. 5120)
Joseph C. Barsalona II (No. 6102)
Eric W. Moats (No. 6441)

*Local Counsel to the Debtors and
Debtors in Possession*

Dated: October 4, 2019
Wilmington, Delaware

**Error! Unknown document property name.**

## PRELIMINARY STATEMENT[2]

The Plan attached hereto as Exhibit A is the outcome of extensive negotiations among the Debtors and certain of their key stakeholders—including an ad hoc group representing more than 70% in aggregate amount held by the Debtors' prepetition and post-petition lenders (the "**Ad Hoc Group**")—that began several months ago.  The Plan contemplates either (i) the liquidation of the Debtors' assets and the distribution of the Sale Proceeds or (ii) to the extent the South Texas Sale is not consummated, a restructuring that will deleverage the Debtors' balance sheet and leave the Debtors positioned to succeed in the highly competitive natural gas midstream industry.

The Debtors' decision to solicit votes for the Plan was precipitated by the historic decline in prices for oil and natural gas, which have remained depressed since 2014.  Prior to commencing bankruptcy proceedings, the Debtors took numerous actions and pursued many strategic avenues aimed at adapting to these evolving market conditions and to position themselves for future success.  However, as market headwinds persisted over a sustained period of time, it became clear that material changes to the Debtors' balance sheet were necessary.  The Plan that the Debtors are proposing, and which is supported by the Ad Hoc Group, will either distribute Sale Proceeds or otherwise restructure the Debtors with significantly reduced debt and further advance the Debtors' efforts to position themselves for long-term success.

The same challenges that have affected the Debtors have caused the distress and the commencement of chapter 11 cases of many other midstream companies.  The Debtors are confident that, upon emergence from chapter 11, they will be well-positioned to weather the storm.

THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN AND CERTAIN OTHER DOCUMENTS AND INFORMATION.  THE FINANCIAL INFORMATION INCLUDED HEREIN IS FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND SHOULD NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW AND WHETHER TO VOTE ON THE PLAN.  THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE.  THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS THAT ARE ATTACHED HERETO ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO SUCH INFORMATION AND DOCUMENTS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the *Chapter 11 Plan for Southcross Energy Partners L.P. and its Affiliated Debtors* (including all exhibits and schedules attached thereto, and as may be amended, altered, modified, or supplemented from time to time, the "**Plan**"); *provided*, that capitalized terms used herein that are not defined herein or in the Plan, but are defined in the title 11 of the United States Code (the "**Bankruptcy Code**") or the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), shall have the meanings ascribed to such terms in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

Error! Unknown document property name.

AND PROVISIONS OF THE PLAN OR SUCH OTHER PLAN-RELATED DOCUMENTS AND INFORMATION, THE PLAN OR SUCH OTHER PLAN-RELATED DOCUMENTS AND INFORMATION, AS THE CASE MAY BE, SHALL GOVERN FOR ALL PURPOSES.

THE STATEMENTS AND INFORMATION CONTAINED HEREIN HAVE BEEN MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH HEREIN SINCE THE DATE HEREOF. EACH HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY REVIEW THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE CASTING A BALLOT (AS DEFINED HEREIN). THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. ANY PERSONS DESIRING ANY SUCH ADVICE OR OTHER ADVICE SHOULD CONSULT WITH THEIR OWN ADVISORS.

ALTHOUGH THE DEBTORS HAVE ATTEMPTED TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT, EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED.

THE FINANCIAL PROJECTIONS (AS DEFINED HEREIN) PROVIDED IN THIS DISCLOSURE STATEMENT HAVE BEEN PREPARED BY THE MANAGEMENT OF THE DEBTORS AND THEIR FINANCIAL ADVISORS. THESE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT, ALTHOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THESE FINANCIAL PROJECTIONS OR THE ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE FINANCIAL PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED AND/OR MAY HAVE BEEN UNANTICIPATED AND, THUS, THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THE FINANCIAL PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

NO PARTY IS AUTHORIZED TO GIVE ANY INFORMATION WITH RESPECT TO THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. NO REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY INFORMATION,

Error! Unknown document property name.

REPRESENTATIONS, OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THE PLAN OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN AND IN THE PLAN SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM.

WITH RESPECT TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING, THREATENED, OR POTENTIAL LITIGATION OR ACTIONS, THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED BY ANY PARTY AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR WILL IT BE CONSTRUED TO CONSTITUTE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS IT RELATES TO THE HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS.

THE SECURITIES DESCRIBED HEREIN WILL BE ISSUED WITHOUT REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR ANY SIMILAR FEDERAL, STATE, OR LOCAL LAW, IN RELIANCE ON THE EXEMPTIONS SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE.  IN ACCORDANCE WITH SECTION 1125(E) OF THE BANKRUPTCY CODE, A DEBTOR OR ANY OF ITS AGENTS THAT PARTICIPATES, IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, IN THE OFFER, ISSUANCE, SALE, OR PURCHASE OF A SECURITY, OFFERED OR SOLD UNDER THE PLAN, OF THE DEBTOR, OF AN AFFILIATE PARTICIPATING IN A JOINT PLAN WITH THE DEBTOR, OR OF A NEWLY ORGANIZED SUCCESSOR TO THE DEBTOR UNDER THE PLAN, IS NOT LIABLE, ON ACCOUNT OF SUCH PARTICIPATION, FOR VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE OFFER, ISSUANCE, SALE, OR PURCHASE OF SECURITIES.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-APPLICABLE BANKRUPTCY LAWS.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "**SEC**"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

SEE ARTICLE IX OF THIS DISCLOSURE STATEMENT, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING," FOR A DISCUSSION OF CERTAIN CONSIDERATIONS IN CONNECTION WITH A DECISION BY A HOLDER OF AN IMPAIRED CLAIM TO ACCEPT THE PLAN.

Error! Unknown document property name.

# TABLE OF CONTENTS

PAGE

### ARTICLE I

INTRODUCTION ....................................................................................................1

A.    Purpose of the Disclosure Statement ....................................................................1

B.    Disclosure Statement Enclosures ..........................................................................2

C.    Confirmation of the Plan ......................................................................................2

D.    Treatment and Classification of Claims and Interests; Impairment.......................3

E.    Voting Procedures and Voting Deadline ...............................................................6

F.    Confirmation Hearing ...........................................................................................7

### ARTICLE II

GENERAL INFORMATION REGARDING THE DEBTORS.................................................7

A.    The Debtors' Businesses, Structure, Management, and Employees.......................7

B.    Debtors' Corporate Structure .............................................................................12

C.    The Debtors' Prepetition Capital Structure.........................................................12

D.    Summary of Events Leading to the Chapter 11 Filings ......................................14

### ARTICLE III

THE CHAPTER 11 CASES ..................................................................................17

A.    First Day Motions ..............................................................................................17

B.    Professional Advisors .........................................................................................21

C.    Schedules and SOFAs.........................................................................................23

D.    De Minimis Assets .............................................................................................23

E.    Bar Date .............................................................................................................23

F.    Holdings Litigation ............................................................................................24

G.    Sale Process .......................................................................................................26

H.    Disclosure and Confirmation Hearings...............................................................30

Error! Unknown document property name.

ARTICLE IV

SUMMARY OF THE PLAN ..................................................................................................31

A.      Considerations Regarding the Plan ...............................................................32

B.      Classification and Treatment of Claims and Interests ...................................33

C.      Acceptance or Rejection of the Plan .............................................................41

D.      Means for Implementation in the Event the South Texas Sale is not Consummated ........42

E.      Means for Implementation in the Event the South Texas Sale is Consummated .............44

F.      Means for Implementation Generally .............................................................48

G.      Provisions Governing Distributions................................................................50

H.      Procedures for Resolving Claims...................................................................55

I.      Executory Contracts and Unexpired Leases .................................................57

J.      Conditions Precedent to Consummation of the Plan .....................................62

K.      Effect of Confirmation....................................................................................64

L.      Retention of Jurisdiction ................................................................................70

M.      Miscellaneous ...............................................................................................72

ARTICLE V

VOTING REQUIREMENTS; ACCEPTANCE AND CONFIRMATION OF THE PLAN ...................................77

A.      General...........................................................................................................77

B.      Parties in Interest Entitled To Vote................................................................77

C.      Classes Impaired and Entitled To Vote Under the Plan .................................78

D.      Voting Procedures and Requirements.............................................................78

E.      Acceptance of Plan ........................................................................................80

F.      Confirmation Without Necessary Acceptances; Cramdown ...........................81

G.      Classification..................................................................................................82

ARTICLE VI

FEASIBILITY AND BEST INTERESTS OF CREDITORS........................................................82

A.      Best Interests Test ........................................................................................82

B.      Liquidation Analysis ......................................................................................83

C.      Application of the Best Interests Test ...........................................................84

D.      Feasibility......................................................................................................84

Error! Unknown document property name.

E.      Valuation of the Debtors ................................................................................85

ARTICLE VII

EFFECT OF CONFIRMATION .....................................................................................85

A.      Binding Effect of Confirmation ....................................................................85
B.      Good Faith .....................................................................................................85

ARTICLE VIII

SECURITIES LAW MATTERS .....................................................................................85

A.      Bankruptcy Code Exemptions from Registration Requirements for the New
        Common Stock................................................................................................85

ARTICLE IX

CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING ....................................87

A.      Certain Bankruptcy and Securities Law Considerations ................................87
B.      Factors Affecting the Debtors' Businesses, Operations, and Financial Condition if
        the Debtors Reorganize Under the Plan........................................................94

ARTICLE X

CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ...........................117

A.      Introduction..................................................................................................117
B.      Partnership Status.........................................................................................118
C.      Definition of "U.S. Holder" .......................................................................119
D.      Certain U.S. Federal Income Tax Consequences to the Debtors and Old LP
        Unitholders...................................................................................................119
E.      Certain U.S. Federal Income Tax Consequences to Holders of Certain Claims ...........121
F.      Certain U.S. Federal Income Tax Consequences of Ownership of New LP Units .........126

ARTICLE XI RECOMMENDATION ...............................................................................131

**Appendices and Schedules**

Appendix A     Chapter 11 Plan for Southcross Energy Partners L.P. and its Affiliated Debtors
Appendix B     Liquidation Analysis
Appendix C     Financial Projections

Error! Unknown document property name.

Appendix D    Valuation Analysis
Appendix E    Organizational Structure

**Error! Unknown document property name.**

# ARTICLE I

# INTRODUCTION

## A.     Purpose of the Disclosure Statement

On April 1, 2019 (the "**Petition Date**"), each of Southcross Energy Partners, L.P. ("**Southcross**" or the "**Partnership**"), Southcross Energy Partners GP, LLC, ("**Southcross GP**"), and Southcross's wholly owned direct and indirect subsidiaries (collectively, the "**Debtors**") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"). The Debtors' chapter 11 cases are being jointly administered under the caption *In re Southcross Energy Partners, L.P.*, Case No. 19-10702 (the "**Chapter 11 Cases**"). The Debtors have continued in possession of their property and have continued to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors submit this disclosure statement (as may be amended, altered, modified, revised, or supplemented from time to time, the "**Disclosure Statement**") in connection with the solicitation of votes on the Plan attached hereto as Exhibit A.

The Plan, attached hereto as Exhibit A, is the outcome of extensive negotiations between the Debtors and certain of their key stakeholders—including an ad hoc group representing more than 70% in aggregate amount held by the Debtors' prepetition and post-petition lenders (the "**Ad Hoc Group**")—that began several months ago. The Plan contemplates either (i) the liquidation of the Debtors' assets and the distribution of the Sale Proceeds or (ii) to the extent the South Texas Sale is not consummated, a restructuring that will deleverage the Debtors' balance sheet and leave the Debtors positioned to succeed in the highly competitive natural gas midstream industry. The Plan contemplates the resolution of all outstanding Claims against, and Interests in, the Debtors.

The Plan is the product of months of hard-fought, arm's length negotiations between the Debtors, the Ad Hoc Group, and certain other interested parties. The Debtors believe the Plan is reflective of these good faith negotiations and will treat holders of Claims and Interests in an economic and fair manner. As discussed further in Article IV.A of this Disclosure Statement, in developing the Plan, the Debtors considered various issues relating to how the distributable value should be allocated among the creditors of the various Debtors, including, without limitation, (i) the value of the Estates on a consolidated and entity-by-entity basis and the proper method of determining such value, (ii) the value of any unencumbered assets after giving effect to a fair allocation of all Administrative Expense Claims, Priority Claims, and Secured Claims, (iii) the projected recoveries of holders of Claims on a consolidated and entity-by-entity basis, and (iv) the nature and treatment of Intercompany Claims. The Debtors believe that the Plan strikes a fair and equitable balance between these competing factors and appropriately distributes value among their stakeholders in accordance with the Bankruptcy Code's priority scheme.

The Debtors submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to holders of Claims against the Debtors in connection with (i) the solicitation of acceptances of the Plan and (ii) a hearing to consider confirmation of the Plan.

Error! Unknown document property name.

The purpose of this Disclosure Statement is to describe the Plan and its provisions and to provide adequate information, as required under section 1125 of the Bankruptcy Code, to holders of Claims against the Debtors who will have the right to vote on the Plan so they can make informed decisions in doing so.  Holders entitled to vote to accept or reject the Plan will receive a Ballot together with this Disclosure Statement to enable them to vote on the Plan.

This Disclosure Statement includes, among other things, (i) information pertaining to the Debtors' prepetition business operations and financial history and (ii) the events leading up to the Chapter 11 Cases.  In addition, this Disclosure Statement includes an overview of the Plan (which overview sets forth certain terms and provisions of the Plan), the effects of confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which distributions will be made under the Plan.  This Disclosure Statement also discusses the confirmation process and the procedures for voting, which procedures must be followed by the holders of Claims entitled to vote under the Plan in order for their votes to be counted.

**B.**      **Disclosure Statement Enclosures**

Accompanying this Disclosure Statement is a ballot (the "**Ballot**") for voting to accept or reject the Plan if you are the record holder of a Claim in a Class entitled to vote on the Plan (each, a "**Voting Class**").

**C.**      **Confirmation of the Plan**

*1.*      *Requirements*

The requirements for confirmation of the Plan are set forth in section 1129 of the Bankruptcy Code.  The requirements for approval of the Disclosure Statement are set forth in section 1125 of the Bankruptcy Code.

*2.*      *Approval of the Plan and Confirmation Hearing*

To confirm the Plan, the Bankruptcy Court must hold a hearing to determine whether the Plan meets the requirements of section 1129 of the Bankruptcy Code.

*3.*      *Only Impaired Classes Vote*

Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests that are "impaired" (as defined in section 1124 of the Bankruptcy Code) under a plan may vote to accept or reject such plan.  Generally, a claim or interest is impaired under a plan if the applicable holder's legal, equitable, or contractual rights are modified under such plan.  In addition, if the holders of claims or interests in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected such plan under section 1126(g) of the Bankruptcy Code and, therefore, such holders are not entitled to vote on such plan.

Under the Plan, holders of Claims in Classes 3 and 4 are impaired and are entitled to vote on the Plan.

2

Under the Plan, holders of Claims and Interests in Classes 5, 6, 7 and 8 are impaired and will not receive or retain any property under the Plan on account of their Claims or Interests in such classes and, therefore, are (i) not entitled to vote on the Plan and (ii) deemed to reject the Plan.

Under the Plan, holders of Claims and Interests in Classes 1 and 2 are unimpaired and therefore, deemed to accept the Plan.

ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASSES 3 AND 4.

## D. Treatment and Classification of Claims and Interests; Impairment

### 1. Treatment of Administrative Expense Claims and Priority Tax Claims

#### (i) Administrative Expense Claims

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a different treatment, or as otherwise expressly provided in the Plan, on the applicable Distribution Date, or as soon thereafter as is reasonably practicable, the holder of such Allowed Administrative Expense Claim shall receive from the applicable Debtors Cash in an amount equal to such Allowed Claim; provided, however, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by any of the Debtors, as debtors in possession, shall be paid by the applicable Debtor in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents relating to, such liabilities.

The DIP Obligations and any other claims which expressly constitute allowed claims under the Final DIP Order shall be deemed Allowed Administrative Expense Claims to the extent payable under the Final DIP Order, the DIP Credit Agreement or the Plan, without the necessity of filing a proof of claim with respect thereto, and shall be paid in Cash on the Effective Date or as soon thereafter as is reasonably practicable without the need to file a proof of such Claim with the Bankruptcy Court in accordance with section 3.2(a) of the Plan and without further order of the Bankruptcy Court

#### (ii) Professional Fee Claims

Except to the extent that the applicable holder of an Allowed Professional Fee Claim agrees to less favorable treatment with the Debtors, or as otherwise expressly set forth in the Plan, each holder of a Professional Fee Claim shall be paid in full in Cash pursuant to this section 3.3. Ad Hoc Group Fee Claims will be paid without (i) the need for the filing of any claim or request for allowance under section 3.2 of the Plan or (ii) any further order of the Bankruptcy Court.

Error! Unknown document property name.

### *(iii)* **Priority Tax Claims**

Except to the extent that the applicable holder of an Allowed Priority Tax Claim has been paid by the Debtors before the Effective Date, or the applicable Debtor and such holder agree to less favorable treatment by the Debtors, each holder of an Allowed Priority Tax Claim shall receive, on account of such Allowed Priority Tax Claim, at the option of the Debtors (a) payment in full in Cash made on or as soon as reasonably practicable after the later of the Effective Date and the first Distribution Date occurring at least 20 calendar days after the date such Claim is Allowed, (b) regular installment payments in accordance with section 1129(a)(9)(C) of the Bankruptcy Code or (c) such other amounts and in such other manner as may be determined by the Bankruptcy Court to provide the holder of such Allowed Priority Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim. For the avoidance of doubt, if the South Texas Sale is consummated on or before the Effective Date, any payment made on account of Allowed Priority Tax Claims shall be paid from the Wind-Down Account.

The Debtors or the Plan Administrator (as applicable) shall have the right, in their sole discretion, to pay any Allowed Priority Tax Claim or any remaining balance of an Allowed Priority Tax Claim (together with accrued but unpaid interest) in full at any time on or after the Effective Date without premium or penalty.

### 2.    *Classification of Other Claims and Interests*

Pursuant to sections 1122 and 1123 of the Bankruptcy Code, Claims and Interests are classified for all purposes, including, without express or implied limitation, voting, confirmation, and distribution pursuant to the Plan, as set forth herein. A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class, and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or Interest is in a particular Class only to the extent that such Claim or Interest is Allowed in that Class and has not been paid or otherwise satisfied prior to the Effective Date. Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, may be adjusted or expunged on the official claims register without a claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

Except as otherwise specifically provided for in the Plan, the Confirmation Order, or other order of the Bankruptcy Court, or as required by applicable non-bankruptcy law, in no event shall any holder of an Allowed Claim be entitled to receive payments that in the aggregate exceed the Allowed amount of such holder's Claim. For the purpose of classification and treatment under the Plan, any Claim in respect of which multiple Debtors are jointly liable shall be treated as a separate Claim against each of the jointly liable Debtors.

Error! Unknown document property name.

## Summary of Classification and Treatment of
## Claims and Interests in the Debtors

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE SUBJECT TO CHANGE.**

The Plan is being proposed as a joint plan of reorganization of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan of reorganization for each Debtor. The Plan groups the Debtors together solely for purposes of describing treatment under the Plan, confirmation of the Plan and making Plan Distributions in respect of Claims against and/or Interests in the Debtors under the Plan. Such groupings shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, nor cause the transfer of any assets or the assumption of any liabilities; and, except as otherwise provided by or permitted in the Plan, all Debtors shall continue to exist as separate legal entities.

The information in the table below is provided in summary form for illustrative purposes only and is subject to material change based on certain contingencies, including those related to the claims reconciliation process. Actual recoveries may widely vary within these ranges, and any changes to any of the assumptions underlying these amounts could result in material adjustments to recovery estimates provided herein and/or the actual distribution received by holders of Allowed Claims. The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' estimates as of the date hereof only. In addition to the cautionary notes contained elsewhere in the Disclosure Statement, it is underscored that the Debtors make no representation as to the accuracy of these recovery estimates. The Debtors expressly disclaim any obligation to update any estimates or assumptions after the date hereof on any basis (including new or different information received and/or errors discovered).

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, confirmation, and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. For a summary of the treatment of each Class of Claims and Interests, see Article IV, "Summary of The Plan," below.

| Class | Designation | Plan Treatment of Allowed Claims and Interests | Entitled to Vote | Projected Recovery Under the Plan | Estimated Allowed Claims |
|---|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired | No | 100% | [•] |
| 2 | Other Secured Claims | Unimpaired | No | 100% | [•] |
| 3 | Prepetition Term Loan Claims | Impaired | Yes | [•]% | [•] |

5

| Class | Designation | Plan Treatment of Allowed Claims and Interests | Entitled to Vote | Projected Recovery Under the Plan | Estimated Allowed Claims |
|---|---|---|---|---|---|
| 4 | Prepetition Revolving Credit Facility Claims | Impaired | Yes | [●]% | [●] |
| 5 | General Unsecured Claims | Impaired | No | 0% | [●] |
| 6 | Sponsor Note Claims | Impaired | No | 0% | [●] |
| 7 | Subordinated Claims | Impaired | No | 0% | [●] |
| 8 | Existing Interests | Impaired | No | 0% | [●] |

### E.    Voting Procedures and Voting Deadline

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan.  To ensure your vote is counted, you must complete, date, sign, and promptly mail the Ballot enclosed with the notice or complete your Ballot using the online portal maintained by the Solicitation and Claims Agent, in each case indicating your decision to accept or reject the Plan in the boxes provided.

The Ballot also contains an election to opt out of the release provisions contained in Section 14.6(b) of the Plan.  Holders of Claims who are deemed to accept or deemed to reject the Plan will not receive Ballots.  If you (a) vote to accept the Plan, (b) do not submit a ballot to accept or reject the Plan and do not opt out of or object to the release provisions of the Plan, or (c) vote to reject the Plan but do not opt out of the release provisions of the plan, you will be deemed to have granted the releases in section 14.6(b) of the plan.

TO BE COUNTED, YOUR BALLOT INDICATING YOUR ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY THE SOLICITATION AND CLAIMS AGENT (THE "**SOLICITATION AND CLAIMS AGENT**") NO LATER THAN 6:00 P.M. (PREVAILING EASTERN TIME) ON **November 25, 2019** (THE "**VOTING DEADLINE**").

In order for the Plan to be accepted by an impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting in such Class must vote to accept the Plan. At least one Voting Class, excluding the votes of insiders, must actually vote to accept the Plan.

YOU ARE URGED TO COMPLETE, DATE, SIGN, AND PROMPTLY MAIL THE BALLOT ENCLOSED WITH THE NOTICE OR COMPLETE YOUR BALLOT USING THE ONLINE PORTAL MAINTAINED BY THE SOLICITATION AND CLAIMS AGENT. PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND LEGIBLY AND TO IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE HOLDER.  IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN

AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT, OR YOU LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THE DISCLOSURE STATEMENT, THE PLAN, OR PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT THE SOLICITATION AND CLAIMS AGENT AT (866) 967-0671 (TOLL-FREE) OR (310) 751-2671 (IF CALLING FROM OUTSIDE THE U.S. OR CANADA) OR AT SouthcrossInfo@kccllc.com.    THE SOLICITATION AND CLAIMS AGENT IS NOT AUTHORIZED TO PROVIDE LEGAL ADVICE AND WILL NOT PROVIDE ANY SUCH ADVICE.

**F.      Confirmation Hearing**

The Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan (the "**Confirmation Hearing**").  The Confirmation Hearing will take place on December 5, 2019 at 10:30 a.m. (prevailing Eastern Time).  Parties in interest will have the opportunity to object to the confirmation of the Plan at the Confirmation Hearing.

THE DEBTORS URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN.

## ARTICLE II

## GENERAL INFORMATION REGARDING THE DEBTORS

**A.      The Debtors' Businesses, Structure, Management, and Employees**

*1.      Overview*

The Debtors provide midstream services to natural gas producers and customers, including natural gas gathering, processing, treatment and compression, and access to natural gas liquid ("**NGL**") fractionation and transportation services.  The Debtors also purchase and sell natural gas and NGLs.  The Debtors' roles in the natural gas industry are shown in the following diagram:

The Debtors' assets and operations are concentrated in and near the resource-rich Eagle Ford Shale region of South Texas. The South Texas catchment area for the Debtors' pipeline network includes multiple active and prospective production zones and its South Texas systems benefit from access to the large industrial market for natural gas and NGLs in and around Corpus Christi, Texas. The Debtors' key assets in South Texas include, but are not limited to, the following:

> *(i)*      Approximately 2,016 miles of pipeline ranging in diameter from 2" to 24". Most of these pipelines feed rich gas from multiple producing fields, including the Eagle Ford Shale, to the Debtors' processing and NGL fractionation facilities at Lone Star, Woodsboro, and Bonnie View.  The residue gas pipelines from the Debtors' processing plants and the remaining pipelines in lean gas service are used to serve multiple industrial and electric generation customers and to deliver gas to other

Error! Unknown document property name.

intrastate and interstate pipelines.  Additionally, these pipelines connect to approximately 805 miles of pipeline owned by Southcross Holdings, LP ("**Holdings**") and its non-Debtor subsidiaries.

(ii)   The Lone Star processing plant, a cryogenic processing plant located in Bee County, Texas, has a capacity of 300 million cubic feet per day. The Debtors acquired Lone Star from Southcross TS Midstream Services, LP (at the time, a subsidiary of Holdings) in August 2014.  This plant is interconnected with other South Texas rich gas supply basins and with Woodsboro via the Bee Line pipeline, which was placed in service in 2013. The Debtors also own an electric generation plant that serves the Lone Star processor.

(iii)  The Woodsboro processing plant, a cryogenic processing plant located in Refugio County, Texas, with a capacity of 200 million cubic feet per day.

(iv)   The Bonnie View NGL fractionation plant, also in Refugio County, has a capacity of 22,500 barrels per day.  The Debtors own a system of NGL pipelines, which includes a (i) propane pipeline from the Bonnie View fractionator to the Robstown fractionator formerly owned by a Holdings subsidiary and (ii) pipeline for Y-grade NGLs (i.e., a mixture of ethane, propane, isobutane, butane, and natural gasoline meeting certain specifications) that connects the Woodsboro plant to Robstown.

(v)    The Valley Wells system, comprised of gathering and treating facilities, has a sour gas treating capacity of approximately 100 million cubic feet per day and is supported by a minimum volume commitment from Holdings for gathering and treating services.  The Valley Wells system is also connected to the Debtors' rich gas system for transport and processing services.

(vi)   20 natural gas compression stations.

(vii)  Joint venture interests (partnered with affiliates of Targa Resources Corp.) in non-Debtor entities T2 Eagle Ford Gathering Company LLC and T2 LaSalle Gathering Company LLC, which operate pipelines.

The Debtors are also a leading midstream service provider in the areas of Mississippi and Alabama in which they operate.  The Debtors' pipelines provide critical supply to industrial, commercial, and power generation customers and to wholesale markets via intrastate and interstate pipeline interconnects.  In particular, several of the large gas-fired power plants across the southern portion of Mississippi access their primary source of natural gas through the Debtors' system of pipelines.  Key assets in these regions include, but are not limited to, the following:

(i)    Approximately 611 miles of pipeline in southern Mississippi, ranging in diameter from 2" to 20" and with an estimated design capacity of 345 million cubic feet per day.  This pipeline network can receive natural gas

Error! Unknown document property name.

from three unaffiliated interstate pipelines—Southeast Supply Header, Southern Natural Gas Company, and Texas Eastern Company—to supplement supply on the Mississippi intrastate system or to market gas off the system.

*(ii)*     Two treating plants in Mississippi.

*(iii)*    Approximately 490 miles of pipeline in northwest and central Alabama, ranging in diameter from 2" to 16" and with an estimated design capacity of 375 million cubic feet per day.  The primary gas supply to the system is coal bed methane gas from the Black Warrior Basin with other volumes gathered from conventional gas wells.  The Alabama system receives natural gas from unaffiliated interstate pipelines and services markets along the system.

Overall, the South Texas assets accounted for 83% of revenue in 2018, Alabama for 5%, and Mississippi for 12%.  Southcross's ten largest customers accounted for 41% of 2018 revenue.  For the three months ended September 30, 2018, Southcross reported total operating revenues of approximately $154.8 million, which represents an 11% decrease in revenue from the same three months during the previous fiscal year, mostly due to a change in Southcross's revenue recognition policies.

The natural gas and NGL industries in which Southcross operates are highly competitive. Southcross's competitors include other midstream companies, producers, and intrastate and interstate pipeline owners, some of which are large companies with greater financial, managerial, and other resources than Southcross.  Competition for natural gas volumes is based primarily on commercial terms, reliability, service levels, flexibility, access to markets, location, available capacity, connection costs, and fuel efficiencies.  In addition to competing for natural gas supply volumes, Southcross faces competition for customer markets in selling residue gas and NGLs. Competition is based primarily on the proximity of pipelines to the markets, price, and assurance of supply.

### 2.    *Management*

The Debtors' current management team is composed of highly capable and experienced professionals.  Information regarding the Debtors' officers is as follows:

| Name | Position |
| --- | --- |
| James W. Swent III | Chairman, President and Chief Executive Officer |
| Michael B. Howe | Senior Vice President, Chief Financial Officer and Principal Accounting Officer |
| William C. Boyer | Senior Vice President and Chief Operating Officer |
| Gregory L. Hood | Senior Vice President and Chief Commercial Officer |
| Kelly J. Jameson | Senior Vice President, General Counsel and Corporate Secretary |

9

*James W. Swent III*.  James W. Swent III was elected as Chairman, President and Chief Executive Officer of Southcross GP on September 17, 2018.  Prior to joining Southcross GP and Southcross Holdings GP LLC ("**Holdings GP**"), Mr. Swent served as the Chairman of the Board, President and Chief Executive Officer of Paragon Offshore Limited from July 2017 to April 2018, a global supplier of offshore jack up contract drilling services. From July 2003 to December 2015, he was Executive Vice President and Chief Financial Officer of Ensco plc, a global provider of offshore contract drilling services.  He joined Ensco in July 2003 as Senior Vice President and Chief Financial Officer and retired in December 2015.  Mr. Swent previously held various financial executive positions in the information technology, telecommunications and manufacturing industries, including positions with Memorex Corporation and Nortel Networks.  He served as Chief Executive Officer and Chief Financial Officer of Cyrix Corporation from 1996 to 1997 and Chief Financial Officer and Chief Executive Officer of American Pad and Paper Company from 1998 to 2000.  Prior to joining Ensco plc, Mr. Swent served as Co-Founder and Managing Director of Amrita Holdings, LLC.

*Michael B. Howe*.  Michael B. Howe was appointed Senior Vice President and Chief Financial Officer of Southcross GP on January 4, 2019.  Mr. Howe also assumed the responsibilities of principal accounting officer.  Mr. Howe, served as Chief Financial Officer of Medical Benevolence Foundation from July 2016 to September 2017.  Prior to joining the Company and from December 2015 to June 2016, Mr. Howe served in Christian ministries, including as a volunteer minister with the Texas Department of Criminal Justice.  From February 2009 to November 2015, Mr. Howe worked for Ensco PLC (NYSE: ESV) during which time he served in various positions including, as Vice President - Strategy (December 2014 to November 2015), Vice President - Human Resources (November 2012 to December 2014), Vice President - Finance (May 2011 to November 2012), and Treasurer (February 2009 to May 2011).  Prior to joining Ensco PLC, Mr. Howe served as Assistant Treasurer for Devon Energy Corporation (NYSE: DVN) from December 2002 to February 2009 and as a Commercial Director at Enron Corporation from May 1997 to December 2001.  Mr. Howe holds a Bachelor of Science in Accounting from Oklahoma State University and a Master in Business Administration from the University of Texas at Austin.  He is a Certified Public Accountant.

*William C. Boyer*.  William C. Boyer was appointed Senior Vice President and Chief Operating Officer of Southcross GP on February 1, 2019. Prior to being elected Senior Vice President and Chief Operating Officer of Southcross GP, Boyer served as Senior Vice President of Operations of Southcross GP since 2017 and previously served as Vice President of Operations of Southcross GP since 2015.  Before joining Southcross GP, Mr. Boyer served as General Manager of Oxy Midstream Operating Company ("**Oxy**"), a company specializing in midstream services of petroleum products, from 2014 to 2015.  In his role at Oxy, Mr. Boyer oversaw the operations, safety, compliance and overall P&L for all of Oxy's midstream businesses including Centurion Pipeline, its crude oil trucking, its NGL railcar terminal, and its propane and crude oil marine terminal businesses in Ingleside, Texas.  Prior to joining Oxy, Mr. Boyer served as President of Centurion Pipeline from 2010 to 2014 where he led the operations, planning, risk management, safety and regulatory functions of the business.  Concurrent with his role at Oxy, Mr. Boyer also served as President of Occidental Energy Transportation, a wholly-owned crude oil trucking subsidiary within Occidental Petroleum that gathered and transported crude oil in New Mexico and Texas.  Prior to such roles, Mr. Boyer held various leadership positions at Occidental Petroleum Corporation over a span of 30 years, including Occidental of

10

Elk Hills in California, Occidental Chemical Corporation in Houston, and Occidental Petroleum's natural gas businesses at various locations.  Mr. Boyer holds a Bachelor of Science in Chemical Engineering from the University of Oklahoma.

*Gregory L. Hood.*  Gregory L. Hood was appointed Senior Vice President and Chief Commercial Officer of Southcross GP in March 2019.  Prior to joining Southcross GP, Mr. Hood served as Principal for Energy Logistic Solutions since 2016.  Mr. Hood was Senior Vice President of Gas Marketing for Occidental Petroleum Corporation ("**Occidental**") from 2000 to 2015, where he was responsible for running the natural gas group including physical and financial trading, origination, and supply and asset management operations.  Prior to this, he served as Vice President of Trading for Occidental where he managed the sale of Occidental gas production in the Permian, South Texas and Gulf Coast regions.  He also managed gas supply for Occidental chemical plants and co-gens.  Before joining Occidental, Mr. Hood served as Director of Trading for KN Energy from 1998 to 2000 with responsibility for the trading of physical gas, managed transport and storage assets in various regions, as well as supplied gas for retail marketing efforts.  Mr. Hood's experience also includes leadership roles at MidCon Marketing from 1996 to 1998 and Natural Gas Pipeline Co from 1989 to 1996.  Mr. Hood received a Bachelor of Science degree in Marketing and Finance from the University of Houston.

*Kelly J. Jameson.*  Kelly J. Jameson was appointed Senior Vice President, General Counsel and Corporate Secretary of Southcross GP in September 2015. Since September 2015, Mr. Jameson has also served as the Senior Vice President, General Counsel and Corporate Secretary of Holdings GP.  Prior to joining Southcross GP and Holdings GP, Mr. Jameson was Associate General Counsel at USA Compression Partners, LP having previously served as Senior Vice President, General Counsel and Corporate Secretary of Crestwood Midstream Partners from 2010 to 2013.  Mr. Jameson was employed by TransCanada Corporation from 2007 to 2010, where he was Senior Counsel and Corporate Secretary for the U.S. subsidiaries of TransCanada Corporation. From 1996 to 2007, Mr. Jameson served as Senior Counsel and Assistant Corporate Secretary for El Paso Corporation, and from 1993 to 1996, he served as Vice President and General Counsel for Cornerstone Natural Gas Company, Inc. Mr. Jameson received a bachelor's degree in business administration from Southern Methodist University and a juris doctor degree from Oklahoma City University.  Mr. Jameson is a member of the Texas Bar Association.

### 3.    *The Debtors' Employees*

Through Southcross GP, the Debtors maintain a workforce of dedicated employees that has enabled them to continue to achieve their high standards of productivity, safety, and environmental compliance despite difficult markets.  Southcross GP employs approximately 194 people in active status, working in both full-time and part-time positions, including executives, engineers, plant technicians, administrative support staff, and other personnel ("**Employees**").  None of Southcross GP's current Employees is represented by a union.  The majority of the Employees (approximately 173) work in Texas, where Southcross GP's headquarters and principal operations are located; the remaining Employees generally work at one of Southcross's plants in Alabama or Mississippi.

Error! Unknown document property name.

Southcross and non-debtor Holdings historically have been engaged in a shared services arrangement for the operations of their respective businesses (the "**Shared Services Arrangement**").  Under the Shared Services Arrangement, Southcross and Holdings generally pay their respective allocated portions of all shared service expenses, including general administration, human resources, technological support, accounting, and labor expenses.

## B.    Debtors' Corporate Structure

Southcross is the direct or indirect parent company of each of the Debtors.  Southcross GP is the sole general partner in Southcross, and its LLC units are held by non-Debtor Southcross Holdings Borrower LP ("**Holdings Borrower**"), which is indirectly owned by Holdings.  Holdings is indirectly owned approximately one-third each by affiliates of Tailwater Capital LLC ("**Tailwater**"), affiliates of EIG Global Energy Partners, LLC ("**EIG**" and, together with Tailwater, the "**Sponsors**"), and a group of financial institutions that were lenders to Holdings prior to its 2016 bankruptcy.

Southcross's partnership units are held by Southcross GP, Holdings Borrower, and public investors who have traded Southcross's common units on the OTCQX since February 28, 2019 under the ticker symbol "SXEE."  Previously, the Existing Southcross Common Units were listed on the New York Stock Exchange ("**NYSE**") under the ticker symbol "SXE," but were delisted after (i) Southcross's unit price had fallen below the NYSE's continued listing standard with average closing price of less than $1.00 over a consecutive 30 trading-day period and (ii) the Partnership failed to cure this non-compliance within the required timeframe.  On September 26, 2019, Southcross filed a Form 15 with the SEC, suspending its current and periodic reporting obligations under the Exchange Act.

Southcross and Southcross GP were each organized in Delaware on April 12, 2012. Southcross's Debtor subsidiaries are each wholly owned, directly or indirectly, by Southcross. Each Debtor is a limited liability company or a limited partnership formed in either Delaware or Texas.  Furthermore, each Debtor is either (a) organized in Delaware, (b) a partnership whose general partner is an earlier-filed Debtor, or (c) a limited liability company whose sole member is an earlier-filed Debtor.  A chart showing the organizational structure of the Debtors is attached hereto as Exhibit E.

## C.    The Debtors' Prepetition Capital Structure

Southcross is the borrower, and each other Debtor other than the General Partner is a guarantor, under two *pari passu* secured credit facilities.

*First,* the Third Amended & Restated Revolving Credit Agreement (the "**Revolving Credit Agreement**"), dated as of August 4, 2014, and amended six times through August 10, 2018, is a five-year revolving credit facility due August 4, 2019 (the "**Revolving Credit Facility**").  The administrative agent for the Revolving Credit Facility is Wilmington Trust, N.A., which succeeded Wells Fargo Bank, N.A., as of August 16, 2019.  The Revolving Credit Facility was originally a $200 million facility with a $75 million sublimit for letters of credit (L/Cs); however, the lenders have reduced their commitments over time to $115 million, with a sublimit of $50 million for L/Cs.  Approximately $81.1 million in principal of loans and

$25.9 million of undrawn letters of credit are currently outstanding under the Revolving Credit Facility. Interest on money borrowed under the Revolving Credit Facility accrues at LIBOR plus a margin between 2.0% and 7.5% and is payable quarterly. The Revolving Credit Agreement includes various financial covenants. Additionally, Southcross's obligations under three interest-rate caps with a notional value of $275 million are secured under the Revolving Credit Facility.

*Second*, the Term Loan Credit Agreement (the "**Term Loan Credit Agreement**" and, together with the Revolving Credit Agreement, the "**Prepetition Credit Agreements**"), dated as of August 4, 2014, is a seven-year $450 million term loan facility due August 4, 2021 (the "**Term Loan Facility**" or "**Term Loans**," and, together with the Revolving Credit Facility, the "**Secured Credit Facilities**"). The administrative agent for the Term Loan Facility is Wilmington Trust, N.A., which succeeded Wells Fargo Bank, N.A., as of March 3, 2016. Interest on the Term Loans accrues at LIBOR plus 4.25% per annum and is due quarterly along with amortization of 1.0% per annum. Due to amortization, the outstanding principal of Term Loans is now $430.875 million.

Obligations under both Secured Credit Facilities are secured by first-priority liens on substantially all of Southcross's real, personal, and other property described in the Secured Credit Facilities' security documents (the "**Prepetition Collateral**"), which includes processing and other facilities, pipelines, cash, contracts, accounts, inventory, general intangibles, fixtures, and various other assets. The Revolving Credit Agreement and Term Loan Credit Agreement contain similar covenant packages (although only the Revolving Credit Agreement benefits directly from its financial covenants), including a requirement that Southcross furnish audited financial statements on or before each annual SEC deadline, without a "going concern" or similar qualification or exception.

In addition to the Secured Credit Facilities, each Debtor, except Southcross GP, is an obligor of certain unsecured notes in the principal amount of approximately $17.4 million (the "**Unsecured Sponsor Notes**"). Southcross issued $15 million of these notes on January 22, 2018 to affiliates of the Sponsors in consideration for cash that those Sponsor affiliates paid to Southcross pursuant to a "Backstop Agreement" between Holdings, the Sponsors, and Wells Fargo Bank, N.A., in its capacity as administrative agent for the Secured Credit Facilities. The Unsecured Sponsor Notes mature on November 5, 2019, and bear interest at a rate of 12.5% per annum, which was paid in kind through December 31, 2018. The Unsecured Sponsor Notes are subordinated to both of the Secured Credit Facilities pursuant to a Subordination Agreement, dated as of January 22, 2018, between the Unsecured Sponsor Notes' initial holders and Wells Fargo Bank, N.A. (in its capacity as administrative agent for the Revolving Credit Facility).

As of the date of this Disclosure Statement, Southcross GP holds all 1,644,111 of the general partnership units of Southcross, which constitute 2.00% of all outstanding partnership units. Southcross GP also holds incentive distribution units, which entitle Southcross GP to receive certain percentages of distributions once cumulative distributions to the common and subordinated unitholders exceed certain thresholds. Holdings Borrower holds 26,492,074 common limited partnership units (32.23% of all outstanding partnership units) of Southcross, and public investors hold 22,202,817 of such common limited partnership units (27.01% of all outstanding partnership units). In addition, Holdings Borrower holds 19,652,831 Class B convertible limited partnership units (23.91% of all outstanding partnership units). Such units

Error! Unknown document property name.

entitle their holder to in-kind distributions of Class B convertible units on a quarterly basis and are convertible into common limited partnership units upon the occurrence of certain events. Holdings Borrower also holds 12,213,713 subordinated limited partnership units (14.86% of all outstanding partnership units). These units entitle their holders to receive distributions after common unitholders have received cumulative distributions over a certain threshold.

### D.    Summary of Events Leading to the Chapter 11 Filings

#### 1.    *Market Challenges Facing the Natural Gas Industry*

Businesses throughout the natural gas industry came under intense pressure during 2015 and 2016, when gas prices (measured per million BTU at the Henry Hub) dropped from a high of $8.15 on February 10, 2014, to a low of $1.49 on March 4, 2016, and extracted gas volumes received at the Debtors' gathering and processing facilities dropped from 494 million cubic feet per day in November 2015 to 281 million cubic feet per day in December 2016. The Debtors' businesses depend almost entirely on the demand for processing of newly extracted natural gas, and their experience during the crash was no exception: the price of Southcross's common units plummeted from a peak of $24.79 on July 7, 2014, to a low of $0.38 on February 11, 2016. While dozens of its peers (including Holdings) filed for chapter 11 as a result of commodity pricing declines, the Debtors narrowly avoided a bankruptcy filing through operational cutbacks, several capital contributions from Holdings and the Sponsors, and a waiver of certain financial covenants under the Revolving Credit Agreement.

Despite avoiding chapter 11 during the crash, the Debtors continued to experience strong headwinds. Some of their major facilities have been permanently shut down. The Bonnie View facility has only recently come back online after significant capital expenditures, and the Debtors continued to labor under a heavier debt burden than competitors that equitized a substantial portion of their funded debt starting in 2015. Meanwhile, natural gas prices have stayed consistently low, with current prices below $2.75 per million BTU.

Industry conditions are influenced by numerous factors over which the Debtors have no control, such as the supply of and demand for natural gas, domestic and worldwide economic conditions, political instability in natural gas producing countries, and merger and divestiture activity among oil and gas producers.

Since the beginning of the decline in 2014, natural gas prices have not rebounded. With no clear timing for a recovery on the horizon, the Debtors determined that surviving through the downturn would require a significant deleveraging and restructuring of their capital structure. Many of the Debtors' competitors have completed or are implementing deleveraging transactions in chapter 11 to remain competitive. To ensure that the Debtors can continue to compete successfully against its substantially deleveraged peers, it will similarly need to right-size its balance sheet.

#### 2.    *Restructuring Initiatives*

Error! Unknown document property name.

The Debtors' management team has taken numerous actions in response to the challenges described above in order to enhance its operations, as well as to improve its liquidity profile and deleverage its balance sheet.

### (i)    Operational Initiatives

From an operational perspective, Southcross removed two major plants from service in the second half of 2016. *First*, Southcross shut down and dismantled the Conroe processing plant (capacity 50 million cubic feet per day) in South Texas. *Second*, Southcross idled the Gregory cryogenic processing plant (135 million cubic feet per day) and fractionator (4,800 barrels per day) and converted the facility into a compressor station. Gas that had been processed at Gregory has been diverted to the newer and more efficient Woodsboro plant.

By 2018, Southcross began to invest in new-growth capital expenditures in order to take advantage of increased fractionation margins (i.e., the difference in price between natural gas products before and after fractionation), successful drilling in the Permian Basin, and a generally improved commercial environment. Most notably, Southcross re-activated the Bonnie View fractionator in November at a cost of approximately $1.5 million.

### (ii)    Liquidity Initiatives

The Debtors have explored several potential sources of liquidity. In late 2017, Southcross negotiated and announced a merger with a publicly owned natural gas transportation company, but ultimately terminated the merger agreement following a funding failure on the part of the potential counterparty. The Debtors then marketed their assets for a potential sale. This process led to discussions of a whole-company sale with a potential strategic purchaser that continued through March 2019, but Southcross GP's board of directors, along with certain of Southcross's lenders, decided that the potential purchaser's offer for an out-of-court transaction was unworkable. Specifically, the Prepetition Credit Agreements' constraints on asset sales made it difficult to conduct a sale process for the non-core Mississippi and Alabama assets on an out-of-court basis.

In February 2019, Southcross successfully negotiated an infusion of $10 million from Holdings in the form of prepayments of certain amounts that would otherwise have become due later in 2019 under contracts between certain of the Debtors and Holdings. Finally, Southcross held discussions with certain of its lenders during the first quarter of 2019 regarding a potential extension of additional funded debt and letter of credit facilities. However, Southcross was unable to obtain agreement on a new out-of-court credit facility.

### (iii)    Financial Restructuring Initiatives

In connection with Holdings' 2016 chapter 11 plan of reorganization, Holdings entered into an Equity Cure Contribution Agreement, dated as of March 17, 2016, pursuant to which Holdings committed to fund up to $50 million in "equity cures" under the Revolving Credit Agreement. Pursuant to the Equity Cure Contribution Agreement, Holdings contributed a total of approximately $532,000 in equity cures with respect to the first two quarters of 2016.

15

Southcross again failed to meet its financial covenants (specifically, the requirement to keep its "Consolidated Total Leverage Ratio" at most 5.00:1.00) with respect to the third quarter of 2016.  After receiving two extensions of the equity cure deadline, Southcross entered into a more comprehensive waiver and amendment to the Revolving Credit Agreement (the "**Fifth Revolver Amendment**"), dated December 29, 2016.  Among other things, the Fifth Revolver Amendment waived the third quarter's breach of the leverage ratio, suspended both leverage ratio tests through (and including) the fourth quarter of 2018, reduced the "Consolidated Interest Coverage Ratio" floor from 2.50:1.00 to 1.50:1.00 through (and including) the fourth quarter of 2018, immediately reduced commitments from $200 million to $145 million, provided for additional commitment reductions down to $115 million at the end of 2018, and reduced the L/C sublimit from $75 million to $50 million.  In consideration for the waiver and covenant suspension, Holdings contributed $17 million to Southcross under an amendment to the Equity Cure Agreement (which Southcross used in part to pay down the Revolving Credit Facility) and committed up to $15 million in additional contributions to be made upon certain triggering events (but no later than December 31, 2017), backstopped by the Sponsors.

On January 2, 2018, Southcross notified Holdings (and Holdings notified the Sponsors) of the obligation to contribute $15 million.  Affiliates of the Sponsors timely funded $15 million into Southcross in exchange for the Unsecured Sponsor Notes described above.

Southcross again failed to meet its financial covenants (in this case, the amended "Consolidated Interest Coverage Ratio" floor of 1.50:1.00) in the second quarter of 2018, prompting a Sixth Amendment to the Revolving Credit Agreement that lowered the floor to 1.25:1.00 solely for that quarter.

In mid-October 2018, Southcross's management initiated discussions regarding the possibility of an amendment and extension of the Revolving Credit Facility, to avoid potential financial covenant defaults and the potential "going concern" default described above.  Southcross retained Davis Polk & Wardwell LLP as counsel on October 25, 2018.

It became clear in December 2018 that Southcross would likely face a liquidity crunch in the first quarter 2019 following (a) the reduction of commitments under the Revolving Credit Facility, (b) material payments of property taxes in January, (c) year-end payments of interest, fees, and amortization under the Secured Credit Facilities, (d) historically low "frac spreads" (i.e., the price differentials between NGLs and raw natural gas), and (e) counterparties' requests for credit support.

After the Ad Hoc Group organized during the first quarter of 2019, Southcross entered into non-disclosure agreements and provided confidential information to certain of those lenders and their professional advisors for the purpose of entering into negotiations over a potential restructuring of Southcross's debt.  Likewise, Southcross provided similar information to the private-side lenders under the Revolving Credit Agreement and to the professional advisors of their administrative agent.  On March 14, 2019, Southcross convened a meeting in New York with lenders holding majorities of the loans outstanding under both credit facilities.  Following that meeting, Southcross and its prepetition lender groups determined to proceed to negotiations over post-petition financing in order to support a post-petition asset sale process.  The Debtors believed that an orderly first-round marketing process would help it and its prepetition lenders

Error! Unknown document property name.

determine whether a further sales process or confirmation of a non-sale plan is the value-maximizing approach to the Debtors' restructuring.  After intense arm's-length negotiations, Southcross secured from certain of its prepetition lenders commitments for $127.5 million of new-money post-petition financing, including $72.5 million in funded debt and $55 million in letter of credit capacity.   Furthermore, Southcross, the administrative agent for the Term Loan Facility, and certain lenders under that facility entered into a Second Amendment to the Term Loan Credit Agreement, dated as of March 29, 2019, for the purpose of facilitating the roll-up of certain pre-petition Term Loans into the post-petition financing.

## ARTICLE III

## THE CHAPTER 11 CASES

On the Petition Date, the Debtors filed voluntary petitions for relief under the Bankruptcy Code.  The Chapter 11 Cases are being jointly administered under the caption *In re Southcross Energy Partners, L.P.*, Case No. 19-10702.  The Debtors have continued in possession of their property and have continued to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request has been made for the appointment of a trustee or examiner, and no official committee has been appointed in the Chapter 11 Cases.

## A.    First Day Motions

On the Petition Date, the Debtors filed a number of "first-day" motions and applications designed to ease the Debtors' transition into chapter 11, maximize the value of the Debtors' assets, and minimize the effects of the commencement of the Chapter 11 Cases.  These motions included, among others:

### 1.    DIP Financing

On the Petition Date, the Debtors filed the *Motion of Debtors for Entry of Interim and Final Orders Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506, and 507, (i) Authorizing the Debtors to Obtain Senior Secured Superpriority Post-petition Financing, (ii) Granting Liens and Superpriority Administrative Expense Claims, (iii) Authorizing the Use of Cash Collateral, (iv) Granting Adequate Protection, (v) Modifying the Automatic Stay, (vi) Scheduling Final Hearing, and (vii) Granting Related Relief* [D.I. 14] (the "**DIP Financing Motion**").  Pursuant to the DIP Financing Motion, the Debtors sought authority to, among other things, obtain debtor-in-possession credit financing in an aggregate principal amount of up to $255 million to be funded by certain of the Prepetition Term Loan Lenders (the "**DIP Lenders**") under a secured term loan and letter of credit facility (the "**DIP Facility**") consisting of (a) new money term loans (the "**DIP Term Loans**") in an aggregate principal amount of up to $72.5 million, (b) letter of credit term loans (the "**DIP LC Loans**") in an aggregate principal amount of up to $55 million, the proceeds of which to be used to cash collateralize prepetition letters of credit issued (or deemed issued) under a letter of credit subfacility in an aggregate principal amount of up to $55 million, and (c) roll-up term loans to refinance dollar-for-dollar prepetition term loans held by the DIP Lenders in the aggregate amount of $127.5 million.

Error! Unknown document property name.

The DIP Financing Motion also requested authority to, among other things, (i) grant the DIP Agent valid, enforceable, non-avoidable, and automatically and fully perfected liens and security interests to secure obligations under the financing arrangements, (ii) grant superpriority administrative claims to the DIP Lenders and the agent for the DIP Facility, and (iii) continue to use the Cash Collateral (as defined in the DIP Financing Motion).

The Bankruptcy Court granted the relief requested in the DIP Financing Motion on an interim basis on April 2, 2019 [D.I. 59] and on a final basis on May 7, 2019 [D.I. 200]. In addition, since the entry of the final order, the DIP Facility has been amended to, among other things, extend certain milestones thereunder, extend the maturity date of the DIP Facility to December 30, 2019 and permit the acquisition of the Acquired Companies (as defined herein) in connection with the Settlement (as defined herein).

### 2. *Cash Management*

On the Petition Date, the Debtors filed the *Motion of Debtors for Entry of Interim and Final Orders Authorizing (i) Debtors To Continue To Maintain Existing Cash Management System, Bank Accounts, and Business Forms and (ii) Financial Institutions To Honor and Process Related Checks and Transfers* [D.I. 13] (the "**Cash Management Motion**"). Pursuant to the Cash Management Motion, the Debtors sought authority to continue to operate their consolidated cash management system, maintain existing bank accounts, use business forms in their present form without reference to Debtors' status as debtors in possession, continue to use certain investment accounts, close existing bank accounts and open new accounts, and continue certain intercompany and netting arrangements between and among the Debtors and their Debtor and non-Debtor affiliates on an a super-priority administrative expense basis.

The Bankruptcy Court granted the relief requested in the Cash Management Motion on an interim basis on April 2, 2019 [D.I. 58] and on a final basis on April 23, 2019 [D.I. 136].

### 3. *Wages and Benefits*

On the Petition Date, the Debtors filed the *Motion of Debtors for Entry of Interim and Final Orders Authorizing (i) Debtors To (a) Pay Prepetition Employee Obligations and (b) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (ii) Current and Former Employees To Proceed with Outstanding Workers' Compensation Claims, and (iii) Financial Institutions To Honor and Process Related Checks and Transfers* [D.I. 9] (the "**Wages and Benefits Motion**"). Pursuant to the Wages and Benefits Motion, the Debtors sought authority to pay certain prepetition wages and honor certain prepetition employee benefit obligations (as well as pay certain administrative costs related to those wages and benefits) to ensure that their business operations could continue in the ordinary course.

The Bankruptcy Court granted the relief requested in the Wages Motion on an interim basis on April 2, 2019 [D.I. 54] and on a final basis on April 23, 2019 [D.I. 141].

### 4. *All Trade*

On the Petition Date, the Debtors filed the *Motion of Debtors for Entry of Interim and Final Orders Authorizing (i) Debtors To Pay Prepetition Trade Claims in the Ordinary Course*

18

*of Business and (ii) Financial Institutions To Honor and Process Related Checks and Transfers* [D.I. 10] (the "**All Trade Motion**").  Pursuant to the All Trade Motion, the Debtors sought authority to pay their prepetition obligations to various vendors and independent contractors that provide necessary materials or services to the Debtors in the ordinary course of business.

The Bankruptcy Court granted the relief requested in the Trade Motion on an interim basis on April 2, 2019 [D.I. 55] and on a final basis on April 29, 2019 [D.I. 164].

### 5.     Goods

On the Petition Date, the Debtors filed the *Motion of Debtors for Entry of Interim and Final Orders (i) Granting Administrative Expense Status to Debtors' Undisputed Obligations to Vendors Arising From the Post-Petition Delivery of Goods Ordered Prepetition, (ii) Authorizing Debtors To Pay Those Obligations in the Ordinary Course of Business, (iii) Authorizing Debtors To Return Goods, and (iv) Authorizing Financial Institutions To Honor and Process Related Checks and Transfers* [D.I. 11] (the "**Goods Motion**").  Pursuant to the Goods Motion, the Debtors sought orders (a) granting administrative priority status under sections 503(b) and 507(a)(2) of the Bankruptcy Code to the claims of numerous vendors and suppliers for undisputed obligations arising from the Debtors' outstanding prepetition purchase orders and other short and longer term contracts for certain goods received and accepted by the Debtors on or after the Petition Date, (b) authorizing the Debtors to pay, in their sole discretion, such obligations in the ordinary course of business under section 363 of the Bankruptcy Code, and (c) authorizing the Debtors, in their sole discretion, under section 546(h) of the Bankruptcy Code, to return goods purchased from vendors by the Debtors prior to the Petition Date for credit against such vendors' prepetition claims.

The Bankruptcy Court granted the relief requested in the Goods Motion on an interim basis on April 2, 2019 [D.I. 56] and on a final basis on April 23, 2019 [D.I. 139], and authorized the Debtors to pay all undisputed obligations arising from the post-petition delivery or shipment of goods in an amount not to exceed $3,000,000.

### 6.     Lienholders

On the Petition Date, the Debtors filed the *Motion of Debtors for Entry of Interim and Final Orders Authorizing (i) Debtors To Pay Certain Prepetition Claims of Gas Vendors and Other Lien Claimants and (ii) Financial Institutions to Honor and Process Related Checks and Transfers* [D.I. 12] (the "**Lienholders Motion**").  Pursuant to the Lienholders Motion, the Debtors sought authority to pay all or a portion of the approximately $23,000,000 owed to certain natural gas vendors and other shippers, contractors, specialty suppliers, mechanics, laborers, and technical engineers for prepetition labor, shipping, delivery, and other charges.

The Bankruptcy Court granted the relief requested in the Gas Vendors Motion on an interim basis on April 2, 2019 [D.I. 57] and on a final basis on April 23, 2019 [D.I. 140], and authorized the Debtors to pay all or some of the claims described above in an amount not to exceed $23,000,000.

### 7.     Taxes

19

On the Petition Date, the Debtors filed the *Motion of Debtors for Entry of Interim and Final Orders Authorizing (i) Debtors To Pay Certain Prepetition Taxes, Governmental Assessments, and Fees and (ii) Financial Institutions To Honor and Process Related Checks and Transfers* [D.I. 8] (the "**Taxes Motion**").  In the ordinary course of the Debtors' businesses, the Debtors collect, withhold, and incur (a) Environmental and Safety Fees and Assessments, (b) Sales and Use Taxes, (c) Franchise Taxes and Fees, (d) Property Taxes, and (e) Other Taxes (each as defined in the Taxes Motion).  The Debtors remit the Covered Taxes and Fees (as defined in the Taxes Motion) to various federal, state, and local Governmental Authorities (as defined in the Taxes Motion), including taxing and licensing authorities.  The Debtors may also incur taxes based on or measured by their net income, but have not sought relief with respect to such taxes.  Pursuant to the Taxes Motion, the Debtors sought authority to pay certain taxes and fees that accrue or arise in the ordinary course of business.

The Bankruptcy Court granted the relief requested in the Taxes Motion on an interim basis on April 2, 2019 [D.I. 53] and on a final basis on April 23, 2019 [D.I. 137].

### 8.  *Insurance*

On the Petition Date, the Debtors filed the *Motion of Debtors for Entry of Interim and Final Orders Authorizing (i) Debtors To Continue and Renew Their Liability, Property, Casualty, and Other Insurance Programs and Honor All Obligations in Respect Thereof and (ii) Financial Institutions To Honor and Process Related Checks and Transfers* [D.I. 7] (the "**Insurance Motion**").  Pursuant to the Insurance Motion, the Debtors sought entry of interim and final orders (a) authorizing, but not directing, them to maintain, continue, and renew, in their sole discretion, their various Insurance Programs (as defined in the Insurance Motion) in the ordinary course of their businesses through several private Insurance Carriers (as defined in the Insurance Motion) on an uninterrupted basis and in accordance with the same practices and procedures as were in effect before the Petition Date and (b) authorizing the Debtors' financial institutions to receive, process, honor, and pay checks or wire transfers used by the Debtors to pay the foregoing.  This would include (y) paying all Insurance Obligations (as defined in the Insurance Motion) arising under the Insurance Programs, including, but not limited to, any Brokers' Fees (as defined in the Insurance Motion), whether due and payable before, on, or after the Petition Date and (z) renewing or obtaining new insurance policies as needed in the ordinary course of business (each as defined in the Insurance Motion).

The Bankruptcy Court granted the relief requested in the Insurance Motion on an interim basis on April 2, 2019 [D.I. 52] and on a final basis on April 23, 2019 [D.I. 138].

### 9.  *Utilities*

On the Petition Date, the Debtors filed the *Motion of Debtors for Entry of Interim and Final Orders (i) Prohibiting Utilities From Altering, Refusing, and Discontinuing Service, (ii) Deeming Utilities Adequately Assured of Future Performance, and (iii) Establishing Procedures for Determining Requests for Additional Adequate Assurance* [D.I. 6] (the "**Utilities Motion**"). The Debtors sought orders (a) prohibiting various utilities from altering, refusing, or discontinuing any Utility Services (as defined in the Utilities Motion) on account of prepetition amounts outstanding or on account of any perceived inadequacy of the Debtors' proposed

Error! Unknown document property name.

adequate assurance, (b) determining that the Debtors' proposed offer of deposits, as set forth in the Utilities Motion, provides the utilities with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code, and (c) approving procedures for resolving requests by utilities for additional or different assurances.

The Bankruptcy Court granted the relief requested in the Utilities Motion on an interim basis on April 2, 2019 [D.I. 51] and on a final basis on April 23, 2019 [D.I. 142].

### 10.    *Equity Lists*

On the Petition Date, the Debtors filed the *Motion of Debtors for Entry of an Order (i) Waiving the Requirements To File Equity Lists and To Provide Notice to Equity Security Holders and (ii) Authorizing Debtors To File a Consolidated List of Debtors' 20 Largest Unsecured Creditors* [D.I. 5] (the "**Equity Lists Motion**").  Pursuant to the Equity Lists Motion, the Debtors sought entry of orders (i) waiving the requirement to file a list of equity security holders for each Debtor and the requirement to give notice of the order for relief to all equity security holders of the Debtors and (ii) authorizing the Debtors to file a consolidated list of the Debtors' 20 largest unsecured creditors authority to pay certain taxes and fees that accrue or arise in the ordinary course of business.

The Bankruptcy Court granted the relief requested in the Equity Lists Motion on a final basis on April 2, 2019 [D.I. 50] and amended the order on April 24, 2019 [D.I. 149].

### 11.    *Joint Administration*

On the Petition Date, the Debtors filed the *Motion of Debtors for Entry of an Order Directing Joint Administration of Chapter 11 Cases* [D.I. 3] (the "**Joint Administration Motion**").  Through the Joint Administration Motion, the Debtors sought entry of an order directing joint administration of the Chapter 11 Cases for procedural purposes only.  On April 2, 2019, the Bankruptcy Court approved the Joint Administration Motion on a final basis [D.I. 48].

## B.    **Professional Advisors**

The Debtors' professional advisors include the following:

- On April 1, 2019, the Debtors filed the *Application of Debtors for Entry of an Order Authorizing Debtors to Employ and Retain Kurtzman Carson Consultants LLC as Notice and Claims Agent for Debtors Nunc Pro Tunc to the Petition Date* [D.I. 4] (the "**KCC 156(c) Retention Application**").  On April 2, 2019, the Bankruptcy Court entered an order approving the KCC 156(c) Retention Application [D.I. 49].  On May 17, 2019, the Debtors filed the Application of Debtors for Authority to Employ and Retain *Kurtzman Carson Consultants LLC as Administrative Advisor for the Debtors Nunc Pro Tunc to the Petition Date* [D.I. 216] (the "**KCC Retention Application**").  On June 10, 2019, the Bankruptcy Court entered an order approving the KCC Retention Application [D.I. 258].

Error! Unknown document property name.

- On April 16, 2019, the Debtors filed the *Application of Debtors for Authority to Employ and Retain Davis Polk & Wardwell LLP as Attorneys for the Debtors Nunc Pro Tunc to The Petition Date* [D.I. 110] (the "**Davis Polk Retention Application**").  On May 3, 2019, the Bankruptcy Court entered an order approving the Davis Polk Retention Application [D.I. 184].

- On April 16, 2019, the Debtors filed the *Debtors' Application for Entry of an Order Under 11 U.S.C. §§ 327(a), 328(a), And 1107(b), Fed. R. Bankr. P. 2014 and 2016, and Del. Bankr. L.R. 2014- 1 and 2016-1, Authorizing Retention and Employment of Morris, Nichols, Arsht & Tunnell LLP as Delaware Bankruptcy Co-Counsel for the Debtors, Nunc Pro Tunc to the Petition Date* [D.I. 105] (the "**Morris Nichols Retention Application**").  On May 3, 2019, the Bankruptcy Court entered an order approving the Morris Nichols Retention Application [D.I. 183].

- On April 16, 2019, the Debtors filed the *Application of Debtors for Authority to (I) Employ and Retain Pricewaterhousecoopers LLP as Tax Services Provider for the Debtors Nunc Pro Tunc to the Petition Date and (II) Waive Certain Information Disclosure Requirements* [D.I. 106] (the "**PWC Retention Application**").  On May 3, 2019, the Bankruptcy Court entered an order approving the PWC Retention Application [D.I. 185].

- On April 16, 2019, the Debtors filed the *Application of Debtors for Authority to (I) Employ and Retain Evercore Group L.L.C. as Investment Banker for the Debtors Nunc Pro Tunc to the Petition Date and (II) Waive Certain Information Disclosure Requirements* [D.I. 107] (the "**Evercore Retention Application**").  On May 3, 2019, the Debtors filed the *Supplemental Declaration of Stephen Hannan in Support of the Application of Debtors for Authority to Employ and Retain Evercore Group L.L.C. as Investment Banker for the Debtors Nunc Pro Tunc to the Petition Date* [D.I. 186].  On May 6, 2019, the Bankruptcy Court entered an order approving the Evercore Retention Application [D.I. 192].

- On April 16, 2019, the Debtors filed the *Application of Debtors for Authority to (I) Employ and Retain Alvarez & Marsal North America, LLC as Financial Advisor for the Debtors Nunc Pro Tunc to the Petition Date and (II) Waive Certain Information Disclosure Requirements* [D.I. 108] (the "**A&M Retention Application**").  On May 2, 2019, the Debtors filed the *Supplemental Declaration of Ed Mosley in Support of the Application of Debtors for Authority to (I) Employ and Retain Alvarez & Marsal North America, LLC as Financial Advisor for the Debtors Nunc Pro Tunc to the Petition Date and (II) Waive Certain Information Disclosure Requirements* [D.I. 175].  On May 6, 2019, the Bankruptcy Court entered an order approving the A&M Retention Application [D.I. 193].

- On May 22, 2019, the Debtors filed the *Application of Debtors for Authority to (I) Employand Retain Deloitte & Touche LLP as Independent Auditor and Accounting Services Provider for the Debtors Nunc Pro Tunc to the Petition Date and (II) Waive Certain Information Disclosure Requirements* [D.I. 222] (the

Error! Unknown document property name.

"**Deloitte Retention Application**").  On June 10, 2019, the Bankruptcy Court entered an order approving the Deloitte Retention Application [D.I. 259].

- The Bankruptcy Court approved procedures for the Debtors to retain and employ certain professionals utilized by the Debtors in the ordinary course of business pursuant to an order entered on May 6, 2019 [D.I. 194].

## C.    Schedules and SOFAs

On April 23, 2019, the Debtors filed the *Motion of Debtors for Extension of Time to File (I) Schedules of Assets and Liabilities, (II) Schedules of Current Income and Expenditures, (III) Schedules of Executory Contracts and Unexpired Leases, and (IV) Statements Of Financial Affairs* [D.I. 148] (the "**Extension Motion**").  On May 3, 2019, the Court entered an order approving the Extension Motion [D.I. 182].  On June 12, 2019, the Debtors filed their Schedules of Assets and Liabilities and Statements of Financial Affairs [D.I. 268–322].

## D.    De Minimis Assets

On April 16, 2019, the Debtors filed the *Debtors' Motion for Approval of Procedures for (I) the Sale of De Minimis Assets Free and Clear of Liens, Claims, Interests, and Encumbrances and (II) the Abandonment of Certain of the Debtors' Property* [D.I. 109] (the "**De Minimis Asset Sale Motion**"), pursuant to which the Debtors sought entry of an order establishing procedures for, among other things, the sale of *de minimis* assets.  On May 6, 2019, the Bankruptcy Court entered the order approving the De Minimis Asset Sale Motion [D.I. 190] (the "**De Minimis Asset Sale Order**").  The De Minimis Asset Sale Order provides, among other things, that if the Sale Price for the sale of a De Minimis Asset (each as defined in the De Minimis Asset Sale Order) that the Debtors believe is arguably out of the ordinary course of the Debtors' businesses is greater than $2,000,000, the Debtors shall file a motion with the Bankruptcy Court requesting approval of such sale pursuant to section 363 of the Bankruptcy Code.  If the Sale Price for the sale of a De Minimis Asset that the Debtors believe is arguably outside of the ordinary course of the Debtors' businesses is greater than $500,000 and less than or equal to $2,000,000, the Debtors must, among other things, file a notice with the Bankruptcy Court.  If the Sale Price of a De Minimis Asset is less than or equal to $500,000, subject to paragraph 16 of the De Minimis Asset Sale Order, the Debtors are authorized to sell such De Minimis Assets without further notice to any party or hearing.  As required by the De Minimis Asset Sale Order, the Debtors file monthly notices of sales of De Minimis Assets.  *See, e.g.*, *Notice of Sale of Certain of the Debtors' De Minimis Assets Free and Clear of Liens, Claims, Interests, and Encumbrances Pursuant to Section 363 of the Bankruptcy Code* [D.I. 221].

## E.    Bar Date

On May 22, 2019, the Debtors filed the *Motion of Debtors for Entry of an Order Establishing Deadlines and Procedures for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof* [D.I. 224] (the "**Bar Date Motion**").  On June 10, 2019, the Bankruptcy Court entered an order approving the Bar Date Motion [D.I. 260] (the "**Bar Date Order**").  Pursuant to the Bar Date Order, the deadline for creditors to file proofs of claim against any of the Debtors was July 19, 2019 at 5:00 p.m. (prevailing Eastern Time).  Solely with

respect to governmental units, the deadline to file a proof of claim (a "Proof of Claim") against the Debtors was September 30, 2019 at 5:00 p.m. (prevailing Eastern Time).

On September 30, 2019, the United States of America filed the *Motion to Extend the Governmental Bar Date with Respect to the United States* [D.I. 510].

### F.    Holdings Litigation[3]

The Debtors derive a material portion of their revenue through long-term, fixed-rate contracts with certain Southcross Holdings Entities.

*First*, Debtor FL Rich Gas Services, LP ("**FL Services**") and non-Debtor Frio LaSalle Pipeline, LP ("**Frio LaSalle**"), a subsidiary of Holdings, are party to a Gas Gathering and Processing Agreement, dated August 1, 2014 (the "**Intercompany GPA**"), pursuant to which FL Services provides processing and transportation services for rich natural gas (*i.e.*, natural gas with high concentrations of methane and ethane) delivered from Holdings' Lancaster and Valley Wells systems. Frio LaSalle is not obligated to deliver to Southcross a minimum volume of gas from the Lancaster system for processing under the Intercompany GPA, but has historically taken advantage of the Intercompany GPA to satisfy its obligations to process and transport rich natural gas that its own counterparties deliver. In 2018, Southcross earned $10.8 million in gross margin under the Intercompany GPA in connection with the Lancaster system.

*Second*, FL Services and Frio LaSalle amended the Intercompany GPA on January 1, 2015 to provide for a minimum volume commitment with respect to the Valley Wells system. As amended, the Intercompany GPA requires Frio LaSalle to deliver and pay for processing of a minimum of 35.0 million cubic feet of gas per day. In 2018, Southcross earned $11.9 million in gross margin under the Intercompany GPA in connection with the Valley Wells system. Frio LaSalle's obligations—including its minimum volume commitments—under the Intercompany GPA run until August 1, 2024.

*Third*, FL Services and Frio LaSalle are party to a Gas Gathering and Treating Agreement, dated May 1, 2015 (the "**FL Rich Gas Services GTA**"), pursuant to which FL Services provides gathering, treating, and compression services for sour natural gas (*i.e.*, natural gas with significant amounts of hydrogen sulfide) at Southcross's Valley Wells system.[4] The FL Rich Gas Services GTA requires Frio LaSalle to deliver and pay for (a) treatment and compression of 60.0 million cubic feet of gas per day and (b) redelivery of 26.5 million cubic feet of treated natural gas per day. In 2018, Southcross earned $13.1 million in gross margin under the FL Rich Gas Services GTA. Frio LaSalle's obligations under the FL Rich Gas Services GTA run until April 30, 2023.

*Fourth*, FL Services and Holdings subsidiaries are party to agreements related to gas compression equipment in the Lancaster system with a capacity of 32,757 horsepower, which

---

[3] Capitalized terms used in this section but not otherwise defined in this section shall have the meanings ascribed to such terms in the 9019 Order (as defined herein).

[4] In 2015, the Valley Wells system was sold by the Southcross Holdings Entities to FL Services.

Error! Unknown document property name.

Holdings sold to FL Services in May 2015. Under a Master Compression Services Agreement dated May 1, 2015 (the "**MCSA**"), FL Services charges Frio LaSalle $21.31 per horsepower-month for use of the equipment to compress gas as part of Holdings' Lancaster system; under a separate Master Services also dated May 1, 2015, Southcross GP charged FL Services $5.38 per horsepower-month for operating costs associated with the compression system. In 2018, Southcross earned $6.0 million in gross margin under the Lancaster compression agreements. Frio LaSalle's obligations under the MCSA run until April 30, 2023.

On August 12, 2019, the Debtors commenced two actions in the Bankruptcy Court under adversary proceeding nos. 19-50283 (MFW) and 19-50286-(MFW) (the "**Adversary Proceedings**"). In the Adversary Proceedings, FL Services asserted claims against the Southcross Holdings Entities (and one of their former subsidiaries) alleging actual and constructive fraudulent transfers under the Texas Uniform Fraudulent Transfer Act, based on various transactions occurring between FL Services and the Southcross Holdings Entities since 2015, *see* Adv. No. 19-50283 (MFW) (Bankr. D. Del.), and, in a separate action, sought a declaratory judgment against Frio LaSalle for breach of contract and the implied duty of good faith and fair dealing under Texas law related to the Intercompany GPA. *See* Adv. No. 19-50286 (MFW).

In order to resolve the Adversary Proceedings in a consensual and efficient manner, the Debtors, in consultation with the Ad Hoc Group, engaged in constructive discussions with the Southcross Holdings Entities regarding the terms of a potential value-maximizing settlement for the benefit of the Debtors' estates and their economic stakeholders. The Debtors believed that the resolution of the Adversary Proceedings and all claims and obligations under the Intercompany Contracts would allow the Debtors to maximize value in their sale efforts (as described below) by removing concerns relating to the Intercompany Contracts without the need to continue prosecuting complex and expensive litigation when the outcome cannot be assured. Indeed, certain buyers had expressed their reluctance to ascribe full value for the Debtors' assets that were the subject of pending litigation (*i.e.*, the Intercompany Contracts). As a result, the disputes with the Southcross Holdings Entities created uncertainty in the Debtors' marketing process, particularly in light of how much revenue the Debtors derive from the Intercompany Contracts. Accordingly, the Debtors believed that a settlement of the Adversary Proceedings would significantly benefit their estates by removing the cloud overhanging their assets and facilitating a cleaner and more predictable marketing process.

On September 16, 2019, the Debtors entered into an agreement in principle with the Southcross Holdings Entities (the "**Settlement**"). The material terms of the Settlement include the following:

- FL Services shall be granted a claim against the Acquired Companies (as defined below) in the amount of $60 million, which claim shall be secured by a lien on substantially all assets of the Acquired Companies;

- 100% of the equity interests of the following companies will be transferred to the Debtors: (a) Frio LaSalle; (b) Frio LaSalle GP, LLC, which is the sole general partner of Frio LaSalle; (c) Southcross Midstream Utility, LP; and (d)

Error! Unknown document property name.

Southcross Midstream T/U GP, LLC, which is the sole general partner of
Southcross Midstream Utility, LP (collectively, the "**Acquired Companies**");

- The Southcross Holdings Entities will transfer $22.5 million in cash to the
  Debtors;

- The Parties agree that all Intercompany Contracts other than the Shared
  Services Agreement will be terminated (other than the Intercompany
  Contracts between the Acquired Companies and the Debtors that the Debtors
  so elect not to terminate), and all Customer Contracts will be indirectly
  transferred to the Debtors pursuant to the contribution of the Acquired
  Companies;

- Each of the Debtors (together with their subsidiaries) and the Southcross
  Holdings Entities (together with the non-Debtor affiliates of Holdings) agreed
  to comprehensive, unrestricted, mutual releases of all claims against each
  other Party, together with (a) such Party's current and former officers,
  directors, shareholders, employees, and professionals (each in their capacity as
  such), and (b) all non-Debtor affiliates of Holdings, and their current and
  former officers, directors, shareholders, employees, and professionals (each in
  the capacity as such); and

- The Debtors shall seek to dismiss the Adversary Proceedings, with prejudice.

On September 25, 2019, the Bankruptcy Court approved the Settlement [D.I. 503] (the
"**9019 Order**").  On October 1, 2019, the Settlement closed, and the Bankruptcy Court entered
an order dismissing the Adversary Proceedings.  *See Order Approving Stipulation Dismissing
Adversary Proceeding*, Adv. Case No. 19-50283, D.I. 18 (MFW) (Bankr. D. Del. Oct. 2, 2019);
*Order Approving Stipulation Dismissing Adversary Proceeding*, Adv. Case No. 19-50286, D.I.
18 (MFW) (Bankr. D. Del. Oct. 2, 2019).

**G.    Sale Process[5]**

*1.    Marketing Process*

In mid-2018, the Debtors engaged an investment banker to market their assets—either for
a sale of the whole company or a sale of certain non-core assets in Mississippi and Alabama.
This process led to discussions of a whole-company sale with a potential strategic purchaser that
continued through March 2019.  Ultimately, however, Southcross concluded, in consultation
with certain of Southcross's lenders, that the potential purchaser's offer for an out-of-court
transaction was unattractive.

Since the Debtors formally retained Evercore Group L.L.C. ("**Evercore**") on March 12,
2019, Evercore and the Debtors have run an extensive marketing process for the potential sale of

---

[5] Capitalized terms used in this section but not otherwise defined in this section shall have the meanings
ascribed to such terms in the Bid Procedures Order (as defined herein).

Error! Unknown document property name.

all or substantially all of the Debtors' assets (the "**Assets**") under section 363 of the Bankruptcy Code. After being retained, Evercore began reaching out to potential purchasers to explore a sale of the Bid Assets. Over the course of the months that followed, Evercore contacted over 65 potential purchasers, and the Debtors executed non-disclosure agreements with over 35 of such parties with respect to a sale of all or some of the Bid Assets. Evercore provided additional details to these parties, including access to confidential diligence materials.

In May 2019, the Debtors received, in accordance with the case milestones set forth in that certain Senior Secured Superpriority Priming Debtor-In-Possession Credit Agreement, dated as of April 3, 2019 (as may be amended, supplemented, or otherwise modified form time to time, the "**DIP Credit Agreement**"), non-binding indications of interest from 21 parties for all or some of the Bid Assets. After evaluating the non-binding indications of interest with Evercore and their other advisors, the Debtors and the Required Lenders (as defined in the DIP Credit Agreement, unless otherwise specified) determined that the continuation of the marketing and sale process would maximize the realizable value of the Bid Assets and recoveries for the benefit of the Debtors' estates and stakeholders. In doing so, the Debtors and Evercore arranged for such parties to meet with management and provided such parties with additional data room access and opportunities to make diligence requests.

The Debtors advanced 28 parties (including 7 parties that did not formally submit a non-binding indication of interest in the first round but that expressed interest in continuing in the process) to the second round of the marketing and sale process. Evercore continued to provide additional due diligence detail to these parties and hosted 19 management presentations for such potential bidders.

### 2.    *Bidding Procedures*

On May 22, 2019, the Debtors filed with the Bankruptcy Court the *Motion of Debtors for Entry of Orders (i)(a) Approving Bidding Procedures for Sale of Debtors' Assets, (b) Authorizing the Selection of a Stalking Horse Bidder, (c) Approving Bid Protections, (d) Scheduling Auction for, and Hearing To Approve, Sale of Debtors' Assets, (e) Approving Form and Manner of Notices of Sale, Auction, and Sale Hearing, (f) Approving Assumption and Assignment Procedures, and (g) Granting Related Relief and (ii)(a) Approving Sale of Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (b) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (c) Granting Related Relief* [D.I. 225] (the "**Bidding Procedures Motion**").

On June 13, 2019, the Bankruptcy Court entered an order approving the Bidding Procedures Motion [D.I. 324] (the "**Bidding Procedures Order**"). Pursuant to the Bidding Procedures Order, the Debtors obtained a pathway to sell all of their right, title, and interest in and to the Assets free and clear of any pledges, liens, security interests, encumbrances, claims, charges, options, and interests thereon (collectively, the "**Interests**") to the maximum extent permitted by section 363 of the Bankruptcy Code, with such Interests to attach to the net proceeds of the sale of the Assets with the same validity and priority as such Interests applied against the Assets. The Bidding Procedures Order also authorized the Debtors, in the exercise of their business judgement (in consultation with the Consulting Parties (as defined in the Bid

Error! Unknown document property name.

Procedures Order)), to (a) agree with any Qualified Bidder that such Qualified Bidder shall be the stalking horse bidder (with respect to the Assets or lot thereof) and (b) enter into a definitive agreement with such Stalking Horse Bidder subject to the terms and conditions set forth in the Bidding Procedures Order.

The Bidding Procedures Order further provides, among other things, that the Debtors are authorized, but not obligated, to exercise their business judgment (in consultation with the DIP Secured Parties and each of the Prepetition Agents), subject to the entry of a Stalking Horse Order, to agree with any Qualified Bidder that (a) such Qualified Bidder's Qualified Bid shall serve as the minimum bid for the Bid Assets or any lot thereof (such Qualified Bidder, a "**Stalking Horse Bidder**" and, such Qualified Bid, a "**Stalking Horse Bid**") and (b) the Debtors will enter into the transaction(s) contemplated in such Stalking Horse Bid unless a higher or otherwise better Qualified Bid is submitted with respect to such Bid Assets or lot thereof, as determined by the Debtors (in consultation with the DIP Secured Parties) in accordance with the Bidding Procedures.  In order to incentivize prospective purchasers to agree to become a Stalking Horse Bidder, the Debtors are authorized, but not obligated, to exercise their business judgment (in consultation with the DIP Secured Parties and each of the Prepetition Agents) to offer the following bid protections to such Stalking Horse Bidder(s), payable if the Debtors consummate a sale pursuant to a Qualified Bid other than the Stalking Horse Bid (if the assets subject to such sale include those to which such Stalking Horse Bid relates): (a) payment of a break-up fee in an amount not to exceed three percent of the purchase price set forth in the Stalking Horse Bid (the "**Break-Up Fee**") and (b) reimbursement of the reasonable and documented fees and expenses of the Stalking Horse Bidder (the "**Expense Reimbursement**" and, together with the Break-Up Fee, the "**Bid Protections**") in an amount up to $1,000,000; provided, however, that (i) the payment of such Break-Up Fee and/or Expense Reimbursement shall be subject to the terms and conditions of the definitive agreement(s) executed between the Debtors and such Stalking Horse Bidder(s), (ii) any Breakup Fee or Expense Reimbursement will not be binding on the Debtors until entry of the Stalking Horse Order and the Sale Order, and (iii) no Break-Up Fee shall be paid to a credit bidder or insider of the Debtors. For the avoidance of doubt, the Debtors will provide Expense Reimbursement only to the Stalking Horse Bidder(s) and such expenses must be reasonable, documented, and subject to review by the Debtors. To the extent payable, any Bid Protections would be paid out of the proceeds of the sale to which they relate.

### 3.      *Stalking Horses*

The Debtors filed two motions to designate Qualified Bidders as Stalking Horse Bidders for specific lots of Assets.  *First*, on August 23, 2019, the Debtors filed the *Motion of Debtors For Entry of an Order (I) Designating Stalking Horse Bidder in Connection with the Mississippi and Alabama Assets, (II) Approving Expense Reimbursement, and (III) Granting Related Relief* [D.I. 439] (the "**Magnolia Stalking Horse Motion**"), which requested authority to designate Magnolia Infrastructure Holdings, LLC as the Stalking Horse Bidder with respect to the sale of the Mississippi and Alabama Assets (collectively, the "**MS/AL Assets**") identified in the form of asset purchase agreement attached to the Magnolia Stalking Horse Motion as Exhibit A.  *Second*, on August 24, 2019, the Debtors filed the *Motion of Debtors For Entry of an Order (I) Designating Stalking Horse Bidder in Connection with the Corpus Christi Pipeline Network Assets, (II) Approving Bid Protections, and (III) Granting Related Relief* [D.I. 440] (the "**Kinder**

Error! Unknown document property name.

**Stalking Horse Motion**"), which requested authority to designate Kinder Morgan Tejas Pipeline LLC as the Stalking Horse Bidder for those Corpus Christi pipeline network assets (collectively, the "**CCPN Assets**") identified in the form of asset purchase agreement attached to the Kinder Stalking Horse Motion as <u>Exhibit A</u>.  On August 30, 2019, the Bankruptcy Court entered orders approving the Magnolia Stalking Horse Motion [D.I. 454] and the Kinder Stalking Horse Motion [D.I. 455].  The Debtors filed revised asset purchase agreements on September 13, 2019 [D.I. 470, 471].

### 4.  *Assumption and Assignment Procedures*

In connection with the Sale Transaction, the Debtors anticipate that they will assume and assign to the Successful Bidders (or their designated assignee(s)) all or certain of the Assumed Contracts and Assumed Leases pursuant to section 365(b) of the Bankruptcy Code. Accordingly, through the Bidding Procedures Motion, the Debtors sought approval of the proposed Assumption and Assignment Procedures set forth in the Bidding Procedures Motion, which are designed to, among other things, (a) outline the process by which the Debtors will serve notice to all Counterparties regarding the potential assumption and assignment, related Cure Costs, if any, and information regarding each Successful Bidder's adequate assurance of future performance and (b) establish objection and other relevant deadlines and the manner for resolving disputes relating to assumption and assignment of the Assumed Contracts and Assumed Leases.  The Assumption and Assignment Procedures are set forth in detail in the Bidding Procedures Motion and were approved through the Bidding Procedures Order.

### 5.  *Post-Holdings Litigation Developments*

As discussed above, certain buyers had expressed their reluctance to ascribe full value for the Debtors' assets that were the subject of pending litigation (*i.e.*, the Intercompany Contracts). As a result, the disputes with the Southcross Holdings Entities created uncertainty in the Debtors' marketing process, particularly in light of how much revenue the Debtors derived from the Intercompany Contracts.  Because the Settlement resulted in both the removal of this uncertainty and an augmented asset base, Evercore re-launched the marketing process with certain of the existing bidders and prospective bidders.  It further incorporated the projections of the Acquired Companies (as defined in the 9019 Order) into its marketing materials and continued dialogue and diligence with certain of these buyers.  Diligence and conversations remain ongoing.

### 6.  *Sale Timeline*

The Auctions shall be conducted on (i) October 16, 2019 at 9:00 a.m. (prevailing Eastern Time) with respect to the G&P assets,[6] (ii) October 17, 2019 at 9:00 a.m. (prevailing Eastern Time) with respect to the MS/AL assets, and (iii) October 17, 2019 at 2:00 p.m. (prevailing Eastern Time) with respect to the CCPN assets, or such later times as the Debtors shall notify all relevant parties.  If (a) no Qualified Bids are submitted by the Bid Deadline other than a Qualified Bid that shall serve as the minimum bid for the Assets or any lot thereof, (b) only one Qualified Bid that is not a Stalking Horse Bid is submitted by the Bid Deadline, or (c) only one

---

[6] The "**G&P Assets**" include all of the Debtors' assets other than the CCPN Assets and the MS/AL Assets.

or more bids for less than all or substantially all of the Debtors' assets are submitted by the Bid Deadline for non-overlapping lots of the Assets, the Debtors may in their discretion (in consultation with the Consulting Parties) elect to cancel the Auctions and seek approval of the transactions contemplated in the Stalking Horse Bid, the Qualified Bid which is not a Stalking Horse Bid, or the transactions in respect of the Partial Bids at the Sale Hearing.

Prior to the conclusion of the Auctions, the Debtors shall (in consultation with the Consulting Parties) (a) review and evaluate each bid made at the Auctions on the basis of financial and contractual terms and other factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Sale, (b) determine and identify the highest or otherwise best offer or collection of offers, (c) determine and identify the next highest or otherwise best offer or collection of offers, and (d) notify all Qualified Bidders participating in the Auction, prior to its adjournment, of (i) the identity of the party or parties that submitted the Successful Bid(s), (ii) the amount and other material terms of the Successful Bid(s), (iii) the identity of the party or parties that submitted the Alternate Bid(s), and (iv) the amount and other material terms of the Alternate Bid(s).

The Sale Hearing will be held on October 22, 2019 at 10:30 a.m. (prevailing Eastern Time) before the Honorable Mary F. Walrath, in the United States Bankruptcy Court for the District of Delaware, 824 N. Market St., Wilmington, Delaware 19801.  The Sale Hearing may be adjourned by the Debtors (with the consent of the Consulting Parties) by an announcement of the adjourned date at a hearing before the Bankruptcy Court or by filing a notice on the Bankruptcy Court's docket.  At the Sale Hearing, the Debtors will seek the Bankruptcy Court's approval of the Successful Bid(s) and, at the Debtors' election (in consultation with the Consulting Parties), the Alternate Bid(s).

The Debtors' presentation to the Bankruptcy Court of the Successful Bid(s) and Alternate Bid(s) will not constitute the Debtors' acceptance of such bid(s), which acceptance will only occur upon approval of such bid(s) by the Bankruptcy Court.  Following the Bankruptcy Court's entry of the order approving any Sale, the Debtors and the Successful Bidder(s) shall proceed to consummate the transaction(s) contemplated by the Successful Bid(s).

## H.    Disclosure and Confirmation Hearings

The hearing to consider approval of the Disclosure Statement will be held on October 28, 2019.  The deadline to object to the approval of the Disclosure Statement is October 21, 2019.  Further, the Debtors will seek entry of an order by the Bankruptcy Court scheduling the Confirmation Hearing to consider confirmation of the Plan.  The Confirmation Hearing will be held on December 5, 2019.  The Debtors anticipate that notice of these hearings will be published and mailed to all known holders of Claims and Interests at least 28 days before the date by which objections must be filed with the Bankruptcy Court.

Error! Unknown document property name.

# ARTICLE IV

## SUMMARY OF THE PLAN

The Debtors believe that the Plan provides the best and most prompt possible recovery to holders of Claims.  The Debtors believe that (a) through the Plan, holders of Allowed Claims will obtain a recovery from the Debtors' estates equal to or greater than the recovery that they would receive if the Debtors' assets were liquidated under chapter 7 of the Bankruptcy Code and (b) consummation of the Plan will maximize the recovery of the holders of Allowed Claims.

The consummation of a plan is the principal objective of a chapter 11 case.  A plan sets forth the means for satisfying Claims against, and interests in, a debtor.  Confirmation of a plan makes the plan binding upon the debtor and any creditor of, or equity holder in, the debtor, whether or not such creditor or equity holder (a) is impaired under or has accepted the plan or (b) receives or retains any property under the plan.  Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, a confirmation order discharges the debtor from any debt that arose prior to the effective date of the plan and substitutes therefor the obligations specified under the confirmed plan.

A chapter 11 plan may specify that the legal, contractual, and equitable rights of the holders of Claims or Interests in certain classes are to remain unaltered by the reorganization effectuated by the plan.  Such classes are referred to as "unimpaired" and, because of such favorable treatment, are deemed to accept the plan.  Accordingly, a debtor need not solicit votes from the holders of Claims or Interests in such classes.  A chapter 11 plan may also specify that certain classes will not receive any distribution of property or retain any Claim against a debtor.  Such classes are deemed not to accept the plan and, therefore, need not be solicited to vote to accept or reject the plan.  Any classes that are receiving a distribution of property under the plan but are not unimpaired will be solicited to vote to accept or reject the plan.

Prior to soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding the plan.  To satisfy the requirements of section 1125 of the Bankruptcy Code, the Debtors are submitting this Disclosure Statement to holders of Claims against the Debtors who are entitled to vote to accept or reject the Plan.

THE REMAINDER OF THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN.  THIS SECTION IS QUALIFIED IN ITS ENTIRETY BY AND IS SUBJECT TO THE PLAN AS WELL AS THE EXHIBITS THERETO AND DEFINITIONS THEREIN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO

Error! Unknown document property name.

THEREIN.   REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS UNDER THE PLAN.   UPON OCCURRENCE OF THE EFFECTIVE DATE, THE PLAN AND ALL SUCH DOCUMENTS WILL BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS AND THEIR ESTATES AND ALL OTHER PARTIES IN INTEREST.   IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT, ON THE ONE HAND, AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, ON THE OTHER HAND, THE TERMS OF THE PLAN AND SUCH OTHER OPERATIVE DOCUMENT SHALL CONTROL.

STATEMENTS AS TO THE RATIONALE UNDERLYING THE TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN ARE NOT INTENDED TO, AND SHALL NOT, WAIVE, COMPROMISE, OR LIMIT ANY RIGHTS, CLAIMS, OR CAUSES OF ACTION IN THE EVENT THE PLAN IS NOT CONFIRMED.

## A.    Considerations Regarding the Plan

The terms of the Plan are the result of an analysis by the Debtors concerning various issues relating to how the distributable value should be allocated among the creditors of the various Debtors.

Based upon the Debtors' analyses, the Plan provides, among other things, as follows:

- holders of Allowed Priority Non-Tax Claims shall be entitled to payment in full in Cash;

- holders of Allowed Other Secured Claims shall be entitled shall be entitled to receive, subject to the terms of the Plan, in full and final satisfaction, settlement, release and discharge of its Allowed Other Secured Claim, at the election of the Debtors: (x) Cash in an amount equal to such Allowed Other Secured Claim; or (y) such other treatment that will render such Other Secured Claim unimpaired pursuant to section 1124 of the Bankruptcy Code; provided, however, that Other Secured Claims incurred by a Debtor in the ordinary course of business may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto, in the discretion of the applicable Debtor without further notice to or order of the Bankruptcy Court;

- holders of allowed Prepetition Term Loan Claims shall be entitled to receive (x) if the South Texas Sale is not consummated on or before the Effective Date, [__]% of the New Common Stock, or (y) if the South Texas Sale is consummated on or before the Effective Date, the portion of the Sale Proceeds allocable to the Prepetition Term Loan Facility Claim in accordance with the terms of Section 3.04 of the DIP Credit Agreement; provided that the Prepetition Term Loan Lender Distribution shall not be made unless the DIP Roll-Up Loans are paid in full;

32

- holders of Allowed Prepetition Revolving Credit Facility Claims shall be entitled to receive (x) if the South Texas Sale is not consummated on or before the Effective Date, [__]% of the New Common Stock and/or $[__] issued under the Exit Revolving Credit Facility, or (y) if the South Texas Sale is consummated on or before the Effective Date, the portion of the Sale Proceeds allocable to the Prepetition Term Loan Facility Claim in accordance with the terms of Section 3.04 of the DIP Credit Agreement; provided that the Prepetition Term Loan Lender Distribution shall not be made unless the DIP Roll-Up Loans are paid in full;

- holders of General Unsecured Claims shall not receive a distribution under the Plan;

- holders of Sponsor Note Claims shall not receive a distribution under the Plan;

- holders of Subordinated Claims shall not receive a distribution under the Plan; and

- holders of Existing Interests shall not receive a distribution under the Plan.

**B.    Classification and Treatment of Claims and Interests**

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders. In accordance with section 1123 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than Administrative Expense Claims and Priority Tax Claims, which pursuant to section 1123(a)(1) of the Bankruptcy Code need not be and have not been classified). The Debtors also are required, under section 1122 of the Bankruptcy Code, to classify Claims against and Interests in the Debtors (except for certain claims classified for administrative convenience) into Classes that contain Claims and Interests that are substantially similar to the other Claims and Interests in such Class.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the claim holder or interest holder agrees to a less favorable treatment of its claim or interest. The Debtors believe that they have complied with such standard. If the Bankruptcy Court finds otherwise, however, it could deny confirmation of the Plan if the holders of Claims and Interests affected do not consent to the treatment afforded them under the Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim also is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law. It is possible that a holder of a Claim or Interest may challenge the Debtors' classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for

Error! Unknown document property name.

the Plan to be confirmed.  If such a situation develops, the Debtors intend, in accordance with the terms of the Plan, to make such permissible modifications to the Plan as may be necessary to permit its confirmation.  Any such reclassification could adversely affect holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan.  EXCEPT AS SET FORTH IN THE PLAN, UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM AND REQUIRES RESOLICITATION, ACCEPTANCE OF THE PLAN BY ANY HOLDER OF A CLAIM OR INTEREST PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.

The amount of any impaired Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim and, accordingly, the total Claims that are ultimately Allowed by the Bankruptcy Court with respect to each impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any impaired Class.  Thus, the actual recovery ultimately received by a particular holder of an Allowed Claim may be adversely or favorably affected by the aggregate amount of Claims Allowed in the applicable Class.  Additionally, any changes to any of the assumptions underlying the estimated Allowed amounts could result in material adjustments to recovery estimates provided herein and/or the actual distribution received by Creditors.  The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' views as of the date hereof only.

The classification of Claims and Interests and the nature of distributions to members of each Class are summarized below.  The Debtors believe that the consideration, if any, provided under the Plan to holders of Claims and Interests reflects an appropriate resolution of their Claims and Interests, taking into account the differing nature and priority (including applicable contractual subordination) of such Claims and Interests.  The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Plan.  Many of these tests are designed to protect the interests of holders of Claims or Interests who are not entitled to vote on the Plan, or do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Bankruptcy Court.

1.    ***DIP Claims, Administrative Expense Claims, Professional Fee Claims, U.S. Trustee Fees, and Priority Tax Claims***

Error! Unknown document property name.

The Plan constitutes a joint chapter 11 plan for all of the Debtors.  All Claims and Interests, except DIP Claims, Administrative Expense Claims, Professional Fee Claims, Ad Hoc Group Fee Claims, Prepetition Lender Fee Claims, Prepetition Agent Fee Claims, U.S. Trustee Fees and Priority Tax Claims, are placed in the Classes set forth in Article IV of the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, DIP Claims, Administrative Expense Claims, Professional Fee Claims, U.S. Trustee Fees, and Priority Tax Claims have not been classified, and the holders thereof are not entitled to vote on this Plan.  A Claim or Interest is placed in a particular Class only to the extent that such Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation and distribution under this Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code.  However, a Claim or Interest is placed in a particular Class for the purpose of receiving Plan Distributions only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest and has not been paid, released or otherwise settled prior to the Effective Date.

### (i)  DIP Claims

The DIP Claims are Allowed Claims.  On the Effective Date, each holder of an Allowed New Money DIP Claim shall receive Cash in an amount sufficient to provide for the payment in full of such claim, in full and final satisfaction, settlement, release and discharge of its New Money DIP Claim.

On the Effective Date, each holder of an Allowed Roll-Up DIP Claim (x) that does not elect to be refinanced on its ballot shall receive either (a) if the South Texas Sale is not consummated on or before the Effective Date, its Pro Rata Share of the Exit Term Loan or (b) if the South Texas Sale is consummated on or before to the Effective Date, Cash in the amount of the portion of the Sale Proceeds allocable to its Allowed Roll-Up DIP Claim in accordance with the terms of Section 3.04 of the DIP Credit Agreement, and, and (y) that elects to be refinanced on its ballot shall receive Cash in the amount of its Roll-Up DIP Claim in each case, in full and final satisfaction, settlement, release and discharge of its Roll-Up DIP Claim.

### (ii)  Administrative Expense Claims

### (a)    Time for Filing Administrative Expense Claims

The holder of an Administrative Expense Claim, other than the holder of:

> (1)    an Administrative Expense Claim that has been Allowed on or before the Effective Date;

> (2)    an Administrative Expense Claim for an expense or liability incurred and payable in the ordinary course of business by a Debtor;

Error! Unknown document property name.

(3)    an Administrative Expense Claim on account of fees and expenses incurred on or after the Petition Date by ordinary course professionals retained by the Debtors pursuant to an order of the Bankruptcy Court;

(4)    a Claim for adequate protection arising under the DIP Order;

(5)    an Intercompany Claim; or

(6)    a claim for Cure Amounts

(and, for the avoidance of doubt, other than a holder of a Professional Fee Claim, DIP Claim, Ad Hoc Group Fee Claim, or with respect to U.S. Trustee Fees) must file with the Bankruptcy Court and serve on the Debtors, the Claims Agent, and the Office of the U.S. Trustee, proof of such Administrative Expense Claim within thirty (30) days after the Effective Date (the "Administrative Bar Date"). Such proof of Administrative Expense Claim must include at a minimum: (i) the name of the applicable Debtor that is purported to be liable for the Administrative Expense Claim and if the Administrative Expense Claim is asserted against more than one Debtor, the exact amount asserted to be owed by each such Debtor; (ii) the name of the holder of the Administrative Expense Claim; (iii) the asserted amount of the Administrative Expense Claim; (iv) the basis of the Administrative Expense Claim; and (v) supporting documentation for the Administrative Expense Claim. **FAILURE TO FILE AND SERVE SUCH PROOF OF ADMINISTRATIVE EXPENSE CLAIM TIMELY AND PROPERLY SHALL RESULT IN SUCH CLAIM BEING FOREVER BARRED AND DISCHARGED. IF FOR ANY REASON ANY SUCH ADMINISTRATIVE CLAIM IS INCAPABLE OF BEING FOREVER BARRED AND DISALLOWED, THEN THE HOLDER OF SUCH CLAIM SHALL IN NO EVENT HAVE RECOURSE TO ANY PROPERTY TO BE DISTRIBUTED PURSUANT TO THE PLAN.** A notice setting forth the Administrative Bar Date will be (i) filed on the Bankruptcy Court's docket and served with the notice of the Effective Date and (ii) posted on the Debtors' Case Information Website. No other notice of the Administrative Bar Date will be provided.

**(b)    Treatment of Administrative Expense Claims**

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a different treatment, or as otherwise expressly provided in the Plan, on the applicable Distribution Date, or as soon thereafter as is reasonably practicable, the holder of such Allowed Administrative Expense Claim shall receive from the applicable Debtor's Cash in an amount equal to such Allowed Claim; provided, however, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by any of the Debtors, as debtors in possession, shall be paid by the applicable Debtor in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents relating to, such liabilities.

The DIP Obligations and any other claims which expressly constitute allowed claims under the Final DIP Order shall be deemed Allowed Administrative Expense Claims to the

Error! Unknown document property name.

extent payable under the Final DIP Order, the DIP Credit Agreement or the Plan, without the necessity of filing a proof of claim with respect thereto, and shall be paid in Cash on the Effective Date or as soon thereafter as is reasonably practicable without the need to file a proof of such Claim with the Bankruptcy Court in accordance with section 3.2(a) of the Plan and without further order of the Bankruptcy Court.

### *(iii)* Professional Fee Claims

Except to the extent that the applicable holder of an Allowed Professional Fee Claim agrees to less favorable treatment with the Debtors, or as otherwise expressly set forth in the Plan, each holder of a Professional Fee Claim shall be paid in full in Cash pursuant to section 3.3 of the Plan.  Ad Hoc Group Fee Claims will be paid without (i) the need for the filing of any claim or request for allowance under section 3.2 of the Plan or (ii) any further order of the Bankruptcy Court.

### (a)     Fee Applications

All requests for payment of Professional Fee Claims must be filed with the Bankruptcy Court by the date that is 60 calendar days after the Confirmation Date; provided that if any Professional Person is unable to file its own request with the Bankruptcy Court, such Professional Person may deliver an original, executed copy and an electronic copy to the Debtors' attorneys and the  Debtors (or the Plan Administrator) at least three Business Days before the deadline, and the Debtors' attorneys shall file such request with the Bankruptcy Court. The objection deadline relating to a request for payment of Professional Fee Claims shall be 4:00 p.m. (prevailing Eastern Time) on the date that is 30 days after filing such request, and a hearing on such request, if necessary, shall be held no later than 30 calendar days after the objection deadline.  Distributions on account of Allowed Professional Fee Claims shall be made as soon as reasonably practicable after such Claims become Allowed.

### (b)     Post-Confirmation Date Fees

Upon the Confirmation Date, any requirement that Professional Persons comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors (or the Plan Administrator) may employ and pay all Professional Persons without any further notice to, action by or order or approval of the Bankruptcy Court or any other party.

### (c)     Fee Escrow Account

On or after the Effective Date, the Debtors shall establish and fund the Fee Escrow Account. The Debtors shall fund the Fee Escrow Account with Cash equal to the Debtors' good faith estimate of the Allowed Professional Fee Claims.  Funds held in the Fee Escrow Account shall not be considered property of the Debtors' Estates or property of the Debtors, but shall revert to the Debtors only after all Allowed Professional Fee Claims have been paid in full.  Fees owing to the applicable holder of an Allowed Professional Fee Claim shall be paid in Cash to such holder from funds held in the Fee Escrow Account when such Claims are Allowed by an order of the Bankruptcy Court or authorized to be paid under the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [D.I. 191]; provided,

that the Debtors' obligations with respect to Allowed Professional Fee Claims shall not be limited by nor deemed limited to the balance of funds held in the Fee Escrow Account. To the extent that funds held in the Fee Escrow Account are insufficient to satisfy the amount of accrued Allowed Professional Fee Claims, the holders of Allowed Professional Fee Claims shall have an Allowed Administrative Expense Claim for any such deficiency, which shall be satisfied in accordance with section 3.2 of the Plan. No Liens, claims, or interests shall encumber the Fee Escrow Account in any way.

### *(iv)*  **U.S. Trustee Fees**

The Debtors or the Plan Administrator as the case may be, shall pay all outstanding U.S. Trustee Fees of a Debtor on an ongoing basis on the date such U.S. Trustee Fees become due, until such time as a final decree is entered closing the applicable Chapter 11 Case, the applicable Chapter 11 Case is converted or dismissed, or the Bankruptcy Court orders otherwise.

### *(v)*  **Priority Tax Claims**

Except to the extent that the applicable holder of an Allowed Priority Tax Claim has been paid by the Debtors before the Effective Date, or the applicable Debtor and such holder agree to less favorable treatment by the Debtors, each holder of an Allowed Priority Tax Claim shall receive, on account of such Allowed Priority Tax Claim, at the option of the Debtors (a) payment in full in Cash made on or as soon as reasonably practicable after the later of the Effective Date and the first Distribution Date occurring at least 20 calendar days after the date such Claim is Allowed, (b) regular installment payments in accordance with section 1129(a)(9)(C) of the Bankruptcy Code or (c) such other amounts and in such other manner as may be determined by the Bankruptcy Court to provide the holder of such Allowed Priority Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim.  For the avoidance of doubt, if the South Texas Sale is consummated on or before the Effective Date, any payment made on account of Allowed Priority Tax Claims shall be paid from the Wind-Down Account.

The Debtors or the Plan Administrator (as applicable) shall have the right, in their sole discretion, to pay any Allowed Priority Tax Claim or any remaining balance of an Allowed Priority Tax Claim (together with accrued but unpaid interest) in full at any time on or after the Effective Date without premium or penalty.

### *2.*    *Classification and Treatment of Other Claims and Interests*

### *(i)*   **Treatment of Claims Against and Interests in the Debtors**

### (a)    **Priority Non-Tax Claims (Class 1)**

The legal, equitable and contractual rights of the holders of Priority Non-Tax Claims are unaltered by the Plan.  Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to a different treatment, on the applicable Distribution Date, each holder of an Allowed Priority Non-Tax Claim shall receive Cash from the applicable Debtor in an amount equal to such Allowed Claim.

Error! Unknown document property name.

**(b)      Other Secured Claims (Class 2)**

The legal, equitable and contractual rights of the holders of Other Secured Claims are unaltered by the Plan.  Except to the extent that a holder of an Allowed Other Secured Claim agrees to a different treatment, on the applicable Distribution Date, or as soon as reasonably practicable thereafter, each holder of an Allowed Other Secured Claim shall each receive, subject to the terms of the Plan, in full and final satisfaction, settlement, release and discharge of its Allowed Other Secured Claim, at the election of the Debtors:

- Cash in an amount equal to such Allowed Other Secured Claim; or

- such other treatment that will render such Other Secured Claim unimpaired pursuant to section 1124 of the Bankruptcy Code;

provided, however, that Other Secured Claims incurred by a Debtor in the ordinary course of business may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto, in the discretion of the applicable Debtor without further notice to or order of the Bankruptcy Court.

Each holder of an Allowed Other Secured Claim shall retain the Liens securing its Allowed Other Secured Claim as of the Effective Date until full and final satisfaction of such Allowed Other Secured Claim is made as provided in the Plan.  On the full payment or other satisfaction of each Allowed Other Secured Claim in accordance with the Plan, the Liens securing such Allowed Other Secured Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

**(c)      Prepetition Term Loan Claims (Class 3)**

The Prepetition Term Loan Claims shall be Allowed under the Plan and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection or any other challenges under any applicable law or regulation by any Person.  On the Effective Date, or as soon as reasonably practicable thereafter, each holder of an Allowed Prepetition Term Loan Claim shall receive, subject to the terms of the Plan, in full and final satisfaction, settlement, release and discharge of its Allowed Prepetition Term Loan Claim, its Pro Rata Share of the Prepetition Term Loan Lender Distribution.

**(d)      Prepetition Revolving Credit Facility Claims (Class 4)**

The Prepetition Revolving Credit Facility Claims shall be Allowed under the Plan and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection or any other challenges under any applicable law or regulation by any Person.  On the Effective Date, or as soon as reasonably practicable thereafter, each holder of an Allowed Prepetition Revolving Credit Facility Claim shall receive, subject to the terms of the Plan, in full and final satisfaction, settlement, release and discharge of

39

its Allowed Prepetition Credit Facility Claim, its Pro Rata Share of the Prepetition Revolving Credit Facility Lender Distribution.


        **(e)**        **General Unsecured Claims (Class 5)**

Holders of Allowed General Unsecured Claims shall not receive or retain any distribution under the Plan on account of such Allowed General Unsecured Claims.

        **(f)**        **Sponsor Note Claims (Class 6)**

Each holder of a Sponsor Note Claim shall not receive or retain any distribution under the Plan on account of such Sponsor Note Claim.

        **(g)**        **Subordinated Claims (Class 7)**

Each holder of and Allowed Subordinated Claims shall not receive or retain any distribution under the Plan on account of such Subordinated Claims.

        **(h)**        **Existing Interests (Class 8)**

Existing Interests shall be discharged, cancelled, released and extinguished, and holders thereof shall not receive or retain any distribution under the Plan on account of such Existing Interests.

        *3.*        **Treatment of Intercompany Claims and Interests**

Notwithstanding anything to the contrary in the Plan, on or after the Effective Date, any and all Intercompany Claims, shall, at the option of the Debtors and subject to the Implementation Memorandum, either be (i) extinguished, canceled, discharged, adjusted and/or otherwise similarly treated or (ii) reinstated and otherwise survive the Debtors' restructuring by virtue of such Intercompany Claims being left unimpaired.  To the extent any Intercompany Claim is reinstated, or otherwise adjusted (including by contribution, distribution in exchange for new debt or equity, or otherwise), paid or continued as of the Effective Date, any such transaction may be effected on or after the Effective Date without any further action by the Bankruptcy Court or by the equity holders of any of the Debtors.

Notwithstanding anything to the contrary in the Plan, except as provided in section 14.2 of the Plan and subject to the Implementation Memorandum, on or after the Effective Date, any and all Intercompany Interests shall survive the Debtors' restructuring by virtue of such Intercompany Interests being left unimpaired to maintain the existing corporate structure of the Debtors.

Error! Unknown document property name.

**C.    Acceptance or Rejection of the Plan**

*1.    Class Acceptance Requirement*

A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of holders of the Allowed Claims in such Class that have voted on the Plan.

*2.    Tabulation of Votes on a Non-Consolidated Basis*

All votes on the Plan shall be tabulated on a non-consolidated basis by Class and by Debtor for the purpose of determining whether the Plan satisfies sections 1129(a)(8) and/or (10) of the Bankruptcy Code.  Notwithstanding the foregoing, the Debtors, in consultation with the Ad Hoc Group, reserve the right to seek to substantively consolidate any two or more Debtors; provided, that, such substantive consolidation does not materially and adversely impact the amount of the Plan Distributions to any Person.

*3.    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code or "Cramdown"*

Because certain Classes are deemed to have rejected the Plan, the Debtors will request confirmation of the Plan, as it may be modified and amended from time to time, under section 1129(b) of the Bankruptcy Code with respect to such Classes.  Subject to sections 16.3  and 16.4 of the Plan, the Debtors reserve the right, in consultation with the Ad Hoc Group, to revoke or withdraw the Plan or, if reasonably acceptable to the Debtors and the Majority Ad Hoc Group, to alter, amend, or modify the plan or, alter, amend, modify, revoke or withdraw any Plan Document, in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.  Subject to sections 16.3 and 16.4 of the Plan (including the consent and consultation rights set forth therein), the Debtors also reserve the right to request confirmation of the Plan, as it may be modified, supplemented or amended from time to time, with respect to any Class that affirmatively votes to reject the Plan..

*4.    Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed as of the date of the deadline for voting to accept or reject the Plan shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan pursuant to section 1129(a)(8) of the Bankruptcy Code.

*5.    Voting Classes; Deemed Acceptance by Non-Voting Classes*

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class timely vote to accept or reject the Plan, the Plan shall be deemed accepted by such Class..

Error! Unknown document property name.

### 6. Confirmation of All Cases

Except as otherwise specified in the Plan, the Plan shall not be deemed to have been confirmed unless and until the Plan has been confirmed as to each of the Debtors; provided, however, that the (i) Debtors, in consultation with the Ad Hoc Group, may at any time waive section 6.6 of the Plan and (ii) Debtors, in consultation with the Ad Hoc Group can withdraw the Plan as to one of more Debtors if the Plan is not confirmed as to them..

## D.    Means for Implementation in the Event the South Texas Sale is not Consummated

The provisions of this section shall only apply in the event that the South Texas Sale is not consummated on or before the Effective Date.

### 1. Continued Corporate Existence and Vesting of Assets in Reorganized Debtors

*(i)*    Except as otherwise provided in the Plan, the Debtors shall continue to exist after the Effective Date as Reorganized Debtors in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and pursuant to the Amended Constituent Documents, for the purposes of satisfying their obligations under the Plan and the continuation of their businesses.  On or after the Effective Date, each Reorganized Debtor, in its discretion, may take such action as permitted by applicable law and such Reorganized Debtor's organizational documents, as such Reorganized Debtor may determine is reasonable and appropriate, including causing: (i) a Reorganized Debtor to be merged into another Reorganized Debtor, or its Subsidiary and/or affiliate; (ii) a Reorganized Debtor to be dissolved; (iii) the legal name of a Reorganized Debtor to be changed; or (iv) the closure of a Reorganized Debtor's case on the Effective Date or any time thereafter.

*(ii)*    Except as otherwise provided in the Plan, on and after the Effective Date, all property of the Estates, wherever located, including all claims, rights and Causes of Action, and any property, wherever located, acquired by the Debtors under or in connection with the Plan, shall vest in each respective Reorganized Debtor free and clear of all Claims, Liens, charges, other encumbrances and Interests.  On and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire and dispose of property, wherever located, and prosecute, compromise or settle any Claims (including any Administrative Expense Claims) and Causes of Action without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by the Plan or the Confirmation Order.  Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date for Professional Persons' fees, disbursements, expenses or related support services without application to the Bankruptcy Court.

*(iii)*    On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions that may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the requirements

Error! Unknown document property name.

of applicable law and any other terms to which the applicable entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable state law; (4) adopting the Management Incentive Plan; and (5) all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

### 2.    [Management Incentive Plan

On or as soon as practicable after the Effective Date, the New Board will adopt a Management Incentive Plan. The Initial MIP Allocation shall be allocated by the New Board on or as soon as reasonably practicable after the Effective Date in a manner determined by the Debtors.]

### 3.    Issuance of New Common Stock

If the South Texas Sale is not consummated on or before the Effective Date, shares of New Common Stock shall be issued on the Effective Date and distributed as soon as practicable thereafter in accordance with the Plan.  All of the New Common Stock issuable in accordance with the Plan, if so issued, shall be duly authorized, validly issued, fully paid, and non-assessable.  The issuance of the New Common Stock is authorized without the need for any further corporate action and without any further action by any Holder of an Allowed Claim or Interest. The Reorganized Debtors shall issue or reserve for issuance a sufficient number of shares of New Common Stock to effectuate such issuances as required under the Management Incentive Plan.

The New Common Stock will not be listed on a national securities exchange, the Reorganized Debtors will not be reporting companies under the Securities Exchange Act, and the Reorganized Debtors shall not be required to and will not file reports with the SEC or any other governmental entity after the Effective Date.  To prevent the Reorganized Debtors from becoming subject to the reporting requirements of the Securities Exchange Act, except in connection with a public offering, the Amended Constituent Documents may impose certain trading restrictions, and the New Common Stock will be subject to certain transfer and other restrictions pursuant to the Amended Constituent Documents designed to maintain the Reorganized Debtors as private, non-reporting companies.

### 4.    Section 1145 Exemption from Registration

Pursuant to section 1145 of the Bankruptcy Code, the issuance of the New Common Stock is exempt from the registration requirements of the Securities Act, and any State or local law requiring registration for offer or sale of a security.

### 5.    Exit Facilities

On the Effective Date, the Reorganized Debtors shall be authorized to enter into (a) the Exit Revolving Credit Facility Agreement and (b) the Exit Term Loan Agreement without the

43

need for any further corporate action.  The entry of the Confirmation Order shall be deemed approval of the Exit Revolving Credit Facility Agreement and the Exit Term Loan Agreement (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein) and authorization for the Reorganized Debtors to enter into and execute the Exit Revolving Credit Facility Agreement, the Exit Term Loan Agreement, and such other documents as the lenders under the Exit Revolving Credit Facility Agreement and the Exit Term Loan Agreement, as applicable, may reasonably require, subject to such modifications as the Reorganized Debtors may deem to be reasonably necessary to consummate either agreement.  The Reorganized Debtors may use the Exit Revolving Credit Facility and/or the Exit Term Loan for any purpose permitted under the Exit Revolving Credit Facility Agreement and/or the Exit Term Loan Agreement, as applicable, including the funding of obligations under the Plan.

On the respective effective dates of the Exit Revolving Credit Facility Agreement and the Exit Term Loan Agreement: (i) the Debtors and the Reorganized Debtors are authorized to execute and deliver the Exit Revolving Credit Facility Documents and the Exit Term Loan Documents, as applicable, and perform their obligations thereunder, including, without limitation, the payment or reimbursement of any fees, expenses, losses, damages, or indemnities; (ii) the Exit Revolving Credit Facility Documents and the Exit Term Loan Documents, as applicable, shall constitute the legal, valid, and binding obligations of the Reorganized Debtors that are parties thereto, enforceable in accordance with their respective terms; and (iii) no obligation, payment, transfer, or grant of security under the Exit Revolving Credit Facility Documents and the Exit Term Loan Documents, as applicable, shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law or subject to any defense, reduction, recoupment, setoff, or counterclaim.  The Debtors and the Reorganized Debtors, as applicable, and the other persons granting any Liens and security interests to secure the obligations under the Exit Revolving Credit Facility Documents and the Exit Term Loan Documents, as applicable, are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary or desirable to establish and further evidence perfection of such Liens and security interests under the provisions of any applicable federal, state, provincial, or other law (whether domestic or foreign) (it being understood that perfection shall occur automatically by virtue of the occurrence of the Effective Date, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties..

## E.    Means for Implementation in the Event the South Texas Sale is Consummated

The provisions of this section shall only apply in the event that the South Texas Sale is consummated on or before the Effective Date.

### 1.    Plan Funding

The Debtors' obligations under the Plan will be funded from all Cash of the Debtors as of the Effective Date (including the Cash received in respect of the Sales on or before to the Effective Date) in accordance with the Budget.  Such Cash shall be used as follows:  (i) first, to

fund the Wind-Down Account (for the avoidance of doubt, subject and subordinate to the Carve Out); (ii) second, to satisfy Allowed DIP Claims; (iii) third, to satisfy Allowed Administrative Expense Claims (to the extent not satisfied from funds on deposit in the Wind-Down Account); (iv) fourth, to satisfy Allowed Prepetition Revolving Credit Facility Claims and Allowed Prepetition Term Loan Facility Claims, in accordance with Section 3.04 of the DIP Credit Agreement; and (v) to otherwise satisfy the Debtors' other obligations under the Plan in accordance with the terms of the Plan.  Notwithstanding anything to the contrary contained in the Plan, the following Claims and expenses shall be required to be paid out of the Wind-Down Account: all Allowed (i) post-petition claims, other than Professional Fee Claims distributed from the Fee Escrow Account, (ii) Administrative Expense Claims and Priority Claims and (iii) professional fees and expenses necessary to wind down the Debtors' estates in a reasonable and appropriate timeline in accordance with the terms of the Plan.

> ## 2.    *Liquidating Debtors*

> *(i)*      Except as provided in the Plan, the Debtors shall continue to exist as the Liquidating Debtors on and after the Effective Date in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized.  The certificates of incorporation of the respective Liquidating Debtors shall, inter alia, prohibit the issuance of nonvoting stock to the extent required by section 1123(a)(6) of the Bankruptcy Code.  On or after the Effective Date, each Liquidating Debtor shall be managed and administered through the Plan Administrator, who shall be appointed the sole officer of each Liquidating Debtor and shall have full authority to administer the provisions of the Plan.  The Plan Administrator, in its discretion, may take such action as permitted by applicable law and each Liquidating Debtor's organizational documents, as such Liquidating Debtor may determine is reasonable and appropriate, including causing: (i) a Liquidating Debtor to be merged into another Liquidating Debtor, or its subsidiary and/or affiliate; (ii) a Liquidating Debtor to be dissolved; (iii) the legal name of a Liquidating Debtor to be changed; or (iv) the closure of a Liquidating Debtor's case on the Effective Date or any time thereafter.  On the Effective Date, all property of the Debtors shall revest in the applicable Liquidating Debtor, free and clear of all Claims, Interests, liens, charges or other encumbrances.

> *(ii)*     All property of the Debtors' Estates, including all Causes of Action, shall be held in the name of the Liquidating Debtors free and clear of all Claims against, and Interests in the Liquidating Debtors, except for the rights to Distribution afforded to the holders of Allowed Claims and Interests under the Plan.

> *(iii)*     From and after the Effective Date, pursuant to the terms and provisions of the Plan, the Liquidating Debtors shall be authorized to:  (i) take all steps and execute all instruments and documents necessary to make Distributions to holders of Allowed Claims and to perform the undertakings under the Plan and/or the Confirmation Order; (ii) comply with the Plan and the obligations hereunder; (iii) employ, retain, or replace professionals to represent them with respect to their responsibilities, including, but not limited to, the Plan Administrator; (iv) if necessary, object to Claims and prosecute such objections; (v) compromise and settle any issue or dispute regarding the amount, validity, priority, treatment, or Allowance of any Claim; (vi) establish, replenish or release reserves, as applicable, if any; (vii) seek a determination of tax liability under section 505 of the Bankruptcy Code, file tax returns and pay taxes, if any, related

Error! Unknown document property name.

to the Debtors; (viii) abandon in any commercially reasonable manner, including abandonment or donation to a charitable organization of their choice, any assets of any of the Debtors if the Liquidating Debtors conclude that they are of no benefit to the Estates or the Liquidating Debtors; (ix) purchase or create and carry all insurance policies and pay all insurance premiums and costs the Liquidating Debtors deem necessary or advisable; and (x) exercise such other powers as may be vested in the Liquidating Debtors pursuant to the Plan or any other Plan Documents or order of the Bankruptcy Court or otherwise act in a manner consistent with the provisions of the Plan which the Liquidating Debtors deem reasonably necessary or desirable with respect to administering the Plan.

### 3. *Plan Administrator*

(i)     Appointment; Duties.  Not less than (7) days prior to the commencement of the Confirmation Hearing and subject to Bankruptcy Court approval, in connection with confirmation of the Plan, the Debtors shall designate the person reasonably acceptable to the Debtors and the Majority Ad Hoc Group who will serve as the Plan Administrator.  On or after the Confirmation Date, but prior to the Effective Date, the Plan Administrator shall assume all of its obligations, powers and authority under the Plan and the Plan Administrator Agreement to: (i) establish bank accounts as may be required to fulfill the Liquidating Debtors' obligations under the Plan; and (ii) exercise such other power and authority as may be set forth in the Confirmation Order.  On the Effective Date, the Plan Administrator shall assume all of its other obligations, powers and authority under the Plan and the Plan Administrator Agreement.

(ii)     Plan Administrator as Fiduciary.  The Plan Administrator shall be a fiduciary of the Liquidating Debtors, shall have such qualifications and experience as are sufficient to enable the Plan Administrator to perform its obligations under the Plan and under the Plan Administrator Agreement, and shall be compensated and reimbursed for expenses as set forth in, and in accordance with, the Plan Administrator Agreement. To the extent necessary, following the Effective Date, the Plan Administrator shall be deemed to be a judicial substitute for the Liquidating Debtors as the party-in-interest in the Chapter 11 Cases, under the Plan or in any judicial proceeding or appeal to which the Debtors are a party, consistent with section 1123(b)(3)(B) of the Bankruptcy Code.  The Plan Administrator shall not be liable for any action it takes or omits to take that it believes in good faith to be authorized or within its rights or powers unless it is ultimately and finally determined by a court of competent jurisdiction that such action or inaction was the result of fraud, gross negligence, breach of fiduciary duty (if any) or willful misconduct.

(iii)     The Plan Administrator Agreement.  The appointment of a Plan Administrator reasonably acceptable to the Debtors and the Majority Ad Hoc Group, pursuant to the Plan Administrator Agreement, shall be deemed to be a valid, binding and enforceable appointment, in accordance with the Plan Administrator Agreement's terms and provisions.  The Plan Administrator Agreement shall be substantially in the form contained in the Plan Supplement.  After the Effective Date, the Plan Administrator Agreement may be amended in accordance with its terms without further order the Bankruptcy Court.

(iv)     Plan Administrator Expenses.  Except as otherwise ordered by the Bankruptcy Court, and subject to the written agreement of the Liquidating Debtors and the

Error! Unknown document property name.

Implementation Memorandum, the amount of any reasonable and documented fees and expenses incurred by the Plan Administrator on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including reasonable attorney and other professional fees and expenses) of the Plan Administrator shall be paid in Cash by the Liquidating Debtors and will not be deducted from Plan Distribution made to holders of Allowed Claims.  The foregoing fees and expenses shall be paid in the ordinary course, upon presentation of invoices to the Liquidating Debtors and without the need for approval by the Bankruptcy Court, as set forth in section 3.2 of the Plan.  In the event that the Plan Administrator and the Liquidating Debtors are unable to resolve a dispute with respect to the payment of the Plan Administrator's fees, costs and expenses, the Plan Administrator may elect to submit any such dispute to the Bankruptcy Court for resolution.

> (*v*)    Resignation, Death, or Removal.  The Plan Administrator may be removed by (i) the Liquidating Debtors at any time prior to the Effective Date to remove the Plan Administrator without cause and (ii) the Bankruptcy Court for cause shown at any time.  In the event of the resignation or removal, liquidation, dissolution, death or incapacity of the Plan Administrator, the Bankruptcy Court shall designate another Person to become a successor Plan Administrator, which shall become fully vested with all of the rights, powers, duties and obligations of its predecessor without further act.

### 4.    Management of the Debtors' Assets

Except as set forth in the Plan, after the Effective Date, all property of the Liquidating Debtors shall be managed and administered by the Plan Administrator.

### 5.    Liquidation of Estates and Distributions of Proceeds

After the Effective Date, all non-Cash assets of the Estates not previously released, disposed of or transferred shall be sold or otherwise liquidated or abandoned as determined to be appropriate by the Plan Administrator.

### 6.    Liquidation of the Debtors

As soon as reasonably practicable after the Distributions have been made to holders of Allowed Claims in accordance with the terms of the Plan, the Liquidating Debtors shall: (a) file their respective certificates of dissolution, together with all other necessary corporate documents, to effect their respective dissolutions under the applicable laws of their respective states of incorporation; and (b) complete and file their respective final federal, state and local tax returns, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of the Debtors or their applicable Estates for any tax incurred during the administration of the Chapter 11 Cases, as determined under applicable tax laws. The filing by the Liquidating Debtors of their respective certificates of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order or rule, including, without limitation, any action by the stockholders or the board of directors or managers of the Liquidating Debtors and expressly without the need to pay any franchise or similar taxes in order to effectuate such dissolution.

Error! Unknown document property name.

**F.      Means for Implementation Generally**

The provisions of this section shall apply regardless of whether the South Texas Sale is consummated on or before the Effective Date.

### 1.      Cancellation of Existing Securities and Agreements

Except for the purpose of evidencing a right to distribution under the Plan, and except as otherwise set forth in the Plan, on the Effective Date all agreements, instruments, and other documents evidencing, related to or connected with any Claim or Interest, other than Intercompany Claims and Intercompany Interests, and any rights of any holder in respect thereof, shall be deemed cancelled, discharged and of no force or effect.  The holders of, or parties to, such cancelled instruments, securities and other documentation will have no rights arising from or relating to such instruments, securities and other documentation or the cancellation thereof, except the rights provided for pursuant to the Plan.  Notwithstanding anything to the contrary in the Plan, (i) the Prepetition Term Loan Agreement and Prepetition Revolving Credit Facility Agreement shall continue in effect solely to the extent necessary to: (a) permit holders of Prepetition Term Loan Claims and the Prepetition Revolving Credit Facility Claims to receive Plan Distributions in accordance with the terms of the Plan; (b) permit the Debtors to make Plan Distributions on account of the Prepetition Term Loan Claims and the Prepetition Revolving Credit Facility Claims; and (c) permit the Prepetition Term Loan Agent and Prepetition Revolving Credit Facility Agent to seek compensation and/or reimbursement of fees and expenses in accordance with the terms of the Plan.  Except as provided pursuant to the Plan, upon the satisfaction of the Prepetition Revolving Credit Facility Claims and the Prepetition Term Loan Claims, the Prepetition Agents and their respective agents, successors and assigns shall be discharged of all of their obligations associated with the Prepetition Revolving Credit Facility and Prepetition Term Loan, as applicable.

### 2.      Boards of Directors

*(i)*      On the Effective Date, the board of directors of each of the Debtors shall consist of those individuals selected by the Debtors, who shall be reasonably acceptable to the Debtors and the Majority Ad Hoc Group, and identified in the Plan Supplement to be filed with the Bankruptcy Court on or before the date of the Confirmation Hearing.

*(ii)*      Unless reappointed pursuant to section 9.2(a) of the Plan, the members of the board of directors of each Debtor prior to the Effective Date shall have no continuing obligations to the Debtors in their capacities as such on and after the Effective Date and each such member shall be deemed to have resigned or shall otherwise cease to be a director of the applicable Debtor on the Effective Date.  Commencing on the Effective Date, each of the directors of each of the Debtors shall serve pursuant to the terms of the applicable organizational documents of such Debtor and may be replaced or removed in accordance therewith, as applicable.

Error! Unknown document property name.

3.	*Corporate Action*

(i)	The Debtors, as applicable, shall serve on the U.S. Trustee quarterly reports of the disbursements made by each Debtor on an entity-by-entity basis until such time as a final decree is entered closing the applicable Chapter 11 Case or the applicable Chapter 11 Case is converted or dismissed, or the Bankruptcy Court orders otherwise.  Any deadline for filing Administrative Expense Claims shall not apply to U.S. Trustee Fees.

(ii)	On the Effective Date, the Amended Constituent Documents and any other applicable amended and restated corporate organizational documents of each of the Debtors shall be deemed authorized in all respects.

(iii)	Any action under the Plan to be taken by or required of the Debtors as applicable, including the adoption or amendment of certificates of incorporation and by-laws, the issuance of securities and instruments, or the selection of officers or directors, shall be authorized and approved in all respects, without any requirement of further action by any of the Debtors', equity holders, holders of partnership interests, sole members, boards of directors or boards of managers, or similar body, as applicable.

(iv)	The Debtors shall be authorized to execute, deliver, file, and record such documents (including the Plan Documents), contracts, instruments, releases and other agreements and take such other action as may be necessary to effectuate and further evidence the terms and conditions of the Plan, without the necessity of any further Bankruptcy Court, corporate, limited liability company, board, member, or shareholder approval or action.  In addition, the selection of the Persons who will serve as the initial directors, officers and managers of the Reorganized Debtors or the Liquidating Debtors, as applicable, as of the Effective Date shall be deemed to have occurred and be effective on and after the Effective Date without any requirement of further action by the board of directors, board of managers, or equity holders of the applicable Reorganized Debtor or Liquidating Debtor.

4.	*Comprehensive Settlement of Claims and Controversies*

Pursuant to Bankruptcy Rule 9019 and in consideration for the Plan Distributions and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith compromise and settlement of all Claims and controversies relating to the rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest or any Plan Distribution on account thereof.  The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that all such compromises or settlements are: (a) in the best interest of the Debtors, the Estates and their respective property and stakeholders; and (b) fair, equitable and reasonable.

5.	*Ad Hoc Lender Group Fee Claim*

The Debtors, on the Effective Date or as soon as reasonably practicable thereafter, shall pay the Ad Hoc Group Lender Fee Claim in full in Cash.

Error! Unknown document property name.

### 6.    Transactions Authorized under Plan

On and after the Effective Date, the Debtors shall be authorized to take such actions as may necessary or appropriate to implement the transactions contemplated by the Plan and/or the Implementation Memorandum.

### 7.    Approval of Plan Documents

The solicitation of votes on the Plan shall be deemed a solicitation for the approval of the Plan Documents and all transactions contemplated hereunder. Entry of the Confirmation Order shall constitute approval of the Plan Documents and such transactions. On the Effective Date, each of the Debtors shall be authorized to enter into, file, execute and/or deliver each of the Plan Documents and any other agreement or instrument issued in connection with any Plan Document without the necessity of any further corporate, board or shareholder action.

## G.    Provisions Governing Distributions

### 1.    Distributions

The Disbursing Agent shall make all Plan Distributions to the applicable holders of Allowed Claims in accordance with the terms of the Plan; provided, however, that all Plan Consideration distributable to (i) the Prepetition Revolving Credit Facility Lenders on account of Prepetition Revolving Credit Facility Claims and (ii) the Prepetition Term Loan Lenders on account of the Prepetition Term Loan Claims shall be made directly to the applicable Prepetition Revolving Credit Facility Lenders and/or Prepetition Term Loan Lenders.

### 2.    No Post-petition Interest on Claims

Unless otherwise specifically provided for in the Plan or Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on such Claim on or after the Petition Date.

### 3.    Date of Distributions

Unless otherwise provided in the Plan, any Plan Distributions and deliveries to be made hereunder shall be made on the Effective Date or as soon as reasonably practicable thereafter; provided, that the Debtors may utilize periodic Distribution Dates to the extent that use of a periodic Distribution Date does not delay payment of the Allowed Claim more than thirty (30) days.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

Error! Unknown document property name.

### 4. *Distribution Record Date*

As of the close of business on the Distribution Record Date, the various lists of holders of Claims in each of the Classes, as maintained by the Debtors, their agents, or, if applicable, the Plan Administrator, shall be deemed closed and there shall be no further changes in the record holders of any of the Claims after the Distribution Record Date.  Neither the Debtors nor the Disbursing Agent shall have any obligation to recognize any transfer of Claims occurring after the close of business on the Distribution Record Date.  Additionally, with respect to payment of any Cure Amounts or any Cure Disputes in connection with the assumption and/or assignment of the Debtors' executory contracts and unexpired leases, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease, even if such non-Debtor party has sold, assigned or otherwise transferred its Claim for a Cure Amount.

### 5. *Disbursing Agent*

#### *(i)* Powers of Disbursing Agent.

The Disbursing Agent shall be empowered to: (i) effectuate all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (ii) make all applicable Plan Distributions or payments contemplated hereby; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court (including any order issued after the Effective Date), pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

#### *(ii)* Expenses Incurred by the Disbursing Agent on or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, and subject to the written agreement of the Debtors, the amount of any reasonable and documented fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including reasonable attorney and other professional fees and expenses) of the Disbursing Agent shall be paid in Cash by the Debtors and will not be deducted from Plan Distributions made to holders of Allowed Claims by the Disbursing Agent.  The foregoing fees and expenses shall be paid in the ordinary course, upon presentation of invoices to the Debtors.  If the Disbursing Agent is an independent third party designated to serve in such capacity, the Plan Administrator shall be permitted to provide to such Disbursing Agent from the Wind-Down Account, without further Bankruptcy Court approval, reasonable compensation for distribution services rendered pursuant to the Plan and reimbursement of reasonable, actual and documented out-of-pocket expenses incurred in providing post-petition services directly related to distributions pursuant to the Plan.

In the event that the Disbursing Agent and the Debtors are unable to resolve a dispute with respect to the payment of the Disbursing Agent's fees, costs and expenses, the Disbursing Agent may elect to submit any such dispute to the Bankruptcy Court for resolution.

#### *(iii)* Bond.

Error! Unknown document property name.

The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court and, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Debtors.  Furthermore, any such entity required to give a bond shall notify the Bankruptcy Court and the U.S. Trustee in writing before terminating any such bond that is obtained.

### *(iv)* Cooperation with Disbursing Agent.

The Debtors shall use all commercially reasonable efforts to provide the Disbursing Agent with the amount of Claims and the identity and addresses of holders of Claims, in each case, as set forth in the Debtors' books and records.  The Debtors will cooperate in good faith with the Disbursing Agent to comply with the withholding and reporting requirements outlined in section 10.17 of the Plan.

### 6.    *Delivery of Distribution*

Subject to the provisions contained in Article X of the Plan, the Disbursing Agent will issue, or cause to be issued, and authenticate, as applicable, all Plan Consideration, and subject to Bankruptcy Rule 9010 and except as provided in section 10.3 of the Plan, make all Plan Distributions or payments to any holder of an Allowed Claim as and when required by the Plan at: (a) the address of such holder on the books and records of the Debtors or their agents; or (b) the address in any written notice of address change delivered to the Debtors or the Disbursing Agent, including any addresses included on any filed proofs of Claim or transfers of Claim filed with the Bankruptcy Court.  In the event that any Plan Distribution to any holder is returned as undeliverable, no distribution or payment to such holder shall be made unless and until the Disbursing Agent has been notified of the then current address of such holder, at which time or as soon as reasonably practicable thereafter such Plan Distribution shall be made to such holder without interest; provided, however, such Plan Distributions or payments shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of the later of 180 days from: (i) the Effective Date; and (ii) the first Distribution Date after such holder's Claim is first Allowed.

### 7.    *Unclaimed Property*

*(i)*    In the event of that the South Texas Sale is consummated on or prior to the Effective Date, ninety (90) days from the later of: (i) the Effective Date, and (ii) the date that a Claim is first Allowed, all unclaimed property, wherever located, or interests in property distributable hereunder on account of such Claim shall revert to the Debtors or the successors or assigns of the Debtors, and any claim or right of the holder of such Claim to such property, wherever located, or interest in property shall be discharged and forever barred.  The Debtors, the Disbursing Agent and the Plan Administrator, if applicable, shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtors' books and records, and the proofs of Claim filed against the Debtors, as reflected on the claims register maintained by the Claims Agent.

Error! Unknown document property name.

(ii)    In the event the South Texas Sale is not consummated on or prior to the Effective Date, ninety (90) days from the later of: (i) the Effective Date, and (ii) the date that a Claim is first Allowed, all unclaimed property, wherever located, or interests in property distributable hereunder on account of such Claim shall be distributed as Plan Consideration pursuant to the terms of the Plan, including in accordance with the allocations set forth in the DIP Credit Agreement, and any claim or right of the holder of such Claim to such property, wherever located, or interest in property shall be discharged and forever barred.

### 8.    Unclaimed New Common Stock

Any Distribution of New Common Stock under the Plan on account of an Allowed Claim that is unclaimed after ninety (90) days after it has been delivered (or attempted to be delivered) shall be deemed forfeited and such shares of New Common Stock shall be cancelled notwithstanding any state or other escheat or similar laws to the contrary, and the entitlement by the holder of such unclaimed Allowed Claim to such Distribution or any subsequent Distribution on account of such Allowed Claim shall be extinguished and forever barred.

### 9.    Satisfaction of Claims

Unless otherwise specifically provided in the Plan, any Plan Distributions and deliveries to be made on account of Allowed Claims hereunder shall be in complete settlement, satisfaction and discharge of such Allowed Claims.

### 10.    Manner of Payment Under Plan

Except as specifically provided in the Plan, at the option of the Debtors, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

### 11.    De Minimis Cash Distributions

The Debtors and the Disbursing Agent shall have no obligation to make a distribution that is less than $100.00 in Cash.

### 12.    Fractional New Common Stock

Notwithstanding any other provision in the Plan to the contrary, no fractional interests of New Common Stock shall be issued or distributed pursuant to the Plan. Whenever any Distribution of a fraction of a share of New Common Stock would otherwise be required under the Plan, the actual Distribution made shall reflect a rounding of such fraction to the nearest whole share (up or down), with half shares or less being rounded down and fractions in excess of a half of a share being rounded up.  If two or more Holders are entitled to equal fractional entitlements and the number of Holders so entitled exceeds the number of whole shares, as the case may be, which remain to be allocated, the Debtors shall allocate the remaining whole shares to such Holders by random lot or such other impartial method as the Debtors deem fair, in the Debtors' sole discretion.  Upon the allocation of all of the whole New Common Stock authorized under the Plan, all remaining fractional portions of the entitlements shall be canceled and shall be of no further force and effect.

Error! Unknown document property name.

### 13.      Distributions on Account of Allowed Claims Only

Notwithstanding anything in the Plan to the contrary, no Plan Distribution shall be made on account of a Claim until such Claim becomes an Allowed Claim in its entirety.

### 14.      No Distribution in Excess of Amount of Allowed Claim

Notwithstanding anything to the contrary in the Plan, no holder of an Allowed Claim shall, on account of such Allowed Claim, receive a Plan Distribution of a value in excess of the Allowed amount of such Claim.

### 15.      Exemption from Securities Laws

The issuance of and the distribution of the New Common Stock, shall be exempt from registration under the Securities Act and any other applicable securities laws pursuant to section 1145 of the Bankruptcy Code, to the maximum extent permitted thereunder.  The New Common Stock may be resold by the holders thereof without restriction, except to the extent that any such holder is deemed to be an "underwriter" as defined in section 1145(b)(1) of the Bankruptcy Code.  The availability of the exemption under section 1145 of the Bankruptcy Code and/or any other applicable securities laws shall not be a condition to occurrence of the Effective Date of the Plan.

### 16.      Setoffs and Recoupments

Except as expressly provided in the Plan, each Debtor may, but shall not be required to, pursuant to sections 553 and 558 of the Bankruptcy Code or applicable non-bankruptcy law, setoff and/or recoup against any Allowed Claim and any Plan Distributions to be made on account of any Allowed Claim, any and all claims, rights and Causes of Action of any nature that such Debtor may hold against the holder of such Allowed Claim pursuant to the Bankruptcy Code or applicable non-bankruptcy law; provided, however, that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver, abandonment or release by a Debtor or its successor of any and all claims, rights and Causes of Action that such Debtor or its successor may possess against the applicable holder; provided further, that, for the avoidance of doubt, the Debtors may not setoff and/or recoup any Allowed Claim, right, or Cause of Action that the Debtor may hold against Allowed DIP Claims, Allowed Prepetition Term Loan Claims, or Allowed Prepetition Revolving Credit Facility Claims.

### 17.      Withholding and Reporting Requirements

In connection with the Plan and all Plan Distributions hereunder, the Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all Plan Distributions hereunder shall be subject to any such withholding and reporting requirements.  The Debtors shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of any Plan Distribution to generate sufficient funds to pay applicable withholding taxes or establishing any other mechanisms the Debtors or the Disbursing Agent believe are reasonable and appropriate, including requiring a holder of a Claim to submit appropriate tax and withholding certifications.  Notwithstanding any other provision of

Error! Unknown document property name.

the Plan: (a) each holder of an Allowed Claim that is to receive a Plan Distribution under the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding and other tax obligations on account of such distribution; and (b) no Plan Distributions shall be required to be made to or on behalf of such holder pursuant to the Plan unless and until such holder has made arrangements satisfactory to the Debtors for the payment and satisfaction of such tax obligations or has, to the Debtors' satisfaction, established an exemption therefrom.

## H.    Procedures for Resolving Claims

### 1.    Objections to Claims

Other than with respect to Professional Fee Claims (or as otherwise expressly provided in any order of the Bankruptcy Court), only the Debtors or the Plan Administrator, as applicable, shall be entitled to object to Claims after the Effective Date.  Any objections to those Claims (other than Administrative Expense Claims) shall be served and filed on or before the later of: (a) the Claims Objection Deadline and (b) such other date as may be fixed by the Bankruptcy Court, whether fixed before or after the date specified in clause (a) hereof (for the avoidance of doubt, this objection deadline may be extended one or more times by the Bankruptcy Court).  Any Claims filed after the Bar Date or Administrative Bar Date, as applicable, shall be deemed Disallowed and expunged in their entirety without further order of the Bankruptcy Court or any action being required on the part of the Debtors, as applicable, unless the Person wishing to file such untimely Claim has received the Bankruptcy Court's authorization to do so. Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the claimant if the objecting party effects service in any of the following manners: (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004; (b) by first class mail, postage prepaid, on the signatory on the proof of claim as well as all other representatives identified in the proof of claim or any attachment thereto; or (c) if counsel has agreed to or is otherwise deemed to accept service, by first class mail, postage prepaid, on any counsel that has appeared on the claimant's behalf in the Chapter 11 Cases (so long as such appearance has not been subsequently withdrawn).  From and after the Effective Date, the Debtors, in their sole discretion, shall have exclusive authority to settle or compromise any Disputed Claim without approval of the Bankruptcy Court.

### 2.    Amendment to Claims

From and after the Confirmation Date, no proof of Claim may be amended to increase or assert additional claims not reflected in a previously timely filed Claim (or Claim scheduled on the applicable Debtor's Schedules, unless superseded by a filed Claim), and any such Claim shall be deemed Disallowed and expunged in its entirety without further order of the Bankruptcy Court or any action being required on the part of the Debtors, unless the claimant has obtained the Bankruptcy Court's prior approval to file such amended or increased Claim.

### 3.    Disputed Claims

Disputed Claims shall not be entitled to any Plan Distributions unless and until they become Allowed Claims.

Error! Unknown document property name.

### 4. *Estimation of Claims*

The Debtors may request that the Bankruptcy Court enter an Estimation Order with respect to any Claim, pursuant to section 502(c) of the Bankruptcy Code, for purposes of determining the Allowed amount of such Claim regardless of whether any Person has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time (including during the pendency of any appeal with respect to the allowance or disallowance of such Claims). In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim for allowance or distribution purposes, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the objecting party may elect to pursue any supplemental proceedings to object to any ultimate allowance of such Claim. All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, resolved or withdrawn by any mechanism approved by the Bankruptcy Court.

### 5. *Reserves*

For purposes of calculating and making Plan Distributions, the Debtors shall be entitled to estimate, in consultation with the Ad Hoc Group, in good faith and with due regard to litigation risks associated with Disputed Claims, the maximum dollar amount of Allowed and Disputed Claims, inclusive of contingent and/or unliquidated Claims in a particular Class. The Debtors also shall be entitled to seek one or more Estimation Orders from the Court for such purposes, regardless of whether the Debtors have previously objected to such Claim or whether the Court has ruled on any such objection, and the Court shall retain jurisdiction to estimate any Claim for purposes of determining the Allowed amount of such Claim at any time. Appropriate Disputed Claims reserves shall be established for each category of Claims as to which estimates are utilized or sought. Unless otherwise expressly set forth in the Confirmation Order, the Debtors shall not be obligated to physically segregate and maintain separate accounts for reserves. Accordingly, reserves may be merely bookkeeping entries or accounting methodologies, which may be revised from time to time, as appropriate.

### 6. *Expenses Incurred on or After the Effective Date*

Except as otherwise ordered by the Bankruptcy Court, and subject to the written agreement of the Debtors, the amount of any reasonable fees and expenses incurred by any Professional Person or the Claims Agent on or after the Effective Date in connection with implementation of the Plan, including reconciliation of, objection to, and settlement of Claims, shall be paid in Cash by the Debtors.

Error! Unknown document property name.

## I.    Executory Contracts and Unexpired Leases

### 1.    General Treatment

As of and subject to the occurrence of the Effective Date and the payment of any applicable Cure Amount, all executory contracts and unexpired leases of the Debtors shall be deemed (a) in the event the South Texas Sale is consummated on or before the Effective Date assumed or assumed and assigned, and (b) if the South Texas Sale is not consummated on or before the Effective Date, rejected, except that: (a) any executory contracts and unexpired leases that previously have been assumed, assumed and assigned, or rejected pursuant to a Final Order of the Bankruptcy Court  (including, without limitation, in connection with any Sale) shall be treated as provided in such Final Order; (b) any executory contracts and unexpired leases listed on the Schedule of Rejected Contracts and Leases or Schedule of Assumed Contracts and Leases shall, as applicable, be deemed assumed, assumed and assigned, or rejected as of the Effective Date; (c) all executory contracts and unexpired leases that are the subject of a separate motion to assume or reject under section 365 of the Bankruptcy Code pending on the Effective Date shall be treated as provided for in the Final Order resolving such motion; and (d) executory contracts and unexpired leases related to the D&O Liability Insurance Policies shall not be rejected; provided, that any executory contracts or unexpired leases that were in effect on the Petition Date and are rejected pursuant to a Final Order of the Bankruptcy Court, listed on the Schedule of Rejected Contracts and Leases or are rejected through a separate motion to reject under section 365 of the Bankruptcy Code shall be deemed terminated upon rejection, provided that rejection of any executory contract or unexpired lease pursuant to the Plan or otherwise will not constitute a termination of obligations owed to the Debtors under such contract or lease that survive breach under applicable law.  Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions, assumptions and assignments and rejections described in section 12.1 of the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Each executory contract and unexpired lease assumed pursuant to section 12.1 of the Plan shall revest in and be fully enforceable by the applicable Debtors in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable federal law. Nothing contained in the Plan or the listing of a document on the Schedule of Rejected Contracts and Leases, Schedule of Assumed Contracts and Leases, any Cure Notice, or the Proposed Assumption and Assignment Notice shall constitute an admission by the Debtors that such document is an executory contract or an unexpired lease or that any Debtor or its successors and assigns has any liability thereunder.

### 2.    Claims Based on Rejection of Executory Contracts or Unexpired Leases

Except as otherwise explicitly set forth in the Plan, all Claims arising from the rejection of executory contracts or unexpired leases, if evidenced by a timely filed proof of claim, will be treated as General Unsecured Claims.  All such Claims shall be discharged as of the Effective Date, and shall not be enforceable against the Debtors, the Estates or their respective properties or interests in property, the Disbursing Agent or, if applicable, the Plan Administrator.  In the event that the rejection of an executory contract or unexpired lease by any of the Debtors pursuant to the Plan results in damages to the other party or parties to such contract or lease, a Claim for such damages, if not evidenced by a timely filed proof of claim, shall be forever barred

Error! Unknown document property name.

and shall not be enforceable against the Debtors or their respective properties or interests in property as agents, successors or assigns, unless a proof of claim is filed with the Bankruptcy Court and served upon counsel for the Debtors on or before the date that is thirty (30) days after the Effective Date of such rejection (which may be the Effective Date, the date on which the Debtors reject the applicable contract or lease as provided in section 12.1 of the Plan, or pursuant to an order of the Bankruptcy Court).

### 3. *Cure of Defaults for Assumed or Assumed and Assigned Executory Contracts and Unexpired Leases*

(i)     Except to the extent that less favorable treatment has been agreed to by the non-Debtor party or parties to each such executory contract or unexpired lease to be assumed or assumed and assigned pursuant to the Plan, any monetary defaults arising under such executory contract or unexpired lease shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the appropriate amount (the "*Cure Amount*") in full in Cash on the later of thirty (30) days after: (i) the Effective Date; or (ii) the date on which any Cure Dispute relating to such Cure Amount has been resolved (either consensually or through judicial decision).

(ii)     With respect to any executory contract or unexpired lease to be assumed or assumed and assigned pursuant to section 12.1 of the Plan, the Debtors shall (i) with respect to any Sale(s), in accordance with, and subject to, the terms and conditions set forth in the Bidding Procedures Order and the Cure Notices, file a Proposed Assumption and Assignment Notice, which shall, among other things, include a schedule of the Proposed Assumed Contracts which the Debtors propose to assume and assign to the Successful Bidder(s) with respect to such Sales, and the Cure Amount with respect thereto and/or (ii) no later than twenty-one (21) calendar days prior to the commencement of the Confirmation Hearing, file a schedule (a "**Cure Schedule**") setting forth the Cure Amount, if any, for each executory contract or unexpired lease to be assumed by the Debtors (and not assigned), that was not listed on any Cure Notice.

Any applicable counterparty may object to the assumption and assignment of an executory contract of or unexpired lease listed as a Proposed Assumed Contract in the Proposed Assumption and Assignment Notice with respect to (i) the ability of a Successful Bidder to provide adequate assurance of future performance or (ii) the Cure Amount listed therein, to the extent such Cure Amount has been modified from a previously stated amount or is with respect to an executory contract or unexpired lease listed as a Proposed Assumed Contract that was not listed previously on any Cure Notice (an "*Assumption and Assignment Objection*").  Any applicable counterparty listed on the Cure Schedule (and not listed on any Cure Notice) may object to the Cure Amount set forth therein (a "*Cure Objection*").  An Assumption and Assignment Objection or Cure Objection must (i) be in writing, (ii) comply with the Bankruptcy Code, Bankruptcy Rules, and Local Rules, (c) state, with specificity, the legal and factual bases thereof (including, if applicable, the Cure Amount that the Counterparty believes is required to cure defaults under the relevant contract or lease), and (d) by no later than 14 days prior to the Confirmation Hearing (the "*Contracts Objection Deadline*") (i) be filed with the Court and (ii) be served on the Objection Notice Parties.  Any party that fails to object to the applicable Cure Amount listed in the Proposed Assumption and Assignment Notice or Cure Schedule (as applicable) or the ability of the Successful Bidder(s) to provide adequate assurance of future performance (as applicable), by the Contracts Objection Deadline, shall be deemed to have

Error! Unknown document property name.

consented to the assumption or assumption and assignment of such executory contract or unexpired lease (as applicable), including the outstanding Cure Amount (including a Cure Amount of $0.00), and shall be forever barred from asserting any objection or claim against the Debtors, the Successful Bidder(s), or the property of any such parties, relating to the assumption or assumption and assignment (as applicable) of such executory contract or unexpired lease, under section 365(b)(1) of the Bankruptcy Code or otherwise, including asserting additional Cure Amounts with respect to such contract or lease.  The proposed Cure Amount for any executory contract or unexpired lease not listed in the Proposed Assumption and Assignment Notice or Cure Schedule shall be $0.  For the avoidance of doubt, to the extent the applicable counterparty to any contract or lease has previously received a Cure Notice from the Debtors, and failed to object to the Cure Amount by the deadline set forth therein, such Cure Amount shall be final in all cases (unless subsequently modified by the Debtors).

      *(iii)*     In the event of a dispute (each, a "***Cure Dispute***") regarding: (i) the Cure Amount; (ii) the ability of the applicable Debtor to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or assumed and assigned; or (iii) any other matter pertaining to the proposed assumption or assumption and assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving such Cure Dispute and approving the assumption or assumption and assignment.  To the extent a Cure Dispute relates solely to the Cure Amount, the applicable Debtor may assume and/or assume and assign the applicable contract or lease prior to the resolution of the Cure Dispute provided, that, such Debtor reserves Cash in an amount sufficient to pay the full amount asserted as the required cure payment by the non-Debtor party to such contract or lease (or such smaller amount as may be fixed or estimated by the Bankruptcy Court).  To the extent the Cure Dispute is resolved or determined against the applicable Debtor such Debtor may reject the applicable executory contract or unexpired lease after such determination, and the counterparty may thereafter file a proof of claim in the manner set forth in section 3.2 of the Plan.

## 4. *Effect of Confirmation Order on Assumption, Assumption and Assignment, and Rejection*

Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute entry of an order by the Bankruptcy Court pursuant to sections 365(a) and 1123(b) of the Bankruptcy Code approving the assumptions, assumptions and assignments and rejections described in Article XII of the Plan and determining that: (a) with respect to such rejections, such rejected executory contracts and unexpired leases are burdensome and that the rejection therein is in the best interests of the Estates; (b) with respect to such assumptions, to the extent necessary, that the applicable Debtor has (i) cured, or provided adequate assurance that the applicable Debtor will promptly cure, any default in accordance with section 365(b)(1)(A) of the Bankruptcy Code, (ii) compensated or provided adequate assurance that it or its affiliate will promptly compensate the counterparty for any actual pecuniary loss to such party resulting from such default, and (iii) provided adequate assurance of future performance under such executory contract or unexpired lease; and (c) with respect to any assignment, to the extent necessary, that the applicable Debtor or the proposed assignee has (i) cured, or provided adequate assurance that it or its affiliate will promptly cure, any default in accordance with section 365(b)(1)(A) of the Bankruptcy Code, (ii) compensated or provided

Error! Unknown document property name.

adequate assurance that the applicable Debtor or the proposed assignee will promptly compensate the counterparty for any actual pecuniary loss to such party resulting from such default, and (iii) that "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) by the assignee has been demonstrated and no further adequate assurance is required. Assumption of any executory contract or unexpired lease and satisfaction of the Cure Amounts shall result in the full discharge, release and satisfaction of any claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the date such executory contract or unexpired lease is assumed.  Each executory contract and unexpired lease assumed pursuant to Article XII of the Plan shall revest in and be fully enforceable by the applicable Debtor in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable federal law.  To the maximum extent permitted by law, to the extent any provision in any executory contract or unexpired lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such executory contract or unexpired lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such executory contract or unexpired lease or to exercise any other default-related rights with respect thereto. Any party that fails to timely file a Cure Dispute on the basis that consent to assume or assume and assign the applicable executory contract is a condition to such assumption or assumption and assignment, shall be deemed to have consented to the assumption or assumption and assignment, as applicable, of such contract.

### 5.    *Compensation and Benefit Programs*

Except as otherwise expressly provided hereunder, in a prior order of the Bankruptcy Court or to the extent subject to a motion pending before the Bankruptcy Court as of the Effective Date, all employment and severance policies (that were in place as of the Petition Date and relate to employees whose employment will continue with the Debtors following the occurrence of the Effective Date), and all compensation and benefit plans, policies, and programs of the Debtors applicable to their respective employees, retirees and non-employee directors including all savings plans, unfunded retirement plans, healthcare plans, disability plans, severance benefit plans, retention plans, incentive plans, and life, accidental death and dismemberment insurance plans are treated as executory contracts under the Plan and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code.  Each of the Debtors may, prior to the Effective Date, enter into employment agreements with employees that become effective on or prior to the Effective Date and survive consummation of the Plan.  Any such agreements (or a summary of the material terms thereof) shall be in form and substance reasonably acceptable to the Debtors and the Majority Ad Hoc Group and be included in the Plan Supplement or otherwise filed with the Bankruptcy Court on or before the date of the Confirmation Hearing.

Error! Unknown document property name.

**6.**  *Assumption of Directors and Officers Insurance Policies*

To the extent that the D&O Liability Insurance Policies issued to, or entered into by, the Debtors prior to the Petition Date constitute executory contracts, notwithstanding anything in the Plan to the contrary, the Debtors shall be deemed to have assumed all of the Debtors' unexpired D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan shall not discharge, impair or otherwise modify any advancement, indemnity or other obligations of the D&O Liability Insurance Policies.

In addition, after the Effective Date, none of the Debtors shall terminate or otherwise reduce the coverage under any of the D&O Liability Insurance Policies with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled from the applicable insurers to the full benefits of any such policy for the full term of such policy regardless of whether such directors and officers remain in such positions after the Effective Date.

On or before the Effective Date, the Debtors shall purchase and maintain directors, officers and employee liability tail coverage for the six year period following the Effective Date on terms no less favorable than the Debtors' existing director, officer and employee coverage and with an aggregate limit of liability upon the Effective Date of no less than the aggregate limit of liability under the existing director, officer and employee coverage upon placement.  From and after the Effective Date, reasonable directors and officers insurance policies shall remain in place in the ordinary course.

**7.**  *Assumption of Certain Indemnification Obligations*

Each Indemnification Obligation to a current or former director, officer, manager or employee who was employed by any of the Debtors in such capacity on or prior to January 1, 2019 (including, for the avoidance of doubt, the members of the board of directors, board of managers or equivalent body of each Debtor at any time) shall be deemed assumed effective as of the Effective Date.  Each Indemnification Obligation that is deemed assumed pursuant to the Plan shall (a) remain in full force and effect, (b) not be modified, reduced, discharged, impaired or otherwise affected in any way, (c) be deemed and treated as an executory contract pursuant to sections 365 and 1123 of the Bankruptcy Code regardless of whether or not proofs of claim have been filed with respect to such obligations and (d) survive Unimpaired and unaffected irrespective of whether such indemnification is owed for an act or event occurring before, on or after the Petition Date.

Any obligations of the Debtors (whether pursuant to their corporate charters, bylaws, certificates of incorporation, other organizational documents, board resolutions, indemnification agreements, employment contracts, policy of providing employee indemnification, applicable state law, specific agreement in respect of any claims, demands, suits, causes of action or proceedings against such Persons or agreements, including amendments, or otherwise) entered into at any time prior to the Effective Date, to indemnify, reimburse or limit the liability of the current and

Error! Unknown document property name.

former directors, officers, managers, employees, attorneys, accountants, investment bankers and other professionals of the Debtors, as applicable, in each case, based upon any act or omission related to such Persons' service with, for or on behalf of the Debtors prior to the Effective Date with respect to all present and future actions, suits and proceedings relating to the Debtors shall survive the Confirmation Order and, except as set forth in the Plan, remain unaffected thereby, and shall not be discharged, irrespective of whether such defense, indemnification, reimbursement or limitation of liability accrued or is owed in connection with an occurrence before or after the Petition Date; provided, that all obligations under section 12.7 of the Plan shall be limited solely to available insurance coverage and neither the Debtors nor the Plan Administrator nor any of their assets shall be liable for any such obligations.  Any Claim based on the Debtors' obligations set forth in section 12.7 of the Plan shall not be a Disputed Claim or subject to any objection in either case by reason of section 502(e)(1)(B) of the Bankruptcy Code. This provision for indemnification obligations shall not apply to or cover any Causes of Action against a Person that result in a Final Order determining that such Person seeking indemnification is liable for fraud, willful misconduct, gross negligence, bad faith, self-dealing or breach of the duty of loyalty.  For the avoidance of doubt, all obligations of the Debtors to indemnify, defend, reimburse, exculpate, advance fees and expenses to, or limit the liability of former directors, officers or employees who were not directors, officers or employees of any of the Debtors at any time on or after January 1, 2019, against any Causes of Action, shall be classified and treated as General Unsecured Claims and shall be discharged on the Effective Date.

## J.      Conditions Precedent to Consummation of the Plan

### 1.      Conditions Precedent to the Effective Date

The occurrence of the Effective Date is subject to:

(i)      the Disclosure Statement Order, in form and substance reasonably acceptable to the Debtors and the Majority Ad Hoc Group, having been entered by the Bankruptcy Court and remaining in full force and effect;

(ii)      the Confirmation Order, in form and substance reasonably acceptable to the Debtors and the Majority Ad Hoc Group, having become a Final Order and remaining in full force and effect;

(iii)      the Plan Documents, including the Plan Supplement, in form and substance reasonably acceptable to the Debtors and the Majority Ad Hoc Group, being filed with the Bankruptcy Court, executed and delivered, and any conditions (other than the occurrence of the Effective Date or certification by a Debtor that the Effective Date has occurred) contained therein having been satisfied or waived in accordance therewith;

(iv)      a chapter 11 trustee, a responsible officer, or an examiner with enlarged powers relating to the operation of the businesses of any of the Debtors (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) not having been appointed in any of the Chapter 11 Cases;

Error! Unknown document property name.

(*v*)    all material governmental, regulatory and third party approvals, authorizations, certifications, rulings, no-action letters, opinions, waivers and/or consents required in connection with the Plan, if any, having been obtained and remaining in full force and effect, and there existing no claim, action, suit, investigation, litigation or proceeding, pending or threatened in any court or before any arbitrator or governmental instrumentality, which would prohibit the consummation of the Plan;

(*vi*)    the Amended Constituent Documents, in form and substance reasonably acceptable to the Debtors and the Majority Ad Hoc Group, shall have been filed with the applicable authorities of the relevant jurisdictions of incorporation and shall have become effective in accordance with such jurisdictions' corporation laws;

(*vii*)    in the event the South Texas Sale is not consummated on or before the Effective Date, the Exit Revolving Credit Facility Agreement and Exit Term Loan Agreement having been consummated, and being in full force and effect;

(*viii*)    all fees and expenses incurred as of the Effective Date by the Prepetition Term Loan Agent, the Prepetition Revolving Credit Facility Agent, the Prepetition Term Loan Lenders and the Prepetition Revolving Credit Facility Lenders that are provided for under the Final DIP Order, other financing or cash collateral order approved by the Bankruptcy Court or the Plan, having been paid in full in Cash by the Debtors; provided, that, payment of any such amounts incurred by such parties as of the Effective Date but not invoiced to the Debtors shall not be a condition precedent to the effectiveness of the Plan and shall be payable by the Debtors, after receipt by the Debtors of one or more invoices therefor (redacted as appropriate to preserve privilege);

(*ix*)    The Wind-Down Account has been funded in full in cash if the South Texas Sale has been consummated; and

(*x*)    the Plan Administrator Agreement shall have been executed by the parties thereto, and the Plan Administrator shall have been appointed and assumed its rights and responsibilities under the Plan and the Plan Administrator Agreement, as applicable, if the South Texas Sale has been consummated.

## 2.    *Satisfaction and Waiver of Conditions Precedent*

Except as otherwise provided in the Plan, any actions taken on the Effective Date shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.  Any of the conditions set forth in section 13.1 of the Plan may be waived in whole or in part, if reasonably acceptable to the Debtors and the Majority Ad Hoc Group, without notice and a hearing, and the Debtors' benefits under any "mootness" doctrine shall be unaffected by any provision of the Plan.  The failure to satisfy or waive any condition may be asserted by the Debtors regardless of the circumstances giving rise to the failure of such condition to be satisfied (including any act, action, failure to act or inaction by the Debtors).  The failure of the Debtors to assert the non-satisfaction of any such conditions shall not be deemed a waiver of any other rights hereunder, and each such right shall be deemed an

Error! Unknown document property name.

ongoing right that may be asserted or waived (as set forth in the Plan) at any time or from time to time.

### 3.    Effect of Failure of Conditions

If all of the conditions to effectiveness have not been satisfied (as provided in Section 13.1 of the Plan) or duly waived (as provided in Section 13.2 of the Plan) and the Effective Date has not occurred on or before the first Business Day that is more than 30 days after the Confirmation Date, or by such later date as set forth by the Debtors in a notice filed with the Bankruptcy Court prior to the expiration of such period, then, if reasonably acceptable to the Debtors and the Majority Ad Hoc Group, the Debtors may file a motion to vacate the Confirmation Order.  Notwithstanding the filing of such a motion, the Confirmation Order shall not be vacated if all of the conditions to consummation set forth in section 13.1 of the Plan are either satisfied or duly waived before the Bankruptcy Court enters an order granting the relief requested in such motion.  If the Confirmation Order is vacated pursuant to section 13.3 of the Plan, the Plan shall be null and void in all respects, the Confirmation Order shall be of no further force or effect, no Plan Distributions shall be made, the Debtors and all holders of Claims and Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, and upon such occurrence, nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims against or Interests in the Debtors; (b) prejudice in any manner the rights of the holder of any Claim against or Interest in the Debtors; or (c) constitute an admission, acknowledgment, offer or undertaking by any Debtor or any other Person with respect to any matter set forth in the Plan.


## K.    Effect of Confirmation

### 1.    Binding Effect

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against, or Interest in, the Debtors and inure to the benefit of and be binding on such holder's respective successors and assigns, whether or not the Claim or Interest of such holder is impaired under the Plan and whether or not such holder has accepted the Plan.

### 2.    Discharge of Claims Against and Interests in the Debtors

If the South Texas Sale is not consummated on or prior to the Effective Date, then upon the Effective Date and in consideration of the Plan Distributions, except as otherwise provided in the Plan or in the Confirmation Order, each Person that is a holder (as well as any trustees and agents for or on behalf of such Person) of a Claim or Interest shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights and liabilities that arose prior to the Effective Date.  Except as otherwise provided in the Plan, upon the Effective Date, all such holders of Claims and Interests shall be forever precluded and enjoined, pursuant to

Error! Unknown document property name.

sections 105, 524, 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in any Debtor or any property, wherever located, of the Estates.

### 3.   *Term of Pre-Confirmation Injunctions or Stays*

Unless otherwise provided in the Plan, all injunctions or stays provided in the Chapter 11 Cases arising prior to the Confirmation Date in accordance with sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

### 4.   *Injunction Against Interference with Plan*

Upon the entry of the Confirmation Order, all holders of Claims and Interests and other Persons, along with their respective present or former affiliates, employees, agents, officers, directors, or principals, shall be enjoined from taking any actions, whether in the United States or elsewhere, to interfere with the implementation or consummation of the Plan.  Moreover, Bankruptcy Code section 1141(c) provides, among other things, that the property dealt with by the Plan is free and clear of all Claims and Interests.  As such, to the fullest extent permissible under applicable law, no Person holding a Claim or Interest may receive any payment from, or seek recourse against, any assets that are to be distributed under the Plan other than assets required to be distributed to that Person under the Plan.  As of the Confirmation Date, to the fullest extent permissible under applicable law, all Persons are precluded and barred from asserting against any property to be distributed under the Plan any Claims, rights, Causes of Action, liabilities, Interests, or other action or remedy based on any act, omission, transaction, or other activity that occurred before the Confirmation Date except as expressly provided in the Plan or the Confirmation Order.

### 5.   *Injunction*

**(i)   Except as otherwise specifically provided in the Plan or the Confirmation Order, as of the Confirmation Date, but subject to the occurrence of the Effective Date, all Persons or Entities who have held, hold or may hold Claims against and/or Interests in the Debtors or the Estates, and all other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, representatives and affiliates are, with respect to any such Claims or Interests, permanently enjoined after the Confirmation Date from: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, their Estates or any of their property, wherever located, or any direct or indirect transferee of any property, wherever located, of, or direct or indirect successor in interest to, any of the foregoing Persons or any property, wherever located, of any such transferee or successor; (ii) enforcing, levying, attaching (including any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Debtors, or their Estates or any of their property, wherever located, or any direct or indirect transferee of any property, wherever located, of, or direct or indirect successor in interest**

Error! Unknown document property name.

to, any of the foregoing Persons, or any property, wherever located, of any such transferee or successor; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors or their Estates or any of their property, wherever located, or any direct or indirect transferee of any property, of, or successor in interest to, any of the foregoing Persons; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan to the full extent permitted by applicable law (including, without limitation, commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan) to the fullest extent permitted by applicable law, or (v) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtors or their Estates, or against the property or interests in property of the Debtors or their Estates, with respect to any such Claim or Interest.  Such injunction shall extend to any successors or assignees of the Debtors and their respective properties and interest in properties; provided, however, that nothing contained in the Plan shall preclude such Persons from exercising their rights, or obtaining benefits, pursuant to and consistent with the terms of the Plan.

        (ii)      By accepting Plan Distributions, each holder of an Allowed Claim or Interest will be deemed to have specifically consented to the injunctions set forth in section 14.5 of the Plan.

      6.    *Releases*

        (i)      Releases by the Debtors.  Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or the Confirmation Order, on and after the Effective Date, for good and valuable consideration, including their cooperation and contributions to the Chapter 11 Cases, the Released Parties shall be deemed released and discharged by the Debtors and their Estates and the Plan Administrator from any and all Claims, obligations, debts, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, asserted or unasserted, existing or hereinafter arising, in law, equity or otherwise, whether for tort, fraud, contract, violations of federal or state laws or otherwise, including Avoidance Actions, those Causes of Action based on veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability or otherwise that the Debtors, their Estates and the Plan Administrator or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity or that any holder of a Claim or Interest or other Entity would have been legally entitled to assert derivatively for or on behalf of the Debtors, or their Estates, based on, relating to or in any manner arising from, in whole or in part, the Debtors, their Estates, the Plan Administrator, the purchase, sale or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtors and any Released Party excluding any assumed executory contract or lease, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Disclosure Statement, the Plan Supplement, the Plan Administrator Agreement, the DIP Credit Agreement, the Chapter 11 Cases, or, in each case, related

Error! Unknown document property name.

agreements, instruments or other documents, or upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that is determined in a Final Order to have constituted willful misconduct (including, without limitation, actual fraud) or gross negligence; **provided**, that if any Released Party directly or indirectly brings or asserts any Claim or Cause of Action that has been released or is contemplated to be released pursuant to the Plan in any way arising out of or related to any document or transaction that was in existence prior to the Effective Date against any other Released Party, and such Released Party does not abandon such Claim or Cause of Action upon request, then the release set forth in the Plan shall automatically and retroactively be null and void *ab initio* with respect to the Released Party bringing or asserting such Claim or Cause of Action; **provided further** that the immediately preceding proviso shall not apply to (i) any action by a Released Party in the Bankruptcy Court (or any other court determined to have competent jurisdiction), including any appeal therefrom, to prosecute the amount, priority or secured status of any prepetition or ordinary course administrative Claim against the Debtors or (ii) any release or indemnification provided for in any settlement or granted under any other court order, **provided** that, in the case of (i) and (ii), the Debtors shall retain all defenses related to any such action.  Notwithstanding anything contained in the Plan to the contrary, the foregoing release shall not release any obligation of any party under the Plan or any document, instrument or agreement executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute its finding that each release described in the Plan is:  (i) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Claims; (ii) in the best interests of the Debtors and all holders of Interests and Claims; (iii) fair, equitable and reasonable; (iv) given and made after due notice and opportunity for hearing; and (v) a bar to the Debtors asserting any claim, Cause of Action or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

*(ii)* <u>Releases by the Holders of Claims and Interests</u>.  Except as otherwise specifically provided in the Plan or the Confirmation Order, on and after the Effective Date, for good and valuable consideration, including the obligations of the Debtors under the Plan, the Plan Consideration and other contracts, instruments, releases, agreements or documents executed and delivered in connection with the Plan, each Releasing Party shall be deemed to have consented to the Plan and the restructuring embodied in the Plan for all purposes, and shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever released and discharged the Released Parties from any and all Claims, Interests, obligations, debts, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, asserted or unasserted, existing or hereinafter arising, in law, equity or otherwise, whether for tort, fraud, contract, violations of federal or state laws or otherwise, including Avoidance

Error! Unknown document property name.

Actions, those Causes of Action based on veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability or otherwise that such Releasing Party would have been legally entitled to assert (whether individually or collectively), based on, relating to or in any manner arising from, in whole or in part, the Debtors, the Estates, the Plan Administrator, the liquidation, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtors and any Releasing Party excluding any assumed executory contract or lease, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Disclosure Statement, the Plan Supplement, the Plan Administrator Agreement, the DIP Credit Agreement, the Prepetition Revolving Credit Facility, the Prepetition Term Loan Agreement, or the Plan or the Disclosure Statement, or, in each case, related agreements, instruments or other documents, or upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that is determined in a Final Order to have constituted willful misconduct (including, without limitation, actual fraud) or gross negligence; **provided** that any holder of a Claim or Interest that elects to opt out of the releases contained in the Plan shall not receive the benefit of the releases set forth in the Plan (even if for any reason otherwise entitled). Notwithstanding anything contained in the Plan to the contrary, the foregoing release shall not release any obligation of any party under the Plan or any document, instrument or agreement executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute its finding that each release described in the Plan is:  (i) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Claims; (ii) in the best interests of the Debtors and all holders of Interests and Claims; (ii) fair, equitable and reasonable; (iv) given and made after due notice and opportunity for hearing; and (v) a bar to the Debtors asserting any claim, Cause of Action or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

*(iii)* Notwithstanding anything to the contrary contained in the Plan, the releases set forth in Section 14.6 of the Plan shall not release any (i) claims against any Person to the extent such Person asserts a crossclaim, counterclaim and/or claim for setoff which seeks affirmative relief against a Debtor or any of its officers, directors, or representatives and (ii) claims against any Person arising from or relating to such Person's gross negligence, willful misconduct, each as determined by a Final Order of the Bankruptcy Court.

68

7.      *Exculpation and Limitation of Liability*

On the Effective Date, except as otherwise provided in the Plan or the Confirmation Order, for good and valuable consideration, to the maximum extent permissible under applicable law, none of the Exculpated Parties shall have or incur any liability to any holder of any Claim or Interest or any other Person for any act or omission in connection with, or arising out of the Debtors' restructuring, including the negotiation, implementation and execution of the Plan, the Plan Supplement, the Chapter 11 Cases, the Prepetition Term Loan Agreement, the Prepetition Revolving Credit Facility Agreement, the Disclosure Statement, the solicitation of votes for and the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, including all documents ancillary thereto, all decisions, actions, inactions and alleged negligence or misconduct relating thereto and all activities leading to the promulgation and confirmation of the Plan except for gross negligence or willful misconduct, each as determined by a Final Order of the Bankruptcy Court.  For purposes of the foregoing, it is expressly understood that any act or omission effected with the approval of the Bankruptcy Court conclusively will be deemed not to constitute gross negligence or willful misconduct unless the approval of the Bankruptcy Court was obtained by fraud or misrepresentation, and in all respects, the applicable Persons shall be entitled to rely on the advice of counsel with respect to their duties and responsibilities under, or in connection with, the Chapter 11 Cases, the Plan, and administration thereof.  The Exculpated Parties have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the distributions of the securities pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

8.      *Injunction Related to Releases and Exculpation*

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities released pursuant to the Plan, including the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities released in or encompassed by sections 14.6 and 14.7 of the Plan.  Each of the Debtors is expressly authorized hereby to seek to enforce such injunction.

9.      *Retention of Causes of Action/Reservation of Rights*

(i)      Except as expressly provided in the Plan or in the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights or Causes of Action that the Debtors, the Estates or the Plan Administrator may have, or that the Debtors, or the Plan Administrator may choose to assert on behalf of their respective Estates or the Estates, as applicable, under any provision of the Bankruptcy Code or any applicable non-bankruptcy law, including, without limitation, (i) any and all Causes of Action or claims against any Person or Entity, to the extent such Person or

Error! Unknown document property name.

Entity asserts a crossclaim, counterclaim and/or claim for setoff that seeks affirmative relief against the Debtors, their officers, directors or representatives or (ii) the turnover of any property of the Estates to the Debtors.

*(ii)* Except as expressly provided in the Plan or in the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights or Causes of Action that the Debtors had immediately prior to the Petition Date or the Effective Date against or regarding any Claim left Unimpaired by the Plan. The Debtors and the Plan Administrator shall have, retain, reserve and be entitled to commence, assert and pursue all such rights and Causes of Action as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights respecting any Claim left Unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced.

*(iii)* Except as expressly provided in the Plan or in the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to release any post-Effective Date obligations of any party under the Plan, or any document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

## L.      Retention of Jurisdiction

Pursuant to sections 105 and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction, to the fullest extent permissible under law, over all matters arising in, arising under, or related to the Chapter 11 Cases for, among other things, the following purposes:

*1.* To hear and determine all matters relating to the assumption or rejection of executory contracts or unexpired leases, including whether a contract or lease is or was executory or expired, and the Cure Disputes resulting therefrom;

*2.* To hear and determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

*3.* To hear and resolve any disputes arising from or relating to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004, or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

*4.* To ensure that Plan Distributions to holders of Allowed Claims are accomplished as provided in the Plan;

*5.* To consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, including any Administrative Expense Claim;

*6.* To enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

Error! Unknown document property name.

7. To issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court (including, without limitation, with respect to releases, exculpations and indemnifications);

8. To hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

9. To hear and determine all matters relating to the allowance, disallowance, liquidation, classification, priority or estimation of any Claim;

10. To resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

11. To hear and determine disputes arising in connection with or related to the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, the Disclosure Statement, any transactions or payments contemplated hereby, or any agreement, instrument, or other document governing or relating to any of the foregoing (including without limitation the Plan Supplement and the Plan Documents); provided that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection or dispute resolution clause that refers disputes to a different court and any disputes concerning documents contained in the Plan Supplement shall be governed in accordance with the provisions of such documents;

12. To take any action and issue such orders, including any such action or orders as may be necessary after occurrence of the Effective Date and/or consummation of the Plan, as may be necessary to construe, enforce, implement, execute, and consummate the Plan, including any release or injunction provisions set forth in the Plan, or to maintain the integrity of the Plan following consummation;

13. To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

14. To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

15. To hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

16. To resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Cases, the Disclosure Statement Hearing, the Confirmation Hearing, any applicable Bar Date, or the deadline for responding or objecting to a Cure Amount, for the purpose of determining whether a Claim or Interest is discharged hereunder, or for any other purpose;

Error! Unknown document property name.

**17.**     To recover all assets of the Debtors and property of the Estates, wherever located;

**18.**     To hear and determine any rights, claims or Causes of Action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal or state statute or legal theory; and

**19.**     To enter a final decree closing each of the Chapter 11 Cases.

As of the Effective Date, notwithstanding anything in Article XV of the Plan to the contrary, the Exit Revolving Credit Facility Agreement and the Exit Term Loan Agreement shall be governed by the respective jurisdictional provisions therein.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, the provisions of Article XV of the Plan shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## M.     Miscellaneous

### 1.     *Exemption from Certain Transfer Taxes*

Pursuant to section 1146(a) of the Bankruptcy Code and to the fullest extent permitted by applicable law, (i) any issuance, transfer, or exchange under the Plan of New Common Stock, and the security interests in favor of the lenders under the Exit Revolving Credit Facility and (ii) the consummation of sale transactions by the Debtors and approved by the Bankruptcy Court on and after the Confirmation Date through and including the Effective Date, including any transfers effectuated under the Plan, the sale by the Debtors of any owned property pursuant to section 363(b) of the Bankruptcy Code, and any assumption, assignment, and/or sale by the Debtors of their interests in unexpired leases of non-residential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, shall constitute a "transfer under a plan" shall not be subject to any stamp, real estate transfer, recording, or other similar tax.

### 2.     *Termination of Professionals*

On the Effective Date, the engagement of each Professional Person retained by the Debtors shall be terminated without further order of the Bankruptcy Court or act of the parties; provided, however, such Professional Person shall be entitled to prosecute their respective Professional Fee Claims and represent their respective constituents with respect to applications for allowance and payment of such Professional Fee Claims and the Debtors shall be responsible for the reasonable and documented fees, costs and expenses associated with the prosecution of such Professional Fee Claims.  Nothing in the Plan shall preclude any Debtor from engaging a former Professional Person on and after the Effective Date in the same capacity as such Professional Person was engaged prior to the Effective Date.

Error! Unknown document property name.

3.      *Amendments*

If reasonably acceptable to the Debtors and the Majority Ad Hoc Group, the Plan may be amended, modified, or supplemented in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court.  In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims pursuant to the Plan, the Debtors may, if reasonably acceptable to the Debtors and the Majority Ad Hoc Group, make appropriate technical adjustments, remedy any defect or omission or reconcile any inconsistencies in the Plan, the Plan Documents and/or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the Plan, and any holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented.

4.      *Revocation or Withdrawal of the Plan*

The Debtors reserve the right, in consultation with the Ad Hoc Group, to revoke, delay or withdraw the Plan, as to any or all of the Debtors, prior to the Effective Date.  If the Debtors revoke, delay or withdraw the Plan, in accordance with the preceding sentence, prior to the Effective Date as to any or all of the Debtors, or if confirmation or consummation as to any or all of the Debtors does not occur, then, with respect to such Debtors: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise not previously approved by Final Order of the Bankruptcy Court embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), assumption, assumption and assignment, or rejection of executory contracts or leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtors or any other Person, (ii) prejudice in any manner the rights of such Debtors or any other Person or (iii) constitute an admission of any sort by the Debtors or any other Person.

5.      *Allocation of Plan Distributions Between Principal and Interest*

To the extent that any Allowed Claim entitled to a distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts.

6.      *Severability*

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, in consultation with the Ad Hoc Group, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void,

73

or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 7.        *Governing Law*

Except to the extent that the Bankruptcy Code or other U.S. federal law is applicable, or to the extent a Plan Document or exhibit or schedule to the Plan provides otherwise, the rights, duties, and obligations arising under the Plan and the Plan Documents shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof to the extent such principles would result in the application of the laws of any other jurisdiction.

### 8.        *Section 1125(e) of the Bankruptcy Code*

The Debtors have, and upon confirmation of the Plan shall be deemed to have, solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, and the Debtors and the Ad Hoc Group (and each of their respective affiliates, agents, directors, officers, employees, advisors, and attorneys) participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer, issuance, sale, solicitation and/or purchase of the securities offered and sold under the Plan, and therefore are not, and on account of such offer, issuance, sale, solicitation, and/or purchase will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or offer, issuance, sale, or purchase of the securities offered and sold under the Plan.

### 9.        *Inconsistency*

In the event of any inconsistency among the Plan, the Disclosure Statement, the Plan Documents, any exhibit to the Plan or any other instrument or document created or executed pursuant to the Plan, the provisions of the Plan shall govern.

### 10.        *Time*

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth in the Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply. If any payment, distribution, act or deadline under the Plan is required to be made or performed or occurs on a day that is not a Business Day, then the making of such payment or distribution, the performance of such act or the occurrence of such deadline shall be deemed to be on the next succeeding Business Day, but shall be deemed to have been completed or to have occurred as of the required date.

Error! Unknown document property name.

### *11.* *Exhibits*

All exhibits to the Plan are incorporated and are a part of the Plan as if set forth in full in the Plan.

### *12.* *Notices*

In order to be effective, all notices, requests, and demands to or upon the Debtors shall be in writing (including by facsimile transmission) and, unless otherwise provided in the Plan, shall be deemed to have been duly given or made only when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

Error! Unknown document property name.

Southcross Energy Partners, L.P. 1
717 Main Street, Suite 5300
Dallas, TX 75201
        Attn: Michael B. Howe
        Fax: (214) 979-3710
Email: michael.howe@southcrossenergy.com

with a copy to (which shall not constitute notice):

Davis Polk & Wardwell LLP
450 Lexington Ave New York, NY 10017
Attn: Marshall S. Huebner, Darren S. Klein, and Steven Z. Szanzer
Fax: (212) 701-5217
Email: marshall.huebner@davispolk.com
        darren.klein@davispolk.com
        steven.szanzer@davispolk.com

-and-

Morris, Nichols, Arsht & Tunnell LLP
1201 N. Market St., 16th Floor, PO Box 1347
Attn: Robert J. Dehney, Andrew R. Remming, Joseph C. Barsalona II, and
Eric W. Moats
Fax: (302) 658-3989
Email: rdehney@mnat.com
        aremming@mnat.com
        jbarsalona@mnat.com
        emoats@mnat.com

### 13.    *Filing of Additional Documents*

On or before substantial consummation of the Plan, the Debtors shall file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### 14.    *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by the Debtors or the Ad Hoc Group (or the Majority Ad Hoc Group) with respect to the Plan shall be or shall be deemed to be, an admission or waiver of any rights of the Debtors or the Ad Hoc Group (or the Majority Ad Hoc Group) with respect to any Claims or Interests prior to the Effective Date.

Error! Unknown document property name.

# ARTICLE V

# VOTING REQUIREMENTS; ACCEPTANCE AND CONFIRMATION OF THE PLAN

## A.    General

The following is a brief summary of the Plan confirmation process.  Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and/or consult their own attorneys.

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.

Section 1129 of the Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court must make a series of findings concerning the Plan and the Debtors, including that (i) the Plan has classified Claims in a permissible manner, (ii) the Plan complies with applicable provisions of the Bankruptcy Code, (iii) the Plan has been proposed in good faith and not by any means forbidden by law, (iv) the disclosure required by section 1125 of the Bankruptcy Code has been made, (v) the Plan has been accepted by the requisite votes of holders of Claims (except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code), (vi) the Plan is feasible and confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors unless such liquidation or reorganization is proposed in the Plan; (vii) the Plan is in the "best interests" of all holders of Claims in an impaired Class by providing to such holders on account of their Claims property of a value, as of the Effective Date, that is not less than the amount that such holders would receive or retain in a chapter 7 liquidation, unless each holder of a Claim in such Class has accepted the Plan, and (viii) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of such fees on the Effective Date.  The Debtors believe that the Plan satisfies section 1129 of the Bankruptcy Code.

## B.    Parties in Interest Entitled To Vote

Pursuant to the Bankruptcy Code, only Classes of Claims that are "impaired" (as defined in section 1124 of the Bankruptcy Code) under the Plan are entitled to vote to accept or reject the Plan.  A Class is impaired if the legal, equitable, or contractual rights to which the Claims of that Class entitled the holders of such Claims are modified, other than by curing defaults and reinstating the Claims.  Classes that are not impaired are not entitled to vote on the Plan and are conclusively presumed to have accepted the Plan.  In addition, Classes that receive no distributions under the Plan are not entitled to vote on the Plan and are deemed to have rejected the Plan.

Error! Unknown document property name.

C.       **Classes Impaired and Entitled To Vote Under the Plan**

The following Classes are impaired under the Plan and entitled to vote on the Plan:

| Class | Designation | Status | Voting Rights |
|-------|-------------|--------|---------------|
| 3 | Prepetition Term Loan Claims | Impaired | Entitled to Vote |
| 4 | Prepetition Revolving Credit Facility Claims | Impaired | Entitled to Vote |

In general, if a Claim or Interest is unimpaired under a plan, section 1126(f) of the Bankruptcy Code deems the holder of such Claim or Interest to have accepted the plan, and thus, the holders of Claims in such unimpaired Classes are not entitled to vote on the plan.  Because Classes 1 and 2 are unimpaired under the Plan, the holders of Claims and Interests in these Classes are not entitled to vote.

In general, if the holder of an impaired Claim or impaired Interest will not receive any distribution under a plan in respect of such Claim or Interest, section 1126(g) of the Bankruptcy Code deems the holder of such Claim or Interest to have rejected the plan, and thus the holders of Claims in such Classes are not entitled to vote on the Plan.  The holders of Claims and Interests in Classes 5, 6, 7 and 8 are conclusively presumed to have rejected the Plan and are therefore not entitled to vote.

Moreover, holders of Claims and Interests in Classes 1 and 2 are either unimpaired and therefore deemed to accept the Plan, or impaired and will not receive or retain any property under the Plan on account of such Claims or Interests and, therefore, are not entitled to vote on the Plan.

D.       **Voting Procedures and Requirements**

The Bankruptcy Court can confirm the Plan only if it determines that the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code.  One of these technical requirements is that the Bankruptcy Court find, among other things, that the Plan has been accepted by the requisite votes of all Classes of impaired Claims and Interests unless approval will be sought under section 1129(b) of the Bankruptcy Code in spite of the nonacceptance by one or more such Classes.

If you have any questions about (i) the procedures for voting your Claim or with respect to the packet of materials that you have received or (ii) the amount of your Claim, please contact the Debtors' Solicitation and Claims Agent at (866) 967-0671 (toll-free) or (310) 751-2671 (if calling from outside the U.S. or Canada).  If you wish to obtain (at no charge) an additional copy of the Plan, this Disclosure Statement, or other solicitation documents, you can obtain them from the Debtors' Case Information Website (located at *http://www.kccllc.net/southcrossenergy*) or by requesting a copy from the Debtors' Solicitation and Claims Agent, which can be reached at 877-709-4750.

Error! Unknown document property name.

1.      **Ballots**

Pursuant to Bankruptcy Rule 3017(c), October 28, 2019, the date of the Disclosure Statement Hearing, shall be the record date for purposes of determining which holders of Claims are entitled to receive solicitation packages and, where applicable, vote on the Plan (the "**Record Date**").  Accordingly, only holders of record as of the Record Date that are otherwise entitled to vote under the Plan will receive a Ballot and may vote on the Plan.

In voting for or against the Plan, please use (i) only the Ballot sent to you with this Disclosure Statement or (ii) the online electronic ballot portal.  If you are a holder of a Claim in Class 3 or 4 and did not receive a Ballot, if your Ballot is damaged or lost or if you have any questions concerning voting procedures, please contact the Solicitation and Claims Agent at (866) 967-0671 (toll-free) or (310) 751-2671 (if calling from outside the U.S. or Canada) or by email at SouthcrossInfo@kccllc.com.

2.      **Submitting Ballots**

If you are entitled to vote to accept or reject the Plan, you should read carefully, complete, and submit your Ballot in accordance with the instructions below.

For your vote to be counted, your Ballot must be properly completed, signed, and returned so that it is actually received by the Solicitation and Claims Agent, Kurtzman Carson Consultants LLC, by no later than the Voting Deadline, unless such time is extended in writing by the Debtors.  If your Ballot is not received by the Solicitation and Claims Agent on or before the Voting Deadline, and such Voting Deadline is not extended by the Debtors as noted above, your vote will not be counted.  If you are submitting a Ballot via first-class mail, overnight courier, or personal delivery, it should be sent to: Southcross Ballot Processing, c/o KCC, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245.  Delivery of a Ballot to the Solicitation and Claims Agent by facsimile or any other electronic means (other than as expressly provide herein) shall not be valid.

Except as otherwise ordered by the Bankruptcy Court, any Ballots received after the Voting Deadline will not be counted absent the consent of the Debtors (in their sole discretion).  The method of delivery of Ballots to the Solicitation and Claims Agent is at the risk of each holder of a Claim, and such delivery will be deemed made only when the original Ballot is actually received by the Solicitation and Claims Agent.  In all cases, sufficient time should be allowed to assure timely delivery.  An original executed Ballot is required to be submitted by the entity submitting any written Ballot.  Delivery of a Ballot by facsimile, telecopy, or any other electronic means shall not be valid; *provided, however*, that Ballots submitted through the online voting portal will be counted.  No Ballot should be sent to the Debtors, their agents (other than the Solicitation and Claims Agent), any administrative agent (unless specifically instructed to do so), or the Debtors' financial or legal advisors, and if so sent will not be counted.  If no holders of Claims in a particular Class that is entitled to vote on the Plan vote to accept or reject the Plan, then such Class shall be deemed to accept the Plan.

Error! Unknown document property name.

3.       *Voting*

If the Debtors have served an objection or request for estimation as to a Claim at least ten calendar days before the Voting Deadline, such Claim is temporarily disallowed for voting purposes only and not for purposes of allowance or distribution, except to the extent and manner as set forth in such objection.

4.       *Releases and Exculpation and Injunction Provisions Under the Plan*

Each Ballot advises the recipient in bold and capitalized print that holders of Claims may only opt out of the release provisions in the Plan ONLY if such holder does not vote to accept the plan. Each Ballot further advises the recipient in bold and capitalized print that if such holder (a) votes to accept the plan, (b) does not submit a ballot to accept or reject the plan and do not opt out of or object to the release provisions of the plan, or (c) votes to reject the plan but do not opt out of the release provisions of the plan, such holder will be deemed to have granted the releases in section 14.6(b) of the plan. Holders who do not grant the releases and consent to the exculpation and injunction provisions contained in Article 14 of the Plan will not receive the benefit of the releases set forth in Article 14 of the Plan.

The Debtors shall mail or cause to be mailed by first-class mail to holders of Claims in Classes 1, 2, 5, 6, 7, and 8 a copy of a notice of non-voting status. In addition, all parties in interest may obtain copies of the Disclosure Statement and the Plan free of charge upon request to the Solicitation and Claims Agent via email at SouthcrossInfo@kccllc.com or via telephone at (866) 967-0671 (toll-free) or at (310) 751-2671, for international callers.

## E.       Acceptance of Plan

As a condition to confirmation of the Plan, the Bankruptcy Code requires that each class of impaired claims vote to accept a plan, except under certain circumstances. See "Confirmation Without Necessary Acceptances; Cramdown" below. A class of claims or interests that is unimpaired under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is impaired unless the plan (i) leaves unaltered the legal, equitable, and contractual rights to which the claim or interest entitles the holder of such claim or interest or (ii) cures any default, reinstates the original terms of the obligation, and does not otherwise alter the legal, equitable, or contractual rights to which the claim or interest entitles the holder of such claim or interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by an impaired class as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class; only those holders that are eligible to vote and that actually vote to accept or reject the plan are counted for purposes of determining whether these dollar and number thresholds are met. Thus, a class of claims will have voted to accept a plan only if two-thirds in amount and a majority in number that actually vote cast their ballots in favor of acceptance. Under section 1126(d) of the Bankruptcy Code, a class of interests has accepted a plan if holders of such interests holding at least two-thirds in amount that actually vote have voted to accept the plan. Holders of claims or interests who fail to vote are not counted as either accepting or rejecting a plan.

Error! Unknown document property name.

In addition to this voting requirement, section 1129 of the Bankruptcy Code requires that a plan be accepted by each holder of a claim or interest in an impaired class or that the plan otherwise be found by a court to be in the best interests of each holder of a claim or interest in such class.  See "Best Interests Test" below.  Moreover, each impaired class must accept the plan for the plan to be confirmed without application of the "fair and equitable" and "unfair discrimination" tests set forth in section 1129(b) of the Bankruptcy Code discussed below.  See "Confirmation Without Necessary Acceptances; Cramdown" below.

## F.    Confirmation Without Necessary Acceptances; Cramdown

In the event that any impaired class of claims or interests does not accept a plan, a debtor nevertheless may move for confirmation of the plan.  A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code.  Section 1129(b) of the Bankruptcy Code requires that a court find that a plan (i) "does not discriminate unfairly" and (ii) is "fair and equitable," with respect to each non-accepting impaired class of claims or interests.  Here, because holders of Claims in Classes 5, 6, 7, and 8 are deemed to reject the Plan, the Debtors will seek confirmation of the Plan from the Bankruptcy Court by satisfying the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code.  The Debtors believe that such requirements are satisfied, as no holder of a Claim or Interest junior to those in Classes 5, 6, 7 or 8 will receive any property under the Plan.

A plan "does not discriminate unfairly" if (i) the legal rights of a nonaccepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the nonaccepting class and (ii) no class receives payments in excess of that which it is legally entitled to receive for its claims or interests.  The Debtors believe that, under the Plan, all impaired Classes of Claims and Interests are treated in a manner that is consistent with the treatment of other Classes of Claims and Interests that are similarly situated, if any, and no class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims or Allowed Interests in such Class.  Accordingly, the Debtors believe that the Plan does not discriminate unfairly as to any impaired Class of Claims or Interests.

The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable."  In order to determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cram down" tests for secured creditors, unsecured creditors, and equity holders, as follows:

> *(i)*    Secured Creditors.  Either (A) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred Cash payments having a present value equal to the amount of its allowed secured claim, (B) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (C) subject to section 363(k) of the Bankruptcy Code, the property securing the claim is sold free and clear of liens, with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (A) or (B) above.

81

*(ii)* <u>Unsecured Creditors</u>.  Either (A) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (B) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

*(iii)* <u>Equity Interests</u>.  Either (A) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest or (B) the holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

As discussed above, the Debtors believe that the distributions provided under the Plan satisfy the "fair and equitable" standard, where required.

## G.    Classification

The Bankruptcy Code requires that, for purposes of treatment and voting, a chapter 11 plan divide the different claims (excluding administrative claims) against, and equity interests in, a debtor into separate classes based upon their legal nature.  Pursuant to section 1122 of the Bankruptcy Code, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.  The Debtors believe that the Plan classifies all Claims and Interests in compliance with the provisions of the Bankruptcy Code because valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims and Interests created under the Plan.  Accordingly, the classification of Claims and Interests in the Plan complies with section 1122 of the Bankruptcy Code.

## ARTICLE VI

## FEASIBILITY AND BEST INTERESTS OF CREDITORS

## A.    Best Interests Test

As noted above, even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires a court to determine that such plan is in the best interests of all holders of claims or interests that are impaired by that plan and that have not accepted the plan.  The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code (the "**Best Interests Test**").

To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor were liquidated under chapter 7, a court must first determine the aggregate

82

dollar amount that would be generated from a debtor's assets if its chapter 11 cases were converted to chapter 7 cases under the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses, and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan. If the hypothetical liquidation distribution to holders of claims or interests in any impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such impaired class.

## B.    Liquidation Analysis

Amounts that a holder of Claims and Interests in Impaired Classes would receive in a hypothetical chapter 7 liquidation are discussed in the liquidation analysis of the Debtors prepared by the Debtors' management with the assistance of its advisors (the "**Liquidation Analysis**"), which is attached hereto as Appendix B.

As described in Appendix B, the Debtors developed the Liquidation Analysis based on the unaudited book values as of [•], 2019, unless otherwise noted in the Liquidation Analysis. The recoveries may change based on further refinements of Allowed Claims and as the Debtors' claims objection and reconciliation process begins following the Petition Date.

As described in the Liquidation Analysis, underlying the analysis is a number of estimates and assumptions that, although developed and considered reasonable by the Debtors' management and advisors, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. The Liquidation Analysis is based on assumptions with regard to liquidation decisions that are subject to change. Accordingly, the values reflected in the Liquidation Analysis might not be realized if the Debtors were, in fact, to undergo a liquidation.

This Liquidation Analysis is solely for the purposes of (i) providing "adequate information" under section 1125 of the Bankruptcy Code to enable the holders of Claims and Interests entitled to vote under the Plan to make an informed judgment about the Plan and (ii) providing the Bankruptcy Court with appropriate support for the satisfaction of the "Best Interests Test" pursuant to section 1129(a)(7) of the Bankruptcy Code, and should not be used or relied upon for any other purpose, including the purchase or sale of securities of, or Claims or Interests in, the Debtors or any of their Affiliates.

Events and circumstances occurring subsequent to the date on which the Liquidation Analysis was prepared may be different from those assumed, or, alternatively, may have been unanticipated, and thus the occurrence of these events may affect financial results in a materially adverse or materially beneficial manner. The Debtors and Reorganized Debtors do not intend to and do not undertake any obligation to update or otherwise revise the Liquidation Analysis to reflect events or circumstances existing or arising after the date the Liquidation Analysis is initially filed or to reflect the occurrence of unanticipated events. Therefore, the Liquidation Analysis may not be relied upon as a guarantee or other assurance of the actual results that will occur.

Error! Unknown document property name.

In deciding whether to vote to accept or reject the Plan, holders of Claims must make their own determinations as to the reasonableness of any assumptions underlying the Liquidation Analysis and the reliability of the Liquidation Analysis.

## C.     Application of the Best Interests Test

The Debtors believe that the continued operation of the Debtors as a going concern satisfies the Best Interests Test for the Impaired Classes.  Notwithstanding the difficulties in quantifying recoveries to holders of Claims and Interests with precision, the Debtors believe that, based on the Liquidation Analysis, the Plan meets the Best Interests Test.  As the Plan and Appendix B indicate, Confirmation of the Plan will provide each holder of an Allowed Claim in an Impaired Class with an equal or greater recovery than the value of any distributions if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code.

## D.     Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires, as a condition to Confirmation, that the Bankruptcy Court find that Confirmation is not likely to be followed by the liquidation of the Debtors or the need for further financial reorganization, unless such liquidation is contemplated by the Plan.  For purposes of demonstrating that the Plan meets this "feasibility" standard, the Debtors, with the assistance of Alvarez and Marsal North America, LLC have analyzed the ability of the Reorganized Debtors to meet their obligations under the Plan and to retain sufficient liquidity and capital resources to conduct their businesses.  As part of this analysis, the Debtors have prepared the financial projections, as set forth in Appendix C (the "**Financial Projections**").

As noted in Appendix C, the Financial Projections present information with respect to all the Reorganized Debtors.  These Financial Projections do not reflect the full impact of "fresh start reporting" in accordance with American Institute of Certified Public Accountants Statement of Position 90-7 "Financial Reporting by Entities in Reorganization under the Bankruptcy Code."  Fresh start reporting may have a material impact on the analysis.

The Debtors have prepared the Financial Projections solely for the purpose of providing "adequate information" under section 1125 of the Bankruptcy Code to enable the holders of Claims entitled to vote under the Plan to make an informed judgment about the Plan and should not be used or relied upon for any other purpose, including the purchase or sale of securities of, or Claims or Interests in, the Debtors.

In addition to the cautionary notes contained elsewhere in this Disclosure Statement and in the Financial Projections, it is underscored that the Debtors make no representation as to the accuracy of the Financial Projections or their ability to achieve the projected results.  Many of the assumptions on which the Financial Projections are based are subject to significant uncertainties.  Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the financial results.  Therefore, the actual results achieved throughout the Projection Period (as defined in the Financial Projections) may vary from the Financial Projections, and the variations may be material.  Also as noted above, the Financial Projections currently do not reflect the full impact of any "fresh start reporting," and its impact on the

Error! Unknown document property name.

Reorganized Debtors' "Consolidated Balance Sheets" and prospective "Results of Operations" may be material.  All holders of Claims in the impaired Classes are urged to examine carefully all of the assumptions on which the Financial Projections are based in connection with their evaluation of, and voting on, the Plan.

Based upon the Financial Projections, the Debtors believe that they will be able to make all distributions and payments under the Plan and that confirmation of the Plan is not likely to be followed by liquidation of the Debtors or the need for further restructuring.

**E.**     **Valuation of the Debtors**

In conjunction with formulating the Plan and satisfying its obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post-confirmation going concern value of the Debtors.  Accordingly, the Debtors, with the assistance of Evercore, produced the Valuation Analysis that is set forth in **Exhibit D** attached hereto and incorporated herein by reference.

# ARTICLE VII

## EFFECT OF CONFIRMATION

**A.**     **Binding Effect of Confirmation**

Confirmation will bind the Debtors and all holders of Claims and Interests to the provisions of the Plan, whether or not the Claim or Interest of any such Holder is impaired under the Plan and whether or not any such holder of a Claim or Interest has accepted the Plan. Confirmation will have the effect of converting all Claims into rights to receive the treatment specified in Article IV of the Plan and cancelling all Interests in the Debtors.

**B.**     **Good Faith**

Confirmation of the Plan will constitute a finding that: (i) the Plan has been proposed in good faith and in compliance with applicable provisions of the Bankruptcy Code and (ii) all solicitations of acceptances or rejections of the Plan have been in good faith and in compliance with applicable provisions of the Bankruptcy Code.

# ARTICLE VIII

## SECURITIES LAW MATTERS

**A.**     **Bankruptcy Code Exemptions from Registration Requirements for the New Common Stock**

### *1.*     *Issuance of New Common Stock*

The Plan provides for the offer, issuance, sale, or distribution of the New Common Stock. The Debtors believe that the New Common Stock are each a "security," as defined in Section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities

Error! Unknown document property name.

laws.  Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of the Securities Act and state securities laws if the following three principal requirements are satisfied: (a) the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan; (b) the recipients of the securities must hold prepetition or administrative expense claims against the debtor or interests in the debtor; and (c) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in exchange for such claim or interest and partly for cash or property.  The Debtors believe that the issuance of the New Common Stock to the holders of Prepetition Term Loan Claims and Prepetition Revolving Credit Facility Claims satisfies the requirements of section 1145(a)(1) of the Bankruptcy Code and are, therefore, exempt from registration under the Securities Act and state securities laws.

> **2.** **_Subsequent Transfers of New Common Stock Covered by the Section 1145(a)(1) Exemption_**

The New Common Stock issued pursuant to the Plan that are covered by the section 1145(a)(1) exemption may be freely transferred by most recipients following the initial issuance under the Plan, and all resales and subsequent transfers of the New Common Stock are exempt from registration under the Securities Act and state securities laws unless the holder is an "underwriter" with respect to such securities.  Section 1145(b) of the Bankruptcy Code defines four types of "underwriters":

(i) persons who purchase a claim against, an interest in, or a claim for an administrative expense against the debtor with a view to distributing any security received in exchange for such claim or interest;

(ii) persons who offer to sell securities offered under a plan for the holders of such securities;

(iii) persons who offer to buy such securities from the holders of such securities, if the offer to buy is:

(A) with a view to distributing such securities; and

(B) under an agreement made in connection with the plan, the consummation of the plan, or with the offer or sale of securities under the plan; or

(iv) a person who is an "issuer" with respect to the securities as the term "issuer" is used in section 2(a)(11) of the Securities Act.

Under section 2(a)(11) of the Securities Act, an "issuer" includes any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control of the issuer.

To the extent that persons who receive New Common Stock pursuant to the Plan are deemed to be "underwriters," resales by such persons would not be exempted by section 1145 of

Error! Unknown document property name.

the Bankruptcy Code from registration under the Securities Act or other applicable law. However, resales of New Common Stock satisfying the requirements of Securities Act rule 144 may be permitted, as the person would be deemed not to be engaged in a distribution and therefore not an "underwriter."  These rules permit the public sale of securities received by such persons if current information regarding the issuer is publicly available and if volume limitations and certain other conditions are met.

Whether or not any particular person would be deemed to be an "underwriter" with respect to the New Common Stock or any other security to be issued pursuant to the Plan would depend upon various facts and circumstances applicable to that person.  Accordingly, the Debtors express no view as to whether any particular person receiving New Common Stock or other securities under the Plan would be an "underwriter" with respect to such New Common Stock or other securities.

Given the complex and subjective nature of the question of whether a particular holder may be an underwriter, the Debtors make no representation concerning the right of any person to trade in the New Common Stock or other securities.  The Debtors recommend that potential recipients of the New Common Stock or other securities consult their own counsel concerning whether they may freely trade New Common Stock or other securities without registration under, or exemption from registration under, the Securities Act, the Securities Exchange Act of 1934 (the "**Exchange Act**") or similar state and federal laws.

## ARTICLE IX

### CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.  THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

A.      **Certain Bankruptcy and Securities Law Considerations**

1.      *General*

While the Debtors believe that, after confirmation of the Plan, the Chapter 11 Cases will be of short duration and will not be materially disruptive to their businesses, the Debtors cannot be certain that this will be the case.  Although the Plan is designed to minimize the length of the Chapter 11 Cases, it is impossible to predict with certainty the amount of time that one or more of the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed.  Even if confirmed on a timely basis, bankruptcy proceedings to confirm the Plan

Error! Unknown document property name.

could have an adverse effect on the Debtors' businesses. Among other things, it is possible that bankruptcy proceedings could adversely affect the Debtors' relationship with their key customers and employees. The proceedings will also involve additional expense and may divert some of the attention of the Debtors' management away from business operations.

### 2.    *Plan Confirmation*

The Debtors can make no assurances that the conditions to confirmation of the Plan will be satisfied or waived or that they will receive the requisite acceptances to confirm the Plan. Further, if the requisite acceptances are not received, the Debtors may seek to accomplish an alternative chapter 11 plan and obtain acceptances to an alternative plan for the Debtors, or otherwise, that may not have the support of the holders of Claims and/or may be required to liquidate these Estates under chapter 7 or 11 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to Creditors as those proposed in the Plan.

Even if the Debtors receive the requisite acceptances, there is no assurance that the Bankruptcy Court will confirm the Plan. Even if the Bankruptcy Court determined that the Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met. Moreover, there can be no assurance that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate the resolicitation of votes. If the Plan is not confirmed, it is unclear what distributions holders of Claims ultimately would receive with respect to their Claims in a subsequent plan.

### 3.    *Objections to classification of Claims*

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims against, and Interests in, the Debtors. The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class. The Debtors believe that all Claims and Interests have been appropriately classified in the Plan.

To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors would seek (a) to modify the Plan to provide for whatever classification might be required for confirmation and (b) to use the acceptances received from any holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such holder ultimately is deemed to be a member. Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification. Except to the extent that modification of classification in the Plan requires resolicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any holder of Claims pursuant to this solicitation will constitute a consent to the Plan's

Error! Unknown document property name.

treatment of such holder, regardless of the Class as to which such holder is ultimately deemed to be a member.

### 4.      *The Debtors may object to the amount or classification of a claim*

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any holder of a Claim where such Claim is subject to an objection.  Any holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 5.      *Failure to consummate the Plan*

As of the date of this Disclosure Statement, there can be no assurance that the conditions to consummation of the Plan will be satisfied or waived.  Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the restructuring completed.

### 6.      *The Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code*

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, when commodities prices are at historically low levels, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of unexpired leases and other executory contracts in connection with cessation of operations.

### 7.      *Failure to consummate the Plan*

As of the date of this Disclosure Statement, there can be no assurance that the conditions to consummation of the Plan will be satisfied or waived.  Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the restructuring completed.

Error! Unknown document property name.

8.      *Undue delay in confirmation may disrupt operations of the Debtors*

Although the Plan is designed to minimize the length of the Chapter 11 Cases, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed.

The continuation of the Chapter 11 Cases, particularly if the Plan is not confirmed in the time frame currently contemplated, could adversely affect operations and relationships with the Debtors' customers, vendors, employees, regulators, and partners.  If confirmation and consummation of the Plan do not occur expeditiously, the Chapter 11 Cases could result in, among other things, increased costs for professional fees and similar expenses.  In addition, prolonged Chapter 11 Cases may make it more difficult to retain and attract management and other key personnel and would require senior management to spend a significant amount of time and effort dealing with the Debtors' financial reorganization instead of focusing on the operation of the Debtors' businesses.

9.      *Plan releases may not be approved*

There can be no assurance that the Plan releases, as provided in Article 14 of the Plan, will be granted.  Failure of the Bankruptcy Court to grant such relief may result in a plan of reorganization that differs from the Plan or the Plan not being confirmed.

10.     *The Exit Term Loan and Exit Revolving Credit Facility may include covenants that impose restrictions on the Debtors' finances and business operations*

In the event that the South Texas Sale is not consummated, the Plan contemplates the Debtors' entering into the Exit Term Loan and Exit Revolving Credit Facility.  The Exit Term Loan and Exit Revolving Credit Facility may include restrictive covenants that could limit the Reorganized Debtors' ability to react to market conditions, satisfy any extraordinary capital needs, or otherwise restrict the Reorganized Debtors' financing and operations.  There can be no assurance that the Reorganized Debtors would be able to comply with such covenants.  If the Reorganized Debtors were to fail to comply with such covenants and terms, the Reorganized Debtors would be required to obtain waivers from the lenders under the Exit Term Loan and Exit Revolving Credit Facility, and if such waivers were not obtained, there could be a material adverse effect on the Reorganized Debtors' financial condition and future performance.

11.     *The Reorganized Debtors may not be able to achieve their projected financial results*

Actual financial results may differ materially from the Financial Projections.  If the Reorganized Debtors do not achieve projected revenue or cash flow levels, the Reorganized Debtors may lack sufficient liquidity to continue operating their businesses consistent with the Financial Projections after the Effective Date.  The Financial Projections represent management's view based on currently known facts and hypothetical assumptions about their future operations; they do not guarantee the Reorganized Debtors' future financial performance.

12.     *The Debtors' financial projections are subject to inherent uncertainty due to the numerous assumptions upon which they are based*

Error! Unknown document property name.

The Financial Projections are based on numerous assumptions including, without limitation, the timing, confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of the Reorganized Debtors, oil and natural gas industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Reorganized Debtors and some or all of which may not materialize. Particular uncertainties with respect to the Reorganized Debtors' operations and financial results arise from the risks and uncertainties relating to, among other things, the following: changes in the demand for the Debtors' natural gas; legislation and regulations relating to the oil and natural gas industry and other environmental initiatives; operational, geological, permit, labor, and weather-related factors; fluctuations in the amount of cash the Debtors generate from operations; future integration of acquired businesses; and numerous other matters of national, regional, and global scale, including those of a political, economic, business, competitive, or regulatory nature. Because the actual results achieved throughout the periods covered by the Financial Projections may vary from the projected results, the Financial Projections should not be relied upon as an assurance of the actual results that will occur.

Except with respect to the Financial Projections and except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that might occur subsequent to the date hereof.  Such events could have a material impact on the information contained in this Disclosure Statement.  Neither the Debtors nor the Reorganized Debtors intend to update the Financial Projections.  The Financial Projections, therefore, may not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the Financial Projections.

### 13.   *As a result of the Chapter 11 Cases, the Debtors' historical financial information may not be indicative of its future financial performance*

The Debtors' capital structure will be significantly altered under any plan ultimately confirmed by the Bankruptcy Court.  Under fresh start reporting rules that may apply to the Debtors upon the effective date of a chapter 11 plan, the Debtors' assets and liabilities would be adjusted to fair values and its accumulated deficit would be restated to zero.  Accordingly, if fresh start reporting rules apply, the Debtors' financial condition and results of operations following its emergence from chapter 11 would not be comparable to the financial condition and results of operations reflected in its historical financial statements.  In connection with the Chapter 11 Cases and the development of a chapter 11 plan, it is also possible that additional restructuring and related charges may be identified and recorded in future periods.  Such charges could be material to the Debtors' consolidated financial position and results of operations in any given period.

### 14.   *Due to fresh start reporting rules, the Reorganized Debtors' financial statements will not be comparable to the Debtors' historical financial statements*

Due to fresh start reporting rules, the Reorganized Debtors' consolidated financial statements will not be comparable to their consolidated historical financial statements.

Error! Unknown document property name.

As a result of the consummation of the Plan and the transactions contemplated thereby, the Reorganized Debtors would be subject to the fresh start reporting rules required by the Financial Accounting Standards Board Accounting Standards Codification Topic 852, Reorganizations.  Accordingly, the Reorganized Debtors' consolidated financial condition and results of operations from and after the Effective Date will not be comparable to the financial condition or results of operations reflected in the Debtors' consolidated historical financial statements.

In addition, the Financial Projections do not currently reflect the full impact of fresh start reporting, which may have a material impact on the Financial Projections.

### 15. *Applicable securities laws may restrict transfers or sales of the New Common Stock*

The Plan provides that, to the maximum extent allowable, the New Common Stock would be issued pursuant to the exemption from registration set forth in section 1145(a) of the Bankruptcy Code and will, therefore, be exempt from, among other things, the registration and prospectus delivery requirements of section 5 of the Securities Act and any other applicable state and federal law requiring registration and/or delivery of a prospectus prior to the offering, issuance, distribution, or sale of securities.

To the extent that the New Common Stock are issued under the Plan, they may be resold by a holder thereof without registration unless, as more fully described below, the holder is an "underwriter" with respect to such securities.  Generally, section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who:

(i)      purchases a claim against, an interest in, or a claim for an administrative expense against the debtor, if such purchase is with a view to distributing any security received in exchange for such a claim or interest;

(ii)      offers to sell securities offered under a plan for the holders of such securities;

(iii)      offers to buy such securities from the holders of such securities, if the offer to buy is:

(A)      with a view to distributing such securities; and

(B)      under an agreement made in connection with the plan, the consummation of the plan, or with the offer or sale of securities under the plan; or

(iv)      is an "issuer" with respect to the securities, as the term "issuer" is used in section 2(a)(11) of the Securities Act.

Under section 2(a)(11) of the Securities Act, an "issuer" includes any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control of the issuer.

Error! Unknown document property name.

To the extent that any persons who receive New Common Stock pursuant to the Plan are deemed to be "underwriters" as defined in section 1145(b) of the Bankruptcy Code, resales of such New Common Stock by such persons would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.  However, resales of New Common Stock satisfying the requirements of Securities Act rule 144 may be permitted, as the person would be deemed not to be engaged in a distribution and therefore not an "underwriter."  These rules permit the public sale of securities received by such persons if current information regarding the issuer is publicly available and if volume limitations and certain other conditions are met.

Whether or not any particular person would be deemed to be an "underwriter" with respect to the New Common Stock or any other security issued pursuant to the Plan would depend upon various facts and circumstances applicable to that person.  Accordingly, the Debtors express no view as to whether any particular person receiving New Common Stock or other securities under the Plan would be an "underwriter" with respect to such New Common Stock or other securities.

See Article VIII, "Securities Law Matters," for additional information regarding restrictions on resale of the New Common Stock.

### 16.    *Allowance of Claims may substantially dilute the recovery to holders of Claims under the Plan*

There can be no assurance that the estimated Claim amounts set forth in this Disclosure Statement are correct, and the actual Allowed amounts of Claims may differ from these estimates.  These estimated amounts are based on certain assumptions with respect to a variety of factors.  Should these underlying assumptions prove incorrect, the actual Allowed amounts of Claims may vary from those estimated herein.  Because certain distributions under the Plan are linked to the amount and value of Allowed Claims, any material increase in the amount of Allowed Claims over the amounts estimated by the Debtors would materially reduce the recovery to certain holders of Allowed Claims under the Plan.

### 17.    *Potential dilution*

The ownership percentage represented by the New Common Stock that may be distributed on the Effective Date under the Plan will be subject to dilution from the equity issued in connection with the Management Incentive Plan and any other shares that may be issued post-emergence, and the conversion of any options, warrants, convertible securities, exercisable securities, or other securities that may be issued post-emergence.  In the future, similar to all companies, additional equity financings or other share issuances by any of the Reorganized Debtors could adversely affect the value of the New Common Stock issuable upon such conversion.  The amount and dilutive effect of any of the foregoing could be material.

### 18.    *Lack of established market for Existing Equity Interests as a consequence of Plan and bankruptcy filing*

As set forth above, holders of Claims and Interests that are not entitled to vote will be given the opportunity to opt out of granting the releases set forth in Section 14.6 of the Plan.

Error! Unknown document property name.

After an election to opt out is made by a holder of such a Claim or Interest, such election will be binding on any buyer of such Claim or Interest in any subsequent sale or re-sale of the shares prior to the date such shares are cancelled.  Specifically, once a holder that holds its non-voting Claims or Interests opts out, such Claims or Interests, as stated above, will be cancelled and discharged under the Plan as of the Effective Date and such opt out holder will not receive any consideration or distributions of any kind whatsoever under the Plan.

**B.      Factors Affecting the Debtors' Businesses, Operations, and Financial Condition if the Debtors Reorganize Under the Plan**

> ***1.      The Debtors will be subject to the risks and uncertainties associated with the Chapter 11 Cases***

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy.  These risks include the following: (a) ability to develop, confirm, and consummate the Plan and transactions contemplated thereunder; (b) ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways.  For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition.  Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities.  Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

> 2.      ***Operating in bankruptcy for a long period of time may harm the Debtors' operations***

The Debtors' future results will be dependent upon the successful confirmation and implementation of a plan of reorganization.  A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity.  So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort

Error! Unknown document property name.

dealing with the reorganization instead of focusing exclusively on business operations.  A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' businesses.  In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases.  The chapter 11 proceedings also require debtor-in-possession financing to fund the Debtors' operations.  If the Debtors are unable to fully draw on the availability under the DIP Facility, the chances of successfully reorganizing the Debtors' businesses may be seriously jeopardized, the likelihood that the Debtors will instead be required to liquidate or sell their assets may be increased, and, as a result, creditor recoveries may be significantly impaired.

Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, the Reorganized Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

3.    *The Debtors expect to have a substantial customer concentration, with a limited number of customers accounting for a substantial portion of Southcross's revenues as a result of Holding' sale of its Robstown fractionation facility and Southcross's affiliate contracts with Holdings*

The Debtors expect to derive a significant portion of their revenues from EPIC Y-Grade Holdings, LP ("**EPIC Y-Grade**"), the purchaser of Robstown, and successor to Holdings' obligations pursuant to the Robstown Purchase Agreement.  EPIC Y-grade is expected to account for more than 30% of Southcross's revenues in 2019.  There are inherent risks whenever a large percentage of total revenues are concentrated with a limited number of customers.  If EPIC Y-Grade would experience declining financial position due to market, economic, or competitive conditions, Southcross could be pressured to reduce the fees it receives or have to accept payment terms which could have an adverse effect on its margins and financial position, and could negatively affect its revenues and results of operations and/or trading price of its units.

Error! Unknown document property name.

> **4.** **Because of the natural decline in production from existing wells in Southcross's areas of operation, Southcross's success depends in part on producers growing production and replacing declining production and also on its ability to obtain new sources of natural gas. Any decrease in the volumes of natural gas that Southcross gathers, compresses, processes, treats, or transports or in the volumes of NGLs that it fractionates or transport could adversely affect Southcross's business and operating results**

The natural gas volumes that support Southcross's business depend on the level of production from natural gas wells connected to Southcross's systems, which may be less than expected and will naturally decline over time. As a result, Southcross's cash flows associated with these wells also will decline over time. In order to maintain or increase throughput levels on its systems, Southcross must obtain new sources of natural gas. The primary factors affecting Southcross's ability to obtain non-dedicated sources of natural gas include (a) the level of successful drilling activity in its areas of operation, (b) Southcross's ability to compete for volumes from successful new wells, and (c) Southcross's ability to compete successfully for volumes from sources connected to other pipelines.

Southcross has no control over the level of drilling activity in its areas of operation, the amount of reserves associated with wells connected to it systems, or the rate at which production from a well declines. In addition, Southcross has no control over producers or their drilling or production decisions, which are affected by, among other things:

- the availability and cost of capital;
- prevailing and projected crude oil, natural gas, and NGL prices;
- demand for crude oil, natural gas, and NGLs;
- levels of reserves;
- geological considerations;
- environmental or other governmental regulations, including the availability of drilling permits and the regulation of hydraulic fracturing; and
- the availability of drilling rigs and other costs of production and equipment.

Fluctuations in energy prices can also greatly affect the development of crude oil and natural gas reserves. Drilling and production activity generally decreases as natural gas, crude oil, or NGL prices decrease. Declines in natural gas, crude oil, or NGL prices could have a negative impact on exploration, development, and production activity, and sustained low prices could lead to a material decrease in such activity. Sustained reductions in exploration or production activity in Southcross's areas of operation could lead to reduced utilization of its assets.

Natural gas, crude oil, and NGL prices have been negatively affected by a combination of factors, including weakening demand, increased production, the decision by the Organization of Petroleum Exporting Countries to keep production levels unchanged, and a strengthening in the U.S. dollar relative to most other currencies. Given the historical volatility of crude oil prices, there remains a risk that prices could further deteriorate due to increased domestic production,

Error! Unknown document property name.

slowing economic growth rates in various global regions and/or the potential for significant supply and demand imbalances.

The decline in natural gas, crude oil, and NGL prices has negatively impacted exploration, development, and production activity, and the sustained low prices of any of these commodities could lead to a material decrease in such activity.  Certain of Southcross's producers and other suppliers are tied to crude oil wells, and any sustained reduction in exploration or production activity in Southcross's areas of operation, whether related to crude oil, natural gas or NGLs, or a combination of them, could lead to reduced utilization of Southcross's assets, including the volume of natural gas flowing in Southcross's system.

Because of these and other factors, even if natural gas and liquid reserves are known to exist in areas served by Southcross's assets, producers may choose not to develop those reserves.  If reductions in drilling activity result in Southcross's inability to maintain the current levels of throughput on its systems, those reductions could reduce its revenue and cash flow.

> **5.**    ***Southcross does not obtain independent evaluations of natural gas and liquid reserves connected to Southcross's gathering and transportation systems on a regular or ongoing basis; therefore, in the future, volumes of natural gas on Southcross's systems could be less than Southcross anticipates***

Southcross does not obtain independent evaluations of the natural gas reserves connected to its systems on a regular or ongoing basis because Southcross's producer customers are often unwilling to share this information for competitive reasons.  Accordingly, Southcross does not have independent estimates of total reserves dedicated to some or all of its systems or the anticipated life of such reserves.  If (a) the total reserves or estimated life of the reserves connected to Southcross's gathering and transportation systems are less than it anticipates and (b) Southcross is unable to secure additional sources of natural gas, such circumstances could have a material adverse effect on Southcross's business, results of operations, and financial condition.

> **6.**    ***Southcross's success depends on drilling activity by customers and its ability to attract and maintain customers in a limited number of geographic areas***

A significant portion of Southcross's assets are located in the Eagle Ford Shale region, and Southcross intends to focus its future capital expenditures largely on developing its business in this area.  As a result, Southcross's financial condition, results of operations, and cash flows are significantly dependent upon the demand for its services in this area.  Due to Southcross's focus on this area, an adverse development in natural gas production from this area, such as decreased development or production activity, would have a significantly greater impact on Southcross's financial condition and results of operations than if it spread expenditures more evenly over a wider geographic area.

> **7.**    ***Southcross's failure to execute effectively on major development projects could result in delays and/or cost over-runs, limitations on its growth and negative effects on its operating results, liquidity, and financial position***

97

Southcross is engaged from time to time in the planning and construction of development projects, some of which may take a number of months before commercial operation. These projects are complex and subject to a number of factors beyond Southcross's control, including delays from third party landowners, the permitting process, unavailability of materials, labor disruptions, environmental hazards, financing, accidents, weather, and other factors. In addition, legislative or regulatory intervention may create limits or prohibit Southcross's ability to perform desired capital projects. Delays in the completion of these types of projects could have a material adverse effect on Southcross's business, financial condition, results of operations, and liquidity. Estimating the timing and expenditures related to these development projects is complex and subject to variables that can increase expected costs. Should the actual costs of these projects exceed estimates, Southcross's liquidity and capital position could be adversely affected. This level of development activity requires effort from Southcross's management and technical personnel and places additional requirements on Southcross's financial resources and internal financial controls.

8. ***Energy prices are volatile, and a change in these prices in absolute terms, or an adverse change in energy prices, particularly natural gas and NGLs relative to one another, could adversely affect Southcross's gross operating margin and cash flow and its ability to make cash distributions to Southcross's unitholders***

Southcross is subject to risks due to frequent and often substantial fluctuations in commodity prices. In the past, the prices of natural gas, NGLs, and other commodities have been extremely volatile, and Southcross expects this volatility to continue. Southcross's future cash flow will be materially adversely affected if it experiences significant, prolonged pricing deterioration.

The markets for and prices of natural gas, NGLs, and other commodities depend on factors that are beyond Southcross's control. These factors include the supply of and demand for these commodities, which fluctuate with changes in market and economic conditions and other factors, including:

- worldwide economic conditions;
- worldwide political events, including actions taken by foreign oil and natural gas producing nations;
- worldwide weather events and conditions, including natural disasters and seasonal changes;
- the levels of domestic production and consumer demand;
- the availability of transportation systems with adequate capacity;
- the volatility and uncertainty of regional pricing differentials;
- the price and availability of alternative fuels;
- the effect of energy conservation measures;
- the nature and extent of governmental regulation and taxation;
- fluctuations in demand from electric power generators and industrial customers; and
- the anticipated future prices of crude oil, natural gas, NGLs, and other commodities.

Error! Unknown document property name.

9. ***Southcross's exposure to direct commodity price risk and volatility in costs to market products may vary***

Southcross currently generates a large portion of its revenues pursuant to fixed-fee contracts under which it is paid based on the volumes of natural gas that it gathers, processes, treats, compresses and transports, and the volumes of NGLs Southcross fractionates and transports, rather than the value of the underlying natural gas or NGLs. Consequently, this portion of Southcross's existing operations and cash flows have limited direct exposure to commodity price levels. Although Southcross intends to enter into similar fixed-fee contracts with new customers in the future, its efforts to obtain such contractual terms may not be successful. Southcross may acquire or develop additional midstream assets or change the arrangements under which it processes its volumes. These changes may also impact Southcross's transportation and gathering costs in a manner that increases its exposure to commodity price risk. Extended or future exposure to the volatility of crude oil and natural gas prices could have a material adverse effect on Southcross's business, results of operations, and financial condition.

In addition, another large portion of Southcross's revenues is generated pursuant to fixed-spread contracts under which Southcross strives to buy and sell equal volumes of natural gas and NGLs at prices based upon the same index price of the commodity. Southcross's ability to do this is based upon a number of factors, including the willingness of customers to accept the same index as a basis, physical differences in geography, product specifications, and the ability to market products at the anticipated differential from the pricing index.

10. ***Unexpected volume changes due to production variability or to gathering, plant, or pipeline system disruptions may increase Southcross's exposure to commodity price movements***

Southcross sells processed natural gas to third parties at plant tailgates, pipeline pooling points, or at inlet meters to the sites of industrial and utility customers. These sales may be interrupted by disruptions to volumes anywhere along the system. Southcross attempts to balance sales with volumes supplied, but unexpected volume variations due to production variability or to gathering, plant, or pipeline system disruptions may expose it to volume imbalances which, in conjunction with movements in commodity prices, could materially impact Southcross's income from operations and cash flow.

11. ***Southcross may not successfully balance its purchases and sales of natural gas, which would increase its exposure to commodity price risks***

Southcross purchases from producers and other suppliers a substantial amount of the natural gas that flows through its pipelines and processing facilities for sale to third parties, including natural gas marketers and others.

Southcross is exposed to fluctuations in the price of natural gas through volumes sold pursuant to commodity-sensitive arrangements and, to a lesser extent, through volumes sold pursuant to Southcross's fixed-spread contracts.

99

In order to mitigate its direct commodity price exposure, Southcross typically attempts to balance its natural gas sales with its natural gas purchases on an aggregate basis across all of its systems. Southcross may not be successful in balancing its purchases and sales and, as such, may become exposed to fluctuations in the price of natural gas. Southcross's overall net position with respect to natural gas can change over time, and its exposure to fluctuations in natural gas prices could materially increase, which in turn could result in increased volatility in Southcross's revenue, gross operating margin, and cash flows.

Although Southcross enters into back-to-back purchases and sales of natural gas in its fixed-spread contracts in which it purchases natural gas from producers or suppliers at receipt points on Southcross's systems and simultaneously sells a similar volume of natural gas at delivery points on Southcross's systems, Southcross may not be able to mitigate all exposure to commodity price risks. Any of these actions could cause Southcross's purchases and sales to become unbalanced. If Southcross's purchases and sales are unbalanced, Southcross will face increased exposure to commodity price risks, which in turn could result in increased volatility in its revenue, gross operating margin, and cash flows.

### 12. *Southcross's industry is highly competitive, and increased competitive pressure could adversely affect its business and operating results*

Southcross competes with other similarly sized midstream companies in its areas of operation. Some of Southcross's competitors are large companies that have greater financial, managerial, and other resources than Southcross. In addition, some of Southcross's competitors have assets in closer proximity to natural gas supplies and have available idle capacity in existing assets that would not require new capital investments for use. Southcross's competitors may expand or construct gathering, compression, treating, processing, or transportation systems or NGL fractionation facilities that would create additional competition for the services Southcross provides to its customers. In addition, Southcross's customers may develop their own gathering, compression, treating, processing, or transportation systems or NGL fractionation facilities in lieu of using Southcross's facilities. Southcross's ability to renew or replace existing contracts with Southcross's customers at rates sufficient to maintain current revenue and cash flow could be adversely affected by the activities of its competitors and customers. All of these competitive pressures could have a material adverse effect on Southcross's business, results of operations, financial condition, and ability to make cash distributions to Southcross's unitholders.

### 13. *Southcross's gathering, processing, and transportation contracts subject it to contract renewal risks*

Southcross gathers, purchases, processes, treats, compresses, transports, and sells most of the natural gas and NGLs on its systems under contracts with terms of various durations. As these contracts expire, Southcross may have to negotiate extensions or renewals with existing suppliers and customers or enter into new contracts with other suppliers and customers. Southcross may be unable to obtain new contracts on favorable commercial terms, if at all. Southcross also may be unable to maintain the economic structure of a particular contract with an existing customer or the overall mix of Southcross's contract portfolio. To the extent Southcross is unable to renew its existing contracts on terms that are favorable to Southcross or

Error! Unknown document property name.

successfully manage its overall contract mix over time, its revenue, gross operating margin and cash flows could decline and its ability to make cash distributions to Southcross's unitholders could be materially and adversely affected.

### 14.    *Southcross depends on a relatively limited number of customers*

A significant percentage of Southcross's revenue is attributable to a relatively limited number of customers.  Southcross's top ten customers, excluding affiliates, accounted for 89.5% of its revenue for the year fiscal quarter ended March 31, 2019.  Southcross has gathering, processing, transportation, and/or sales contracts with each of these customers of varying duration and commercial terms.  If Southcross is unable to renew its contracts with one or more of these customers on favorable terms, it may not be able to replace any of these customers in a timely fashion, on favorable terms or at all.  In addition, many of Southcross's customers are oil and gas companies that are facing liquidity constraints in light of the current commodity price environment and may be disproportionately affected by such constraints as compared to larger, better capitalized companies.  This concentration of Southcross's customers in the energy industry may impact its overall exposure to credit risk as customers may be affected similarly by prolonged changes in economic and industry conditions.  If a significant number of Southcross's customers experience a prolonged business decline or disruptions or enter into bankruptcy, Southcross will incur increased exposure to credit risk and bad debts.  Any material nonpayment or nonperformance by any of Southcross's key customers could have a material adverse effect on its revenue, gross operating margin, cash flows, and its ability to make cash distributions to Southcross's unitholders.  In any of these situations, Southcross's revenue, gross operating margin, cash flows, and its ability to make cash distributions to Southcross's unitholders may be adversely affected.  Southcross expects its exposure to concentrated risk of nonpayment or nonperformance to continue as long as it remains substantially dependent on a relatively limited number of customers for a substantial portion of its revenue.

### 15.    *If third party pipelines, other midstream facilities, or purchasers of Southcross's products interconnected to its gathering or transportation systems become partially or fully unavailable, or if the volumes Southcross gathers, process, or transport do not meet the natural gas and NGL quality requirements of such pipelines or facilities, Southcross's gross operating margin, cash flow, and its ability to make distributions to its unitholders could be adversely affected*

Southcross's natural gas gathering and transportation pipelines, NGL pipelines, and processing and treating facilities connect to other pipelines or facilities owned and operated by unaffiliated third parties.  The continuing operation of such third party pipelines, processing plants, facilities of purchasers of Southcross's products, and other midstream facilities is not within Southcross's control.  These pipelines and facilities may become unavailable because of testing, turnarounds, line repair, reduced operating pressure, lack of operating capacity, regulatory requirements, curtailments of receipt or deliveries due to insufficient capacity, or damage from natural disasters or other operational hazards.  In addition, if the costs to Southcross to access and transport on these third party pipelines significantly increase, its profitability could be reduced.  If any such increase in costs occurred, if any of these pipelines or other midstream facilities become unable to receive, transport or process natural gas, or if the volumes Southcross gathers, processes, treats, or transports do not meet the natural gas quality

requirements (such as hydrocarbon dew point, temperature, and foreign content including water, sulfur, carbon dioxide, and hydrogen sulfide) of such pipelines or facilities, Southcross's gross operating margin, cash flow, and its ability to make cash distributions to Southcross's unitholders could be adversely affected.

16.     ***Significant portions of Southcross's pipeline systems and processing plants have been in service for several decades, and Southcross has a limited ownership history with respect to all of its assets.  There could be unknown events or conditions or increased maintenance or repair expenses and downtime associated with Southcross's pipelines, and processing and treating plants that could have a material adverse effect on its business and operating results***

Significant portions of Southcross's pipeline systems and processing plants have been in service for many decades.  Southcross's executive management team has a limited history of operating its assets.  There may be historical occurrences or latent issues regarding Southcross's pipeline systems of which its executive management team may be unaware and that may have a material adverse effect on its business and results of operations.  The age and condition of Southcross's pipeline systems could also result in increased maintenance or repair expenditures, and any downtime associated with increased maintenance and repair activities could materially reduce Southcross's revenue.  Any significant increase in maintenance and repair expenditures or loss of revenue due to the age or condition of Southcross's pipeline systems could adversely affect Southcross's business and results of operations and its ability to make cash distributions to Southcross's unitholders.  In addition, portions of Southcross's pipeline systems are in public rights-of-way that may need to be moved or relocated from time to time at the request of government entities.  Southcross may not be fully reimbursed for the expenses related to these relocations.

17.     ***Certain claims may not be discharged and may have a material adverse effect on the Debtors' financial condition and results of operations***

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation.  With few exceptions, all Claims that arise prior to the Debtors' filing of their petitions or before confirmation of the plan of reorganization (a) would be subject to compromise and/or treatment under the plan of reorganization and/or (b) would be discharged in accordance with the terms of the plan of reorganization.  Any Claims not ultimately discharged through a plan of reorganization could be asserted against the reorganized entity and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations.

18.     ***Southcross's business involves many hazards and operational risks, some of which may not be fully covered by insurance.  If a significant accident or event occurs for which Southcross is not adequately insured, including any interruption of its operations as a result of such accident or event, or if Southcross fails to recover all anticipated insurance proceeds for significant accidents or events for which Southcross is insured, its operations and financial results could be adversely affected***

Error! Unknown document property name.

Southcross's operations are subject to all of the risks and hazards inherent in the gathering, compressing, treating, processing, and transportation of natural gas and the fractionation and transportation of NGLs, including:

- damage to pipelines and plants, related equipment, and surrounding properties caused by hurricanes, tornadoes, floods, fires, and other natural disasters, acts of terrorism, and actions by third parties;
- inadvertent damage from construction, vehicles, farm, and utility equipment;
- leaks of natural gas, including gas with high levels of hydrogen sulfide, and other hydrocarbons or losses of natural gas as a result of human error, the malfunction of equipment or facilities, which can result in personal injury and loss of life, pollution, damage to equipment and suspension of operations;
- ruptures, fires, and explosions; and
- other hazards, including those associated with high-sulfur content, or sour gas, that could also result in personal injury and loss of life, pollution, and suspension of operations.

These risks could result in substantial losses due to personal injury and loss of life, severe damage to and destruction of property and equipment, and pollution or other environmental damage. These risks may also result in interruptions, curtailment, or suspension of Southcross's operations. A natural disaster or other hazard affecting the areas in which Southcross operates could have a material adverse effect on its operations. Southcross is not fully insured against all risks inherent in its business. In addition, although Southcross is insured for environmental pollution resulting from environmental accidents that occur on a sudden and accidental basis, Southcross may not be insured against all environmental accidents that might occur, some of which may result in toxic tort claims. If a significant accident or event occurs for which Southcross is not fully insured, it could adversely affect Southcross's operations and financial condition. Furthermore, Southcross may not be able to maintain or obtain insurance of the type and amount it desires at reasonable rates. As a result of market conditions, premiums and deductibles for certain of Southcross's insurance policies may substantially increase. In some instances, certain insurance could become unavailable or available only for reduced amounts of coverage. Additionally, Southcross may be unable to recover from prior owners of its assets, pursuant to its indemnification rights, for potential environmental liabilities.

**19.      Southcross may not benefit from its acquisition strategy. If Southcross is unable to make acquisitions on economically acceptable terms from Holdings or third parties, its future growth may be affected and the acquisitions it does make may reduce, rather than increase, its cash generated from operations on a per unit basis**

As part of Southcross's business strategy, it regularly evaluates opportunities to enhance the value of its business by pursuing acquisitions that increase its cash generated from operations on a per unit basis. Although Southcross remains subject to financial and other covenants in its credit facilities that may limit its ability to pursue certain strategic opportunities, Southcross

Error! Unknown document property name.

intends to continue to evaluate and, when appropriate, pursue strategic acquisition opportunities as they arise.

If Southcross is unable to make accretive acquisitions from Holdings or third parties whether because Southcross is (a) unable to identify attractive acquisition candidates or negotiate acceptable purchase contracts, (b) unable to obtain financing for these acquisitions on economically acceptable terms because the terms of Southcross's indebtedness restrict it from making acquisitions, (c) outbid by competitors, or (d) for any other reason, then Southcross's future growth could be limited.  Furthermore, even if Southcross makes acquisitions that it believes will be accretive, these acquisitions may nevertheless result in a decrease in the cash generated from operations on a per unit basis.

Any acquisition involves potential risks, including, among other things:

- mistaken assumptions about volumes, revenue, and costs, including synergies;
- an inability to secure adequate customer commitments to use the acquired systems or facilities;
- the risk that natural gas reserves expected to support the acquired assets may not be of the anticipated magnitude or may not be developed as anticipated;
- an inability to integrate successfully the assets or businesses Southcross acquires, particularly given the relatively small size of Southcross's management team and their limited history with Southcross's assets;
- coordinating geographically disparate organizations, systems, and facilities;
- the assumption of unknown liabilities;
- limitations on rights to indemnity from the seller;
- mistaken assumptions about the overall costs of equity or debt;
- the diversion of management's and employees' attention from other business concerns;
- unforeseen difficulties operating in new geographic areas and business lines; and
- customer or key employee losses at the acquired businesses.

Southcross cannot provide any assurance, however, with respect to the timing, likelihood, size, or financial effect of any potential transaction involving the Company, as Southcross may not be successful in identifying and consummating any acquisition, particularly in light of its low liquidity levels, or in integrating any newly acquired business into its operations.  Further, if Southcross consummates any future acquisitions, its capitalization and results of operations may change significantly, and its unitholders will not have the opportunity to evaluate the economic, financial and other relevant information that Southcross will consider in determining the application of these funds and other resources.

### 20. *Southcross's access to capital may be further limited due to deterioration of conditions in the global capital markets, weakening of macroeconomic conditions and negative changes in financial performance*

Error! Unknown document property name.

In general, Southcross has relied, in large part, on banks and capital markets to fund its operations, contractual commitments, and refinance existing debt.  These markets can experience high levels of volatility and access to capital can be constrained for an extended period of time. In addition to conditions in the capital markets, a number of other factors, including Southcross's financial performance, substantial indebtedness and any sustained depression of natural gas, NGL and/or crude oil prices (including further extension of the low energy price environment that began in the second half of 2014), could cause Southcross to incur increased borrowing costs and to have greater difficulty accessing public and private markets in the future for both secured and unsecured debt.  If Southcross is unable to secure financing on acceptable terms, its other sources of funds, including available cash, bank facilities and cash flow from operations may not be adequate to fund its operations, contractual commitments, and refinance existing debt.

21.    ***Increases in interest rates could adversely impact Southcross's unit price and its ability to issue equity or incur debt for acquisitions or other purposes***

Interest rates on future credit facilities and debt offerings could be higher than current levels, causing Southcross's financing costs to increase accordingly.  As with other yield-oriented securities, Southcross's unit price is impacted by Southcross's level of cash distributions and implied distribution yield.  The distribution yield is often used by investors to compare and rank yield-oriented securities for investment decision-making purposes.  Therefore, changes in interest rates, either positive or negative, may affect the yield requirements of investors who invest in Southcross's units, and a rising interest rate environment could have an adverse impact on Southcross's unit price, its ability to issue equity or incur debt for acquisitions or other purposes and the costs to Southcross of any such issuance or incurrence.

22.    ***A shortage of skilled labor in the midstream natural gas industry could reduce labor productivity and increase costs, which could have a material adverse effect on Southcross's business and results of operations***

The gathering, processing, treating, compression, and transportation of natural gas and NGL fractionation and transportation services require skilled laborers in multiple disciplines, such as equipment operators, mechanics, and engineers, among others.  Southcross has from time to time encountered shortages for these types of skilled labor.  If Southcross experiences shortages of skilled labor in the future, its labor and overall productivity or costs could be materially and adversely affected.  If Southcross's labor prices increase or if it experiences materially increased health and benefit costs with respect to Southcross GP's employees, Southcross's results of operations could be materially and adversely affected.

23.    ***The terms of Southcross's indebtedness will include restrictions and financial covenants that may restrict Southcross's business and financing activities***

The operating and financial restrictions and covenants in any future financing agreements may restrict Southcross's ability to finance future operations or capital needs or to engage, expand, or pursue its business activities or to pay distributions to Southcross's unitholders. Southcross's future ability to comply with these restrictions and covenants is uncertain and will be affected by the levels of cash flow from its operations and other events or circumstances

Error! Unknown document property name.

beyond its control.  If market or other economic conditions deteriorate, Southcross's ability to comply with these covenants may be impaired.  If Southcross violates any provisions of such financing agreements that are not cured or waived within the appropriate time periods provided therein, a significant portion of its indebtedness may become immediately due and payable, Southcross's ability to make distributions to Southcross's unitholders will be inhibited and its lenders' commitment to make further loans to Southcross may terminate.  Southcross might not have, or be able to obtain, sufficient funds to make these accelerated payments.  In addition, Southcross's obligations under its Exit Revolving Credit Facility are secured by substantially all of its assets, and if Southcross is unable to repay Southcross's indebtedness under Southcross's revolving credit facility, the lenders could seek to foreclose on Southcross's assets.

The Exit Term Loan and Exit Revolving Credit Facility limits Southcross's ability among other things, to:

- incur or guarantee additional debt;
- make distributions on or redeem or repurchase units;
- make certain investments and acquisitions;
- make capital expenditures;
- incur certain liens or permit them to exist;
- enter into certain types of transactions with affiliates;
- merge or consolidate with another company; and
- transfer, sell or otherwise dispose of assets.

 A failure to comply with the provisions of the Debtors' Exit Term Loan and Exit Revolving Credit Facility will result in a default or an event of default that could enable its lenders, subject to the terms and conditions of the Exit Term Loan and Exit Revolving Credit Facility, to declare the outstanding principal of that debt, together with accrued and unpaid interest, to be immediately due and payable.  If the payment of Southcross's debt is accelerated, its assets may be insufficient to repay such debt in full, and Southcross's unitholders could experience a partial or total loss of their investment.

> **24.     If Southcross continues to be unable to generate enough cash flow from operations to service its indebtedness or is unable to use future borrowings to refinance its indebtedness or fund other capital needs, Southcross may have to undertake alternative financing plans, which may have onerous terms or may be unavailable**

Southcross cannot assure that its business will generate sufficient cash flow from operations to service its outstanding indebtedness, or that future borrowings will be available to it in an amount sufficient to enable Southcross to pay its indebtedness or to fund its other capital needs.  If Southcross does not generate sufficient cash flow from operations to satisfy its debt obligations, it may have to undertake alternative financing plans, such as:

- refinancing or restructuring all or a portion of its debt;
- obtaining alternative financing;
- selling assets;

Error! Unknown document property name.

- reducing or delaying capital investments;
- seeking to raise additional capital; or
- revising or delaying Southcross's strategic plans.

However, Southcross cannot be assured that it would be able to implement alternative financing plans, if necessary, on commercially reasonable terms or at all, or that undertaking alternative financing plans, if necessary, would allow Southcross to meet its debt obligations and capital requirements, or that these actions would be permitted under the terms of its various debt instruments.

Southcross continually monitors the capital markets and its capital structure and may make changes to its capital structure from time to time, with the goal of maintaining financial flexibility, preserving or improving liquidity, strengthening its balance sheet, meeting its debt service obligations and/or achieving cost efficiency. Southcross's ability to restructure or refinance its indebtedness will depend on the condition of the capital markets and its financial condition at such time. Any refinancing of Southcross's indebtedness could cause it to incur high transaction costs, may be at higher interest rates and may require Southcross to comply with more onerous covenants, which could further restrict its business operations. The terms of existing or future debt instruments, including the Exit Revolving Credit Facility, may restrict Southcross from adopting some of these alternatives. In addition, any failure to make payments of interest and principal on Southcross's outstanding indebtedness on a timely basis would likely harm its ability to incur additional indebtedness. In the absence of sufficient cash flows and capital resources, Southcross could face substantial liquidity problems and might be required to dispose of material assets or operations to meet its debt service and other obligations. Southcross's debt instruments restrict its ability to dispose of assets and its use of the proceeds from such disposition. Southcross may not be able to consummate those dispositions, and the proceeds of any such disposition may not be adequate to meet any debt service obligations then due.

Southcross can provide no assurances that any alternative strategic action or financing plan undertaken will be successful in allowing Southcross to meet its debt obligations or will result in additional liquidity. Southcross's inability to generate sufficient cash flow to satisfy its debt obligations or to obtain alternative financing could materially and adversely affect its ability to make payments on its indebtedness and its business, financial condition, results of operations and cash flows.

25. ***Southcross is subject to stringent environmental laws and regulations that may expose it to significant costs and liabilities***

Southcross's natural gas gathering, processing, compression, treating, and transportation operations and NGL fractionation services are subject to stringent and complex federal, state, and local environmental laws and regulations that govern the discharge of materials into the environment or otherwise relate to environmental protection (including, for example, the Clean Air Act (the "**CAA**"), the Comprehensive Environmental Response, Compensation, and Liability Act, the Endangered Species Act and the Resource Conservation and Recovery Act).

Error! Unknown document property name.

These laws and regulations may impose numerous obligations that are applicable to Southcross's operations, including the acquisition of permits to conduct regulated activities, the incurrence of capital or operating expenditures to limit or prevent releases of materials from Southcross's pipelines and facilities, and the imposition of substantial liabilities and remedial obligations for pollution resulting from its operations or at locations currently or previously owned or operated by Southcross  Numerous governmental authorities, such as the U.S. Environmental Protection Agency (the "**EPA**"), and analogous state agencies, have the power to enforce compliance with these laws and regulations and the permits issued under them, oftentimes requiring difficult and costly corrective actions or costly pollution control measures. Failure to comply with these laws, regulations and permits may result in the assessment of administrative, civil and criminal penalties, the imposition of remedial obligations and the issuance of injunctions limiting or preventing some or all of Southcross's operations.  In addition, Southcross may experience a delay in obtaining or be unable to obtain required permits or regulatory authorizations, which may cause Southcross to lose potential and current customers, interrupt its operations and limit its growth and revenue.

There is a risk that Southcross may incur significant environmental costs and liabilities in connection with its operations due to historical industry operations and waste disposal practices, Southcross's handling of hydrocarbon and other wastes and potential emissions and discharges related to its operations.  Joint and several, strict liability may be incurred, without regard to fault, under certain of these environmental laws and regulations in connection with discharges or releases of hazardous wastes and other materials on, under or from Southcross's properties and facilities, many of which have been used for midstream activities for a number of years, oftentimes by third parties not under Southcross's control.  Private parties, including the owners of the properties through which Southcross's gathering or transportation systems pass and facilities where its wastes are taken for reclamation or disposal, may also have the right to pursue legal actions to enforce compliance as well as to seek damages for non-compliance with environmental laws and regulations or for personal injury or property damage.  In addition, changes in environmental laws occur frequently, and any such changes that result in additional permitting obligations or more stringent and costly waste handling, storage, transport, disposal, or remediation requirements could have a material adverse effect on Southcross's operations or financial position.  Southcross may not be able to recover all or any of these costs from insurance.

### 26. *Climate change legislation, regulatory initiatives, and litigation could result in increased operating costs and reduced demand for the natural gas services Southcross provides*

The EPA has adopted regulations under existing provisions of the CAA that require certain large stationary sources to obtain Prevention of Significant Deterioration pre-construction permits and Title V operating permits for greenhouse gas ("**GHG**") emissions, which does not currently apply to Southcross's facilities.  In addition, in September 2009, the EPA issued a final rule requiring the monitoring and reporting of GHG emissions from certain large GHG emissions sources.  Southcross's Gregory, Woodsboro, Bonnie View, Lone Star, and El Dorado facilities are or will be required to report under this rule.  This reporting rule was expanded in November

Error! Unknown document property name.

2010 to include petroleum and natural gas facilities, including certain natural gas transmission compression facilities, and again in October 2015 to include onshore petroleum and natural gas gathering and boosting activities and natural gas transmission pipelines. Southcross has submitted the reports required under the reporting rule on a timely basis and has adopted procedures for future required reporting. In addition, on June 3, 2016, the EPA published regulations to control emissions of methane, a GHG, and volatile organic compounds from various oil and natural gas operations, although on June 16, 2017, the EPA proposed to stay for 2 years certain requirements in the final rule. Both the stay and the underlying rules have been the subject of litigation. In September 2018, the EPA proposed revisions to the 2016 rules, which, according to the EPA, are intended to "streamline implementation, reduce duplicative EPA and state requirements, and significantly decrease unnecessary burdens on domestic energy producers." Future implementation of these standards is uncertain at this time. Compliance with the 2016 rules, if they are not stayed, or significantly revised pursuant to EPA's 2018 proposal, could result in additional costs, including increased capital expenditures and operating costs, for Southcross and its customers which may adversely impact Southcross's business.

While Congress has from time to time considered legislation to reduce emissions of GHGs, the prospect for adoption of significant legislation at the federal level to reduce GHG emissions is perceived to be low at this time. Several states have also implemented programs to reduce and/or monitor GHG emissions. Although it is not possible at this time to predict how legislation or new regulations that may be adopted to address GHG emissions would impact Southcross's business, any such future laws and regulations that limit emissions of GHGs could adversely affect demand for the oil and natural gas that exploration and production operators produce, including Southcross's current or future customers, which could thereby reduce demand for its midstream services.

In addition, in December 2015, over 190 countries, including the United States, reached an agreement to reduce GHG emissions (the "**Paris Agreement**"). On June 1, 2017, however, President Trump announced that the United States would withdraw from the Paris Agreement unless it could re-enter on more favorable terms. Such withdrawal has not yet been finalized, and it is not possible at this time to predict how or when the United States might impose restrictions on GHGs as a result of the Paris Agreement. Further, several state and local governments have stated their commitment to its principles in their effectuation of policy and regulations. Southcross continues to monitor the international, state, and local efforts to address climate change. To the extent the United States and other countries implement this agreement or impose other climate change regulations on the oil and gas industry, it could have an adverse direct or indirect effect on Southcross's business.

Legislation or regulations that may be adopted to address climate change could also affect the markets for Southcross's products by making its products more or less desirable than competing sources of energy. To the extent that Southcross's products are competing with higher GHG emitting energy sources, its products would become more desirable in the market with more stringent limitations on GHG emissions. To the extent that Southcross's products are competing with lower GHG emitting energy sources such as solar and wind, its products would become less desirable in the market with more stringent limitations on GHG emissions.

Error! Unknown document property name.

Southcross cannot predict with any certainty at this time how these possibilities may affect Southcross's operations.

Finally, increasing concentrations of GHGs in the Earth's atmosphere may produce climate changes that have significant physical effects, such as increased frequency and severity of storms, floods, and other climatic events, and effects upon sea levels, the arability of farmland, and water availability and quality. If such effects were to occur, Southcross's operations, and those of Southcross's customers, have the potential to be adversely affected. Potential adverse effects could include disruption of Southcross's activities, including, for example, damages to Southcross's facilities from powerful winds or floods, or increases in its costs of operation or reductions in the efficiency of Southcross's operations, as well as potentially increased costs for insurance coverage in the aftermath of such effects. Significant physical effects of climate change could also have an indirect effect on Southcross's financing and operations by disrupting the operations of its customers, and the service companies or suppliers with whom it has a business relationship. Due to their location, Southcross's operations along the Gulf Coast are vulnerable to operational and structural damages resulting from hurricanes and other severe weather systems and Southcross's insurance may not cover all associated losses. Southcross is taking steps to mitigate physical risks from storms, but no assurance can be given that future storms will not have a material adverse effect on Southcross's business.

### 27. *Increased regulation of hydraulic fracturing could result in reductions or delays in natural gas production by Southcross's customers, which could adversely impact its revenues*

A portion of Southcross's customers' natural gas production is developed from unconventional sources, such as shales, that require hydraulic fracturing as part of the completion process. Hydraulic fracturing involves the injection of water, sand, and chemicals under pressure into the formation to stimulate gas production. Hydraulic fracturing has become the subject of opposition, additional private and government studies, and increased federal, state, and local regulation. For example, from time to time, Congress has considered legislation to amend the Safe Drinking Water Act to subject hydraulic fracturing operations to regulation under that Act's Underground Injection Control Program and to require disclosure of chemicals used in the hydraulic fracturing process. The EPA has adopted and proposed new regulations under the CAA requiring, among other things, the use of "reduced emission completion" technology for certain hydraulic fracturing operations and related equipment, and has solicited public comment on a possible federal reporting requirement for fluids used in hydraulic fracturing pursuant to the Toxic Substances Control Act. Compliance with such laws and regulations could result in additional costs, including increased capital expenditures and operating costs, for Southcross and its customers, which may adversely impact Southcross's cash flows and results of operations.

Furthermore, a number of public and private studies are underway regarding the connection, if any, between the disposal of waste water associated with hydraulic fracturing and observed seismicity in the vicinity of such disposal operations. Several states, municipalities, and local regulatory bodies have also proposed or adopted, or are considering, legislative or

Error! Unknown document property name.

regulatory restrictions on hydraulic fracturing, including in some cases by imposing moratoria on hydraulic fracturing or regarding permitting, casing, and cementing of wells; testing of nearby water wells; restrictions on access to, and usage of, water; and restrictions on the type of chemical additives that may be used in hydraulic fracturing operations.  Southcross cannot predict whether any other legislation will be enacted and if so, what its provisions would be.  Additional levels of regulation and permits required through the adoption of new laws and regulations at the federal, state or local level could lead to delays, increased operating costs, and prohibitions for producers who drill near Southcross's pipelines.  This could reduce the volumes of natural gas available to move through Southcross's gathering systems which could materially and adversely affect its revenue and results of operations.

> ### 28. *Southcross's construction of new assets may not result in revenue increases and will be subject to regulatory, environmental, political, legal, and economic risks, which could adversely affect its results of operations and financial condition*

One of Southcross's business strategies relates to organic growth projects.  The construction of additions or modifications to Southcross's existing systems and the construction of new midstream assets involve numerous regulatory, environmental, political, legal, and economic uncertainties that are beyond Southcross's control.  Such expansion projects may also require the expenditure of significant amounts of capital, and financing may not be available on economically acceptable terms or at all.  If Southcross undertakes these projects, such projects may not be completed on schedule, at the budgeted cost, or at all.  Moreover, Southcross's revenue may not increase immediately upon the expenditure of funds on a particular project.

For instance, if Southcross expands a pipeline, the construction may occur over an extended period of time, yet Southcross will not receive any material increases in revenue until the project is completed and placed into service.  Moreover, Southcross could construct facilities to capture anticipated future growth in production in a region in which such growth does not materialize or only materializes over a period materially longer than expected.  Since Southcross is not engaged in the exploration for and development of natural gas and crude oil reserves, Southcross often does not have access to third party estimates of potential reserves in an area prior to constructing facilities in that area.  To the extent Southcross relies on estimates of future production in its decision to construct additions to Southcross's systems, such estimates may prove to be inaccurate as a result of the numerous uncertainties inherent in estimating quantities of future production.  As a result, new facilities may not attract enough throughput to achieve Southcross's expected investment return, which could adversely affect its results of operations and financial condition.

In addition, the construction of additions to Southcross's existing gathering and transportation assets may require it to obtain new rights-of-way or environmental authorizations.  Southcross may be unable to obtain such rights-of-way or authorizations and may, therefore, be unable to connect new natural gas volumes to its systems or capitalize on other attractive expansion opportunities.  Additionally, it may become more expensive for Southcross to obtain new rights-of-way or authorizations or to renew existing rights-of-way or authorizations.  If the

Error! Unknown document property name.

cost of renewing or obtaining new rights-of-way or authorizations increases materially, Southcross's cash flows could be adversely affected.

**29.** ***A change in the jurisdictional characterization or regulation of Southcross's assets or a change in regulatory laws and regulations or the implementation of existing laws and regulations could result in increased regulation of its assets which could materially and adversely affect Southcross's financial condition, results of operations and cash flows***

Intrastate natural gas transportation facilities that do not provide interstate transmission services, and natural gas gathering facilities, are exempt from the jurisdiction of the Federal Energy Regulatory Commission ("**FERC**") under the Natural Gas Act ("**NGA**"). Although FERC has not made any formal determinations with respect to any of Southcross's facilities, Southcross believes that its intrastate natural gas pipelines and related facilities that are not engaged in providing interstate transmission services are engaged in exempt gathering and intrastate transportation and, therefore, are not subject to FERC jurisdiction. Southcross also believes that its natural gas gathering pipelines meet the traditional tests that FERC has used to determine if a pipeline is a gathering pipeline and is therefore not subject to FERC's jurisdiction. The distinction between FERC-regulated transmission services and federally unregulated gathering services has been the subject of substantial litigation and, over time, FERC's policy for determining which facilities it regulates has changed. In addition, the distinction between FERC-regulated transmission facilities, on the one hand, and intrastate transportation and gathering facilities, on the other, is a fact-based determination made by FERC on a case-by-case basis. If FERC were to consider the status of an individual facility and determine that the facility and/or services provided by it are not exempt from FERC regulation under the NGA and that the facility provides interstate service, the rates for, and terms and conditions of, services provided by such facility would be subject to regulation by FERC under the NGA or the Natural Gas Policy Act of 1978 (the "**NGPA**"). Such regulation could decrease revenue, increase operating costs and, depending upon the facility in question, could adversely affect Southcross's results of operations and cash flows. In addition, if any of Southcross's facilities were found to have provided services or otherwise operated in violation of the NGA or NGPA, this could result in the imposition of civil penalties as well as a requirement to disgorge charges collected for such service in excess of the rate established by FERC.

Some of Southcross's intrastate pipelines provide interstate transportation service regulated under Section 311 of the NGPA. Rates charged under Section 311 must be "fair and equitable," and amounts collected in excess of fair and equitable rates are subject to refund with interest. Accordingly, such regulation may prevent Southcross from recovering its full cost of service allocable to such interstate transportation service. In addition, some of Southcross's intrastate pipelines may be subject to complaint-based state regulation with respect to its rates and terms and conditions of service, which may prevent Southcross from recovering some of its costs of providing service. The inability to recover Southcross's full costs due to FERC and state regulatory oversight and compliance could materially and adversely affect its revenues.

Error! Unknown document property name.

Moreover, FERC regulation affects Southcross's gathering, transportation, and compression business generally. FERC's policies and practices across the range of its natural gas regulatory activities, including, for example, its policies on open access transportation, market transparency, market manipulation, ratemaking, capacity release, segmentation, and market center promotion, directly and indirectly affect Southcross's gathering and pipeline transportation business. In addition, the classification and regulation of Southcross's gathering and intrastate transportation facilities also are subject to change based on future determinations by FERC, the courts, or Congress.

State regulation of gathering facilities generally includes safety and environmental regulation and complaint-based ratable take requirements and rate regulation. State and local regulation may cause Southcross to incur additional costs or limit its operations and may prevent Southcross from choosing the customers to which it provides service. Due to increased gathering activity, among other considerations, natural gas gathering is beginning to receive greater legislative and regulatory scrutiny which could result in new regulations or enhanced enforcement of existing laws and regulations. Increased regulation of natural gas gathering could adversely affect Southcross's financial condition, results of operations, cash flows, and its ability to make cash distributions to Southcross's unitholders.

### 30. *Southcross may incur greater than anticipated costs and liabilities as a result of pipeline safety regulation, including integrity management program testing and related repairs*

The U.S. Department of Transportation, through the Pipeline and Hazardous Materials Safety Administration, has adopted regulations requiring pipeline operators to develop integrity management programs for transmission pipelines located where a leak or rupture could harm "high consequence areas" unless the operator effectively demonstrates by risk assessment that the pipeline could not affect the area. High consequence areas include high population areas, areas that are sources of drinking water, ecological resource areas that are unusually sensitive to environmental damage from a pipeline release, and commercially navigable waterways. The regulations require operators, including Southcross, to:

- perform ongoing assessments of pipeline integrity;
- identify and characterize applicable threats to pipeline segments that could impact a high consequence area;
- maintain processes for data collection, integration, and analysis;
- repair and remediate pipelines as necessary; and
- implement preventive and mitigating actions.

In addition, many states, including the states in which Southcross operates, have adopted regulations similar to existing DOT regulations for intrastate pipelines. Although many of Southcross's pipeline facilities fall within a class that is currently not subject to these requirements, Southcross may incur significant costs and liabilities associated with repair, remediation, preventative, or mitigation measures associated with its non-exempt pipelines, particularly in South Texas. Southcross has incurred costs of approximately $0.8 million and

Error! Unknown document property name.

$0.9 million during the years ended December 31, 2018 and 2017, respectively, in order to complete the testing required by existing DOT regulations and their state counterparts. This expenditure included all costs associated with repairs, remediations, preventative, and mitigating actions related to the 2018 and 2017 testing programs.

Should Southcross fail to comply with DOT or comparable state regulations, it could be subject to penalties and fines. Additionally, pipeline safety reforms, including new requirements, enhanced penalties and changes in the administration and enforcement of safety laws have been implemented in recent years, and the consideration of additional reforms is ongoing. Such legislative and regulatory changes could have a material effect on Southcross's operations and costs of transportation service.

> **31.** ***The implementation of statutory and regulatory requirements for derivative transactions could increase the costs and have an adverse impact on Southcross's ability to hedge risks associated with its business and increase the working capital requirements to conduct these activities***

The Dodd-Frank Wall Street Reform and Consumer Protection Act (the "**Dodd-Frank Act**") was enacted in 2010 and amended the Commodity Exchange Act. This law regulates derivative and commodity transactions, including crude oil and gas hedging transactions used in Southcross's risk management activities. The Dodd-Frank Act requires the Commodity Futures Trading Commission ("**CFTC**") and other regulators to promulgate rules and regulations implementing the new legislation. While many of the regulations have been promulgated and are already in effect, the rulemaking and implementation process is still ongoing, and Southcross cannot yet predict the ultimate effect of the rules and regulations on its business.

In its rulemaking under the Dodd-Frank Act, the CFTC will likely finalize regulations to set position limits for certain futures and option contracts in the major energy markets and for swaps that are their economic equivalents, although certain bona fide hedging transactions would be exempt from these position limits provided that various conditions are satisfied. Once finalized, the position limits rule and its companion rule on aggregation may have an impact on Southcross's ability to hedge its exposure to certain enumerated commodities.

The Dodd-Frank Act provisions are also intended to change fundamentally the way swap transactions are entered into, transforming an over-the-counter market, in which parties negotiate directly with each other, into a regulated market, in which many swaps are to be executed on registered exchanges or swap execution facilities and cleared through central counterparties. To date, several categories of interest rate and index credit default swaps have been designated by the CFTC as mandatorily clearable swaps. These swaps may also be required to be traded on registered swap execution facilities or exchanges. Both the clearing and the trading requirements are likely to increase significantly transaction costs of entering into swaps (e.g., by entering into agreements with and paying commission to brokerage and clearing intermediaries). Even if Southcross choses to rely on the end-user exception from the clearing and trading requirements, Southcross would be required to take certain steps to qualify for the end-user exception. As the CFTC further designates swap contracts as required to be cleared and traded on a trading facility,

Error! Unknown document property name.

the utility of the end-user exception will become even more important. Southcross's ability to rely on the end-user exception may change the profitability of Southcross's trades or the efficiency of its hedging.

The Dodd-Frank Act and any new regulations could, among other things, significantly increase the cost of entering into derivative and commodity contracts (including from swap record-keeping and reporting requirements), materially alter the terms of derivative contracts, reduce the availability of some derivatives to protect against risks Southcross encounters, reduce Southcross's ability to monetize or restructure its existing derivative contracts, require greater collateral support for derivative contracts, and potentially increase Southcross's exposure to less creditworthy counterparties. If Southcross reduces Southcross's use of derivatives as a result of the Dodd-Frank Act and regulations, its results of operations may become more volatile and its cash flows may be less predictable. Any of these consequences could have a material adverse effect on Southcross's financial condition, results of operations, and cash available for distribution to unitholders.

Because the CFTC is still in the process of interpreting its regulations, it is possible that some of the derivative and commodity contracts used in Southcross's business may be treated differently in the future. For example, the CFTC may further revise its definitions for spots, forwards, forwards with volumetric optionality, trade options, full requirements contracts, and certain other contracts that may combine the elements of physical commodity trades and cash settlement, netting, and book-outs. If these contracts were classified as swaps, the costs of entering into these contracts will likely increase.

Under the Dodd-Frank Act, the CFTC is also directed generally to prevent price manipulation and fraud in physical commodities markets traded in interstate commerce, including physical energy and other commodities, as well as financial instruments, such as futures, options, and swaps. Pursuant to the Dodd-Frank Act, the CFTC has adopted additional anti-market manipulation, anti-fraud, and disruptive trading practices regulations that prohibit, among other things, fraud and price manipulation in the physical commodities, futures, options, and swaps markets. Accordingly, the CFTC and the self-regulatory organizations ("**SROs**"), such as commodity futures exchanges, are continuing to develop their respective enforcement authorities and compliance priorities under the Dodd-Frank Act. Given the novelty of the regulations under the Dodd-Frank Act, it is difficult to predict how these new enforcement priorities of the CFTC and the SROs will impact Southcross's business. Should Southcross violate the Commodity Exchange Act, as amended, the regulations promulgated by the CFTC, and any rules adopted by the SROs thereunder, it could be subject to CFTC enforcement action and material penalties and sanctions.

In February 2017, the U.S. President ordered the Secretary of the U.S. Treasury to review certain existing rules and regulations, such as those promulgated under the Dodd-Frank Act. However, the implications of that review are not yet known, and none of the rules and regulations promulgated under the Dodd-Frank Act have been modified or rescinded as of the date of this report. Given the uncertainty associated with both the results of the existing Dodd-Frank Act requirements and the manner in which additional provisions of the Dodd-Frank Act

Error! Unknown document property name.

will be implemented by various regulatory agencies and through regulations, the full extent of the impact of such requirements on Southcross's operations is unclear.  Accordingly, the changes resulting from the Dodd-Frank Act may impact the profitability of business activities, require changes to certain business practices, or otherwise adversely affect Southcross's financial condition, results of operations, cash flows, and Southcross's ability to satisfy its debt service obligations.

### 32.    *Cyber-attacks, acts of terrorism or other disruptions could adversely impact Southcross's results of operations and its ability to make cash distributions to unitholders*

Southcross is subject to cyber security risks related to breaches in the systems and technology that it uses to (a) manage its operations and other business processes and (b) protect sensitive information maintained in the normal course of Southcross's businesses.  The oil and natural gas industry has become increasingly dependent on digital technologies to conduct certain processing activities.  For example, Southcross depends on digital technologies to perform many of its services and to process and record financial and operating data.  At the same time, cyber incidents, including deliberate attacks, have increased.  The U.S. government has issued public warnings that indicate that energy assets might be specific targets of cyber security threats.  Southcross's technologies, systems, and networks, and those of its vendors, suppliers, and other business partners, may become the target of cyberattacks or information security breaches that could result in the unauthorized release, gathering, monitoring, misuse, loss, or destruction of proprietary and other information, or other disruption of business operations.  In addition, certain cyber incidents, such as surveillance, may remain undetected for an extended period.  Southcross's systems and insurance coverage for protecting against cyber security risks may not be sufficient.  As cyber incidents continue to evolve, Southcross will likely be required to expend additional resources to continue to modify or enhance its protective measures or to investigate and remediate any vulnerability to cyber incidents.  Southcross's insurance coverage for cyberattacks may not be sufficient to cover all the losses it experiences as a result of such cyberattacks.

### 33.    *Southcross GP's ability to operate Southcross's business effectively could be impaired if Southcross fails to attract and retain key management and personnel*

Southcross's ability to operate its business and implement its strategies will depend on Southcross GP's continued ability to attract and retain highly skilled management personnel with midstream natural gas industry experience.  Competition for these persons in the midstream natural gas industry is intense.  Given Southcross's size, it may be at a disadvantage, relative to its larger competitors, in the competition for these personnel.  Southcross may not be able to continue to employ senior executives and key personnel or attract and retain qualified personnel in the future.  Southcross's failure to retain or attract senior executives and key personnel could have a material adverse effect on its ability to operate its business effectively.

Error! Unknown document property name.

Southcross does not have employees.  Southcross relies solely on officers and employees of Southcross GP to operate and manage its business.

> **34.** **The amount of cash Southcross has available for distribution to holders of its common units, subordinated units, and Class B Convertible Units depends primarily on Southcross's cash flow rather than on its profitability, which may prevent Southcross from making distributions, even during periods in which Southcross records net income**

The amount of cash Southcross has available for distribution depends primarily upon its cash flow and not solely on profitability, which will be affected by non-cash items.  As a result, Southcross may make cash distributions during periods when it records losses for financial accounting purposes and may not make cash distributions during periods when it records net earnings for financial accounting purposes.

## ARTICLE X

## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN[7]

### A.    Introduction

The following discussion summarizes certain U.S. federal income tax consequences expected to result from the consummation of the Plan to the Debtors and U.S. Holders (defined below) of Prepetition Term Loan Claims and Prepetition Revolving Credit Facility Claims, but it does not purport to be a comprehensive description of all tax considerations that may be relevant to a particular person.  This discussion applies only to U.S. Holders that hold Prepetition Term Loan Claims and Prepetition Revolving Credit Facility Claims as "capital assets" within the meaning of Section 1221 of the Internal Revenue Code (as defined herein) (generally, property held for investment) and that will hold New Loans (as defined below) and/or interests in Reorganized Southcross L.P. ("**New LP Units**") as capital assets.  This discussion does not address all U.S. federal income tax considerations that may be relevant to a Debtor or a particular holder of any Claim in light of its particular circumstances, and it does not deal with tax issues with respect to taxpayers subject to special treatment under the U.S. federal income tax laws (including, for example, broker dealers, insurance companies, financial institutions, real estate investment trusts, tax-exempt organizations, small business investment companies, regulated investment companies, U.S. persons whose functional currency is not the U.S. dollar, persons subject to the alternative minimum tax, or the Medicare contribution tax and persons holding Claims as part of a "straddle," "hedge," "constructive sale" or "conversion transaction" with other investments).  No aspect of non-U.S., state, local, or estate and gift taxation is addressed herein.  This discussion also does not address the U.S. federal income tax consequences to U.S. Holders (a) whose Claims are unimpaired or otherwise entitled to payment in full under the Plan or (b) that are deemed to accept or deemed to reject the Plan (other than U.S. Holders of Existing Interests in Southcross Energy Partners, L.P. (the "**Old LP Unitholders**")).  Additionally, this discussion does not address the treatment of the receipt of any consideration other than in a

---

[7] DPW Tax to revise.

Error! Unknown document property name.

person's capacity as a U.S. Holder of a Prepetition Term Loan Claim and/or a Prepetition Revolving Credit Facility Claim.

This discussion is not a complete analysis of all potential U.S. federal income tax consequences and does not address any tax consequences arising under any state, local or non-U.S. tax laws or U.S. federal estate or gift tax laws.  This discussion is based on the Internal Revenue Code of 1986, as amended (the "**Internal Revenue Code**"), Treasury Regulations promulgated thereunder (the "**Treasury Regulations**"), judicial decisions, and published rulings and administrative pronouncements of the Internal Revenue Service (the "**IRS**"), all as in effect on the date of this Disclosure Statement.  These authorities may change, possibly retroactively, resulting in U.S. federal income tax consequences different from those discussed below.  No ruling has been or will be sought from the IRS, and no legal opinion of counsel will be rendered, with respect to the matters discussed below.  There can be no assurance that the IRS will not take a contrary position regarding the U.S. federal income tax consequences resulting from the consummation of the Plan or that any contrary position would not be sustained by a court.

**U.S. HOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO THEM OF THE CONSUMMATION OF THE PLAN AND THE OWNERSHIP AND DISPOSITION  OF NEW LP UNITS AND NEW LOANS PURSUANT TO THE PLAN, AS WELL AS ANY TAX CONSEQUENCES ARISING UNDER ANY STATE, LOCAL, OR NON-U.S. TAX LAWS, OR ANY OTHER U.S. FEDERAL TAX LAWS.  THE DEBTORS AND THE REORGANIZED DEBTORS SHALL NOT BE LIABLE TO ANY PERSON FOR ANY TAX LIABILITY WITH RESPECT TO SUCH U.S. HOLDERS' TAX LIABILITY IN ANY MANNER.**

## B.    Partnership Status

We (as used in this Article, references to "we," "us," or "our" are references to Southcross or Reorganized Southcross L.P., as the case may be) believe that we are, and have been since our initial public offering, properly classified as a partnership for U.S. federal income tax purposes, and each of the other Debtors (all of whom are subsidiaries of Southcross) are treated as disregarded entities for U.S. federal income tax purposes.  As a disregarded entity, Southcross and the other Debtors are not themselves subject to U.S. federal income tax.  Instead, each Old LP Unitholder is required to report on its U.S. federal income tax return, and is subject to tax in respect of, its distributive share of each item of income, gain, loss, deduction, and credit of such Debtors. Accordingly, the U.S. federal income tax consequences of the transactions contemplated by the Plan generally will not be borne by the Debtors, but instead will be borne by the Old LP Unitholders.

However, the IRS has made no determination as to our status or the status of our subsidiaries for U.S. federal income tax purposes.  If we fail to qualify as a partnership for U.S. federal income tax purposes, we will be treated as if we had transferred all of our assets, subject to liabilities, to a newly formed corporation, on the first day of the year in which we fail to qualify as a partnership, in return for stock in that corporation, and then distributed that stock to the Old LP Unitholders or the holders of New LP Units ("**New LP Unitholders**"), as applicable, in liquidation of their interests in us.  This deemed contribution and liquidation should be tax-

118

free to New LP Unitholders and us so long as we, at that time, do not have liabilities in excess of the tax basis of our assets. Thereafter, we would be treated as an association taxable as a corporation for U.S. federal income tax purposes.

**THE DISCUSSION BELOW ASSUMES THAT WE ARE CURRENTLY AND, FOLLOWING CONSUMMATION OF THE PLAN, WILL CONTINUE TO BE, CLASSIFIED AS A PARTNERSHIP FOR U.S. FEDERAL INCOME TAX PURPOSES.**

## C.    Definition of "U.S. Holder"

A "**U.S. Holder**" is a beneficial owner of Prepetition Term Loan Claims, Prepetition Revolving Credit Facility Claims, Existing Interests in Southcross ("**Old LP Units**"), New LP Units or rights and obligations under the Exit Revolving Credit Facility and/or the Exit Term Loan (each of the Exit Revolving Credit Facility and the Exit Term Loan, a "**New Loan**") for U.S. federal income tax purposes, as the case may be, that is or is treated as:

- an individual who is a citizen or resident of the United States;

- a corporation created or organized under the laws of the United States, any state thereof, or the District of Columbia; or

- an estate or trust the income of which is subject to U.S. federal income tax regardless of its source.

If a partnership or other entity or arrangement classified as a partnership for U.S. federal income tax purposes holds Prepetition Term Loan Claims, Prepetition Revolving Credit Facility Claims, Old LP Units, New LP Units, or New Loans, the tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership.  Beneficial owners of Prepetition Term Loan Claims, Prepetition Revolving Credit Facility Claims, Old LP Units, New LP Units, and/or New Loans who are partners in a partnership holding any of such instruments should consult their tax advisors.

## D.    Certain U.S. Federal Income Tax Consequences to the Debtors and Old LP Unitholders

### 1.    Taxable Transfer of Assets of the Debtors and Liquidation of the Debtors

If, pursuant to the Plan, the Debtors' assets are liquidated, the Debtors will recognize gain or loss on the sale of their assets.  As described above, because each of the Debtors is a disregarded entity for U.S. federal income tax purposes, such gain or loss will be allocated to the Old LP Unitholders.  The amount of gain or loss allocable to any particular Old LP Unitholder depends, in part, on the price the Old LP Unitholder paid for its Old LP Units and the extent to which it has previously been allocated income or  amortization or depreciation deductions with respect to the transferred assets.  Accordingly, each Old LP Unitholder is urged to consult its tax advisors regarding the allocation of gain and loss and the deductibility of any losses recognized as a result of the transfer of assets of the Debtors.

119

The Old LP Unitholders are not expected to receive, directly or indirectly, any Sales Proceeds under the Plan and, therefore, generally no gain or loss is expected to be recognized by the Old LP Unitholders as a result of the liquidation of the Debtors.

## 2. *Cancellation of Debt*

In connection with the implementation of the Plan, irrespective of whether the Debtors' assets are liquidated or the restructuring occurs, we likely will recognize cancellation of debt ("**COD**") income for U.S. federal income tax purposes.  COD income is generally the amount by which indebtedness that is discharged (reduced by any unamortized discount) exceeds any consideration given in exchange therefor.

As described above, because we are a partnership for U.S. federal income tax purposes, such COD income and any other income recognized by us upon implementation of the Plan will be allocated to the Old LP Unitholders.  Certain statutory or judicial exceptions potentially can apply to limit the amount of COD income required to be included in income by the Old LP Unitholders, depending on the Old LP Unitholders' circumstances.  In particular, exceptions are available that would allow COD income to be excluded from gross income if the COD income is taken into account by a taxpayer that is insolvent (but only to the extent of insolvency) or in bankruptcy.  These exceptions apply at the "partner" level and thus depend on whether the partner (*i.e.*, the Old LP Unitholder to whom the COD income is allocated) is itself insolvent or in bankruptcy.  The fact that we or any other Debtors are insolvent and in bankruptcy is not relevant for this purpose.  For purposes of determining an Old LP Unitholder's insolvency (measured immediately prior to the Effective Date), the Old LP Unitholder would be treated as if it were individually liable for an amount of partnership debt equal to the allocated amount of the COD income.  To the extent any amount of COD income is excludable by an Old LP Unitholder by reason of the insolvency or bankruptcy exception, the Old LP Unitholder generally would be required to reduce certain tax attributes (such as net operating losses, tax credits, possibly tax basis in assets and passive losses) after the determination of its tax liability for the taxable year.

An Old LP Unitholder's adjusted tax basis in Old LP Units will be increased to the extent of any income or gain allocated to such Old LP Unitholder and decreased (but not below zero) to the extent of any loss or deduction allocated to such Old LP Unitholder, whether or not such loss is disallowed and thus not deductible.

To the extent an Old LP Unitholder was allocated losses in taxable years ending prior to the Effective Date, such losses may have been suspended by reason of certain provisions of the Internal Revenue Code (in particular, those relating to so-called "passive activity losses" or the "at risk" rules).  As a result of the transaction, all or part of such losses may become deductible.

For U.S. federal income tax purposes, the discharge of our indebtedness pursuant to the Plan will result in a deemed cash distribution to each Old LP Unitholder based on the amount of the indebtedness allocable to such Old LP Unitholder's Old LP Units.  To the extent that any such deemed cash distribution exceeds the Old LP Unitholder's adjusted tax basis in its Old LP Units (after adjustment for net gain or loss allocable to the Old LP Unitholder as

Error! Unknown document property name.

described above), such Old LP Unitholder will recognize capital gain. Any such capital gain generally should be long-term if the Old LP Unitholder's holding period in its Old LP Units is more than one year and otherwise should be short-term. An Old LP Unitholder's adjusted tax basis in its Old LP Units will be decreased (but not below zero) to the extent of any such deemed cash distribution.

### 3.  Cancellation of Old LP Units

If pursuant to the Plan the restructuring occurs, each Old LP Unitholder will recognize a loss with respect to the cancellation of its equity interest in Southcross to the extent of its basis in Southcross. The loss would generally be capital except to the extent attributable to certain assets described in Section 751 of the Internal Revenue Code

*The U.S. federal income tax consequences of the Plan are complex, and may be particularly adverse for Old LP Unitholders. Accordingly, all Old LP Unitholders are urged to consult their tax advisors regarding the U.S. federal income tax consequences to them (taking into account their personal circumstances), including the potential for substantial allocations of taxable income without the receipt of cash distributions.*

### E.  Certain U.S. Federal Income Tax Consequences to Holders of Certain Claims

#### 1.  *U.S. Holders of Prepetition Term Loan Claims and Prepetition Revolving Credit Facility Claims (Class 3 and 4)*

##### (i)  Receipt of Sale Proceeds in Satisfaction of Claims

If a U.S. holder of Prepetition Term Loan Claims and Prepetition Revolving Credit Facility Claims receives Sale Proceeds in complete satisfaction of such Claims pursuant to the Plan, the U.S. holder will generally recognize gain or loss equal to the difference between the amount of cash received and such U.S. holder's adjusted tax basis in the satisfied Claim. Any recognized gain or loss will generally be capital gain or loss and will generally be long-term capital gain or loss if, at the Effective Date, such U.S. holder's holding period in the Claim is more than one year. Long-term capital gains of non-corporate taxpayers are currently taxed at lower rates than those applicable to ordinary income. The deductibility of capital losses is subject to limitations.

121

### *(ii)* Exchanges of Prepetition Term Loan Claims and/or Prepetition Revolving Credit Facility Claims for New Loans and/or New LP Units

*Treatment of Exchanges.*  An exchange of a Prepetition Term Loan Claim or a Prepetition Revolving Credit Facility Claim (each, an "**Old Loan**") for New Loans will be treated as an exchange, rather than as a continuation of the Old Loan, for U.S. federal income tax purposes if the differences between the Old Loan and the New Loan constitutes a "significant modification" of the Old Loan under applicable Treasury Regulations.  A "significant modification" occurs if, based on all the facts and circumstances and taking into account all modifications of the Old Loan collectively, the legal rights or obligations that are altered and the degree to which they are altered is "economically significant."  The remainder of this discussion assumes that an exchange of an Old Loan for a New Loan (the "**Debt Exchange**") is a significant modification.

The exchange of Old Loans for New LP Units (the "**Equity Exchange**") is an exchange subject to Section 721 of the Internal Revenue Code.

*Recognition of Gain or Loss on Debt Exchange.*  A U.S. Holder of Old Loans should recognize gain or loss on the Debt Exchange.  The amount of such gain or loss will equal the difference between the "issue price" of the New Loans (less amounts attributable to any accrued but unpaid interest, which will be taxable as interest to the extent not previously included in income) and the U.S. Holder's adjusted tax basis in the Old Loans exchanged pursuant to the Debt Exchange (generally equal to the amount the U.S. Holder paid for the Old Loans, reduced by any payments on such Old Loans, other than payments of qualified stated interest).  Any gain or loss will be capital gain or loss, and will be long-term capital gain or loss if the U.S. Holder has held the Old Loans for more than one year at the time of the Debt Exchange.  Otherwise, such gain or loss will be short-term capital gain or loss.  The U.S. Holder's initial tax basis in the New Loans should be equal to their "issue price" on the Effective Date.  The U.S. Holder's holding period in the New Loans should begin on the day after the Effective Date.

A U.S. Holder that acquired an Old Loan at any time other than at original issuance at a market discount generally will be required to treat any gain recognized on the Debt Exchange as ordinary income to the extent of accrued market discount, unless an election to include market discount income currently as it accrues was made by the U.S. Holder.  A U.S. Holder will be considered to have acquired a New Loan at a market discount if its tax basis in the Old Loan immediately after acquisition was less than the sum of all amounts payable thereon (other than payments of qualified stated interest) after the acquisition date, unless the difference is less than 0.25% of the issue price multiplied by the number of complete years from the acquisition date to maturity (in which case, the difference is *de minimis* market discount).

*Recognition of Gain or Loss on Equity Exchange.*  A U.S. Holder of an Old Loan should not recognize gain or loss on the Equity Exchange, except to the extent that New LP Units are received in exchange for accrued but unpaid interest (which will be taxable as interest to the extent not previously included in income).  The U.S. Holder's initial tax basis in the New LP Units received in exchange for an Old Loan should be equal to the U.S. Holder's adjusted tax

Error! Unknown document property name.

basis in such Old Loan to the extent exchanged pursuant to the Equity Exchange.  The U.S. Holder's holding period in the New LP Units should include the U.S. Holder's holding period for the Old Loan exchanged for such New LP Units.

### *(iii)* Ownership and Disposition of New Loans

*Issue Price.* The issue price of a debt instrument issued in exchange for another debt instrument depends on whether either debt instrument is considered "traded on an established market" ("**publicly traded**").  We believe that neither the Prepetition Term Loan Claims nor the Prepetition Revolving Credit Facility Claims are treated as publicly traded.  If the New Loans are treated as publicly traded for U.S. federal income tax purposes, the "issue price" of the New Loans will be the fair market value of the New Loans as of their issue date.  If, however, the New Loans are also not treated as publicly traded, then the issue price of the New Loans issued in the Debt Exchange will be the principal amount of such New Loans.  The New Loans will be considered to be publicly traded if, at any time during the 31-day period ending 15 days after their issue date, the New Loans are traded on an "established market."  The New Loans will be considered to trade on an established market if (i) there is a price for an executed purchase or sale of the New Loans that is reasonably available within a reasonable period of time after the sale, (ii) there is at least one price quote for the New Loans from at least one reasonably identifiable broker, dealer or pricing service, which price quote is substantially the same as the price for which the person receiving the quoted price could purchase or sell the New Loans (a "**firm quote**"), or (iii) there is at least one price quote for the New Loans other than a firm quote, available from at least one such broker, dealer, or pricing service.

The Treasury Regulations require Reorganized Southcross L.P. to make a determination as to whether the New Loans are publicly traded, and if Reorganized Southcross L.P. determines that the New Loans are publicly traded, to determine the fair market value of the New Loans on their issue date.  The Treasury Regulations require Reorganized Southcross L.P. to make such determinations available to U.S. Holders in a commercially reasonable fashion, including by electronic publication, within 90 days of the issue date of the New Loans.  The Treasury Regulations provide that each of these determinations is binding on a holder unless the holder satisfies certain conditions.  Certain rules apply as to whether a sales price or quote may establish the fair market value of the New Loans and under what conditions Reorganized Southcross L.P. may otherwise establish the fair market value of the New Loans.  Because the relevant trading period for determining whether the New Loans are publicly traded and the issue price of the New Loans has not yet occurred, we are unable to determine the issue price of the New Loans at this time.

*Payments of Qualified Stated Interest.* Payments of qualified stated interest on a New Loan generally will be taxable to a U.S. Holder as ordinary income at the time such interest is received or accrued, in accordance with such U.S. Holder's method of tax accounting for U.S. federal income tax purposes.  Qualified stated interest generally means stated interest that is unconditionally payable in cash or in property (other than debt instruments of the issuer) at least annually at a single fixed rate or a single qualified floating rate.

Error! Unknown document property name.

*Original Issue Discount.* The New Loans will be treated as issued with original issue discount ("**OID**") for U.S. federal income tax purposes if the "stated redemption price at maturity" exceeds their "issue price" (see "—*Ownership and Disposition of New Loans—Issue Price*" above) by an amount equal to or more than a statutorily defined *de minimis* amount (generally, 0.25% multiplied by the product of the stated redemption price at maturity and the number of complete years to maturity). The "stated redemption price at maturity" of a New Loan is the total of all payments to be made under the New Loan other than qualified stated interest. If a New Loan were treated as having OID, a U.S. Holder would be required to include the OID in ordinary income on an annual basis under a constant yield accrual method regardless of such U.S. Holder's regular method of accounting for U.S. federal income tax purposes. A U.S. Holder would be required to include in income in each taxable year the sum of the daily portions of OID for each day on which it held a New Loan during the taxable year. To determine the daily portions of OID, the amount of OID allocable to an accrual period is determined, and a ratable portion of such OID is allocated to each day in the accrual period. An accrual period may be of any length and the length of the accrual periods may vary over the life of the New Loan, provided that no accrual period may be longer than one year and each scheduled payment of interest or principal on the New Loan must occur on either the first day or last day of an accrual period. The amount of OID allocable to an accrual period will equal (A) the product of (i) the New Loan's adjusted issue price at the beginning of the accrual period and (ii) the New Loan's yield to maturity (adjusted to reflect the length of the accrual period), less (B) any qualified stated interest allocable to the accrual period.

A New Loan's adjusted issue price at any time generally will be its original issue price, increased by the amount of OID on such New Loan accrued for each prior accrual period and decreased by the amount of payments on such New Loan other than payments of qualified stated interest. A New Loan's yield to maturity is the discount rate that, when used in computing the present value of all principal and interest payments to be made on the New Loan, produces an amount equal to the New Loan's original issue price.

*Bond Premium*. If a U.S. Holder's initial tax basis in a New Loan exceeds such New Loan's stated redemption price at maturity, the New Loan will be treated as acquired by such U.S. Holder with bond premium. In such case, the U.S. Holder will not be required to accrue any OID on such New Loan. Generally, a U.S. Holder may elect to amortize such bond premium (or, if it results in a smaller premium, an amount computed with reference to the amount payable on an earlier call date) as an offset to interest income in respect of a New Loan, using a constant yield method as prescribed under the applicable Treasury Regulations, over the remaining term of the New Loan. A U.S. Holder that elects or has elected to amortize bond premium must reduce its basis in a New Loan by the amount of premium used to offset interest. An election to amortize bond premium, once made, applies to all debt instruments held or subsequently acquired by the U.S. Holder on or after the first day of the first taxable year to which the election applied and may not be revoked without the consent of the IRS. **U.S. Holders should consult their tax advisors regarding the availability and impact of premium for U.S. federal income tax purposes**.

*Sale, Retirement or Other Taxable Disposition*. A U.S. Holder of a New Loan will recognize gain or loss upon the sale, redemption, retirement or other taxable disposition of the New Loan equal to the difference between the amount realized upon the disposition (less

Error! Unknown document property name.

a portion allocable to any accrued interest that has not yet been included in income by the U.S. Holder, which generally will be taxable as ordinary income) and the U.S. Holder's adjusted tax basis in the New Loan.  A U.S. Holder's tax basis in a New Loan should be its "issue price" unless the New-Debt-Instrument was issued with OID, in which case its tax basis would be its "adjusted issue price" at the time of the disposition.  Any gain or loss on the sale, redemption, retirement or other taxable disposition of the New Loan generally will be capital gain or loss, and will be long-term capital gain or loss if the U.S. Holder has held the New Loan for more than one year as of the date of disposition.  The deductibility of capital losses is subject to limitations.

### *(iv)* Ownership and Disposition of New LP Units

The U.S. federal income tax consequences to a U.S. Holder of ownership and disposition of New LP Units received in the Equity Exchange are described below in "*Certain U.S. Federal Income Tax Consequences of Ownership of New LP Units*."

### 2.    *Accrued Interest*

To the extent a U.S. Holder receives consideration that is attributable to unpaid accrued interest, the U.S. Holder may be required to treat such consideration as a payment of interest. In this regard, there is general uncertainty regarding the extent to which the receipt property under the Plan should be treated as attributable to unpaid accrued interest.  To the extent any property received pursuant to the Plan is considered attributable to unpaid accrued interest, a U.S. Holder will recognize ordinary income to the extent the value of the property exceeds the amount of unpaid accrued interest previously included in gross income by the U.S. Holder.  A U.S. Holder's tax basis in such property should be equal to the amount of interest income treated as satisfied by the receipt of the property, and its holding period in the property should begin on the day after the Effective Date.  A U.S. Holder generally will be entitled to recognize a loss to the extent any accrued interest previously included in its gross income is not paid in full.

HOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE EXTENT TO WHICH CONSIDERATION RECEIVED UNDER THE PLAN SHOULD BE TREATED AS ATTRIBUTABLE TO UNPAID ACCRUED INTEREST.

### 3.    *Information Reporting and Backup Withholding*

The Debtors and applicable withholding agents will withhold all amounts required by law to be withheld from payments in connection with distributions under the Plan or in connection with payments made on account of consideration received pursuant to the Plan, and will comply with all applicable information reporting requirements.  A U.S. Holder may be subject to backup withholding, unless (i) the U.S. Holder is a corporation or other exempt recipient or (ii) in the case of backup withholding, the U.S. Holder provides a correct taxpayer identification number and certifies that it is not subject to backup withholding.  The amount of any backup withholding from a payment to a U.S. Holder will be allowed as a credit against the holder's U.S. federal income tax liability and may entitle it to a refund, provided that the required information is timely furnished to the IRS.  In addition, from an information reporting

Error! Unknown document property name.

perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  U.S. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the U.S. Holders' tax returns.

### F.    Certain U.S. Federal Income Tax Consequences of Ownership of New LP Units

#### 1.    Limited Partner Status

New LP Unitholders generally will be treated as partners of Reorganized Southcross L.P. for U.S. federal income tax purposes.

#### 2.    Tax Consequences of New LP Unit Ownership

##### (i)  Flow-Through of Taxable Income

Subject to the discussion below under "—*Entity-Level Collections*," we will not pay any U.S. federal income tax.  Instead, each New LP Unitholder will be required to report on its income tax return its share of our income, gains, losses, and deductions without regard to whether we make cash distributions to it.  Consequently, we may allocate income to a New LP Unitholder even if it has not received a cash distribution. Each New LP Unitholder will be required to include in income its allocable share of our income, gains, losses, and deductions for our taxable year ending with or within its taxable year.

##### (ii)  Allocations

In general our items of income, gain, loss, and deduction will be allocated among the New LP Unitholders as set forth in the Reorganized Southcross LPA.  While we believe that the allocations set forth in the Reorganized Southcross LPA should be respected for U.S. federal income tax purposes, the IRS could challenge such allocations, possibly resulting in less favorable allocations to a particular New LP Unitholder for U.S. federal income tax purposes.

##### (iii)  Limitations on the Deductibility of Losses and Expenses

Various limitations may apply to restrict the deductibility of losses realized, and expenses incurred, by us. The principal limitations include the limitation on the deductibility of interest under Section 163(j), the limitations on the deductibility of "investment interest" under Section 163(d), the limitations under Section 469 on the deductibility of losses from "passive activities", the "excess business loss" limitation, the limitations under the "at risk" rules, limitations on the deductibility of capital losses, and capitalization requirements. However, it is possible that other limitations will apply.  U.S. Holders should consult their tax advisors concerning the application of these and other limitations on the deductibility of losses and expenses.

##### (iv)  Passthrough Deduction

126

For taxable years before January 1, 2026, a non-corporate New LP Unitholder may claim a deduction equal to a portion of the net business income it derives from "qualified trades or businesses" conducted in the United States. Prospective New LP Unitholders should consult their tax advisors regarding the application of this deduction.

### *(v)* **Treatment of Distributions**

In general, a New LP Unitholder will not recognize taxable income as a consequence of receiving a distribution (whether in cash or in kind) from Reorganized Southcross L.P., except to the extent that any cash distributed exceeds the New LP Unitholder's adjusted tax basis in its New LP Units.  Any such excess will be treated as gain from the sale of the New LP Unitholder's New LP Units and generally will result in capital gain or loss, except to the extent attributable to assets described in Section 751 of the Internal Revenue Code." See "—*Disposition of New LP Units*" below.  Because the basis of a New LP Unitholder's New LP Units will be increased by the New LP Unitholder's share of our net income, a distribution corresponding to the New LP Unitholder's share of our net income will generally not be taxable.  A New LP Unitholder generally will not recognize a loss for U.S. federal income tax purposes as a consequence of receiving a distribution from us, except that if a New LP Unitholder receives a distribution solely of cash in complete liquidation of its interest, the New LP Unitholder will recognize a loss equal to the excess, if any, of its adjusted tax basis in its New LP Units over the amount of such cash.

### 3.    *Disposition of New LP Units*

Upon a sale or other taxable disposition of all or any portion of a New LP Unitholder's New LP Units, a New LP Unitholder will generally recognize gain or loss in an amount equal to the difference between the amount realized and the adjusted tax basis of the New LP Units or the transferred portion thereof.  The amount realized will be equal to the amount of cash and the fair market value of other property received by the New LP Unitholder, plus the portion of the New LP Unitholder's share (if any) of our liabilities that is attributable to the transferred New LP Units.

In general, gain or loss recognized by a New LP Unitholder on the disposition of all or any portion of its New LP Units will be capital gain or loss, but a New LP Unitholder may recognize ordinary income or loss on the disposition in respect of its share of assets that are described in Section 751 of the Code.  Under certain circumstances, a New LP Unitholder could recognize ordinary income in respect of Section 751 assets on the disposition of all or any portion of its New LP Units even though the New LP Unitholder recognizes an overall loss on the disposition.

If a New LP Unitholder transfers less than all of its New LP Units, the New LP Unitholder will take into account the percentage of its adjusted tax basis in its New LP Units that is equal to the percentage of the New LP Units that are transferred, determined by comparing the relative fair market values of the portion of the New LP Units that are transferred and the portion of the New LP Units that are retained.

### 4.    *Administrative Matters*

Error! Unknown document property name.

### (i)  Information Returns and Audit Procedures

We intend to furnish to each New LP Unitholder, after the close of each calendar year, specific tax information, including a Schedule K-1, which describes New LP Unitholder's share of our income, gain, loss and deduction for our preceding taxable year.  In preparing this information, which will not be reviewed by counsel, we will take various accounting and reporting positions to determine each New LP Unitholder's share of income, gain, loss, and deduction.  We cannot provide assurances that those positions will yield a result that conforms to the requirements of the Internal Revenue Code, Treasury Regulations, or administrative interpretations of the IRS.  Furthermore, we cannot provide assurances that the IRS will not successfully contend in court that those positions are impermissible.  Any challenge by the IRS could negatively affect the value of the New LP Units.

### (ii)  Partnership Representative

A partnership that files a U.S. federal income tax return is required to designate a "partnership representative" with a substantial presence in the United States to act on its behalf in tax-related proceedings.  If the partnership representative is an entity, the partnership must appoint an individual with a substantial presence in the United States to act on behalf of the partnership representative.  The partnership representative (and such individual, if any) will have the authority to make all decisions with respect to any tax audit of, or other tax-related administrative or judicial proceeding with respect to, the partnership.  Actions taken, and decisions made, by the partnership representative (and such individual) will be binding on the partnership and its partners.  We will designate our partnership representative and, if the partnership representative is an entity, we will designate an individual who will act on behalf of the partnership representative.

### (iii)  Partnership Audits

Audits of the U.S. federal income tax treatment of our income, gains, losses, deductions and credits generally will be conducted at the entity level in a single proceeding, which the partnership representative of the relevant entity will control, rather than by individual audits of the partners' tax returns.  The legal and accounting costs incurred by us in connection with any audit of such entity's tax returns will be borne by us, but New LP Unitholders will bear the cost of audits of their own returns.

Under the rules applicable to U.S. federal tax audits of partnership tax returns for taxable years beginning after December 31, 2017, the partners in a partnership are not required to receive notice of, and are not entitled to participate in, any such audit, and any adjustment made in any such audit will be binding on all of the partners.  Any tax arising from an audit of a partnership tax return, as well as any resulting interest and penalties, will generally be payable by the partnership in the year in which the determination becomes final unless the partnership elects to send statements ("**Adjustment Statements**") to its partners for the audited year informing them of their shares of the adjustments made on audit.  If a partnership sends Adjustment Statements, the partners will generally be required to pay any tax, interest (at a rate that is two percentage points higher than the interest rate generally applicable for tax underpayments) and penalties arising from such adjustments as if the adjustments were made

128

in the audited year and any other affected year, as applicable, but will not be required to amend their tax returns for any prior year.  In general, if a partnership pays the tax resulting from an audit adjustment, the amount will be determined by applying the highest rate of tax in effect for the audited year to the net adjustment amount.  The net adjustment amount may be reduced, with the approval of the IRS, (i) to account for certain types of income and for the status of certain partners, such as corporations or tax-exempt partners, and (ii) by the portion of such net adjustment amount that is taken into account by partners that file amended returns for the reviewed year (and any intervening year for which their tax attributes are adjusted) or that participate in a "pull-in" procedure pursuant to which a partner may pay tax in the same amount, and adjust its tax attributes, as if it had filed all applicable amended returns.

Although it is possible that we will elect to send Adjustment Statements in the event of an adjustment arising out of an audit, there can be no assurance in this regard.  If we pay any tax, interest and/or penalties arising from an audit of a tax return, each current and former New LP Unitholder may be required to indemnify us for the portion, if any, of the payment that is attributable to such current or former New LP Unitholder.  It is possible that the amount of any such entity-level payment that is borne by a current New LP Unitholder or former New LP Unitholder will exceed the amount of additional tax that would have been payable by such current or former New LP Unitholder if we had elected to send Adjustment Statements.

If a current or former New LP Unitholder fails to indemnify us for the payment of any tax, interest and/or penalties attributable to such current or former New LP Unitholder, a portion of the economic burden of such payment will be borne by each then-current New LP Unitholder.  Thus, there can be no assurance that the economic burden of any such payment will not be borne by New LP Unitholders that would not have owed additional tax, or would have owed additional tax in a lesser amount than their shares of such payment, if we had elected to send Adjustment Statements to the New LP Unitholders.

The partnership audit rules described above are new and partnerships do not yet have any significant experience with them. New LP Unitholders should consult with their tax advisors concerning the application of these rules.

**THE FOREGOING DISCUSSION OF CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSIDERATIONS IS FOR GENERAL INFORMATION ONLY AND IS NOT TAX ADVICE. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS REGARDING THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO THEM OF THE CONSUMMATION OF THE PLAN DESCRIBED HEREIN, AS WELL AS ANY OTHER TAX CONSEQUENCES, INCLUDING ANY TAX CONSEQUENCES ARISING UNDER STATE, LOCAL, OR NON-U.S. TAX LAWS. NEITHER THE PROPONENTS OF THE PLAN NOR THEIR PROFESSIONALS WILL HAVE ANY LIABILITY TO ANY PERSON ARISING FROM OR RELATED TO THE U.S. FEDERAL, STATE, LOCAL, non-u.s. OR ANY OTHER TAX CONSEQUENCES OF THE PLAN OR THE FOREGOING DISCUSSION.**

Error! Unknown document property name.

Error! Unknown document property name.

## ARTICLE XI

## RECOMMENDATION

The Debtors believe that confirmation and consummation of the Plan are in the best interests of the Debtors, their Estates, and their creditors.  The Plan provides for an equitable distribution to holders of Claims.  The Debtors believe that any alternative to confirmation of the Plan, such as liquidation under chapter 7 of the Bankruptcy Code, could result in significant delay, litigation and additional costs, as well as a reduction in the distributions to holders of Claims in certain Classes.  **Consequently, the Debtors urge all eligible holders of impaired Claims to vote to ACCEPT the Plan and to complete and submit their Ballots so that they will be RECEIVED by the Solicitation and Claims Agent on or before the Voting Deadline.**

Error! Unknown document property name.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

Respectfully submitted,

Southcross Energy Partners GP, LLC (for itself and on behalf of all Debtors)

*/s/ DRAFT*
Name: James W. Swent III
Title:   Chairman, President and Chief Executive Officer

Error! Unknown document property name.

**Appendix A**

Debtors' Chapter 11 Plan

**Error! Unknown document property name.**

**Appendix B**

Liquidation Analysis

**Error! Unknown document property name.**

**Appendix C**

Financial Projections

**Error! Unknown document property name.**

## Appendix D

Valuation Analysis

Error! Unknown document property name.