# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| SOUTHCROSS ENERGY PARTNERS, L.P., | ) Case No. 19-10702 (MFW) |
| *et al.*, | ) |
|  | ) Jointly Administered |
| Debtors.[1] | ) |
|  | ) |

## DISCLOSURE STATEMENT SUPPLEMENT FOR FIRST AMENDED CHAPTER 11 PLAN FOR SOUTHCROSS ENERGY PARTNERS L.P. AND ITS AFFILIATED DEBTORS

> ~~THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE AMENDED PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT SUPPLEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT SUPPLEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT SUPPLEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT SUPPLEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.~~

| | |
|---|---|
| DAVIS POLK & WARDWELL LLP | MORRIS, NICHOLS, ARSHT & TUNNELL LLP |
| 450 Lexington Avenue | 1201 North Market Street, 16th Floor |
| New York, New York 10017 | P.O. Box 1347 |
| Telephone: (212) 450-4000 | Wilmington, Delaware 19899-1347 |
| Facsimile: (212) 701-5800 | Telephone: (302) 658-9200 |
| Marshall S. Huebner | Facsimile: (302) 658-3989 |
| Darren S. Klein | Robert J. Dehney (No. 3578) |
| Steven Z. Szanzer | |

---

[1] The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective Employer Identification Numbers, are as follows: Southcross Energy Partners, L.P. (5230); Southcross Energy Partners GP, LLC (5141); Southcross Energy Finance Corp. (2225); Southcross Energy Operating, LLC (9605); Southcross Energy GP LLC (4246); Southcross Energy LP LLC (4304); Southcross Gathering Ltd. (7233); Southcross CCNG Gathering Ltd. (9553); Southcross CCNG Transmission Ltd. (4531); Southcross Marketing Company Ltd. (3313); Southcross NGL Pipeline Ltd. (3214); Southcross Midstream Services, L.P. (5932); Southcross Mississippi Industrial Gas Sales, L.P. (7519); Southcross Mississippi Pipeline, L.P. (7499); Southcross Gulf Coast Transmission Ltd. (0546); Southcross Mississippi Gathering, L.P. (2994); Southcross Delta Pipeline LLC (6804); Southcross Alabama Pipeline LLC (7180); Southcross Nueces Pipelines LLC (7034); Southcross Processing LLC (0672); FL Rich Gas Services GP, LLC (5172); FL Rich Gas Services, LP (0219); FL Rich Gas Utility GP, LLC (3280); FL Rich Gas Utility, LP (3644); Southcross Transmission, LP (6432); T2 EF Cogeneration Holdings LLC (0613); and T2 EF Cogeneration LLC (4976). The debtors' mailing address is 1717 Main Street, Suite 5300, Dallas, TX 75201.

(each admitted *pro hac vice*)

*Counsel to the Debtors and Debtors in Possession*

Andrew R. Remming (No. 5120)
Joseph C. Barsalona II (No. 6102)
Eric W. Moats (No. 6441)

*Local Counsel to the Debtors and Debtors in Possession*

Dated: January 6, 7, 2020
Wilmington, Delaware

## PRELIMINARY STATEMENT[1]

The *First Amended Chapter 11 Plan for Southcross Energy Partners, L.P. and its Affiliated Debtors* (as amended, supplemented, and/or modified from time to time, the "**Amended Plan**") attached hereto as <u>Exhibit A-1</u> is substantially similar to the *Chapter 11 Plan for Southcross Energy Partners, L.P. and its Affiliated Debtors* [D.I. 675] (the "**Original Plan**") and reflects certain operational issues relating to the Debtors' businesses as well as other facts and circumstances in the Chapter 11 Cases. The Amended Plan is the outcome of extensive negotiations among the Debtors and certain of their key stakeholders—including an ad hoc group representing more than 70% in aggregate amount of the debt held by the Debtors' prepetition and post-petition lenders (the "**Ad Hoc Group**")—that began almost a year ago. The Amended Plan contemplates a restructuring that will deleverage the Debtors' balance sheet, distribute the proceeds of the Debtors' MS/AL Assets and CCPN Assets to the Debtors' creditors,[2] enable the Debtors to reorganize around their South Texas assets, and leave the Debtors positioned to succeed in the highly competitive natural gas midstream industry.

THE DEBTORS ARE SENDING YOU THIS DOCUMENT (AS MAY BE AMENDED, ALTERED, MODIFIED, REVISED, OR SUPPLEMENTED FROM TIME TO TIME, THE "**DISCLOSURE STATEMENT SUPPLEMENT**") AS A SUPPLEMENT TO THE *DISCLOSURE STATEMENT FOR CHAPTER 11 PLAN FOR SOUTHCROSS ENERGY PARTNERS L.P. AND ITS AFFILIATED DEBTORS* [D.I. 677] (THE "**DISCLOSURE STATEMENT**") BECAUSE YOU ARE A CREDITOR THAT IS ENTITLED TO VOTE ON THE AMENDED PLAN.

THIS DISCLOSURE STATEMENT SUPPLEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE AMENDED PLAN AND CERTAIN OTHER DOCUMENTS AND INFORMATION. THE FINANCIAL INFORMATION INCLUDED HEREIN IS FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE AMENDED PLAN AND SHOULD NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW AND WHETHER TO VOTE ON THE AMENDED PLAN. THE DEBTORS BELIEVE THAT THE SUMMARIES HEREIN ARE FAIR AND ACCURATE. HOWEVER, THE SUMMARIES HEREIN, INCLUDING THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS THAT ARE ATTACHED HERETO, ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO SUCH INFORMATION AND DOCUMENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT SUPPLEMENT AND THE TERMS AND PROVISIONS OF THE AMENDED PLAN OR SUCH OTHER PLAN-RELATED DOCUMENTS AND INFORMATION, THE AMENDED PLAN OR SUCH OTHER PLAN-RELATED DOCUMENTS AND INFORMATION, AS THE CASE MAY BE, SHALL GOVERN FOR ALL PURPOSES.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Amended Plan or the Disclosure Statement; *provided*, that capitalized terms used herein that are not defined herein or in the Amended Plan or the Disclosure Statement, but are defined in title 11 of the United States Code (the "**Bankruptcy Code**") or the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), shall have the meanings ascribed to such terms in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

[2] The CCPN Sale closed on November 6, 2019, as set forth in the CCPN Closing Notice (as defined below), and the MS/AL Sale closed on December 16, 2019, as set forth in the MS/AL Closing Notice (as defined below).

THE STATEMENTS AND INFORMATION CONTAINED HEREIN HAVE BEEN MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED.  HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SUPPLEMENT SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH HEREIN SINCE THE DATE HEREOF.  EACH HOLDER OF A CLAIM ENTITLED TO VOTE ON THE AMENDED PLAN SHOULD CAREFULLY REVIEW THE AMENDED PLAN, THE DISCLOSURE STATEMENT, AND THIS DISCLOSURE STATEMENT SUPPLEMENT IN THEIR ENTIRETY BEFORE CASTING A BALLOT (AS DEFINED HEREIN).  NEITHER THE DISCLOSURE STATEMENT NOR THIS DISCLOSURE STATEMENT SUPPLEMENT CONSTITUTES LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE.  ANY PERSONS DESIRING ANY SUCH ADVICE OR OTHER ADVICE SHOULD CONSULT WITH THEIR OWN ADVISORS.

ALTHOUGH THE DEBTORS HAVE ATTEMPTED TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT SUPPLEMENT, EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT SUPPLEMENT HAS NOT BEEN AUDITED.

THE FINANCIAL PROJECTIONS (AS DEFINED HEREIN) PROVIDED IN THIS DISCLOSURE STATEMENT SUPPLEMENT HAVE BEEN PREPARED BY THE MANAGEMENT OF THE DEBTORS AND THEIR FINANCIAL ADVISORS.  THESE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT, ALTHOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL.  THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THESE FINANCIAL PROJECTIONS OR THE ABILITY TO ACHIEVE THE PROJECTED RESULTS.  SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE.  FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE FINANCIAL PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED AND/OR MAY HAVE BEEN UNANTICIPATED AND, THUS, THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER.  THE FINANCIAL PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

NO PARTY IS AUTHORIZED TO GIVE ANY INFORMATION WITH RESPECT TO THE AMENDED PLAN OTHER THAN THAT WHICH IS CONTAINED IN THE DISCLOSURE STATEMENT AND THIS DISCLOSURE STATEMENT SUPPLEMENT.  NO REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THE DISCLOSURE STATEMENT AND THIS DISCLOSURE STATEMENT SUPPLEMENT.  ANY INFORMATION, REPRESENTATIONS, OR INDUCEMENTS MADE

TO OBTAIN AN ACCEPTANCE OF THE AMENDED PLAN OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN OR IN THE DISCLOSURE STATEMENT (AS APPLICABLE) AND IN THE AMENDED PLAN SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM.

WITH RESPECT TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING, THREATENED, OR POTENTIAL LITIGATION OR ACTIONS, NEITHER THE DISCLOSURE STATEMENT NOR THIS DISCLOSURE STATEMENT SUPPLEMENT CONSTITUTES, AND MAY NOT BE CONSTRUED BY ANY PARTY AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER, BUT RATHER SHOULD BE CONSTRUED AS STATEMENTS MADE IN SETTLEMENT NEGOTIATIONS. NEITHER THE DISCLOSURE STATEMENT NOR THIS DISCLOSURE STATEMENT SUPPLEMENT WILL BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR WILL IT BE CONSTRUED TO CONSTITUTE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE AMENDED PLAN AS IT RELATES TO THE HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS.

THE SECURITIES DESCRIBED HEREIN WILL BE ISSUED WITHOUT REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR ANY SIMILAR FEDERAL, STATE, OR LOCAL LAW, IN RELIANCE ON THE EXEMPTIONS SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE AND SECTION 4(a)(2) OF THE SECURITIES ACT AND RULE 506 OF REGULATION D PROMULGATED THEREUNDER. IN ACCORDANCE WITH SECTION 1125(E) OF THE BANKRUPTCY CODE, A DEBTOR OR ANY OF ITS AGENTS THAT PARTICIPATES, IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, IN THE OFFER, ISSUANCE, SALE, OR PURCHASE OF A SECURITY, OFFERED OR SOLD UNDER THE AMENDED PLAN, OF THE DEBTOR, OF AN AFFILIATE PARTICIPATING IN A JOINT PLAN WITH THE DEBTOR, OR OF A NEWLY ORGANIZED SUCCESSOR TO THE DEBTOR UNDER THE AMENDED PLAN, IS NOT LIABLE, ON ACCOUNT OF SUCH PARTICIPATION, FOR VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE OFFER, ISSUANCE, SALE, OR PURCHASE OF SECURITIES.

THE DISCLOSURE STATEMENT AND THIS DISCLOSURE STATEMENT SUPPLEMENT HAVE BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-APPLICABLE BANKRUPTCY LAWS. NEITHER THE DISCLOSURE STATEMENT NOR THIS DISCLOSURE STATEMENT SUPPLEMENT HAVE BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "**SEC**"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

SEE ARTICLE IX OF THIS DISCLOSURE STATEMENT SUPPLEMENT, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING," (INCORPORATING BY REFERENCE ARTICLE IX OF THE DISCLOSURE STATEMENT (AS APPLICABLE)) FOR A DISCUSSION OF CERTAIN CONSIDERATIONS IN

CONNECTION WITH A DECISION BY A HOLDER OF AN IMPAIRED CLAIM TO ACCEPT THE AMENDED PLAN.

*[Remainder of This Page Intentionally Left Blank]*

# TABLE OF CONTENTS

PAGE

## ARTICLE I

INTRODUCTION .......................................................................................................... 1

A.       Purpose of the Disclosure Statement Supplement ........................ 1

B.       Disclosure Statement Supplement Enclosures ............................ 3

C.       Confirmation of the Amended Plan ............................................. 3

D.       Treatment and Classification of Claims and Interests; Impairment ...... 4

E.       Voting Procedures and Voting Deadline ..................................... 6

F.       Continued Solicitation Hearing and Confirmation Hearing ........ 7

## ARTICLE II

GENERAL INFORMATION REGARDING THE DEBTORS ............................... 9

## ARTICLE III

THE CHAPTER 11 CASES ....................................................................................... 9

A.       Sale of Assets ................................................................................. 9

B.       Executory Contracts and Unexpired Leases ............................... 10

C.       Financing ...................................................................................... 10

D.       Cooperation Agreement .............................................................. 11

E.       Exit Financing .............................................................................. 12

## ARTICLE IV

SUMMARY OF THE AMENDED PLAN ............................................................. 13

## ARTICLE V

VOTING REQUIREMENTS; ACCEPTANCE AND CONFIRMATION OF THE AMENDED PLAN ...... ~~15~~16

A.       General .................................................................................. ~~15~~16

B.       Parties in Interest Entitled To Vote ........................................... 16

C.       Classes Impaired and Entitled To Vote Under the Amended Plan ...... ~~16~~17

D.       Voting Procedures and Requirements ........................................ 17

E.      Acceptance of Amended Plan ................................................................. 19

F.      Confirmation Without Necessary Acceptances; Cramdown ..................... 20

G.      Classification ......................................................................................... 21

ARTICLE VI

FEASIBILITY AND BEST INTERESTS OF CREDITORS ....................................... 21

A.      Best Interests Test .................................................................................. 21

B.      Liquidation Analysis .............................................................................. 22

C.      Application of the Best Interests Test ..................................................... 23

D.      Feasibility .............................................................................................. 23

E.      Valuation of the Debtors ......................................................................... 24

ARTICLE VII

EFFECT OF CONFIRMATION ........................................................................... 24

A.      Binding Effect of Confirmation .............................................................. 24

B.      Good Faith ............................................................................................. 24

ARTICLE VIII

SECURITIES LAW MATTERS .......................................................................... 2425

ARTICLE IX

CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING ................... 25

ARTICLE X

CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE AMENDED PLAN ......... 2627

A.      Partnership Status .................................................................................. 28

B.      Definition of "U.S. Holder" ................................................................... 2829

C.      Certain U.S. Federal Income Tax Consequences to the Debtors and LP Unitholders ... 29

D.      Certain U.S. Federal Income Tax Consequences to Holders of Loans ....... 3031

E.      Certain U.S. Federal Income Tax Consequences to Exit Lenders participating in the Exit Financing ......... 32

F.      Certain U.S. Federal Income Tax Consequences of Ownership of New Units ......... 33

ARTICLE XI

RECOMMENDATION .......................................................................................................... 37

## **Exhibits**

| | |
|---|---|
| Exhibit A-1 | Amended Plan |
| Exhibit A-2 | Amended Plan Blackline (marked against the Original Plan) |
| Exhibit B | Liquidation Analysis |
| Exhibit C | Financial Projections |
| Exhibit D | Valuation Analysis |

# ARTICLE I

# INTRODUCTION

**A.      Purpose of the Disclosure Statement Supplement**

On April 1, 2019 (the "**Petition Date**"), each of Southcross Energy Partners, L.P. ("**Southcross**" or the "**Partnership**"), Southcross Energy Partners GP, LLC, ("**Southcross GP**"), and Southcross's wholly owned direct and indirect subsidiaries (collectively, the "**Debtors**") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**").  The Debtors' chapter 11 cases are being jointly administered under the caption *In re Southcross Energy Partners, L.P.*, Case No. 19-10702 (the "**Chapter 11 Cases**"). The Debtors have continued in possession of their property and have continued to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

On November 7, 2019, the Court entered the Disclosure Statement Order,[1] after which, on November 7, 2019, the Debtors filed solicitation versions of the Original Plan and the Disclosure Statement.  The Debtors then served solicitation packages and related documents in accordance with the Disclosure Statement Order.[2]

The Debtors have determined that the Original Plan and the Disclosure Statement require amendment and/or supplementation to ensure that all parties in interest, particularly the creditors in the classes entitled to vote (the "**Voting Classes**"), have "adequate information" within the meaning of section 1125 of the Bankruptcy Code in advance of the Voting Deadline and the Confirmation Hearing (each as defined below).  Based on the non-renewal of a material customer contract, and certain other factors, the Debtors, in consultation with their advisors, have revised the Liquidation Analysis, Financial Projections, and Valuation Analysis (each as defined below), attached hereto as <u>Exhibits B</u>, <u>C</u>, and <u>D</u>, respectively, and, in addition have made certain other changes to the Original Plan, as explained herein.

Accordingly, the Amended Plan reflects certain operational issues relating to the Debtors' businesses as well as other facts and circumstances in the Chapter 11 Cases.  The Amended Plan is the outcome of extensive negotiations among the Debtors and certain of their key stakeholders—including the Ad Hoc Group—that began almost a year ago.  The Amended Plan contemplates a restructuring that will deleverage the Debtors' balance sheet, distribute the proceeds of the Debtors' MS/AL Assets and CCPN Assets to the Debtors' creditors,[3] enable the Debtors to reorganize around their South Texas assets (including pursuant to the Credit Bid

---

[1] *See Order (I) Approving the Disclosure Statement, (II) Establishing Procedures for the Solicitation and Tabulation of Votes to Accept or Reject the Plan, (III) Approving the Form of Ballot and Solicitation Materials, (IV) Establishing the Voting Record Date, (V) Fixing the Date, Time, and Place for the Confirmation Hearing and the Deadline for Filing Objections Thereto, and (VI) Approving Related Notice Procedures* [D.I. 674] (the "**Disclosure Statement Order**").

[2] *See Affidavit of Service* [D.I. 697].

[3] *See* note 3, *supra*.

Transaction, as applicable), and leave the Debtors positioned to succeed in the highly competitive natural gas midstream industry.  The Amended Plan contemplates the resolution of all outstanding Claims against, and Interests in, the Debtors.

The treatment for each class of creditors under the Amended Plan is substantially the same as the treatment set forth in the Original Plan.  However, the Amended Plan provides that if 100% of the holders of Allowed Roll-Up DIP Claims fail to consent to the treatment of Allowed Roll-Up DIP Claims set forth in Section 3.1 of the Amended Plan, such holders will be given substantially the same treatment through the consummation of the Credit Bid Transaction.  As set forth in Section 7.3 of the Amended Plan and described in Article IV herein, the Credit Bid Transaction, if implemented, would be consummated by transferring all or substantially all of the Debtors' assets (other than as necessary to satisfy the New Money DIP Claims, the Carve-Out, and the Wind Down Budget) to a newly formed acquisition company ("**NewCo**") in exchange for the Roll-Up DIP Claims, Prepetition Revolving Credit Facility Claims, and Prepetition Term Loan Claims, as credit bid by the DIP Agent and Prepetition Agents at the direction of the Credit Bid Required Lenders.  Creditors in the Voting Classes would each receive their Pro Rata Share of the New Common Units and New Preferred Units issued by NewCo (instead of Reorganized Southcross) on the same terms set forth in the Original Plan.

The Debtors believe the Amended Plan is reflective of good faith negotiations and will treat holders of Claims and Interests in an economic and fair manner.  In developing the Amended Plan, the Debtors considered various issues relating to how the distributable value should be allocated among the creditors of the various Debtors, including, without limitation, (i) the value of the Estates on a consolidated and entity-by-entity basis and the proper method of determining such value, (ii) the value of any unencumbered assets after giving effect to a fair allocation of all Administrative Expense Claims, Priority Tax-Claims, Priority Non-Tax Claims, and Secured Claims, (iii) the projected recoveries of holders of Claims on a consolidated and entity-by-entity basis, and (iv) the nature and treatment of Intercompany Claims.  The Debtors believe that the Amended Plan strikes a fair and equitable balance between these competing factors and appropriately distributes value among their stakeholders in accordance with the Bankruptcy Code's priority scheme.

The Debtors submit this Disclosure Statement Supplement pursuant to section 1125 of the Bankruptcy Code to holders of Claims against the Debtors in connection with (i) the continuing solicitation of acceptances of the Amended Plan and (ii) a hearing to consider confirmation of the Amended Plan.

The purpose of this Disclosure Statement Supplement is to describe the Amended Plan and how its provisions differ from the Original Plan and to provide adequate information, as required under section 1125 of the Bankruptcy Code, to holders of Claims in the Voting Classes so they can make informed decisions in doing so.  Holders entitled to vote to accept or reject the Amended Plan will receive a Supplemental Solicitation Package (as defined in the Continued

Solicitation Motion[4]) to enable them to vote, or modify their prior vote, on the Amended Plan; provided, as discussed in in subsection E below, parties entitled to vote are authorized to rely upon Ballots submitted in connection with the Original Plan.

This Disclosure Statement Supplement (including by reference to certain provisions of the Disclosure Statement) includes, among other things, (i) information pertaining to the Debtors' prepetition business operations and financial history and (ii) the events leading up to the Chapter 11 Cases.  In addition, this Disclosure Statement Supplement (including by reference to certain provisions of the Disclosure Statement) includes an overview of the Amended Plan (which overview sets forth certain terms and provisions of the Amended Plan), the effects of confirmation of the Amended Plan, certain risk factors associated with the Amended Plan, the manner in which distributions will be made under the Amended Plan, and how the Amended Plan differs from the Original Plan.  This Disclosure Statement Supplement also discusses the confirmation process and the procedures for voting, which procedures must be followed by the holders of Claims entitled to vote under the Amended Plan in order for their votes to be counted; provided, as discussed in in subsection E below, parties entitled to vote are authorized to rely upon Ballots submitted in connection with the Original Plan; only the latest dated Ballot timely received will be deemed to reflect the voter's intent respecting the Amended Plan and, thus, will supersede any prior Ballots.  Parties entitled to vote shall be authorized in their sole discretion to complete an electronic Ballot and electronically sign and submit the Ballot to the Claims Agent.

## B.    Disclosure Statement Supplement Enclosures

Accompanying this Disclosure Statement Supplement (along with the rest of the Supplemental Solicitation Package) is a ballot (the "**Ballot**") for voting to accept or reject the Amended Plan if you are the record holder of a Claim in the Voting Classes.

## C.    Confirmation of the Amended Plan

### 1.    Requirements

The requirements for confirmation of the Amended Plan are set forth in section 1129 of the Bankruptcy Code.  The requirements for approval of the Disclosure Statement (as supplemented herein by this Disclosure Statement Supplement) are set forth in section 1125 of the Bankruptcy Code.

### 2.    Approval of the Amended Plan and Confirmation Hearing

To confirm the Amended Plan, the Bankruptcy Court must hold a hearing to determine whether the Amended Plan meets the requirements of section 1129 of the Bankruptcy Code.

---

[4] See *Debtors' Motion For Entry of an Order (I) Approving the Debtors' Continued Solicitation of the Amended Chapter 11 Plan, (II) Approving the Adequacy of the Disclosure Statement Supplement in Connection With the Amended Chapter 11 Plan, (III) Establishing Certain Deadlines and Procedures in Connection With Confirmation of the Amended Chapter 11 Plan, and (IV) Granting Related Relief* [D.I. 768] (the "**Continued Solicitation Motion**").

### 3. *Only Impaired Classes Vote*

Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests that are "impaired" (as defined in section 1124 of the Bankruptcy Code) under a plan may vote to accept or reject such plan.  Generally, a claim or interest is impaired under a plan if the applicable holder's legal, equitable, or contractual rights are modified under such plan.  In addition, if the holders of claims or interests in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected such plan under section 1126(g) of the Bankruptcy Code and, therefore, such holders are not entitled to vote on such plan.

Under the Amended Plan, holders of Claims in Classes 3 and 4 are impaired and are entitled to vote on the Amended Plan.

Under the Amended Plan, holders of Claims and Interests in Classes 5, 6, 7, and 8 are impaired and will not receive or retain any property under the Amended Plan on account of their Claims or Interests in such classes and, therefore, are (i) not entitled to vote on the Amended Plan and (ii) deemed to reject the Amended Plan.

Under the Amended Plan, holders of Claims and Interests in Classes 1 and 2 are unimpaired and therefore, deemed to accept the Amended Plan.

ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE AMENDED PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASSES 3 AND 4.

### D. **Treatment and Classification of Claims and Interests; Impairment**

Pursuant to sections 1122 and 1123 of the Bankruptcy Code, Claims and Interests are classified for all purposes, including, without express or implied limitation, voting, confirmation, and distribution pursuant to the Amended Plan, as set forth herein.  A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class, and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class.  A Claim or Interest is in a particular Class only to the extent that such Claim or Interest is Allowed in that Class and has not been paid or otherwise satisfied prior to the Effective Date.  Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, may be adjusted or expunged on the official claims register without a claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

Except as otherwise specifically provided for in the Amended Plan, the Confirmation Order, or other order of the Bankruptcy Court, or as required by applicable non-bankruptcy law, in no event shall any holder of an Allowed Claim be entitled to receive payments that in the aggregate exceed the Allowed amount of such holder's Claim.  For the purpose of classification and treatment under the Amended Plan, any Claim in respect of which multiple Debtors shall be jointly liable shall be treated as a separate Claim against each of the jointly liable Debtors.

**Summary of Classification and Treatment of**
**Claims and Interests in the Debtors**

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE SUBJECT TO CHANGE.**

The Amended Plan is being proposed as a joint plan of reorganization of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan of reorganization for each Debtor.  The Amended Plan groups the Debtors together solely for purposes of describing treatment under the Amended Plan, confirmation of the Amended Plan and making distributions ("**Plan Distributions**") in respect of Claims against and/or Interests in the Debtors under the Amended Plan.  Such groupings shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, nor cause the transfer of any assets or the assumption of any liabilities; and, except as otherwise provided by or permitted in the Amended Plan, all Debtors shall continue to exist as separate legal entities.

The information in the table below is provided in summary form for illustrative purposes only and is subject to material change based on certain contingencies, including those related to the claims reconciliation process.  Actual recoveries may widely vary within these ranges, and any changes to any of the assumptions underlying these amounts could result in material adjustments to recovery estimates provided herein and/or the actual distribution received by holders of Allowed Claims.  The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' estimates as of the date hereof only.  In addition to the cautionary notes contained elsewhere herein and in the Disclosure Statement, it is underscored that the Debtors make no representation as to the accuracy of these recovery estimates.  The Debtors expressly disclaim any obligation to update any estimates or assumptions after the date hereof on any basis (including new or different information received and/or errors discovered).

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, confirmation, and distribution pursuant to the Amended Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.[5]

| Class | Designation | Amended Plan Treatment of Allowed Claims and Interests | Entitled to Vote | Projected Recovery Under the Amended Plan | Estimated Allowed Claims |
|---|---|---|---|---|---|
| | | | | | |

---

[5] Note that the projected recoveries set forth in the table herein are based on a $2.0 million Upfront Payment and a $28.5 million Oversubscription Payment (each in the form of New Series B Preferred Units).

| Class | Designation | Amended Plan Treatment of Allowed Claims and Interests | Entitled to Vote | Projected Recovery Under the Amended Plan | Estimated Allowed Claims |
|---|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired | No | 100% | $0.00 |
| 2 | Other Secured Claims | Unimpaired | No | 100% | $0.00 |
| 3 | Prepetition Revolving Credit Facility Claims | Impaired | Yes | 33.7% | $81,293,201.51 |
| 4 | Prepetition Term Loan Claims | Impaired | Yes | 6.1% | $309,418,355.97 |
| 5 | General Unsecured Claims | Impaired | No | 0% | $215,150.00 |
| 6 | Sponsor Note Claims | Impaired | No | 0% | $17,382,775.47 |
| 7 | Subordinated Claims | Impaired | No | 0% | $0.00 |
| 8 | Existing Interests | Impaired | No | 0% | N/A |

If a controversy arises regarding whether any Claim is properly classified under the Amended Plan, the Bankruptcy Court shall, upon proper motion and notice, determine such controversy at the Confirmation Hearing. If the Bankruptcy Court finds that the classification of any Claim is improper, then such Claim shall be reclassified and the Ballot previously cast by the holder of such Claim shall be counted in, and the Claim shall receive the treatment prescribed in, the Class in which the Bankruptcy Court determines such Claim should have been classified, without the necessity of resoliciting any votes on the Amended Plan.

**E.     Voting Procedures and Voting Deadline**

If you were entitled to vote to accept or reject the Original Plan, a Ballot was enclosed with the Disclosure Statement you received, for the purpose of voting on the Original Plan. **To the extent you have already submitted a Ballot with respect to the Original Plan, such vote will remain binding and effective with respect to the Amended Plan if you take no further action**. To the extent that you are a holder of a Claim in the Voting Classes who has not previously submitted a Ballot, or you have previously submitted a Ballot but after reviewing this Disclosure Statement Supplement you choose to change your vote, to ensure your vote is counted, you must complete, date, sign, and promptly mail the Ballot enclosed with the Supplemental Solicitation Package you have received or complete your Ballot using the online portal maintained by the Claims Agent, so your vote is actually received by the Claims Agent prior to the Voting Deadline, in each case indicating your decision to accept or reject the Amended Plan in the boxes provided. Note that, pursuant to paragraph 5(k) the Disclosure Statement Order, "[w]henever a Claimholder casts more than one Ballot voting the same Claim prior to the Voting Deadline, only the latest-dated Ballot timely received will be deemed to reflect the voter's intent and, thus, will supersede any prior Ballots." Accordingly, any Ballot

submitted in connection with the Amended Plan will supersede any Ballot previously cast by such party.

The Ballot also contains an election to opt out of the release provisions contained in Article XII of the Amended Plan. Holders of Claims who are deemed to accept or deemed to reject the Amended Plan will not receive Ballots and will not be deemed to have granted the releases in Article XII of the Amended Plan. If you vote to accept the Amended Plan (or have previously voted to accept the Original Plan and do not change your vote) but do not (or did not previously) opt out of the release provisions of the Amended Plan, you will be deemed to have granted the releases in Article XII of the Amended Plan. See Article V.D.3 herein for additional details.

TO BE COUNTED, YOUR BALLOT INDICATING YOUR ACCEPTANCE OR REJECTION OF THE AMENDED PLAN (TO THE EXTENT YOU HAVE EITHER NOT PREVIOUSLY SUBMITTED A BALLOT OR CHOOSE TO SUBMIT A NEW BALLOT CHANGING YOUR VOTE) MUST BE RECEIVED BY THE CLAIMS AGENT NO LATER THAN 6:00 P.M. (PREVAILING EASTERN TIME) ON JANUARY 21, 2020 (THE "**VOTING DEADLINE**").

In order for the Amended Plan to be accepted by an impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting in such Class must vote to accept the Amended Plan. At least one Voting Class, excluding the votes of insiders, must actually vote to accept the Amended Plan.

YOU ARE URGED TO COMPLETE, DATE, SIGN, AND PROMPTLY MAIL THE BALLOT ENCLOSED WITH THE NOTICE OR COMPLETE YOUR BALLOT USING THE ONLINE PORTAL MAINTAINED BY THE CLAIMS AGENT. PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND LEGIBLY AND TO IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE HOLDER. IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE AMENDED PLAN AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT, YOU LOST YOUR BALLOT, OR YOU PREVIOUSLY SUBMITTED A BALLOT BUT CHOOSE TO CHANGE YOUR VOTE, OR IF YOU HAVE ANY QUESTIONS CONCERNING THE DISCLOSURE STATEMENT, THIS DISCLOSURE STATEMENT SUPPLEMENT, THE AMENDED PLAN, OR PROCEDURES FOR VOTING ON THE AMENDED PLAN, PLEASE CONTACT THE CLAIMS AGENT AT (866) 967-0671 (TOLL-FREE) OR (310) 751-2671 (IF CALLING FROM OUTSIDE THE U.S. OR CANADA) OR AT SouthcrossInfo@kccllc.com. THE CLAIMS AGENT IS NOT AUTHORIZED TO PROVIDE LEGAL ADVICE AND WILL NOT PROVIDE ANY SUCH ADVICE.

## F.   Continued Solicitation Hearing and Confirmation Hearing

The hearing to consider approval of the Continued Solicitation Motion was held on January 7, 2020 at 10:30 a.m. (prevailing Eastern Time). Pursuant to the Continued Solicitation Order (as defined below), the Bankruptcy Court has scheduled a hearing to consider confirmation of the Amended Plan (the "**Confirmation Hearing**"). The Confirmation Hearing will take place on January 27, 2020 at 10:30 a.m. (prevailing Eastern Time). Parties in interest will have the

opportunity to object to the confirmation of the Amended Plan at the Confirmation Hearing. The deadline for filing an objection to confirmation of the Amended Plan is January 21, 2020 at 6:00 p.m.

THE DEBTORS URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE AMENDED PLAN TO VOTE TO ACCEPT THE AMENDED PLAN.

Set forth below is a summary table of certain key dates and deadlines for the confirmation process with respect to the Amended Plan.

| Deadline | Proposed Date |
|---|---|
| **Deadline To File Rule 3018 Motions[6]** | **4:00 p.m. (prevailing Eastern Time) on the fifth day after the later of (i) service of the Confirmation Notice[7] and (ii) service of notice of an objection, if any, to such Claim** |
| **Debtors' Deadline To File Plan Supplement** | **January 9, 2020** |
| **Debtors' Deadline To File Amended Schedule of Rejected Contracts and Leases** | **January 13, 2020** |
| **Deadline To Object to Rule 3018 Motions** | **January 21, 2020** |
| **Voting Deadline** | **January 21, 2020 at 6:00 p.m. (prevailing Eastern Time)** |
| **Deadline To Object to Amended Plan Confirmation** | **January 21, 2020 at 6:00 p.m. (prevailing Eastern Time)** |
| **Deadline for Replies to Amended Plan Objections** | **January 23, 2020** |
| **Confirmation Hearing** | **January 27, 2020 at 10:30 a.m. (prevailing Eastern Time)** |

## ARTICLE II

## GENERAL INFORMATION REGARDING THE DEBTORS

The information set forth in Article II of the Disclosure Statement, including (without limitation, as applicable) with respect to (a) the Debtors' businesses, structure, management, and

---

[6] As defined in the Disclosure Statement Order.

[7] As defined in the *Motion of Debtors for Entry of an Order (I) Approving the Disclosure Statement, (II) Establishing Procedures for the Solicitation and Tabulation of Votes to Accept or Reject the Plan, (III) Approving the Form of Ballot and Solicitation Materials, (IV) Establishing the Voting Record Date, (V) Fixing the Date, Time, and Place for the Confirmation Hearing and the Deadline for Filing Objections Thereto, and (VI) Approving Related Notice Procedures* [D.I. 521].

employees, (b) the Debtors' corporate structure, and (c) the summary of events leading to the filings of the Chapter 11 Cases is generally incorporated herein by reference.[8]

## ARTICLE III

## THE CHAPTER 11 CASES

The Debtors incorporate by reference herein the summary of events and filings set forth in Article III of the Disclosure Statement (other than with respect to matters or deadlines expressly updated in this Disclosure Statement Supplement).  In addition, by way of supplement, below is a summary of the material events in the Chapter 11 Cases related to occurrences subsequent to the Bankruptcy Court's entry of the Disclosure Statement Order.  Note that the following supplemental disclosure does not attempt to summarize all document filings or events that have occurred during such period.  Furthermore, although the Debtors believe that these summaries are fair and accurate, these summaries are qualified in their entirety to the extent that they do not set forth every detail of such events.

A.      **Sale of Assets**

    *1.*      CCPN Assets:

        *a.*      On October 22, 2019, the Bankruptcy Court entered the CCPN Sale Order [D.I. 596]

        *b.*      On November 19, 2019, the Debtors filed the *Notice of Closing of Sale of CCPN Assets to Kinder Morgan Tejas Pipeline LLC* [D.I. 707], which was subsequently amended on November 21, 2019, by the *Amended Notice of Closing of Sale of CCPN Assets to Kinder Morgan Tejas Pipeline LLC* [D.I. 711] (the "**CCPN Closing Notice**").  The CCPN Closing Notice provided notice that, on November 6, 2019, in accordance with the CCPN Sale Order, the CCPN Sale closed and attached thereto as Exhibit A the Amended Final Assumed Contracts Schedule (as defined therein).

    *2.*      MS/AL Assets

        *a.*      On October 22, 2019, the Bankruptcy Court entered the MS/AL Sale Order [D.I. 595].

        *b.*      On December 20, 2019 the Debtors filed the *Notice of Closing of Sale of MS/AL Assets to Magnolia Infrastructure Holdings, LLC* [D.I. 781] (the "**MS/AL Closing Notice**").  The MS/AL Closing Notice provided notice that, on December 16, 2019, in accordance with the MS/AL Sale Order,

---

[8] Note that as of November 18, 2019, Michael B. Howe, previously the Debtors' Senior Vice President, Chief Financial Officer, and Principal Accounting Officer, has left the management of the Debtors in order to pursue other interests.

the MS/AL Sale closed and attached thereto as <u>Exhibit A</u> the Final Assumed Contracts Schedule (as defined therein).

**B.     Executory Contracts and Unexpired Leases**

      *1.*     Cure Notices

            *a.*     On June 13, 2019, the Debtors filed and served on each applicable counterparty the Potential Assumption and Assignment Notice [D.I. 327].

            *b.*     On August 15, 2019, the Debtors filed and served on each applicable counterparty the Supplemental Assumption and Assignment Notice [D.I. 429].

            *c.*     On September 23, 2019, the Debtors filed and served on each applicable counterparty the Second Supplemental Notice [D.I. 496].

            *d.*     On November 18, 2019, the Debtors filed and served on each applicable counterparty the Third Supplemental Notice [D.I. 705].

      *2.*     Notice of Rejected Contracts and Leases

On December 2, 2019, in accordance with the Original Plan the Debtors filed and served on the applicable counterparties the Notice of Rejected Contracts and Leases [D.I. 725] including the Schedule of Rejected Contracts and Leases attached thereto as Exhibit A, setting forth the contracts and leases the Debtors intend to reject, subject to the Debtors' right under the Disclosure Statement Order and Section 10.1 of the Original Plan (and Section 10.1 of the Amended Plan) to remove any contract or lease from the Schedule of Rejected Contracts and Leases up until the commencement of the Confirmation Hearing. On or before January 13, 2020, the Debtors intend to file a supplement to the Notice of Rejected Contracts and Leases.  To the extent that any of the executory contracts and unexpired leases of the Debtors are not listed on the Schedule of Rejected Contracts and Leases (as supplemented) prior to the commencement of the Confirmation Hearing, those executory contracts and unexpired leases of the Debtors shall be assumed under the Amended Plan (or assumed and assigned to NewCo, as applicable).

**C.     Financing**

      *1.*     The DIP Credit Agreement, dated as of April 3, 2019, has been amended as follows:

            *a.*     First Amendment to Senior Secured Superpriority Priming Debtor-In-Possession Credit Agreement, dated as of May 20, 2019.

            *b.*     Second Amendment to Senior Secured Superpriority Priming Debtor-In-Possession Credit Agreement, dated as of June 12, 2019.

            *c.*     Third Amendment to Senior Secured Superpriority Priming Debtor-In-Possession Credit Agreement, dated as of August 23, 2019.

      *d.*      Fourth Amendment to Senior Secured Superpriority Priming Debtor-In-Possession Credit Agreement, dated as of October 1, 2019.

      *e.*      Fifth Amendment to Senior Secured Superpriority Priming Debtor-In-Possession Credit Agreement, dated as of October 31, 2019.

      *f.*      Sixth Amendment to Senior Secured Superpriority Priming Debtor-In-Possession Credit Agreement, dated as of November 25, 2019.

      *g.*      Seventh Amendment to Senior Secured Superpriority Priming Debtor-In-Possession Credit Agreement, dated as of December 30, 2019.

    *2.*    Adequate Protection Stipulation

On December 6, 2019, the Bankruptcy Court entered the Order Approving Stipulation Regarding Modification to Adequate Protection Payments [D.I. 734] approving the stipulation attached thereto as Exhibit 1, which provides, among other things, that, notwithstanding paragraph 14(c) of the Final DIP Order, the Debtors shall not be required to provide adequate protection to the Prepetition Agents for the benefit of the Prepetition Secured Parties in the form of Adequate Protections Payments (each as defined in the Final DIP Order) that have or may accrue after November 29, 2019.

## D.    Cooperation Agreement

    The holders of 100% of DIP Roll-UP Loans have entered into a cooperation agreement, dated December 12, 2019 (the "**Cooperation Agreement**"), which provides, among other things, that each holder of DIP Roll-UP Loans signatory thereto (the "**Consenting Roll-Up DIP Lenders**"):

    *1.*    consents to the treatment of Allowed Roll-Up DIP Claims set forth in the Original Plan, which may be amended in a manner that is reasonably acceptable to the Debtors and the Majority Ad Hoc Group in accordance with Section 14.3 of the Original Plan; provided, that each holder of an Allowed Roll-Up DIP Claim continues to receive its Pro Rata Share of any such amended treatment;

    *2.*    shall, if such Consenting Roll-Up DIP Lender holds any other Claims, including, without limitation, Prepetition Revolving Credit Facility Claims and/or Prepetition Term Loan Claims, timely vote each such claim in favor of the Original Plan and shall not withdraw, amend, or revoke such vote; and

    *3.*    shall not, directly or indirectly, object to, delay, impede, or take any other action to interfere with the acceptance, implementation, confirmation, or consummation of the Original Plan, including by filing any motion or pleading with the Bankruptcy Court that is not materially consistent with the Cooperation Agreement, whether in its capacity as a holder of Allowed Roll-Up DIP Claims or other Claims.

Accordingly, the Cooperation Agreement provides that each of the Consenting Roll-Up DIP Lenders is bound to support the Amended Plan if it is supported by the Debtors and the Majority Ad Hoc Group, notwithstanding the revised financial projections (and revised Class 3 and 4 recoveries) set forth in this Disclosure Statement Supplement and the Debtors' procurement of the Exit Financing (as defined below).  However, out of an abundance of caution, the Debtors' have revised the Original Plan (as described in Article IV below) to assure that even were a Consenting Roll-Up DIP Lender to violate the Cooperation Agreement by failing to support the Amended Plan, the Amended Plan will still be capable of confirmation by the Bankruptcy Court.

**E.      Exit Financing**

As discussed in Article IV.E  of the Disclosure Statement, the Original Plan contemplated exit financing consisting of an Exit Revolving Credit Facility (the "**Original Exit Financing**"). Since October 2019, the Debtors, with the assistance of their advisors, had engaged in an extensive process to obtain exit financing proposals from various financial institutions in preparation for their emergence from bankruptcy.  This process involved broad-based marketing procedures led by experienced investment banking professionals at Evercore.  However, notwithstanding these extensive efforts to obtain such Original Exit Financing from a third party, to date the Debtors have been unsuccessful.  Ultimately, the Debtors reached an agreement with the Initial Exit Lenders (as defined in the Exit Financing Term Sheet) establishing the terms for obtaining commitments for approximately $65 million in Exit Financing necessary to consummate the Amended Plan.

Specifically, the Exit Facility contemplates the incurrence of First-lien senior secured credit facilities (the "**Exit Credit Facility**") in an aggregate principal amount of up to $65,000,000, consisting of (i) a revolving credit facility in an aggregate principal amount at any time outstanding up to $30,000,000 ("**Revolving Commitments**" and, the loans extended thereunder, "**Revolving Loans**") and (ii) a single-draw term loan facility in an aggregate principal amount of up to $35,000,000 (the "**Term Commitments**" and, the term loans extended thereunder, "**Term Loans**"), the proceeds of which will be used to cash collateralize a letter of credit subfacility (the "**Letter of Credit Subfacility**" and, collectively with the Exit Credit Facility, the "**Exit Financing**").  The Exit Financing will be incurred upon the Closing Date (as defined in the Exit Financing Motion) and will be used for, among other things, working capital requirements, general corporate purposes, and the cash collateralization of letters of credit or, following the Closing Date, for use as Alternate Cash Collateral (as defined in the Exit Financing Motion). The terms of the Exit Financing are described with more particularity in the Exit Financing Motion[9] and the amended term sheet attached to the *Notice of Amended Exit Financing Term Sheet* [D.I. 793] (the "**Exit Financing Term Sheet**").[10]

The Exit Financing will be provided by the Initial Exit Lenders and each other bank, financial institution, and other institutional lender that makes a commitment to the Exit Credit

---

[9] *See Debtors' Motion For Entry of an Order (I) Authorizing Entry Into the Exit Financing Commitment Letter, (II) Approving Alternate Transaction Fee, and (III) Granting Related Relief* [D.I. 769] (the "**Exit Financing Motion**").

[10] The Exit Financing Motion was approved by the Court's *Order (I) Authorizing Entry Into the Exit Financing Commitment Letter, (II) Approving Alternate Transaction Fee, and (III) Granting Related Relief* [D.I. 815].

Facility, including pursuant to the syndication process described in the Exit Financing Term Sheet or that otherwise becomes a lender from time to time.  As set forth in greater detail in the syndication procedures described in the Exit Financing Term Sheet, the Initial Exit Lenders, in consultation with the Debtors, will seek to syndicate the Exit Credit Facility to all holders of Allowed Roll-Up DIP Claims, Allowed Prepetition Revolving Credit Facility Claims, and holders of Allowed Prepetition Term Loan Claims.

The Debtors believe that the approval of the Exit Financing is in the best interests of the Debtors, their estates, and all parties in interest in the Chapter 11 Cases.  Furthermore, pursuant to the Cooperation Agreement, the Consenting Roll-Up DIP Lenders are bound to support the Amended Plan, including the Exit Financing.  However, given the possibility that a Consenting Roll-Up DIP Lender might violate the Cooperation Agreement and vote against or object to the Amended Plan, the Amended Plan provides for the possibility of the Credit Bid Transaction to assure the Debtors are able to emerge from chapter 11 on the timeline approved by the Bankruptcy Court in the Continued Solicitation Order.[10][11]

## ARTICLE IV

## SUMMARY OF THE AMENDED PLAN

The Debtors incorporate by reference the summary of the Original Plan set forth in Article IV of the Disclosure Statement (as applicable).  Furthermore, the specific revisions to the Original Plan reflected in the Amended Plan can be seen in the blackline attached hereto as Exhibit A-2.

This section provides a summary of the material modifications to the structure and means for implementation of the Amended Plan, and is qualified in its entirety by reference to the Amended Plan (as well as the exhibits thereto and definitions therein).

The statements contained in this Disclosure Statement Supplement include summaries of the provisions contained in the Amended Plan and in the documents referred to therein.  The statements contained in this Disclosure Statement Supplement do not purport to be precise or complete statements of all the terms and provisions of the Amended Plan or documents referred to therein, and reference is made to the Amended Plan and to such documents for the full and complete statement of such terms and provisions of the Amended Plan or documents referred to therein.

The Amended Plan controls the actual treatment of Claims against, and Interests in, the Debtors under the Amended Plan and will, upon the occurrence of the Effective Date, be binding upon all holders of Claims against and Interests in the Debtors, the Debtors' Estates, the Reorganized Debtors, all parties receiving property under the Amended Plan, NewCo (as applicable), and other parties in interest.  In the event of any conflict between this Disclosure

---

[10][11] *See Order (I) Approving the Debtors' Continued Solicitation of the Amended Chapter 11 Plan, (II) Approving the Adequacy of the Disclosure Statement Supplement in Connection With the Amended Chapter 11 Plan, (III) Establishing Certain Deadlines and Procedures in Connection With Confirmation of the Amended Chapter 11 Plan, and (IV) Granting Related Relief* [D.I. [•][814] (the "**Continued Solicitation Order**").

Statement Supplement, the Disclosure Statement, and the Amended Plan or any other operative document, the terms of the Amended Plan and/or such other operative document shall control.

The Debtors have received commitments from certain of their existing lenders to provide the Exit Financing (as noted above). The Exit Financing should provide sufficient liquidity to carry out the terms of the Amended Plan without amendment.

The Debtors have determined to provide for the possibility of the Credit Bid Transaction in the Amended Plan to assure that the Amended Plan is capable of confirmation by the Bankruptcy Court in the event that a Consenting Roll-Up DIP Lender does not consent to their treatment under the Amended Plan (notwithstanding their obligation to do so under the Cooperation Agreement). Accordingly, the Amended Plan provides that in the event 100% of the Roll-Up DIP Lenders do not consent to the treatment set forth in Section 3.1 of the Amended Plan, the Credit Bid Transaction shall be implemented. **Implementation of the Credit Bid Transaction is a purely mechanical device that will result in substantially the same economic treatment for all of the Debtors' creditors as they would receive if the Credit Bid Transaction is not implemented.** If the Credit Bid Transaction is implemented, NewCo will stand in for the Reorganized Debtors as the surviving entity for most purposes. For example, if the Credit Bid Transaction is consummated, the holders of Prepetition Revolving Credit Facility Claims (Class 3) and Prepetition Term Loan Claims (Class 4) will receive New Common Units and New Preferred Units in NewCo rather than Reorganized Southcross, and executory contracts and unexpired leases that would otherwise have been assumed by the Reorganized Debtors will be assumed and assigned to NewCo.

As set forth in Section 7.3 of the Amended Plan, in the event that all Roll-Up DIP Lenders do not consent to the treatment set forth in Section 3.1 of the Amended Plan, with the agreement of the Debtors and the Majority Ad Hoc Group, the Credit Bid Transaction will be carried out in the following manner:

*a.*    the Debtors shall transfer all or substantially all of their assets, other than as necessary to satisfy the New Money DIP Claims, the Carve-Out, and the Wind Down Budget, to NewCo free and clear of all liens, Claims, encumbrances, and other interests pursuant to sections 363, 365, and/or 1123 of the Bankruptcy Code, the Amended Plan, and the Confirmation Order;

*b.*    upon entry of the Confirmation Order by the Bankruptcy Court, all matters provided for under the Credit Bid Transaction Agreement (which shall be filed with the Bankruptcy Court prior to the commencement of the Confirmation Hearing) and the Amended Plan with respect to the Credit Bid Transaction, and any documents in connection therewith, shall be deemed authorized and approved without any requirement of further act or action by the Debtors, the Debtors' interest holders, general partners, limited partners, boards of directors, or any other Person;

*c.*    the Credit Bid Required Lenders and the Debtors will agree to an appropriate Wind Down Budget sufficient to pay, in Cash, all Allowed Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, and professional

fees and expenses necessary to wind down the Debtors' estates on a reasonable and appropriate timeline; and

*d.*     the Debtors shall be authorized to execute and deliver, and to consummate the transactions contemplated by, the Credit Bid Transaction Agreement and the Amended Plan, as well as to execute, deliver, file, record, and issue any note, documents, or agreements in connection therewith, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Person.

Furthermore, pursuant to the Credit Bid Transaction Agreement, NewCo shall be treated as a partnership for U.S. federal and applicable state and local income tax purposes unless otherwise directed in writing by the Credit Bid Required Lenders, in which case NewCo shall be treated as a corporation for U.S. federal and applicable state and local income tax purposes.  If consummated, the Credit Bid Transaction will represent the settlement, compromise, and satisfaction of the DIP Claims (other than New Money DIP Claims, which will be satisfied in Cash by the Reorganized Debtors), Prepetition Revolving Credit Facility Claims, and Prepetition Term Loan Claims.  If there is any dispute among the Debtors and the Credit Bid Required Lenders regarding the Wind Down Budget, such dispute shall be resolved by the Bankruptcy Court.  Any Carve-Out funds that are unused after satisfaction of all Allowed Claims with recourse to the Carve-Out shall be transferred by Reorganized Southcross to NewCo as soon as reasonably practicable following satisfaction of all such Claims.

In the event all Roll-UP DIP Lenders do not consent to the treatment set forth in Section 3.1 of the Amended Plan, and the Bankruptcy Court does not enter the Confirmation Order, the Amended Plan shall be deemed a motion to approve the Credit Bid Transaction, in accordance with Section 7.3 of the Amended Plan, under sections 105(a), 363, and 365 of the Bankruptcy Code and the applicable Bankruptcy Rules.

## ARTICLE V

## VOTING REQUIREMENTS; ACCEPTANCE AND CONFIRMATION OF THE AMENDED PLAN

**A.    General**

The following is a brief summary of the Amended Plan confirmation process.  Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and/or consult their own attorneys.

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Amended Plan.

Section 1129 of the Bankruptcy Code requires that, in order to confirm the Amended Plan, the Bankruptcy Court must make a series of findings concerning the Amended Plan and the Debtors, including that (i) the Amended Plan has classified Claims in a permissible manner, (ii)

the Amended Plan complies with applicable provisions of the Bankruptcy Code, (iii) the Amended Plan has been proposed in good faith and not by any means forbidden by law, (iv) the disclosure required by section 1125 of the Bankruptcy Code has been made, (v) the Amended Plan has been accepted by the requisite votes of holders of Claims (except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code), (vi) the Amended Plan is feasible and confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors unless such liquidation or reorganization is proposed in the Amended Plan; (vii) the Amended Plan is in the "best interests" of all holders of Claims in an impaired Class by providing to such holders on account of their Claims property of a value, as of the Effective Date, that is not less than the amount that such holders would receive or retain in a chapter 7 liquidation, unless each holder of a Claim in such Class has accepted the Amended Plan, and (viii) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Amended Plan provides for the payment of such fees on the Effective Date.  The Debtors believe that the Amended Plan satisfies section 1129 of the Bankruptcy Code.

**B.    Parties in Interest Entitled To Vote**

Pursuant to the Bankruptcy Code, only Classes of Claims that are "impaired" (as defined in section 1124 of the Bankruptcy Code) under the Amended Plan are entitled to vote to accept or reject the Amended Plan.  A Class is impaired if the legal, equitable, or contractual rights to which the Claims of that Class entitled the holders of such Claims are modified, other than by curing defaults and reinstating the Claims.  Classes that are not impaired are not entitled to vote on the Amended Plan and are conclusively presumed to have accepted the Amended Plan.  In addition, Classes that receive no distributions under the Amended Plan are not entitled to vote on the Amended Plan and are deemed to have rejected the Amended Plan.

**C.    Classes Impaired and Entitled To Vote Under the Amended Plan**

The following Classes are impaired under the Amended Plan and entitled to vote on the Amended Plan:

| Class | Designation | Status | Voting Rights |
|-------|-------------|--------|---------------|
| 3 | Prepetition Revolving Credit Facility Claims | Impaired | Entitled to Vote |
| 4 | Prepetition Term Loan Claims | Impaired | Entitled to Vote |

In general, if a Claim or Interest is unimpaired under a plan, section 1126(f) of the Bankruptcy Code deems the holder of such Claim or Interest to have accepted the plan, and thus, the holders of Claims in such unimpaired Classes are not entitled to vote on the plan.  Because Classes 1 and 2 are unimpaired under the Amended Plan, the holders of Claims and Interests in these Classes are not entitled to vote.

In general, if the holder of an impaired Claim or impaired Interest will not receive any distribution under a plan in respect of such Claim or Interest, section 1126(g) of the Bankruptcy

Code deems the holder of such Claim or Interest to have rejected the plan, and thus, the holders of Claims in such Classes are not entitled to vote on the Amended Plan.  The holders of Claims and Interests in Classes 5, 6, 7 and 8 are conclusively presumed to have rejected the Amended Plan and are therefore not entitled to vote.

**D.      Voting Procedures and Requirements**

The Bankruptcy Court can confirm the Amended Plan only if it determines that the Amended Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code. One of these technical requirements is that the Bankruptcy Court find, among other things, that the Amended Plan has been accepted by the requisite votes of all Classes of impaired Claims and Interests unless approval will be sought under section 1129(b) of the Bankruptcy Code in spite of the nonacceptance by one or more such Classes.

If you have any questions about (i) the procedures for voting your Claim or with respect to the Supplemental Solicitation Package that you have received or (ii) the amount of your Claim, please contact the Debtors' Claims Agent at (866) 967-0671 (toll-free) or (310) 751-2671 (if calling from outside the U.S. or Canada).  If you wish to obtain (at no charge) an additional copy of the Amended Plan, the Disclosure Statement, this Disclosure Statement Supplement, or other solicitation documents, you can obtain them from the Debtors' Case Information Website (located at *http://www.kccllc.net/southcrossenergy*) or by requesting a copy from the Debtors' Claims Agent, which can be reached at 877-709-4750.

*1.      Ballots*

Pursuant to Bankruptcy Rule 3017(c), November 6, 2019, the date of the Disclosure Statement Hearing, shall be the record date for purposes of determining which holders of Claims are entitled to receive solicitation packages and, where applicable, vote on the Amended Plan (the "**Record Date**").  Accordingly, only holders of record as of the Record Date that are otherwise entitled to vote under the Amended Plan will receive a Supplemental Solicitation Package, including a Ballot, and may vote on the Amended Plan.

In voting for or against the Amended Plan, please use (i) only the Ballot sent to you with the Disclosure Statement or this Disclosure Statement Supplement or (ii) the online electronic ballot portal.  If you are a holder of a Claim in Class 3 or 4 and did not receive a Ballot, if your Ballot is damaged or lost or if you have any questions concerning voting procedures, please contact the Claims Agent at (866) 967-0671 (toll-free) or (310) 751-2671 (if calling from outside the U.S. or Canada) or by email at SouthcrossInfo@kccllc.com.

*2.      Submitting Ballots*

If you are entitled to vote to accept or reject the Amended Plan, you should read carefully, complete, and submit your Ballot in accordance with the instructions below (if applicable).

If you were entitled to vote to accept or reject the Original Plan, a Ballot was enclosed with the Disclosure Statement you received, for the purpose of voting on the Original Plan.  **To the extent you have already submitted a Ballot with respect to the Original Plan, such vote will remain binding and effective with respect to the Amended Plan if you take no further**

**action**.  To the extent that you are a holder of a Claim in those Classes entitled to vote who has not previously submitted a Ballot, or have previously submitted a Ballot but after reviewing this Disclosure Statement Supplement you choose to change your vote, to ensure your vote is counted, you must complete, date, sign, and promptly mail the Ballot enclosed with the notice (following the directions set forth in the following paragraph) or complete your Ballot using the online portal maintained by the Claims Agent, so your vote is actually received by the Claims Agent prior to the Voting Deadline, in each case indicating your decision to accept or reject the Amended Plan in the boxes provided.  Note that, pursuant to paragraph 5(k) the Disclosure Statement Order, "[w]henever a Claimholder casts more than one Ballot voting the same Claim prior to the Voting Deadline, only the latest-dated Ballot timely received will be deemed to reflect the voter's intent and, thus, will supersede any prior Ballots." Accordingly, any Ballot submitted in connection with the Amended Plan will supersede any Ballot previously cast by such party.

For your vote to be counted, your Ballot must be properly completed, signed, and returned so that it is actually received by the Claims Agent, Kurtzman Carson Consultants LLC, by no later than the Voting Deadline, unless such time is extended in writing by the Debtors.  If your Ballot is not received by the Claims Agent on or before the Voting Deadline, and such Voting Deadline is not extended by the Debtors as noted above, your vote will not be counted.  If you are submitting a Ballot via first-class mail, overnight courier, or personal delivery, it should be sent to: Southcross Ballot Processing, c/o KCC, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245.  Delivery of a Ballot to the Claims Agent by facsimile or any other electronic means (other than as expressly provide herein) shall not be valid.

Except as otherwise ordered by the Bankruptcy Court, any Ballots received after the Voting Deadline will not be counted absent the consent of the Debtors (in their sole discretion). The method of delivery of Ballots to the Claims Agent is at the risk of each holder of a Claim, and such delivery will be deemed made only when the original Ballot is actually received by the Claims Agent.  In all cases, sufficient time should be allowed to assure timely delivery.  An original executed Ballot is required to be submitted by the entity submitting any written Ballot. Delivery of a Ballot by facsimile, telecopy, or any other electronic means shall not be valid; *provided, however*, that Ballots submitted through the online voting portal will be counted.  No Ballot should be sent to the Debtors, their agents (other than the Claims Agent), any administrative agent (unless specifically instructed to do so), or the Debtors' financial or legal advisors, and if so sent will not be counted.  If no holders of Claims in a particular Class that is entitled to vote on the Amended Plan vote to accept or reject the Amended Plan, then such Class shall be deemed to accept the Amended Plan.

### 3.     *Releases and Exculpation and Injunction Provisions Under the Amended Plan*

Each Ballot advises the recipient in bold and capitalized print that holders of Claims may opt out of the release provisions in the Amended Plan if such holder votes to accept the Amended Plan.  Each Ballot further advises the recipient in bold and capitalized print that if such holder votes to accept the Amended Plan but does not opt out of the release provisions of the Amended Plan, such holder will be deemed to have granted the releases in Article XII of the Amended Plan.  Holders who do not grant the releases and consent to the exculpation and injunction

provisions contained in Article 12 of the Amended Plan will not receive the benefit of the releases set forth in Article 12 of the Amended Plan.

The Debtors, in connection with solicitation of the Original Plan and Disclosure Statement, have mailed or caused to be mailed by first-class mail to holders of Claims in Classes 1, 2, 5, 6, 7, and 8 a copy of a notice of non-voting status and such notice remains valid with respect to the Amended Plan.  In addition, all parties in interest may obtain copies of the Disclosure Statement, this Disclosure Statement Supplement, and the Amended Plan free of charge upon request to the Claims Agent via email at SouthcrossInfo@kccllc.com or via telephone at (866) 967-0671 (toll-free) or at (310) 751-2671, for international callers.

## E.    Acceptance of Amended Plan

As a condition to confirmation of a chapter 11 plan, the Bankruptcy Code requires that each class of impaired claims vote to accept a plan, except under certain circumstances.  See "Confirmation Without Necessary Acceptances; Cramdown" below.  A class of claims or interests that is unimpaired under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.  A class is impaired unless the plan (i) leaves unaltered the legal, equitable, and contractual rights to which the claim or interest entitles the holder of such claim or interest or (ii) cures any default, reinstates the original terms of the obligation, and does not otherwise alter the legal, equitable, or contractual rights to which the claim or interest entitles the holder of such claim or interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by an impaired class as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class; only those holders that are eligible to vote and that actually vote to accept or reject the plan are counted for purposes of determining whether these dollar and number thresholds are met.  Thus, a class of claims will have voted to accept a plan only if two-thirds in amount and a majority in number that actually cast their ballots in favor of acceptance.  Under section 1126(d) of the Bankruptcy Code, a class of interests has accepted a plan if holders of such interests holding at least two-thirds in amount that actually vote have voted to accept the plan.  Holders of claims or interests who fail to vote are not counted as either accepting or rejecting a plan.

In addition to this voting requirement, section 1129 of the Bankruptcy Code requires that a plan be accepted by each holder of a claim or interest in an impaired class or that the plan otherwise be found by a court to be in the best interests of each holder of a claim or interest in such class.  See "Best Interests Test" below.  Moreover, each impaired class must accept the plan for the plan to be confirmed without application of the "fair and equitable" and "unfair discrimination" tests set forth in section 1129(b) of the Bankruptcy Code discussed below.  See "Confirmation Without Necessary Acceptances; Cramdown" below.

## F.    Confirmation Without Necessary Acceptances; Cramdown

In the event that any impaired class of claims or interests does not accept a plan, a debtor nevertheless may move for confirmation of the plan.  A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of

claims and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code requires that a court find that a plan (i) "does not discriminate unfairly" and (ii) is "fair and equitable," with respect to each non-accepting impaired class of claims or interests. Here, because holders of Claims in Classes 5, 6, 7, and 8 are deemed to reject the Amended Plan, the Debtors will seek confirmation of the Amended Plan from the Bankruptcy Court by satisfying the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. The Debtors believe that such requirements are satisfied, as no holder of a Claim or Interest junior to those in Classes 5, 6, 7 or 8 will receive any property under the Amended Plan.

A plan "does not discriminate unfairly" if (i) the legal rights of a nonaccepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the nonaccepting class and (ii) no class receives payments in excess of that which it is legally entitled to receive for its claims or interests. The Debtors believe that, under the Amended Plan, all impaired Classes of Claims and Interests are treated in a manner that is consistent with the treatment of other Classes of Claims and Interests that are similarly situated, if any, and no class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims or Allowed Interests in such Class. Accordingly, the Debtors believe that the Amended Plan does not discriminate unfairly as to any impaired Class of Claims or Interests.

The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable." In order to determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cram down" tests for secured creditors, unsecured creditors, and equity holders, as follows:

1.  Secured Creditors. Either (A) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred Cash payments having a present value equal to the amount of its allowed secured claim, (B) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (C) subject to section 363(k) of the Bankruptcy Code, the property securing the claim is sold free and clear of liens, with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (A) or (B) above.

2.  Unsecured Creditors. Either (A) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (B) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

3.  Equity Interests. Either (A) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest or (B) the holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

As discussed above, the Debtors believe that the distributions provided under the Amended Plan satisfy the "fair and equitable" standard, where required.

## G.    Classification

The Bankruptcy Code requires that, for purposes of treatment and voting, a chapter 11 plan divide the different claims (excluding administrative claims) against, and equity interests in, a debtor into separate classes based upon their legal nature.  Pursuant to section 1122 of the Bankruptcy Code, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.  The Debtors believe that the Amended Plan classifies all Claims and Interests in compliance with the provisions of the Bankruptcy Code because valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims and Interests created under the Amended Plan.  Accordingly, the classification of Claims and Interests in the Amended Plan complies with section 1122 of the Bankruptcy Code.

## ARTICLE VI

## FEASIBILITY AND BEST INTERESTS OF CREDITORS

## A.    Best Interests Test

As noted above, even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires a court to determine that such plan is in the best interests of all holders of claims or interests that are impaired by that plan and that have not accepted the plan.  The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code (the "**Best Interests Test**").

To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor were liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its chapter 11 cases were converted to chapter 7 cases under the Bankruptcy Code.  To determine if a plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses, and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan.  If the hypothetical liquidation distribution to holders of claims or interests in any impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such impaired class.

B.      **Liquidation Analysis**

Amounts that a holder of Claims and Interests in Impaired Classes would receive in a hypothetical chapter 7 liquidation are discussed in the liquidation analysis of the Debtors prepared by the Debtors' management with the assistance of its advisors (the "**Liquidation Analysis**"), which is attached hereto as <u>Exhibit B</u>.

As described in Exhibit B, the Debtors developed the Liquidation Analysis based on forecasted values as of January 31, 2020, unless otherwise noted in the Liquidation Analysis. The recoveries may change based on further refinements of Allowed Claims and as the Debtors' claims objection and reconciliation process begins following the Petition Date.

As described in the Liquidation Analysis, underlying the analysis is a number of estimates and assumptions that, although developed and considered reasonable by the Debtors' management and advisors, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management.  The Liquidation Analysis is based on assumptions with regard to liquidation decisions that are subject to change.  Accordingly, the values reflected in the Liquidation Analysis might not be realized if the Debtors were, in fact, to undergo a liquidation.

This Liquidation Analysis is solely for the purposes of (i) providing "adequate information" under section 1125 of the Bankruptcy Code to enable the holders of Claims and Interests entitled to vote under the Amended Plan to make an informed judgment about the Amended Plan and (ii) providing the Bankruptcy Court with appropriate support for the satisfaction of the "Best Interests Test" pursuant to section 1129(a)(7) of the Bankruptcy Code, and should not be used or relied upon for any other purpose, including the purchase or sale of securities of, or Claims or Interests in, the Debtors or any of their Affiliates.

Events and circumstances occurring subsequent to the date on which the Liquidation Analysis was prepared may be different from those assumed, or, alternatively, may have been unanticipated, and thus the occurrence of these events may affect financial results in a materially adverse or materially beneficial manner.  The Debtors and Reorganized Debtors do not intend to and do not undertake any obligation to update or otherwise revise the Liquidation Analysis to reflect events or circumstances existing or arising after the date the Liquidation Analysis is initially filed or to reflect the occurrence of unanticipated events.  Therefore, the Liquidation Analysis may not be relied upon as a guarantee or other assurance of the actual results that will occur.

In deciding whether to vote to accept or reject the Amended Plan, holders of Claims must make their own determinations as to the reasonableness of any assumptions underlying the Liquidation Analysis and the reliability of the Liquidation Analysis.

C.      **Application of the Best Interests Test**

The Debtors believe that the continued operation of the Debtors as a going concern satisfies the Best Interests Test for the Impaired Classes.  Notwithstanding the difficulties in quantifying recoveries to holders of Claims and Interests with precision, the Debtors believe that,

based on the Liquidation Analysis, the Amended Plan meets the Best Interests Test.  As the Amended Plan and Exhibit B indicate, Confirmation of the Amended Plan will provide each holder of an Allowed Claim in an Impaired Class with an equal or greater recovery than the value of any distributions if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code.

## D.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires, as a condition to Confirmation, that the Bankruptcy Court find that Confirmation is not likely to be followed by the liquidation of the Debtors or the need for further financial reorganization, unless such liquidation is contemplated by the Amended Plan.  For purposes of demonstrating that the Amended Plan meets this "feasibility" standard, the Debtors, with the assistance of Alvarez and Marsal North America, LLC have analyzed the ability of the Reorganized Debtors and NewCo (as applicable) to meet their obligations under the Amended Plan and to retain sufficient liquidity and capital resources to conduct their businesses.  As part of this analysis, the Debtors have prepared the `financial projections`, as set forth in Exhibit C (the "**Financial Projections**").

As noted in Exhibit C, the Financial Projections present information with respect to all the Reorganized Debtors.  These Financial Projections do not reflect the full impact of "fresh start reporting" in accordance with American Institute of Certified Public Accountants Statement of Position 90-7 "Financial Reporting by Entities in Reorganization under the Bankruptcy Code." Fresh start reporting may have a material impact on the analysis.

The Debtors have prepared the Financial Projections solely for the purpose of providing "adequate information" under section 1125 of the Bankruptcy Code to enable the holders of Claims entitled to vote under the Amended Plan to make an informed judgment about the Amended Plan and should not be used or relied upon for any other purpose, including the purchase or sale of securities of, or Claims or Interests in, the Debtors.

In addition to the cautionary notes contained the Disclosure Statement, elsewhere in this Disclosure Statement Supplement, and in the Financial Projections, it is underscored that the Debtors make no representation as to the accuracy of the Financial Projections or their ability to achieve the projected results.  Many of the assumptions on which the Financial Projections are based are subject to significant uncertainties.  Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the financial results.  Therefore, the actual results achieved throughout the Projection Period (as defined in the Financial Projections) may vary from the Financial Projections, and the variations may be material.  Also as noted above, the Financial Projections currently do not reflect the full impact of any "fresh start reporting," and its impact on the Reorganized Debtors' "Consolidated Balance Sheets" and prospective "Results of Operations" may be material.  All holders of Claims in the impaired Classes are urged to examine carefully all of the assumptions on which the Financial Projections are based in connection with their evaluation of, and voting on, the Amended Plan.

Based upon the Financial Projections, the Debtors believe that they will be able to make all distributions and payments under the Amended Plan and that confirmation of the Amended

Plan is not likely to be followed by liquidation of the Debtors or the need for further restructuring.

E.    **Valuation of the Debtors**

In conjunction with formulating the Amended Plan and satisfying its obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post-confirmation going concern value of the Debtors.  Accordingly, the Debtors, with the assistance of Evercore, produced the valuation analysis (the "**Valuation Analysis**") that is set forth in Exhibit D attached hereto and incorporated herein by reference.

# ARTICLE VII

# EFFECT OF CONFIRMATION

A.    **Binding Effect of Confirmation**

Confirmation will bind the Debtors and all holders of Claims and Interests to the provisions of the Amended Plan, whether or not the Claim or Interest of any such Holder is impaired under the Amended Plan and whether or not any such holder of a Claim or Interest has accepted the Amended Plan.  Confirmation will have the effect of converting all Claims into rights to receive the treatment specified in Article IV of the Amended Plan and cancelling all Interests in the Debtors.

B.    **Good Faith**

Confirmation of the Amended Plan will constitute a finding that (i) the Amended Plan has been proposed in good faith and in compliance with applicable provisions of the Bankruptcy Code and (ii) all solicitations of acceptances or rejections of the Amended Plan have been in good faith and in compliance with applicable provisions of the Bankruptcy Code.

# ARTICLE VIII

# SECURITIES LAW MATTERS

Article VIII of the Disclosure Statement is incorporated herein by reference (as applicable).  The Debtors believe that, pursuant to section 1145 of the Bankruptcy Code, the issuance of the New Common Units and New Series A Preferred Units is exempt from the registration requirements of the Securities Act and any State or local law requiring registration for offer or sale of a security.  In addition, the Debtors believe that, pursuant to section 4(a)(2) of the Securities Act and Rule 506 of Regulation D promulgated thereunder, the issuance of the New Series B Preferred Units is exempt from the registration requirements of the Securities Act and any State or local law requiring registration for offer or sale of a security.

Section 4(a)(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving a public offering are exempt from registration under the Securities Act.  Regulation D is a non-exclusive safe harbor from registration promulgated by the SEC under Section 4(a)(2) of the Securities Act.  The Debtors believe that the New Series B Preferred

Units will be issuable without registration under the Securities Act in reliance upon the exemption from registration provided under Section 4(a)(2) of the Securities Act and Rule 506 of Regulation D because only "accredited investors" (as defined in Rule 501(a) of Regulation D under the Securities Act) or "qualified institutional buyers" within the meaning of Rule 144A will be eligible to purchase the New Series B Preferred Units.

Any securities issued in reliance on Section 4(a)(2) or Regulation D will be "restricted securities" that may not be sold, exchanged, assigned, or otherwise transferred unless they are registered, or an exemption from registration applies, under the Securities Act.  Under Rule 144, the public resale of restricted securities is permitted if certain conditions are met, and these conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer, as defined in Rule 144.  A non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities after a six-month holding period unless certain current public information regarding the issuer is not available at the time of sale, in which case the non-affiliate may resell after a one-year holding period.  An affiliate may resell restricted securities after the applicable holding period but only if certain current public information regarding the issuer is available at the time of the sale and only if the affiliate also complies with the volume, manner of sale, and notice requirements of Rule 144.

## ARTICLE IX

## CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING

THE AMENDED PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH IN ARTICLE IX OF THE DISCLOSURE STATEMENT, WHICH ARE INCORPORATED HEREIN BY REFERENCE (AS APPLICABLE).  HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE AMENDED PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS SET FORTH IN THE DISCLOSURE STATEMENT, AS WELL AS THE OTHER INFORMATION SET FORTH THEREIN AND IN THIS DISCLOSURE STATEMENT SUPPLEMENT AND ANY DOCUMENTS DELIVERED TOGETHER HEREWITH OR THEREWITH AND REFERRED TO OR INCORPORATED BY REFERENCE HEREIN OR THEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE AMENDED PLAN.  SUCH FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE AMENDED PLAN AND ITS IMPLEMENTATION.

In addition to the risk factors set forth in the Disclosure Statement and incorporated herein by reference, the following additional risk factors should be considered.

### a.       *The Exit Financing may result in large Oversubscription Fees.*

As set forth with specificity in the Exit Financing Term Sheet, if the Exit Financing is approved by the Bankruptcy Court, on the Effective Date, the Debtors shall make a payment (the "**Oversubscription Payment**") to each Eligible Exit Lender (as defined in the Exit Financing Term Sheet) (an "**Oversubscribing Lender**") whose (I)(a) Revolving Commitment exceeds (b) the product of $30,000,000 multiplied by such Oversubscribing Lender's Ratable Subscription

Share (as defined in the Exit Financing Term Sheet) or whose (II)(a) Term Commitment exceeds (b) the product of $35,000,000 multiplied by such Oversubscribing Lender's Ratable Subscription Share (the sum of (x) the difference between (I)(a) minus (I)(b) plus (y) the difference between (II)(a) minus (II)(b), the "**Oversubscription Amount**"). The Oversubscription Payment due to each eligible Oversubscribing Lender shall be in the form of New Series B Preferred Units with an initial liquidation preference equal to 200% of such eligible Oversubscribing Lender's Oversubscription Amount.

Accordingly, the Oversubscription Payment due with respect to the Exit Financing varies substantially on the basis of the Oversubscription Amount for each applicable lender. Although the Debtors anticipate that a significant number of holders of Allowed Roll-Up DIP Claims, Allowed Prepetition Revolving Credit Facility Claims, and/or Allowed Prepetition Term Loan Claims will participate in the Exit Financing (thus lowering the Oversubscription Amount for each participating lender), the Debtors cannot provide assurances that the Oversubscription Amount will not ultimately be equal to the maximum amount of New Series B Preferred Units possible.

### b.    *The Debtors expect to have a substantial customer concentration, with a limited number of customers accounting for a substantial portion of their revenues.*

This Disclosure Statement Supplement incorporates by reference the risk factor set forth in Disclosure Statement Article IX.B.3, with respect to the Debtors' expectation that they will derive a significant portion of their revenues from EPIC Y-Grade. As noted therein, there are inherent risks whenever a large percentage of total revenues are concentrated with a limited number of customers. Presently, the risk to the Debtors from substantial customer concentration has become more acute on account of the non-renewal of a material customer contract, which has resulted in the revised Liquidation Analysis, Financial Projections, and Valuation Analysis attached hereto as <u>Exhibits B</u>, <u>C</u> and <u>D</u>, respectively.

### ARTICLE X

### CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE AMENDED PLAN

The following discussion summarizes certain U.S. federal income tax consequences expected to result from the consummation of the Amended Plan to the Debtors and U.S. Holders (defined below) of Roll-Up DIP claims, Prepetition Revolving Credit Facility Claims and Prepetition Term Loan Claims (each, a "**Loan**"), but it does not purport to be a comprehensive description of all tax considerations that may be relevant to a particular person. This discussion applies only to U.S. Holders that hold Loans as "capital assets" within the meaning of Section 1221 of the Internal Revenue Code (as defined herein) (generally, property held for investment) and will hold equity interests in NewCo ("**New Units**") as capital assets. This discussion assumes that any New Preferred Units issued as a result of the consummation of the Amended Plan are treated as equity interests in NewCo for U.S. federal income tax purposes and are therefore considered New Units for purposes of this discussion. However, it is possible that any New Preferred Units that are issued are treated as debt for U.S. federal income tax purposes. This discussion does not address all U.S. federal income tax considerations that may be relevant

to a Debtor or a particular holder of any Loan in light of its particular circumstances, and it does not deal with tax issues with respect to taxpayers subject to special treatment under the U.S. federal income tax laws (including, for example, broker dealers, insurance companies, financial institutions, real estate investment trusts, tax-exempt organizations, small business investment companies, regulated investment companies, U.S. persons whose functional currency is not the U.S. dollar, persons subject to the alternative minimum tax, or the Medicare contribution tax and persons holding Loans as part of a "straddle," "hedge," "constructive sale" or "conversion transaction" with other investments).  No aspect of non-U.S., state, local, or estate and gift taxation is addressed herein.  This discussion also does not address the U.S. federal income tax consequences to U.S. Holders (a) whose Loans are unimpaired or otherwise entitled to payment in full under the Amended Plan or (b) that are deemed to accept or deemed to reject the Amended Plan (other than U.S. Holders of Existing Interests in Southcross Energy Partners, L.P. (the "**LP Unitholders**")).  Additionally, this discussion does not address the treatment of the receipt of any consideration other than in a person's capacity as a U.S. Holder of a Loan.

This discussion is not a complete analysis of all potential U.S. federal income tax consequences and does not address any tax consequences arising under any state, local or non-U.S. tax laws or U.S. federal estate or gift tax laws.  This discussion is based on the Internal Revenue Code of 1986, as amended (the "**Internal Revenue Code**"), Treasury Regulations promulgated thereunder (the "**Treasury Regulations**"), judicial decisions, and published rulings and administrative pronouncements of the Internal Revenue Service (the "**IRS**"), all as in effect on the date of this Disclosure Statement Supplement.  These authorities may change, possibly retroactively, resulting in U.S. federal income tax consequences different from those discussed below.  No ruling has been or will be sought from the IRS, and no legal opinion of counsel will be rendered, with respect to the matters discussed below.  There can be no assurance that the IRS will not take a contrary position regarding the U.S. federal income tax consequences resulting from the consummation of the Amended Plan or that any contrary position would not be sustained by a court.

**U.S. HOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO THEM OF THE CONSUMMATION OF THE AMENDED PLAN AND THE OWNERSHIP AND DISPOSITION  OF NEW UNITS PURSUANT TO THE AMENDED PLAN, AS WELL AS ANY TAX CONSEQUENCES ARISING UNDER ANY STATE, LOCAL, OR NON-U.S. TAX LAWS, OR ANY OTHER U.S. FEDERAL TAX LAWS.  THE DEBTORS AND THE REORGANIZED DEBTORS SHALL NOT BE LIABLE TO ANY PERSON FOR ANY TAX LIABILITY WITH RESPECT TO SUCH U.S. HOLDERS' TAX LIABILITY IN ANY MANNER.**

## A.    Partnership Status

We (as used in this Article, references to "we," "us," or "our" are references to Southcross) believe that we are, and have been since our initial public offering, properly classified as a partnership for U.S. federal income tax purposes, and each of the other Debtors (all of whom are subsidiaries of Southcross) are treated as disregarded entities for U.S. federal income tax purposes.  As a partnership or a disregarded entity, Southcross and each other Debtor are not themselves subject to U.S. federal income tax.  Instead, each LP Unitholder is required to

report on its U.S. federal income tax return, and is subject to tax in respect of, its distributive share of each item of income, gain, loss, deduction, and credit of such Debtors. Accordingly, the U.S. federal income tax consequences of the transactions contemplated by the Amended Plan generally will not be borne by the Debtors, but instead will be borne by the LP Unitholders.

However, the IRS has made no determination as to our status or the status of our subsidiaries for U.S. federal income tax purposes. If we fail to qualify as a partnership for U.S. federal income tax purposes, we will be treated as if we had transferred all of our assets, subject to liabilities, to a newly formed corporation, on the first day of the year in which we fail to qualify as a partnership, in return for stock in that corporation, and then distributed that stock to the LP Unitholders in liquidation of their interests in us.  This deemed contribution and liquidation should be tax-free to us and the LP Unitholders so long as we, at that time, do not have liabilities in excess of the tax basis of our assets. Thereafter, we would be treated as an association taxable as a corporation for U.S. federal income tax purposes.

**THE DISCUSSION BELOW ASSUMES THAT WE ARE CURRENTLY AND, UNTIL OUR LIQUIDATION, WILL CONTINUE TO BE, CLASSIFIED AS A PARTNERSHIP FOR U.S. FEDERAL INCOME TAX PURPOSES. THE DISCUSSION BELOW FURTHER ASSUMES THAT AS OF THE EXCHANGE (AS DEFINED BELOW), NEWCO WILL BE CLASSIFIED AS A PARTNERSHIP FOR U.S. FEDERAL INCOME TAX PURPOSES, AND THAT NEWCO WILL CONTINUE TO BE CLASSIFIED AS A PARTNERSHIP FOR U.S. FEDERAL INCOME TAX PURPOSES FOLLOWING THE EXCHANGE.**

**B.      Definition of "U.S. Holder"**

A "**U.S. Holder**" is a beneficial owner of a Loan, Existing Interests in Southcross ("**LP Units**"), or New Units for U.S. federal income tax purposes, as the case may be, that is or is treated as:

- an individual who is a citizen or resident of the United States;

- a corporation created or organized under the laws of the United States, any state thereof, or the District of Columbia; or

- an estate or trust the income of which is subject to U.S. federal income tax regardless of its source.

If a partnership or other entity or arrangement classified as a partnership for U.S. federal income tax purposes holds a Loan, LP Units, or New Units, the tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership.  Beneficial owners of a Loan, LP Units, and/or New Units, who are partners in a partnership holding any of such instruments should consult their tax advisors.

**C.      Certain U.S. Federal Income Tax Consequences to the Debtors and LP Unitholders**

*1.      Credit Bid Transaction*

The Debtors will recognize gain or loss on the sale of the Debtors' assets pursuant to the Credit Bid Transaction. As described above, because each of the Debtors is a partnership or disregarded entity for U.S. federal income tax purposes, such gain or loss will be allocated to the LP Unitholders. The amount of gain or loss allocable to any particular LP Unitholder depends, in part, on the price the LP Unitholder paid for its LP Units and the extent to which it has previously been allocated income or amortization or depreciation deductions with respect to the transferred assets. Accordingly, each LP Unitholder is urged to consult its tax advisors regarding the allocation of gain and loss and the deductibility of any losses recognized as a result of the transfer of the Debtors' assets.

>    2.    *Cancellation of Debt*

In connection with the implementation of the Amended Plan, we likely will recognize cancellation of debt ("**COD**") income for U.S. federal income tax purposes. COD income is generally the amount by which indebtedness that is discharged (reduced by any unamortized discount) exceeds any consideration given in exchange therefor.

As described above, because we are a partnership for U.S. federal income tax purposes, such COD income and any other income recognized by us upon implementation of the Amended Plan will be allocated to the LP Unitholders. Certain statutory or judicial exceptions potentially can apply to limit the amount of COD income required to be included in income by the LP Unitholders, depending on the LP Unitholders' circumstances. In particular, exceptions are available that would allow COD income to be excluded from gross income if the COD income is taken into account by a taxpayer that is insolvent (but only to the extent of insolvency) or in bankruptcy. These exceptions apply at the "partner" level and thus depend on whether the partner (*i.e.*, the LP Unitholder to whom the COD income is allocated) is itself insolvent or in bankruptcy. The fact that we or any other Debtors are insolvent and in bankruptcy is not relevant for this purpose. For purposes of determining an LP Unitholder's insolvency (measured immediately prior to the Effective Date), the LP Unitholder would be treated as if it were individually liable for an amount of partnership debt equal to the allocated amount of the COD income. To the extent any amount of COD income is excludable by an LP Unitholder by reason of the insolvency or bankruptcy exception, the LP Unitholder generally would be required to reduce certain tax attributes (such as net operating losses, tax credits, possibly tax basis in assets and passive losses) after the determination of its tax liability for the taxable year.

An LP Unitholder's adjusted tax basis in LP Units will be increased to the extent of any income or gain allocated to such LP Unitholder and decreased (but not below zero) to the extent of any loss or deduction allocated to such LP Unitholder, whether or not such loss is disallowed and thus not deductible.

To the extent an LP Unitholder was allocated losses in taxable years ending prior to the Effective Date, such losses may have been suspended by reason of certain provisions of the Internal Revenue Code (in particular, those relating to so-called "passive activity losses" or the "at risk" rules). As a result of the transaction, all or part of such losses may become deductible.

For U.S. federal income tax purposes, the discharge of our indebtedness pursuant to the Amended Plan will result in a deemed cash distribution to each LP Unitholder based on the amount of the indebtedness allocable to such LP Unitholder's LP Units.  To the extent that any such deemed cash distribution exceeds the LP Unitholder's adjusted tax basis in its LP Units (after adjustment for net gain or loss allocable to the LP Unitholder as described above), such LP Unitholder will recognize capital gain.  Any such capital gain generally should be long-term if the LP Unitholder's holding period in its LP Units is more than one year and otherwise should be short-term.  An LP Unitholder's adjusted tax basis in its LP Units will be decreased (but not below zero) to the extent of any such deemed cash distribution.

### 3. *Liquidation of the Debtors and Cancellation of LP Units*

We will not recognize any gain or loss on the liquidation of the Debtors. Each LP Unitholder will recognize a loss with respect to the cancellation of its equity interest in Southcross to the extent of its basis in Southcross.  The character of any such loss is unclear. Accordingly, each LP Unitholder who recognizes a loss with respect to the cancellation of its equity interest in Southcross should consult its tax advisors regarding the treatment of such loss.

*The U.S. federal income tax consequences of the Amended Plan are complex, and may be particularly adverse for LP Unitholders.  Accordingly, all LP Unitholders are urged to consult their tax advisors regarding the U.S. federal income tax consequences to them (taking into account their personal circumstances), including the potential for substantial allocations of taxable income without the receipt of cash distributions.*

## D.    Certain U.S. Federal Income Tax Consequences to Holders of Loans

### 1.    Contribution of Loans to NewCo in Exchange for New Units

A U.S. Holder of a Loan should not recognize gain or loss on the contribution of the Loan in exchange for New Units (the "**Exchange**"), except to the extent that New Units are received in exchange for accrued but unpaid interest (which will be taxable as interest to the extent not previously included in income).  The U.S. Holder's initial tax basis in the New Units received in exchange for a Loan should be equal to the U.S. Holder's adjusted tax basis in such Loan to the extent exchanged pursuant to the Exchange.  The U.S. Holder's holding period in the New Units should include the U.S. Holder's holding period for the Loan exchanged for such New Units. NewCo's basis in a Loan should generally be equal to the exchanging U.S. Holder's basis in such Loan immediately prior to the Exchange (which generally should be equal to the amount the exchanging U.S. Holder paid for such Loan, reduced by any payments on such Loan after acquisition, other than payments of qualified stated interest). NewCo's holding period in a Loan should generally include the exchanging U.S. Holder's holding period in such Loan immediately prior to the Exchange.

### 2.    Credit Bid Transaction

On the transfer of our assets to NewCo in complete satisfaction of the Loans pursuant to the Credit Bid Transaction, NewCo will generally realize gain or loss equal to the difference

between the fair market value of the transferred assets and NewCo's adjusted tax basis in such Loans. As discussed below, such gain or loss will be allocated to the holders of New Units ("**New Unitholders**") pursuant to Section 704(c) of the Internal Revenue Code and other applicable tax principles. Any such gain or loss will generally be capital gain or loss and will generally be long-term capital gain or loss if, on the Effective Date, NewCo's holding period in the Loan is more than one year. Long-term capital gains of non-corporate taxpayers are currently taxed at lower rates than those applicable to ordinary income. The deductibility of capital losses is subject to limitations. Gain attributable to Loans acquired at any time other than at original issuance at a market discount generally will be treated as ordinary income to the extent of accrued market discount, unless an election to include market discount income currently as it accrues was made. A Loan will be considered to have been acquired at a market discount if the exchanging U.S. Holder's tax basis in the Loan immediately after it initially acquired the Loan was less than the sum of all amounts payable thereon (other than payments of qualified stated interest) after the acquisition date, unless the difference is less than 0.25% of the issue price multiplied by the number of complete years from the acquisition date to maturity (in which case, the difference is *de minimis* market discount). Any consideration received by PurchaseCo that is attributable to accrued but unpaid interest on the Loans generally would not be included in gross income by the New Unitholders to the extent of amounts included in gross income by the New Unitholders in respect of accrued but unpaid interest on the Exchange.

### *3.*     Information Reporting and Backup Withholding

The Debtors and applicable withholding agents will withhold all amounts required by law to be withheld from payments in connection with distributions under the Amended Plan or in connection with payments made on account of consideration received pursuant to the Amended Plan, and will comply with all applicable information reporting requirements. A U.S. Holder may be subject to backup withholding, unless (i) the U.S. Holder is a corporation or other exempt recipient or (ii) in the case of backup withholding, the U.S. Holder provides a correct taxpayer identification number and certifies that it is not subject to backup withholding. The amount of any backup withholding from a payment to a U.S. Holder will be allowed as a credit against the holder's U.S. federal income tax liability and may entitle it to a refund, provided that the required information is timely furnished to the IRS. In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. U.S. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Amended Plan would be subject to these regulations and require disclosure on the U.S. Holders' tax returns.

### E.     Certain U.S. Federal Income Tax Consequences to Exit Lenders participating in the Exit Financing

Pursuant to the Amended Plan, the Exit Lenders (as defined in the Exit Financing Term Sheet) will provide the Revolving Commitments to extend the Revolving Loans and the Term Commitments to extend the Term Loans, and an Eligible Exit Lender will receive on the

Closing Date an Upfront Payment and, if certain conditions are met, an Oversubscription Payment (each as defined in the Exit Financing Term Sheet), each paid in the form of New Series B Preferred Units.

### 1. Revolving Loans and Associated Payments

Although it is unclear, we believe that for U.S. federal income tax purposes the portion of an Upfront Payment and any Oversubscription Payment that is paid in connection with a Revolving Commitment is treated as a payment of a commitment fee in respect of the Revolving Commitment. The tax treatment of the receipt of such commitment fee is uncertain. Each Eligible Exit Lender is urged to consult its tax advisors regarding the characterization and tax treatment of the receipt of any portion of any Upfront Payment and Oversubscription Payment in connection with its Revolving Commitment.

### 2. Term Loans and Associated Payments

As described above, pursuant to the Amended Plan, the Exit Lenders will extend Term Loans in connection with the Exit Financing in addition to providing the Revolving Commitments. We believe that a portion of the Upfront Payment and any Oversubscription Payment (to the extent certain conditions are met) paid to an Eligible Exit Lender should be treated as attributable to the Term Loan extended by such Eligible Exit Lender.

Assuming this is correct, the issue price of a Term Loan received by an Eligible Exit Lender will be determined by applying the "investment unit" rules and treating the Term Loan as part of an investment unit that includes the new Series B Preferred Units paid to the Eligible Exit Lender as the portion of the Upfront Payment and any Oversubscription Payment paid in connection with the Term Loan. Generally, the issue price of an investment unit is determined by applying the issue price rules applicable to debt instruments, and the debt instrument's issue price is its allocable portion of the issue price of the investment unit, based on the relative fair market value of the debt instrument and the other property right (*i.e.*, the New Series B Preferred Units). Thus, the issue price of the investment unit would be equal to the cash for which the investment unit was sold to the Eligible Exit Lender, and the issue price of the Term Loan will equal the allocable portion of such investment unit's issue price, determined by multiplying the investment unit's issue price by the fraction obtained by dividing the fair market value of the Term Loan by the sum of the fair market value of the Term Loan and the fair market value of the New Series B Preferred Units.

As a result, it is expected that the issue price of the Term Loan component of each investment unit will be lower and, depending on amount, if any, of the Oversubscription Payment received by an Eligible Exit Lender, could be significantly lower, than the Term Loan's "stated redemption price at maturity" (*i.e.*, the sum of all payments to be made on the Term Loans, other than "qualified stated interest," including payments as a result of any interest that is "payable in kind"). To the extent that a Term Loan's stated redemption at maturity exceeds its issue price by more than a statutorily defined *de minimis* amount, the debt instrument is treated as issued with original issue discount ("**OID**"). An Eligible Exit Lender that would be treated as a U.S. Holder (if it held a Loan, LP Units, or New Units) will generally be required to include any OID in income over the term of such Term Loan in

accordance with a constant yield-to-maturity method, regardless of whether the Eligible Exit Lender is a cash or accrual method taxpayer, and regardless of whether and when such Eligible Exit Lender received cash payments of interest on such Term Loan (other than cash attributable to qualified stated interest, which is includible in income in accordance with the U.S. Holder's normal method of tax accounting).

The investment unit rules and OID rules are complex, and Eligible Exit Lenders are urged to consult with their tax advisors regarding the characterization and tax treatment of the receipt of the Term Loans and the Upfront Payments and any Oversubscription Payments received in connection with the Term Loans.

### F.    Certain U.S. Federal Income Tax Consequences of Ownership of New Units

#### 1.    *Member Status*

New Unitholders generally will be treated as partners of NewCo for U.S. federal income tax purposes.

#### 2.    *Tax Consequences of New Unit Ownership*

##### a.    **Flow-Through of Taxable Income**

Subject to the discussion below under "—*Entity-Level Collections*," NewCo will not pay any U.S. federal income tax.  Instead, each New Unitholder will be required to report on its income tax return its share of NewCo's income, gains, losses, and deductions without regard to whether NewCo makes cash distributions to it.  Consequently, NewCo may allocate income to a New Unitholder even if it has not received a cash distribution. Each New Unitholder will be required to include in income its allocable share of NewCo's income, gains, losses, and deductions for NewCo's taxable year ending with or within its taxable year.

##### b.    **Allocations**

In general, NewCo's items of income, gain, loss, and deduction will be allocated among the New Unitholders as set forth in the New LLC Agreement.  Under Section 704(c) of the Internal Revenue Code, specified items of income, gain, loss and deductions must be allocated in a manner that accounts for any difference between the adjusted tax basis and fair market value (such difference, a "book-tax difference") associated with property at the time of its contribution to a partnership.  Accordingly, the federal income tax burden associated with any book-tax disparity in the Loans contributed to NewCo will be borne by the New Unitholders based on their relative book-tax disparities. Treasury Regulations under Section 704(c) require partnerships to use a reasonable method for allocation of items affected by Section 704(c). While the allocations set forth in the New LLC Agreement should be respected for U.S. federal income tax purposes, the IRS could challenge such allocations, possibly resulting in less favorable allocations to a particular New Unitholder for U.S. federal income tax purposes.

##### c.    **Limitations on the Deductibility of Losses and Expenses**

Various limitations may apply to restrict the deductibility of losses realized, and expenses incurred, by NewCo. The principal limitations include the limitation on the deductibility of interest under Section 163(j), the limitations on the deductibility of "investment interest" under Section 163(d), the limitations under Section 469 on the deductibility of losses from "passive activities", the "excess business loss" limitation, the limitations under the "at risk" rules, limitations on the deductibility of capital losses, and capitalization requirements.  However, it is possible that other limitations will apply.  U.S. Holders should consult their tax advisors concerning the application of these and other limitations on the deductibility of losses and expenses.

### d.   Passthrough Deduction

For taxable years before January 1, 2026, a non-corporate New Unitholder may claim a deduction equal to a portion of the net business income it derives from "qualified trades or businesses" conducted in the United States. Prospective New Unitholders should consult their tax advisors regarding the application of this deduction.

### e.   Treatment of Distributions

In general, a New Unitholder will not recognize taxable income as a consequence of receiving a distribution (whether in cash or in kind) from NewCo, except to the extent that any cash distributed exceeds the New Unitholder's adjusted tax basis in its New Units.  Any such excess will be treated as gain from the sale of the New Unitholder's New Units and generally will result in capital gain or loss, except to the extent attributable to assets described in Section 751 of the Internal Revenue Code." See "—*Disposition of New Units*" below.  Because the basis of a New Unitholder's New Units will be increased by the New Unitholder's share of NewCo's net income, a distribution corresponding to the New Unitholder's share of NewCo's net income will generally not be taxable.  A New Unitholder generally will not recognize a loss for U.S. federal income tax purposes as a consequence of receiving a distribution from NewCo, except that if a New Unitholder receives a distribution solely of cash in complete liquidation of its interest, the New Unitholder will recognize a loss equal to the excess, if any, of its adjusted tax basis in its New Units over the amount of such cash.

### 3.   *Disposition of New Units*

Upon a sale or other taxable disposition of all or any portion of a New Unitholder's New Units, a New Unitholder will generally recognize gain or loss in an amount equal to the difference between the amount realized and the adjusted tax basis of the New Units or the transferred portion thereof.  The amount realized will be equal to the amount of cash and the fair market value of other property received by the New Unitholder, plus the portion of the New Unitholder's share (if any) of NewCo's liabilities that is attributable to the transferred New Units.

In general, gain or loss recognized by a New Unitholder on the disposition of all or any portion of its New Units will be capital gain or loss, but a New Unitholder may recognize ordinary income or loss on the disposition in respect of its share of assets that are described in Section 751 of the Internal Revenue Code.  Under certain circumstances, a New Unitholder

could recognize ordinary income in respect of Section 751 assets on the disposition of all or any portion of its New Units even though the New Unitholder recognizes an overall loss on the disposition.

If a New Unitholder transfers less than all of its New Units, the New Unitholder will take into account the percentage of its adjusted tax basis in its New Units that is equal to the percentage of the New Units that are transferred, determined by comparing the relative fair market values of the portion of the New Units that are transferred and the portion of the New Units that are retained.

### 4. Administrative Matters

#### a. Information Returns and Audit Procedures

We believe that NewCo intends to furnish to each New Unitholder, after the close of each calendar year, specific tax information, including a Schedule K-1, which describes New Unitholder's share of income, gain, loss and deduction for NewCo's preceding taxable year. In preparing this information, which will not be reviewed by counsel, NewCo will take various accounting and reporting positions to determine each New Unitholder's share of income, gain, loss, and deduction. NewCo cannot provide assurances that those positions will yield a result that conforms to the requirements of the Internal Revenue Code, Treasury Regulations, or administrative interpretations of the IRS. Furthermore, NewCo cannot provide assurances that the IRS will not successfully contend in court that those positions are impermissible. Any challenge by the IRS could negatively affect the value of the New Units.

#### b. Partnership Representative

A partnership that files a U.S. federal income tax return is required to designate a "partnership representative" with a substantial presence in the United States to act on its behalf in tax-related proceedings. If the partnership representative is an entity, the partnership must appoint an individual with a substantial presence in the United States to act on behalf of the partnership representative. The partnership representative (and such individual, if any) will have the authority to make all decisions with respect to any tax audit of, or other tax-related administrative or judicial proceeding with respect to, the partnership. Actions taken, and decisions made, by the partnership representative (and such individual) will be binding on the partnership and its partners. NewCo will designate a partnership representative and, if the partnership representative is an entity, will designate an individual who will act on behalf of the partnership representative.

#### c. Partnership Audits

Audits of the U.S. federal income tax treatment of NewCo's income, gains, losses, deductions and credits generally will be conducted at the entity level in a single proceeding, which the partnership representative of the relevant entity will control, rather than by individual audits of the partners' tax returns. The legal and accounting costs incurred in connection with any audit of such entity's tax returns will be borne by NewCo, but New Unitholders will bear the cost of audits of their own returns.

Under the rules applicable to U.S. federal tax audits of partnership tax returns for taxable years beginning after December 31, 2017, the partners in a partnership are not required to receive notice of, and are not entitled to participate in, any such audit, and any adjustment made in any such audit will be binding on all of the partners.  Any tax arising from an audit of a partnership tax return, as well as any resulting interest and penalties, will generally be payable by the partnership in the year in which the determination becomes final unless the partnership elects to send statements ("**Adjustment Statements**") to its partners for the audited year informing them of their shares of the adjustments made on audit.  If a partnership sends Adjustment Statements, the partners will generally be required to pay any tax, interest (at a rate that is two percentage points higher than the interest rate generally applicable for tax underpayments) and penalties arising from such adjustments as if the adjustments were made in the audited year and any other affected year, as applicable, but will not be required to amend their tax returns for any prior year.  In general, if a partnership pays the tax resulting from an audit adjustment, the amount will be determined by applying the highest rate of tax in effect for the audited year to the net adjustment amount.  The net adjustment amount may be reduced, with the approval of the IRS, (i) to account for certain types of income and for the status of certain partners, such as corporations or tax-exempt partners, and (ii) by the portion of such net adjustment amount that is taken into account by partners that file amended returns for the reviewed year (and any intervening year for which their tax attributes are adjusted) or that participate in a "pull-in" procedure pursuant to which a partner may pay tax in the same amount, and adjust its tax attributes, as if it had filed all applicable amended returns.

Although it is possible that NewCo will elect to send Adjustment Statements in the event of an adjustment arising out of an audit, there can be no assurance in this regard.  If NewCo pays any tax, interest and/or penalties arising from an audit of a tax return, each current and former New Unitholder may be required to indemnify NewCo for the portion, if any, of the payment that is attributable to such current or former New Unitholder.  It is possible that the amount of any such entity-level payment that is borne by a current New Unitholder or former New Unitholder will exceed the amount of additional tax that would have been payable by such current or former New Unitholder if NewCo had elected to send Adjustment Statements.

If a current or former New Unitholder fails to indemnify NewCo for the payment of any tax, interest and/or penalties attributable to such current or former New Unitholder, a portion of the economic burden of such payment will be borne by each then-current New Unitholder. Thus, there can be no assurance that the economic burden of any such payment will not be borne by New Unitholders that would not have owed additional tax, or would have owed additional tax in a lesser amount than their shares of such payment, if NewCo had elected to send Adjustment Statements to the New Unitholders.

The partnership audit rules described above are new and partnerships do not yet have any significant experience with them. New Unitholders should consult with their tax advisors concerning the application of these rules.

**THE FOREGOING DISCUSSION OF CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSIDERATIONS IS FOR GENERAL INFORMATION ONLY AND IS NOT TAX ADVICE. HOLDERS SHOULD CONSULT THEIR OWN TAX**

**ADVISORS REGARDING THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO THEM OF THE CONSUMMATION OF THE AMENDED PLAN DESCRIBED HEREIN, AS WELL AS ANY OTHER TAX CONSEQUENCES, INCLUDING ANY TAX CONSEQUENCES ARISING UNDER STATE, LOCAL, OR NON-U.S. TAX LAWS.  NEITHER THE PROPONENTS OF THE AMENDED PLAN NOR THEIR PROFESSIONALS WILL HAVE ANY LIABILITY TO ANY PERSON ARISING FROM OR RELATED TO THE U.S. FEDERAL, STATE, LOCAL, NON-U.S. OR ANY OTHER TAX CONSEQUENCES OF THE AMENDED PLAN OR THE FOREGOING DISCUSSION.**

## ARTICLE XI

## RECOMMENDATION

The Debtors believe that confirmation and consummation of the Amended Plan are in the best interests of the Debtors, their Estates, and their creditors.  The Amended Plan provides for an equitable distribution to holders of Claims.  The Debtors believe that any alternative to confirmation of the Amended Plan, such as liquidation under chapter 7 of the Bankruptcy Code, could result in significant delay, litigation and additional costs, as well as a reduction in the distributions to holders of Claims in certain Classes.  **Consequently, the Debtors urge all eligible holders of impaired Claims to vote to ACCEPT the Amended Plan and to complete and submit their Ballots so that they will be RECEIVED by the Claims Agent on or before the Voting Deadline.**

January ___7, 2020

Southcross Energy Partners GP, LLC (for itself and on behalf of all Debtors)

*/s/ James W. Swent III*
Name: James W. Swent III
Title:   Chief Executive Officer

**Exhibit A-1**

**Amended Plan**

**<u>Exhibit A-2</u>**

**Amended Plan Blackline**

**Exhibit B**

## Liquidation Analysis

### 1) Introduction

The Debtors, with the assistance of their restructuring, legal, and financial advisors, have prepared this hypothetical Liquidation Analysis in connection with the Debtors' Amended Plan and Disclosure Statement Supplement pursuant to chapter 11 of the Bankruptcy Code. The Liquidation Analysis indicates the estimated recoveries that may be obtained by Classes of Claims and Interests in a hypothetical liquidation pursuant to chapter 7 of the Bankruptcy Code upon disposition of assets as an alternative to the Amended Plan. Accordingly, asset values discussed herein may be different than amounts referred to in the Amended Plan. The Liquidation Analysis is based upon the assumptions discussed herein.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that the Bankruptcy Court find, as a condition to confirmation of the Amended Plan, that each holder of a Claim or Interest in each Impaired Class: (i) has accepted the Amended Plan; or (ii) will receive or retain under the Amended Plan property of a value, as of the Effective Date, that is not less than the amount that such Person would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. In order to make these findings, the Bankruptcy Court must: (1) estimate the cash proceeds (the "**Liquidation Proceeds**") that a chapter 7 trustee (the "**Trustee**") would generate if each Debtor's chapter 11 cases were converted to a chapter 7 case on the Effective Date and the assets of such Debtor's estate were liquidated; (2) determine the distribution (the "**Liquidation Distribution**") that each holder of a Claim or Interest would receive from the Liquidation Proceeds under the priority scheme dictated in chapter 7; and (3) compare each holder's Liquidation Distribution to the distribution under the Amended Plan (the "**Plan Distribution**") that such holder would receive if the Amended Plan were confirmed and consummated. Accordingly, asset values discussed herein may be different than amounts referred to in the Amended Plan. The Liquidation Analysis is based upon certain assumptions discussed herein and in the Disclosure Statement and the Disclosure Statement Supplement.

THE DEBTORS MAKE NO REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE ESTIMATES AND ASSUMPTIONS CONTAINED HEREIN, OR A TRUSTEE'S ABILITY TO ACHIEVE FORECASTED RESULTS. IN THE EVENT THAT THE CHAPTER 11 CASES ARE CONVERTED TO A CHAPTER 7 LIQUIDATION, ACTUAL RESULTS COULD VARY MATERIALLY FROM THE ESTIMATES AND PROJECTIONS SET FORTH IN THIS LIQUIDATION ANALYSIS.

### 2) Basis of Presentation

The Liquidation Analysis has been prepared assuming that the Debtors' chapter 7 liquidation would commence on or about January 31, 2020 (the "**Liquidation Date**"). The *pro forma* values referenced herein are projected as of January 31, 2020. The Debtors assume January 31, 2020 to be a reasonable proxy for the anticipated Effective Date. The Liquidation Analysis was prepared on a legal entity basis for each Debtor and summarized into a consolidated report.

The Liquidation Analysis represents an estimate of recovery values and percentages based upon a hypothetical liquidation if a trustee were appointed by the Bankruptcy Court to convert assets into cash. The determination of the hypothetical proceeds from the liquidation of assets is a <u>highly uncertain</u> process involving the extensive use of estimates and assumptions that, although considered reasonable by management and their advisors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors and their management team. The Liquidation Analysis should be read in conjunction with the assumptions, qualifications, and explanations set forth in the Disclosure Statement, the Disclosure Statement Supplement, and the Amended Plan in their entirety as well as the notes and assumptions set forth below.

The Liquidation Analysis assumes the Debtors and certain non-Debtor subsidiaries[1], enter chapter 7 on January 31, 2020, a proxy for the assumed Effective Date of the Debtors' chapter 11 plan.

The Liquidation Analysis incorporates the fact that that the CCPN Assets were sold on November 6, 2019, and that the MS/AL Assets were sold on December 16, 2019. Proceeds from these asset sales, net of transaction fees, immediately pay down debt pursuant to the DIP Facility terms. The January 31, 2020 balances are adjusted to exclude all CCPN Assets and MS/AL Assets.

The Liquidation Analysis assumes that the Debtors' equity interests in T2 Eagle Ford Gathering Company LLC and T2 LaSalle Gathering Company LLC (the "**<u>Joint Venture Entities</u>**") are sold in a three-month period post-conversion to chapter 7.

For liquidating legal entities, the Liquidation Analysis assumes a timeline in which:

- on the Liquidation Date, the Debtors' operations cease as soon as is safely practicable;

- all assets are assumed to be sold and book-keeping is finalized by May 31, 2020, over a 4-month period following the cessation of operations.

In preparing the Liquidation Analysis, the Debtors have estimated an amount of allowed claims for each Class of claimants based upon a review of the Debtors' balance sheets as of October 31, 2019, adjusted for estimated balances as of the Liquidation Date where needed. The estimate of all allowed claims in the Liquidation Analysis is based on the par value of each of these Claims. The estimate of the amount of Allowed Claims set forth in the Liquidation Analysis should not be relied upon for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims under

---

[1] Non-debtor entities include recently acquired Southcross Holdings entities (Frio LaSalle Pipeline, LP, Frio LaSalle GP, LLC, Southcross Midstream Utility, LP, and Southcross Midstream T/U GP, LLC), Southcross Energy acquired all assets at each of these entities, excluding cash. The Debtors received a $60 million secured claim at these entities and therefore it is assumed that all proceeds flow to the Debtors secured lenders.

the Amended Plan.  The actual amount of Allowed Claims could be materially different from the amount of Claims estimated in the Liquidation Analysis.

The cessation of business in a liquidation is likely to trigger certain claims that otherwise would not exist under a chapter 11 plan absent a liquidation.  Examples of these kinds of claims included in this analysis are various potential employee claims (for such items as severance), unpaid chapter 11 administrative claims and rejection damages claims relating to executory contracts or unexpired leases.

The Liquidation Analysis also does not include estimates for the tax consequences that may be triggered upon the liquidation and sale of assets in the manner described above.  Such tax consequences may be material.

The Liquidation Analysis does not include recoveries resulting from any potential preference, fraudulent transfer, or other litigation or avoidance actions.

## 3)  Liquidation Process

For purposes of this analysis, the Debtors' hypothetical liquidation would be conducted in a chapter 7 environment with the Trustee managing the bankruptcy estate of each Debtor (each an "**Estate**" or the "**Estates**") to maximize recovery in an expedited process.  The Trustee's initial step would be to develop a liquidation plan to generate proceeds from the sale of entity specific assets for distribution to creditors.  The three major components of the liquidation are as follows:

- generation of cash proceeds from asset sales, largely sold on a piecemeal basis;

- costs related to the liquidation process, such as personnel retention costs, severance, Estate wind-down costs and Trustee, professional, and other administrative fees; and

- distribution of net proceeds generated from asset sales to the holders of Claims and Interests in accordance with the priority scheme under chapter 7 of the Bankruptcy Code.[2]

## 4)  Distribution of Net Proceeds to Claimants

Any available net proceeds would be allocated to the applicable holders of Claims and Interests in strict priority in accordance with section 726 of the Bankruptcy Code:

- Pursuant to the DIP Credit Agreement and Final DIP Order, all proceeds realized from the liquidation or other disposition of all or substantially all of the Debtors' assets shall be subject first to the Carve-Out before repayment of any DIP Obligations, Adequate Protection Obligations, 507(b) Claims, Prepetition Secured

---

[2]  The liquidation process would include a reconciliation of claims asserted against the Estates to determine the allowed Claim amount per Class.

Debt (each as defined in the Final DIP Order), or any other claims against the Debtors.   The Carve-Out means a carve-out from the DIP Superpriority Claims, the DIP Liens (other than DIP Liens in the Cash Collateral, held in Cash Collateral Account, securing DIP Letters of Credit), the 507(b) Claims, and the Adequate Protection Liens (each as defined in the Final DIP Order) in an amount equal to the sum of (i) all court and U.S. Trustee fees, (ii) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an aggregate amount not to exceed $50,000, and (iii) to the extent allowed by the Court at any time, all unpaid fees and expenses (the "**Professional Fees**") incurred by persons or firms retained by the Debtors, pursuant to section 327, 328, or 363 of the Bankruptcy Code (or by a Committee, if any, pursuant to section 328 and 1103 of the Bankruptcy Code).   As such, the estimate of accrued and unpaid Carve-Out fees as of the Liquidation Date is $7.5 million.  This chapter 7 liquidation analysis is based on the assumption that the Carve-Out provided for in the Final DIP Order is sufficient to satisfy the costs and expenses of a hypothetical chapter 7 liquidation.  It is possible that the amounts necessary to conduct a hypothetical chapter 7 liquidation are more or less than amounts permitted to be paid as part of the Carve-Out.  The Debtors believe that the Final DIP Order also requires that a Wind-Down Account be established, if necessary, if a Section 363 Sale is conducted by a chapter 7 trustee.  The DIP Lenders, Prepetition Revolving Credit Facility Lenders and Prepetition Term Loan Lenders do not believe the Final DIP Order requires this result.

- DIP Claims consist of any claim held by any of the DIP Lenders or the DIP Agent arising under or related to the DIP Credit Agreement or the Final DIP Order, including any Claim for principal, interest, fees and expenses to the extent not otherwise satisfied pursuant to an Order of the Court.

- The New Money DIP Claims consist of the new money DIP Term Loan of $72.7 million and DIP LC Loan of $55.1 million. Additionally, there were fees paid-in-kind on the new money DIP loans due to the DIP extension and the unpaid DIP exit fee, which is calculated at 1.5% of the outstanding new money DIP.  The New Money DIP Claims have priority over all remaining claims other than the Carve-Out claims described above. Prior to the Liquidation Date, the New Money DIP Claims were paid down with proceeds from the CCPN Sale and the MS/Al Sale, emission credits sales, and other compressor asset sales proceeds.  Additionally, after incorporating assumed letters of credit drawn by counterparties upon the Liquidation Date the remaining cash available in the DIP LC Loan account is assumed to be used to repay the remaining

New Money DIP Claims.  As such, there are no remaining New Money DIP Claims as of the Liquidation Date.

- The DIP Term Loan Roll-Up consists of prepetition claims of $127.5 million that were rolled up in proportion with the total new money DIP loans.  Additionally, there were fees paid-in-kind on the DIP Term Loan Roll-Up due to the DIP extension. Prior to the Liquidation Date, a portion of the DIP Term Loan Roll-Up was paid down with remaining proceeds from asset sales and remaining cash in the DIP LC Loan account (as described above) after the satisfaction of all New Money DIP Claims.  These paydowns are allocated between the DIP Term Loan Roll-Up Claims and the Prepetition Revolving Credit Facility Claims (described below) in accordance with the terms described in the Amended Plan. As such, the balance of the DIP Term Loan Roll-Up as of the Liquidation Date is $116.9 million.

- Prepetition Revolving Credit Facility Claim means any Claim arising under the Prepetition Revolving Credit Facility and the Prepetition Revolving Credit Facility Agreement.  Prior to the Liquidation Date, a portion of the Prepetition Revolving Credit Facility Claims were paid down with remaining proceeds from asset sales and remaining cash in the DIP LC Loan account after the satisfaction of all New Money DIP Claims.  These paydowns are allocated between the DIP Term Loan Roll-Up and the Prepetition Revolving Credit Facility (described above), in accordance with the terms described in the Amended Plan. As such, the balance of the Prepetition Revolving Credit Facility Claims as of the Liquidation Date is $79.1 million.

- Prepetition Term Loan Claims means any Claim arising under the Prepetition Term Loan and the Prepetition Term Loan Agreement. As of the Liquidation Date, the balance of the Prepetition Term Loan Claims is $309.5 million.

- Chapter 11 Administrative Expense and Priority Claims:  Administrative expense Claims not otherwise covered by the Carve-Out include post-petition liabilities, post-petition severance for all employees terminated as part of the liquidation of the company and restructuring transaction fees (in excess of those covered by the Carve-Out).

- General Unsecured Claims: includes contract rejection claims and various other unsecured liabilities.

- Sponsor Notes:  includes unsecured notes dated January 22, 2018.

- Existing Interests:  includes any equity security in a Debtor as defined in section 101(16) of the Bankruptcy Code, including all common stock or units, preferred stock or units, or other instruments evidencing an ownership interest in any of the Debtors.

## 5)  Conclusion

The Debtors have determined, as summarized in the following analysis, upon the Effective Date, the Amended Plan will provide all holders of Claims and Interests with a recovery (if any) that is not less than what they would otherwise receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code, and as such believe that the Amended Plan satisfies the requirement of 1129(a)(7) of the Bankruptcy Code.

The following Liquidation Analysis should be reviewed with the accompanying notes. The following tables reflect the rollup of the deconsolidated liquidation analysis for the Debtors.

**Summary of Net Proceeds Available for Distribution**

| | Low | Midpoint | High |
|---|---|---|---|
| Gross Liquidation Proceeds | $ 67,579,346 | $ 80,286,411 | $ 100,507,718 |
| Less: Liquidation Costs | (6,223,812) | (6,732,094) | (7,540,946) |
| **Net Liquidation Proceeds** | **$ 61,355,535** | **$ 73,554,317** | **$ 92,966,772** |

**Summary of Recovery (%)**

| | Remaining Claim | Low | Midpoint | High |
|---|---|---|---|---|
| Less: Pre-Chapter 7 Professional Fees Carve-Out | $ 7,475,283 | 100% | 100% | 100% |
| Less: Remaining New Money DIP Claims (1) (2) | - | | | |
| Less: Remaining DIP Term Loan Roll-Up Claims (2) | 116,913,652 | 39% | 48% | 62% |
| Less: Remaining Pre-Petition Revolving Credit Facility Claims | 79,093,795 | 11% | 13% | 17% |
| Less: Pre-Petition Term Loan Claims | 309,418,356 | 0% | 0% | 0% |
| Less: Ch. 11 Administrative, Priority, and Priority Tax Claims | 16,753,223 | 0% | 0% | 0% |
| Less: General Unsecured Claims | 12,859,813 | 0% | 0% | 0% |
| Less: Sponsor Notes | 17,382,775 | 0% | 0% | 0% |
| Less: Equity Interests | N/A | 0% | 0% | 0% |
| Total Pre-Petition Revolving Credit Facility Claims | 79,093,795 | 11% | 13% | 17% |
| Total Term Loan Claims | $ 426,332,008 | 11% | 13% | 17% |

Notes:
*(1) The New Money DIP Claims are paid in full upon conversion through a combination of asset sale proceeds and remaining cash in the DIP LC escrow account. See additional information in Exhibit B and Disclosure Statement.*
*(2) Recoveries on the total DIP claims of ($259.4 M) are 72%, 76%, and 83% in the low, midpoint, and high scenarios, respectively.*

*[Remainder of This Page Intentionally Left Blank]*

Southcross Energy Liquidation Analysis
Consolidation of Debtor Entities

| Assets | Notes | 1/31/2020 Estimated Value | Recovery Estimate % | | | Recovery Estimate $ | | |
|---|---|---|---|---|---|---|---|---|
| | | | Low | Midpoint | High | Low | Midpoint | High |
| Cash | [A] | $ 15,212,360 | 100% | 100% | 100% | 15,212,360 | 15,212,360 | 15,212,360 |
| Trade Accounts Receivable | [B] | 27,119,810 | 60% | 70% | 80% | 16,307,886 | 19,025,867 | 21,743,848 |
| Prepaid Expenses | [C] | 4,679,623 | 0% | 0% | 0% | - | - | - |
| Property, plant and equipment, net | [D] | | | | | | | |
| Construction in Progress | [E] | 5,579,000 | 0% | 0% | 0% | - | - | - |
| Pipeline | [F] | 150,284,840 | 0% | 0% | 5% | - | - | 7,514,242 |
| Plants | [G] | 125,714,365 | 10% | 16% | 22% | 12,341,500 | 19,907,500 | 27,473,500 |
| Compressors | [H] | 26,504,757 | 65% | 70% | 75% | 17,275,700 | 18,604,600 | 19,933,500 |
| Rights of Way | [I] | 27,196,319 | 0% | 0% | 0% | - | - | - |
| Capital Leases | [J] | 806,464 | 0% | 0% | 0% | - | - | - |
| Other | [K] | 6,283,283 | 3% | 6% | 9% | 157,082 | 353,435 | 549,787 |
| Investments in Joint Ventures | [L] | 88,346,563 | 7% | 8% | 9% | 6,284,818 | 7,182,649 | 8,080,480 |
| Other Assets | [M] | 6,392,867 | 0% | 0% | 0% | - | - | - |
| **Total Assets / Gross Liquidation Proceeds** | | $ 484,180,252 | 14% | 17% | 21% | $ 67,579,346 | $ 80,286,411 | $ 100,507,718 |
| **Less Liquidation Adjustments** | | | | | | | | |
| Chapter 7 Trustee Fee | [N] | | | | | (2,027,380) | (2,408,592) | (3,015,232) |
| Chapter 7 Professional Fees | [O] | | | | | (675,793) | (802,864) | (1,005,077) |
| Employee Company Costs to Wind Down Estate | [P] | | | | | (839,820) | (839,820) | (839,820) |
| Non-Employee Company Costs to Wind Down Estate | [Q] | | | | | (2,680,818) | (2,680,818) | (2,680,818) |
| **Total Liquidation Adjustments** | | | | | | $ (6,223,812) | $ (6,732,094) | $ (7,540,946) |
| **Liquidation Proceeds Available for Distribution to Creditors** | | | | | | $ 61,355,535 | $ 73,554,317 | $ 92,966,772 |

Summary Hypothetical Waterfall Scenario

| | Notes | Claim Est. | Recovery Estimate $ | | |
|---|---|---|---|---|---|
| | | | Low $ | Midpoint $ | High $ |
| Less: Pre-Chapter 7 Professional Fees Carve-Out | [R] | $ 7,475,283 | 7,475,283 | 7,475,283 | 7,475,283 |
| **Remaining Proceeds** | | | 53,880,252 | 66,079,034 | 85,491,488 |
| Less: Remaining New Money DIP Claims (1) (2) | [S] | - | - | - | - |
| **Remaining Proceeds** | | | 53,880,252 | 66,079,034 | 85,491,488 |
| Less: Remaining DIP Term Loan Roll-Up Claims (2) | [T] | 116,913,652 | 45,448,562 | 55,738,364 | 72,112,974 |
| **Remaining Proceeds** | | | 8,431,690 | 10,340,670 | 13,378,514 |
| Less: Remaining Pre-Petition Revolving Credit Facility Claims | [U] | 79,093,795 | 8,431,690 | 10,340,670 | 13,378,514 |
| **Remaining Proceeds** | | | - | - | - |
| Less: Pre-Petition Term Loan Claims | [V] | 309,418,356 | - | - | - |
| **Remaining Proceeds** | | | - | - | - |
| Less: Ch. 11 Administrative, Priority, and Priority Tax Claims | [W] | 16,753,223 | - | - | - |
| **Remaining Proceeds** | | | - | - | - |
| Less: General Unsecured Claims | [X] | 12,859,813 | - | - | - |
| **Remaining Proceeds** | | | - | - | - |
| Less: Sponsor Notes | [Y] | 17,382,775 | - | - | - |
| **Remaining Proceeds** | | | - | - | - |
| Less: Equity Interests | [Z] | N/A | - | - | - |
| **Remaining Proceeds** | | | - | - | - |

Notes:
(1) The New Money DIP Claims are paid in full upon conversion through a combination of asset sale proceeds and remaining cash in the DIP LC escrow account. See additional information in Exhibit B and Disclosure Statement.
(2) Recoveries on the total DIP claims of ($259.4 M) are 72%, 76%, and 83% in the low, midpoint, and high scenarios, respectively.

*[Remainder of This Page Intentionally Left Blank]*

9

**Specific Notes to the Liquidation Analysis**

*Net Liquidation Proceeds*

- **Note A - Cash**

  o Consists of rollforward of book cash as of the Liquidation Date for all legal entities.

  o The analysis assumes that the Debtors cease operations immediately upon the Liquidation Date and no cash is generated or used through operations.

  o The projected cash balance as of January 31, 2020 is based on the latest *pro forma* cash flow forecast projections prepared by the Debtors and its advisors.

  o The adjusted letters of credit restricted cash account balance is $49.1 million prior to the Liquidation Date due to the original issue discount of 1.5% and a vendor prepayment made out of the account of $5.1 million.

  o Upon the Liquidation Date, $31.8 million of the $49.1 million escrow account for letters of credit is used to pay down the New Money DIP Claims, the DIP Term Loan Roll-Up Claims and the Prepetition Revolving Credit Facility Claims, while the remaining $17.3 million is assumed to be drawn by counterparties. These balances are adjusted out of the *pro forma* cash balance at January 31, 2020.

  o The Debtors estimate a 100% recovery of the *pro forma* balance of cash.

- **Note B - Accounts Receivable**

  o Accounts receivable consists of invoices and accrued revenues due under normal trade terms, generally requiring payment within 30 to 60 days of production.

  o The analysis assumes that a chapter 7 Trustee would retain certain existing staff to handle collection efforts for outstanding trade accounts receivable for the entities undergoing liquidation.

  o There are high risks with collecting accounts receivable once a liquidation is announced.

  o The adjustments to collections reflect the potential costs of litigation if customers do not pay or delay payments, customers attempting to offset payables due to business disruption, contract breach expenses as a result of the cessation of operations including the cost to connect to other pipelines, and other offset risks as certain customers are also vendors.

      ○   The Debtors estimate the liquidation recovery value of accounts receivable is 60% to 80% of the *pro forma* value.

- **Note C - Prepaid Expenses**

  ○   Prepaid Expenses includes short-term portion of prepaid expenses. Prepaid expenses include insurance, Board fees, safety assessment, and other short term prepaids.

  ○   Prepaid expenses have been adjusted for the estimated net book value as of January 31, 2020.

  ○   The Debtors believe that recovery on the prepaid assets is unlikely due to the nature of the assets.

  ○   The Debtors estimate the liquidation recovery value of prepaid expenses is 0% of the *pro forma* value.

- **Note D – Property, Plant, and Equipment**

  ○   Property, Plant, and Equipment includes various asset groups – Construction in Progress, Pipeline, Plants, Compressors, Rights-of-Way, Capital Leases, and Other.

  ○   There was an impairment taken on all property, plant & equipment during the first quarter of 2020.  As such, each asset has been adjusted to reflect the fair value.

  ○   Each asset has been adjusted to reflect an estimated balance at January 31, 2020.

  ○   Each asset group has a unique liquidation value range as detailed below in Notes E – Notes K.

- **Note E - Property, Plant, and Equipment – Construction in Progress**

  ○   Property, Plant, and Equipment – Construction in Progress consists of various in process capital expenditure projects for both growth and maintenance of current PP&E.

  ○   In a liquidation scenario, the recovery on these projects is captured with the related asset category the construction is for and therefore there is no separate recovery for this account.

o   The Debtors estimate the liquidation recovery value of Property, Plant, and Equipment – Construction in Progress is 0% of the *pro forma* value.

- **<u>Note F - Property, Plant, and Equipment - Pipeline</u>**

  o   Property, Plant, and Equipment - Pipeline consists of more than 2,000 miles of pipelines located in the Eagle Ford region of South Texas and approximately 1,100 miles of pipelines in Mississippi and Alabama.  The pipeline assets sold in the MS/AL Sale and the CCPN Sale are shown as sold prior to the Liquidation Date.

  o   The South Texas pipeline would be sold as-is, with all costs to disassemble and relocate the assets born by the buyer. After considering the state of the industry, the costs of building new pipelines, the costs of transport and the low potential recovery values of any scrap sales, it is highly unlikely that any party would find it economical to purchase the existing South Texas pipeline in an inactive state.

  o   Based on discussions with management and certain third-party industry experts, the Debtors estimate the liquidation recovery on the remaining Property, Plant and Equipment – Pipeline is 0% to 5% of the *pro forma* value.

- **<u>Note G - Property, Plant, and Equipment – Plants</u>**

  o   Property, Plant, and Equipment - Plants consists of gas processing (Woodsboro, Lone Star), treating (Lancaster, Valley Wells) and fractionation (Bonnie View) plant facilities.

  o   Estimated recoveries are built up on a plant by plant basis, based on estimates from management team and guidance on current market rates for inactive plants from brokers.

  o   These recoveries assume that the Debtors have ceased operations and no volumes are moving through the plants and they are sold in a fire-sale scenario. The buyer would purchase the plants as-is and would be responsible for any dismantling and transportation costs to relocate the assets to an operating location. Recovery estimates in this section includes the plants, but not the compressors (which are covered in Note H below) and assume the buyers will pay all ad valorem property taxes when due and as such will net out the estimated unpaid amounts from the purchase price.

  o   The Debtors estimate the liquidation recovery value of Property, Plant and Equipment – Plants is 10% to 22% of the *pro forma* value.

- **<u>Note H - Property, Plant, and Equipment - Compressors</u>**

  o Property, Plant, and Equipment - Compressors consist of the engine, skid, scrubbers, and coolers used in the gas transportation and refinement processes.

  o Recovery estimates based on the as is sale value of the inactive compressor package, factoring in dismantling and transportation costs for the assets sold as-is to the buyer.

  o The Debtors management team, along with guidance from industry experts, estimated recovery values in an orderly liquidation process in a range of 65 to 75% of the Property, Plant, and Equipment – Compressors *pro forma* value.

- **<u>Note I - Property, Plant, and Equipment – Rights-of-Way</u>**

  o Property, Plant, and Equipment – Rights-of-Way consists of agreements that allow Debtor to construct and maintain pipelines on others property.

  o Right-of-Ways and Easements are contracts with land owners and do not contain much value in a liquidation scenario.

  o The Debtors estimate the liquidation recovery value of Property, Plant, and Equipment – Rights of Way is 0% of the *pro forma* value.

- **<u>Note J - Property, Plant, and Equipment – Capital Leases</u>**

  o Property, Plant, and Equipment – Capital Leases consist of leases for vehicles.

  o Capital Leases are offset by liabilities representing the lease payments remaining which would eliminate the value to recover on the assets in a liquidation.

  o The Debtors estimate the liquidation recovery value of Property, Plant, and Equipment – Capital Leases is 0% of *pro forma* value.

- **<u>Note K - Property, Plant, and Equipment – Other</u>**

  o Property, Plant and Equipment – Other are other Property, Plant and Equipment assets such as Land & Buildings, Furniture & Fixtures, and Equipment (including IT Equipment).

- These assets are believed to have some recoverable value based primarily on the underlying land assets while the other types are not assumed to have a material recoverable value.

- The Debtors estimate the liquidation recovery value of Property, Plant, and Equipment –and Other are 3% to 9% of *pro forma* value.

- **Note L - Investment in JV**

  - Investment in JV consists of the Debtors' joint venture interest in T2 Eagle Ford Gathering Company LLC and T2 LaSalle Gathering Company LLC.

  - The estimated liquidation recovery value is based on a buyer paying a discount to the current market rates based on contractual and estimated future volumes.

  - Management provided an estimated range of values which were considered and discounted to reflect the fire-sale nature of the disposition.

  - The Debtors estimate the liquidation recovery value of the Investment in JV is 7% to 9% of the *pro forma* value.

- **Note M - Other Assets**

  - Other Assets consist of long-term insurance prepayments, professional fee retainers, lessee rights of use, and intangibles.

  - The deposits account consists of professional fee retainers and has been adjusted to zero as of January 31, 2020.

  - The long-term prepaid account consists of prepayments for insurance that have been adjusted to account for use until January 31, 2020.

  - Due to the nature of these assets, the Debtors estimate the liquidation recovery value of Other Assets is 0% of the *pro forma* value.

*Liquidation Adjustments*

- **Note N - Chapter 7 Trustee Fees**

  - Chapter 7 Trustee Fees consist of fees paid to the Chapter 7 Trustee to liquidate the Estates of the Debtors.

- o The estimate is based on Section 326 of the Bankruptcy Code and is calculated at 3% of all gross liquidation proceeds.

- o Based on the Liquidation proceeds forecast, the Debtors estimate the Chapter 7 Trustee Fees to be $2.0 million to $3.0 million.

- **Note O - Chapter 7 Trustee Professional Fees**

  - o Chapter 7 Professional Fees consist of fees paid to the Chapter 7 trustee professionals to liquidate the Estates of the Debtors.

  - o The analysis assumes an estimated 1% of all gross liquidating proceeds will be incurred in order to assist the Chapter 7 Trustee in liquidating the Estates.

  - o Based on the Liquidation proceeds forecast, the Debtors estimate the Chapter 7 Trustee Professional Fees to be $0.7 million to $1.0 million.

- **Note P - Employee Company Costs to Wind-Down Estates**

  - o Employee Costs to Wind-Down the Estates include the costs to retain employees and consultants for the wind-down period.

  - o A portion of the Estates' employees would be required to assist the Chapter 7 Trustee to wind down the Estates to collect cash, pay liabilities and maintain the books and records.

  - o The Employee Company Costs to Wind-Down the Estates are estimated to be $0.8 million.

- **Note Q - Non- Employee Company Costs to Wind-Down Estates**

  - o Non-Employee Company Costs to Wind-Down Estates consist of G&A costs (HR, Tax, IT, etc.) which are required to maintain the workforce required to wind down the Debtors' business in an orderly fashion as described above.

  - o The asset monetization and wind-down period is expected to last ~4 months from the Liquidation Date to the end of the case.

  - o The Employee Company Costs to Wind-Down the Estates are estimated to be $2.7 million.

*Claims*

- **<u>Note R – Pre-Chapter 7 Professional Fees Carve-Out</u>**

  - Pre-Liquidation Date accrued Professional Fees consist of accrued and unpaid professional fees related to Debtor, lender, and related party professionals as of the Liquidation Date, net of retainers.

  - The Pre-Chapter 7 Professional Fees Carve-Out is $7.5 million as of the Liquidation Date and recoveries will be 100%.

- **<u>Note S – New Money DIP Claims</u>**

  - The New Money DIP Claims are repaid in full prior to the Liquidation Date as described above.

- **<u>Note T – DIP Term Loan Roll-Up Claims</u>**

  - Including the pre-Liquidation Date paydown described above, the Debtors estimate that there will be approximately $116.9 million outstanding on the Liquidation Date and that the recoveries on the DIP Term Loan Roll-Up Claims will be 39% to 62%.

- **<u>Note U - Prepetition Revolving Credit Facility Claims</u>**

  - Including the pre-Liquidation Date paydown described above, the Debtors estimate that there will be approximately $79.1 million outstanding on the Liquidation Date and that the recoveries on the Prepetition Revolving Credit Facility Claims will be 11% to 17%.

- **<u>Note V - Prepetition Term Loan Claims</u>**

  - Prepetition Term Loan Claims consist of outstanding balances owed under the prepetition term loan facility, excluding balances related to the DIP Term Loan roll-up.

  - The Debtors estimate that there will be approximately $309.5 million outstanding on the Liquidation Date and that the recoveries on the Prepetition Term Loan Claims will be 0%.

- **<u>Note W – Chapter 11 Administrative and Priority Claims</u>**

  o  Administrative and priority claims consists of any administrative and priority Claims against any Debtor.

  o  The Debtors estimate that there will be approximately $16.8 million of total administrative, priority, and tax claims and that there will be a 0% recovery on these claims.

- **<u>Note X – General Unsecured Claims</u>**

  o  General Unsecured Claims consists of claims against any Debtor including contract rejection damage claims and various other unsecured liabilities.

  o  The Debtors estimate that there will be approximately $12.9 million of General Unsecured Claims remaining as of the Liquidation Date and that the recoveries will be 0%.

- **<u>Note Y – Sponsor Notes</u>**

  o  Sponsor Notes consists of unsecured notes dated January 22, 2018 of $17.4 million and the Debtors estimate that the recoveries will be 0%.

- **<u>Note Z - Existing Interests</u>**

  o  Existing Interests consists of Interests of any holders of any class of equity securities of any of the Debtors, represented by shares of common or preferred stock, limited partnership interests or other instruments evidencing an ownership interest in any of the Debtors, whether or not certificated, transferable, voting or denominated "stock" or a similar security, or any option, warrant or right, contractual or otherwise, to acquire any such interest.

  o  The Debtors estimate that there will be no recovery for potential Existing Interests on the Liquidation Date.

**Exhibit C**

### Financial Projections[1]

The Amended Plan provides, among other things, that Southcross will be reorganized to include all the gathering and processing assets in South Texas, the Lancaster assets, and the Valley Wells assets and that the proceeds of the CCPN Sale and MS/AL Sale will be distributed to creditors. Accordingly, in conjunction with preparation of the Amended Plan and the Disclosure Statement Supplement, Southcross, with the assistance of the other Debtors, their management team and advisors, prepared the following Financial Projections for the fiscal year ending December 31, 2020 ("FY2020") through the fiscal year ending December 31, 2024 ("FY2024," and, such period, the "Projection Period") for post-Effective Date Southcross (on a consolidated basis).

The Financial Projections are based on a number of assumptions made by Southcross and the other Debtors with respect to the future operating performance of the post-Effective Date Southcross and the Reorganized Debtors.[2]  Although Southcross and the other Debtors have prepared the Financial Projections in good faith and believe the assumptions to be reasonable, it is important to note that neither Southcross nor the other Debtors can provide any assurance that such assumptions will be realized and such assumptions, therefore, remain subject to the risk factors set forth in the Disclosure Statement and the Disclosure Statement Supplement (as applicable) and the assumptions described herein, including all relevant qualifications and footnotes.

Neither Southcross nor the other Debtors have generally published financial projections of their respective anticipated financial positions, results of operations, or cash flows. Accordingly, neither Southcross nor the other Debtors will, and disclaim any obligation to, furnish updated business plans or projections to holders of Claims or other parties in interest after the Effective Date, or to include such information in documents required to be filed with any regulatory or other governmental body (such as the SEC) or otherwise make such information public, unless required to do so by the SEC or other regulatory body pursuant to the provisions of the Amended Plan.

As described in detail in the Disclosure Statement and the Disclosure Statement Supplement, a variety of risk factors could affect Southcross and/or the other Reorganized Debtors' financial results and holders of Claims entitled to vote to accept or reject the Amended Plan should consider those risk factors.  Accordingly, the Financial Projections should be reviewed in conjunction with the risk factors set forth in the Disclosure Statement and the Disclosure Statement Supplement and the assumptions described herein, including all relevant qualifications and footnotes.  Although the Financial Projections represent Southcross and the other Debtors' respective best estimates and good faith judgment (for which Southcross and the other Debtors, as applicable, believe they have a reasonable basis) of the results of future operations, financial position, and cash flows of Southcross and the other Debtors, as applicable, they are only estimates and actual results may vary considerably from the Financial Projections.  Consequently, the Financial Projections should not be regarded as a representation by Southcross or the other Debtors, or their respective advisers or representatives, that the projected results of operations,

---

[1]   Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Disclosure Statement Supplement, to which the Financial Projections are attached.

[2]   References to the Reorganized Debtors herein include NewCo, as applicable.

financial position, and cash flows of Southcross or the other Debtors, as applicable, will be achieved.

The Financial Projections were not prepared with a view toward compliance with the published guidelines of the SEC or the guidelines established by the American Institute of Certified Public Accountants for preparation and presentation of prospective financial information. The projected consolidated balance sheet does reflect an estimate of the impact of "fresh start" accounting, but a detailed "fresh start" analysis was not completed.

Moreover, the Financial Projections may contain certain statements that are "forward-looking statements" within the meaning of the private securities litigation reform act of 1995. These statements are subject to a number of assumptions, risks, and uncertainties, many of which are beyond the control of Southcross and/or the other Debtors, including the implementation of the Amended Plan, and the continuing availability of sufficient borrowing capacity or other financing to fund operations. Holders of Claims entitled to vote on the Amended Plan are cautioned that the forward-looking statements speak as of the date made and are not guarantees of future performance. Actual results or developments may differ materially from the expectations expressed or implied in the forward-looking statements, and the Debtors undertake no obligation to update any such statements.

The Financial Projections, while presented with numerical specificity, are necessarily based on a variety of estimates and assumptions which, though considered reasonable by the Debtors, may not be realized and are inherently subject to significant business, economic, industry, regulatory, legal, market, and financial uncertainties and contingencies, many of which are beyond the control of Southcross and/or the other Reorganized Debtors, as applicable. Southcross and the other Debtors caution that no representations can be made or are made as to the accuracy of the projections or to Southcross, the other Debtors', and/or the Reorganized Debtors' ability to achieve the projected results. Some assumptions inevitably will be incorrect. Moreover, events and circumstances occurring subsequent to the date on which Southcross and the other Debtors prepared these projections may be different from those assumed, or, alternatively, may have been unanticipated, and thus the occurrence of these events may affect financial results in a materially adverse or materially beneficial manner. Except as otherwise provided in the Amended Plan, the Disclosure Statement, or the Disclosure Statement Supplement, Southcross, the other Debtors, and the Reorganized Debtors, as applicable, do not intend and undertake no obligation to update or otherwise revise these Financial Projections to reflect events or circumstances existing or arising after the date of the Disclosure Statement Supplement or to reflect the occurrence of unanticipated events. Therefore, the Financial Projections may not be relied upon as a guarantee or other assurance of the actual results that will occur. In deciding whether to vote to accept or reject the Amended Plan, holders of Claims entitled to vote to accept or reject the Amended Plan must make their own determinations as to the reasonableness of such assumptions and the reliability of the projections, and should consult with their own advisors.

## General Assumptions

- *Methodology*. The Financial Projections contain the operational and capital expenditure plans for Southcross. The projected performance of Southcross was analyzed by key

management personnel and incorporate numerous assumptions regarding industry and revenue growth, productivity improvements, and other operating and cost reduction initiatives. The Financial Projections account for the CCPN Sale and MS/AL Sale. In addition, the Financial Projections assume all remaining assets, including the gathering and processing assets in South Texas, the Lancaster assets, and the Valley Wells assets, continue operating and does not assume sales or closure of any operating assets nor any acquisitions of new operating units.

- *Assumed Effective Date*. The Financial Projections assume that the Effective Date will occur on or before January 31, 2020 (the "<u>Assumed Effective Date</u>"). However, the growth assumptions in the Consolidated Financial Projections section include full 2020 projections for illustrative purposes, while the projected financials include a stub period for 2020 from an assumed emergence date of January 31, 2020 to December 31, 2020.

- *Macroeconomic and Industry Environment*. The Financial Projections and related volume and pricing assumptions are based on input from Southcross's senior management and certain industry reports prepared by various third parties.

- *Operating Conditions*. The Financial Projections assume a reversion to operating conditions upon emergence that would be normal for a company of a similar size and nature with capitalization consistent with that of Southcross.

## Consolidated Financial Projections

- *Net Sales*. During the Projection Period, the sales of Southcross are expected to grow from approximately $308 million in FY2020 to approximately $399 million in FY2024. Assumptions related to customer acquisition, increased system utilization, and contract renegotiation were considered in arriving at sales assumptions.

- *Cost of Sales*. The Financial Projections expect Southcross's gas purchases to grow from $204 million in FY2020 to $288 million in FY2024, in correlation with the growth in sales.

- *Selling, General and Administrative Expenses*. Southcross's Selling, General, and Administrative ("<u>SG&A</u>") expenses are expected to decrease slightly from FY2020 ($16.2 million) to FY2024 ($16.1 million) as a result of implemented strategies and anticipated management cost savings resulting from the CCPN Sale and MS/AL Sale, and the planned consolidation of the back offices in Houston. SG&A expenses include labor and benefits, business technology, plant SG&A, office costs, and other administrative expenses.

- *EBITDA*. Southcross's EBITDA is expected to grow from approximately $24.6 million in FY2020 to $30.1 million in FY2024.

- *Interest Expense*. Reorganized Southcross's interest expense is expected to remain at approximately $5.4 million per year as a result of an assumed $65 million Exit Credit Facility consisting of (i) a revolving credit facility in an aggregate principal amount at any time outstanding up to $30,000,000 and (ii) a single-draw term loan facility in an aggregate principal amount of up to $35,000,000, the proceeds of which will be used to cash collateralize a letter of credit subfacility (collectively, the "<u>Exit Financing</u>").

- *Income Taxes*. The Financial Projections do not project income taxes during the Projection Period as the reorganized entity is assumed to continue to operate as an MLP.

*Projected Financials Key Assumptions*

Southcross's post-Effective Date projected balance sheet sets forth the projected consolidated financial position of Southcross Energy Partners, L.P. after giving effect to the Amended Plan. All financials for 2020 below reflect a stub period from the assumed emergence date of January 31, 2020 to December 31, 2020.

*General Assumptions*:

- *Overview*.    The projected consolidated opening balance sheet was developed from expected changes in assets and liabilities of Southcross from the October 2019 unaudited actual balance sheets for each subsidiary rolled forward and including estimated fresh-start adjustments to January 31, 2020, and after giving effect to the occurrence of the Effective Date.    The Financial Projections reflect Southcross's projected post-Effective Date consolidated balance sheet as of each fiscal-year end, reflecting projected results of operations and assumed investments in fixed assets and working capital.

- *Cash*.    After payment of New Money DIP Claims and all transaction related expenses (e.g., accrued and unpaid professional fees, sales fees, financing fees, reserves, and restructuring fees), Southcross's post-Effective Date cash balance is projected to total approximately $25.4 million.    Projected cash included in the Financial Projections reflects the impact on cash from the projected operating results, capital investment, working capital changes, and debt service assumed in these Financial Projections. Actual cash may vary from cash reflected in the projected consolidated balance sheet because of variances in the Financial Projections and potential changes in cash needed to consummate the Amended Plan.

- *Debt*.    The projected consolidated balance sheet reflects the existence of the Exit Financing as of the Assumed Effective Date with any projected payments made in the ordinary course of operations based on newly defined terms. The following table outlines the debt structure prior to the Assumed Effective Date and contemplated under the Amended Plan.    The Financial Projections capture interest expense based on contemplated terms.

4

**DEBT STRUCTURE**

*(US $ in thousands)*

| Debt | | 1/31/2020 | Post-Emergence 1/31/2020 |
|------|---|-----------|--------------------------|
| New Money DIP | $ | 27,010 | $ - |
| LC Collateral DIP | | 20,489 | - |
| Existing TL (1) | | 438,187 | - |
| Existing RCF (2) | | 81,293 | - |
| Unsecured Sponsor Notes | | 17,383 | - |
| New 1L RCF (3) | | - | 30,000 |
| New 2L Term Loan (4) | | - | 35,000 |

(1) Balance reflects the projected amount at emergence inclusive of the accrued and unpaid interest.
    Roll-Up Component exchanged for New Series A Preferred Units.
(2) Balance reflects the projected amount at emergence inclusive of the accrued and unpaid interest.
    Ratable (with TL Roll-Up) portion of RCF exchanged for New Series A Preferred Units.
(3) Reflects commitments that will be undrawn at the time of emergence. $30m represents the size of the facility.
(4) Facility sized at $35m to replace DIP Letters of Credit assumed upon emergence.

- *Working Capital.* Balances for accounts receivable and accounts payable are based on Southcross's long-term historical turnover ratios which result in a Days Sales Outstanding assumption of 37 days and a Days Payable Outstanding assumption of 28 days. Other working capital accounts are assumed to fluctuate throughout the year due to items such as prepayments, property taxes, bonuses, and interest payments.
- *Capital Expenditures.* Southcross has capital projects planned during the Projection Period designed to pursue strategic growth, improve competitiveness, expand capacity, and maintain pipeline integrity and safety standards.

**PROJECTED CAPITAL EXPENDITURES**

| | FYE December 31, | | | | |
|---|---|---|---|---|---|
| *(US $ in thousands)* | 2020 (1) | 2021 | 2022 | 2023 | 2024 |
| Maintenance Cap Ex | $ 7,624 | $ 7,268 | $ 7,275 | $ 10,282 | $ 7,289 |
| Growth Cap Ex | 8,538 | 4,640 | 3,005 | 3,140 | 1,640 |
| **Total Cap Ex** | **$ 16,162** | **$ 11,908** | **$ 10,280** | **$ 13,422** | **$ 8,929** |

(1) 2020 is a stub period from the assumed emergence date of January 31, 2020 to December 31, 2020.

*Projected Income Statement – Consolidated*

| PROJECTED INCOME STATEMENT | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | FYE December 31, | | | | | | |
| (US $ in thousands) | | **2020** [1] | | **2021** | | **2022** | | **2023** | | **2024** |
| | | | | | | | | | | |
| Gas Sales | $ | 284,763 | $ | 338,222 | $ | 357,968 | $ | 383,748 | $ | 399,113 |
| Cost of Sales | | 189,326 | | 232,406 | | 248,708 | | 273,155 | | 288,011 |
| ***Gross Margin*** | **$** | ***95,437*** | **$** | ***105,816*** | **$** | ***109,260*** | **$** | ***110,593*** | **$** | ***111,102*** |
| *Gross Margin %* | | *34%* | | *31%* | | *31%* | | *29%* | | *28%* |
| | | | | | | | | | | |
| Operating Expenses | $ | 57,877 | $ | 63,270 | $ | 63,650 | $ | 64,287 | $ | 64,930 |
| SG&A | | 14,831 | | 15,138 | | 15,440 | | 15,749 | | 16,064 |
| **EBITDA** | **$** | ***22,729*** | **$** | ***27,409*** | **$** | ***30,169*** | **$** | ***30,558*** | **$** | ***30,109*** |
| | | | | | | | | | | |
| Depreciation & Amortization | $ | 10,365 | $ | 11,870 | $ | 12,363 | $ | 12,996 | $ | 13,375 |
| Interest Expense [2] | | 4,978 | | 5,424 | | 5,424 | | 5,424 | | 5,439 |
| **Net Income** | **$** | ***7,386*** | **$** | ***10,115*** | **$** | ***12,382*** | **$** | ***12,137*** | **$** | ***11,295*** |

**Footnotes**
(1) 2020 is a stub period from the assumed emergence date of January 31, 2020 to December 31, 2020.
(2) For purposes of this analysis, no excess cash flow sweep is contemplated.

*[Remainder of This Page Intentionally Left Blank]*

*Projected Balance Sheet – Consolidated*

| PROJECTED BALANCE SHEET | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | FYE December 31, | | | | | | | |
| (US $ in thousands) | | 2020 | | 2021 | | 2022 | | 2023 | | 2024 |
| **Assets** | | | | | | | | | | |
| Cash | $ | 33,657 | $ | 43,940 | $ | 57,905 | $ | 69,717 | $ | 84,755 |
| Reserved Cash | | 35,000 | | 35,000 | | 35,000 | | 35,000 | | 35,000 |
| Accounts Receivable | | 32,025 | | 34,343 | | 36,256 | | 38,533 | | 39,983 |
| Prepaid Expenses | | 4,649 | | 4,716 | | 4,785 | | 4,854 | | 5,296 |
| Current Assets | | 62 | | 62 | | 62 | | 62 | | 62 |
| Total Current Assets | $ | 105,393 | $ | 118,061 | $ | 134,008 | $ | 148,165 | $ | 165,097 |
| | | | | | | | | | | |
| Property, Plant and Equip | $ | 173,527 | $ | 173,564 | $ | 171,481 | $ | 171,907 | $ | 167,460 |
| Investment in JV | | 9,071 | | 9,071 | | 9,071 | | 9,071 | | 9,071 |
| Other Assets | | 2,747 | | 2,339 | | 1,923 | | 1,498 | | 1,066 |
| **Total Assets** | **$** | **290,737** | **$** | **303,035** | **$** | **316,483** | **$** | **330,641** | **$** | **342,694** |
| | | | | | | | | | | |
| **Liabilities** | | | | | | | | | | |
| AP and Accrued Expenses | $ | 21,161 | $ | 23,419 | $ | 24,562 | $ | 26,661 | $ | 27,499 |
| Property Tax Liability | | 13,005 | | 13,265 | | 13,530 | | 13,801 | | 14,077 |
| Accrued Payroll | | 3,629 | | 3,702 | | 3,776 | | 3,851 | | 3,928 |
| Capital Lease Obligations LT | | 995 | | 995 | | 995 | | 995 | | 995 |
| Other Current Liabilities | | 124 | | 124 | | 124 | | 124 | | 124 |
| Total Current Liabilities | $ | 38,914 | $ | 41,505 | $ | 42,987 | $ | 45,433 | $ | 46,624 |
| | | | | | | | | | | |
| New Revolver | $ | - | $ | - | $ | - | $ | - | $ | - |
| New Term Loan [1] | | 35,000 | | 35,000 | | 35,000 | | 35,000 | | 35,000 |
| Total Long-Term Debt | $ | 35,000 | $ | 35,000 | $ | 35,000 | $ | 35,000 | $ | 35,000 |
| | | | | | | | | | | |
| Capital Lease Obligations LT | | 1,295 | | 1,295 | | 1,295 | | 1,295 | | 1,295 |
| Office Lease - LT Liabilities | | 2,747 | | 2,339 | | 1,923 | | 1,498 | | 1,066 |
| Total Liabilities | $ | 77,956 | $ | 80,140 | $ | 81,205 | $ | 83,227 | $ | 83,985 |
| | | | | | | | | | | |
| **Total Liabilities & Equity** | **$** | **290,737** | **$** | **303,035** | **$** | **316,483** | **$** | **330,641** | **$** | **342,694** |

**Footnotes**
(1) For purposes of this analysis, no excess cash flow sweep is contemplated.

*Projected Cash Flow Statement – Consolidated*

**PROJECTED CASH FLOW STATEMENT**

| | FYE December 31, | | | | |
|---|---|---|---|---|---|
| (US $ in thousands) | 2020[1] | 2021 | 2022 | 2023 | 2024 |
| **Cash Flow From Operations** | | | | | |
| Net Income | $ 7,386 | $ 10,115 | $ 12,382 | $ 12,137 | $ 11,295 |
| Depreciation | 10,365 | 11,870 | 12,363 | 12,996 | 13,375 |
| Change in Working Capital | | | | | |
| (Increase) / Decrease in Current Assets | (4,613) | (2,385) | (1,982) | (2,346) | (1,893) |
| Increase / (Decrease) in Current Liabilities | 11,286 | 2,592 | 1,482 | 2,446 | 1,191 |
| **Total Cash From Operations** | $ 24,424 | $ 22,191 | $ 24,245 | $ 25,233 | $ 23,968 |
| | | | | | |
| **Cash Flow From Investing Activities** | | | | | |
| Capital Expenditures | $ (16,162) | $ (11,908) | $ (10,280) | $ (13,422) | $ (8,929) |
| (Increase) / Decrease in Other Non-Current Assets | (2,747) | 408 | 416 | 424 | 433 |
| (Increase) / Decrease in Other Non-Current Liabilities | 2,747 | (408) | (416) | (424) | (433) |
| **Total Cash From Investing** | $ (16,162) | $ (11,908) | $ (10,280) | $ (13,422) | $ (8,929) |
| | | | | | |
| **Cash Flow From Financing Activities** | | | | | |
| Increase / (Decrease) in Financing [2] | - | - | - | - | - |
| **Total Cash From Financing** | $ - | $ - | $ - | $ - | $ - |
| | | | | | |
| **Net Cash from Operations, Investing and Financing** | $ 8,262 | $ 10,283 | $ 13,965 | $ 11,811 | $ 15,039 |
| | | | | | |
| Beginning Cash Balance | $ 25,395 | $ 33,657 | $ 43,940 | $ 57,905 | $ 69,717 |
| *Net Cash from Operations, Investing and Financing* | 8,262 | 10,283 | 13,965 | 11,811 | 15,039 |
| **Ending Cash Balance** | $ 33,657 | $ 43,940 | $ 57,905 | $ 69,717 | $ 84,755 |

**Footnotes**
(1) 2020 is a stub period from the assumed emergence date of January 31, 2020 to December 31, 2020.
(2) For purposes of this analysis, no excess cash flow sweep is contemplated.

**Exhibit D**

## Valuation Analysis

THE VALUATION INFORMATION CONTAINED IN THE FOLLOWING ANALYSIS IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE AMENDED PLAN. THIS VALUATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING ADEQUATE INFORMATION AS REQUIRED BY SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE AMENDED PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE AMENDED PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF CLAIMS AGAINST THE DEBTORS. IN ADDITION, THE VALUATION OF NEWLY-ISSUED SECURITIES IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT. ACTUAL MARKET PRICES OF SUCH SECURITIES AT ISSUANCE WILL DEPEND UPON, AMONG OTHER THINGS, PREVAILING INTEREST RATES, CONDITIONS IN THE FINANCIAL MARKETS, THE ANTICIPATED INITIAL SECURITIES HOLDINGS OF PREPETITION CREDITORS, SOME OF WHICH MAY PREFER TO LIQUIDATE THEIR INVESTMENT RATHER THAN HOLD IT ON A LONG-TERM BASIS, AND OTHER FACTORS WHICH GENERALLY INFLUENCE PRICES OF SECURITIES.

THE ESTIMATES OF THE RANGES OF ENTERPRISE VALUE AND EQUITY VALUE DETERMINED BY EVERCORE DO NOT REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS. THE IMPUTED ESTIMATE OF THE RANGE OF THE EQUITY VALUE OF REORGANIZED DEBTORS ASCRIBED IN THIS ANALYSIS DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET TRADING VALUE. ANY SUCH TRADING VALUE MAY BE MATERIALLY DIFFERENT FROM THE IMPUTED ESTIMATE OF THE EQUITY VALUE RANGE FOR THE REORGANIZED DEBTORS ASSOCIATED WITH EVERCORE'S VALUATION ANALYSIS.

As outlined in Section III.G. of the Disclosure Statement, Evercore ran a comprehensive marketing process for substantially all of the Debtors' assets. The marketing process resulted in the sale of certain of the Debtors' assets, including:

- Sale of the MS / AL Assets to Magnolia Infrastructure Holdings, LLC for $31.5 million of gross proceeds;[1] and

- Sale of the CCPN Assets to Kinder Morgan Tejas Pipeline, LLC for $76.0 million of gross proceeds.[2]

Solely for purposes of this Valuation Analysis, the Debtors' G&P Assets[3] (including the Acquired Companies) are collectively referred to as the Reorganized Debtors[4].

Solely for purposes of the Amended Plan and the Disclosure Statement Supplement, Evercore has estimated the total enterprise value (the "**Total Enterprise Value**") and implied equity value (the "**Equity Value**") of the Reorganized Debtors on a going concern basis and *pro forma* for the transactions contemplated by the Amended Plan.

---

[1] The MS/AL Sale closed on December 16, 2019, as set forth in the MS/AL Closing Notice .
[2] The CCPN Sale closed on November 6, 2019, as set forth in the CCPN Closing Notice.
[3] The **"G&P Assets"** include all of the Debtors' assets other than the CCPN Assets and the MS/AL Assets.
[4] If the Credit Bid Transaction is consummated, the G&P Assets will be owned by NewCo.

In estimating the going concern value of the Reorganized Debtors Evercore met with the Debtors' senior management team to discuss the Debtors' assets, operations, and future prospects, and reviewed the Debtors' historical financial information, certain of the Debtors' internal financial and operating data, the Reorganized Debtors' Financial Projections provided in **Exhibit C** to the Disclosure Statement Supplement, and publicly available third-party information and conducted such other studies, analyses, and inquiries we deemed appropriate.

The valuation analysis herein represents a valuation of the Reorganized Debtors as the continuing operators of the G&P Assets, including the Acquired Companies, after giving effect to the Amended Plan, based on the application of standard values techniques. The estimated values set forth in this **Exhibit D**: (a) do not purport to constitute an appraisal of the assets of the Reorganized Debtors; (b) do not constitute an opinion on the terms and provisions or fairness from a financial point of view to any holder of the consideration to be received by such holder under the Amended Plan; (c) do not constitute a recommendation to any holder of Claims or Interests as to how such holder should vote or otherwise act with respect to the Amended Plan; and (d) do not necessarily reflect the actual market value that might be realized through a sale or liquidation of the Reorganized Debtors.

In preparing the estimates set forth below, Evercore has relied upon the accuracy, completeness, and fairness of financial and other information furnished by the Debtors. Evercore did not attempt to independently audit or verify such information, nor did it perform an independent appraisal of the assets or liabilities of the Reorganized Debtors.

The estimated values set forth herein assume that the Reorganized Debtors will achieve their Financial Projections in all material respects. Evercore has relied on the Debtors' representation and warranty that the Financial Projections: (a) have been prepared in good faith; (b) are based on fully disclosed assumptions, which, in light of the circumstances under which they were made, are reasonable; (c) reflect the Debtors' best currently available estimates; and (d) reflect the good faith judgments of the Debtors. Evercore does not offer an opinion as to the attainability of the Financial Projections. As disclosed in the Disclosure Statement and Disclosure Statement Supplement, the future results of the Reorganized Debtors are dependent upon various factors, many of which are beyond the control or knowledge of the Debtors and Evercore, and consequently, are inherently difficult to project.

This analysis contemplates facts and conditions known and existing as of the date of the Disclosure Statement Supplement. Events and conditions subsequent to this date, including updated Financial Projections, as well as other factors, could have a substantial effect upon the Total Enterprise Value. Among other things, failure to consummate the Amended Plan in a timely manner may have a materially negative effect on the Total Enterprise Value. For purposes of this valuation, Evercore has assumed that no material changes that would affect value will occur between the date of the Disclosure Statement Supplement and the assumed Effective Date.

Evercore did not consider any one analysis or factor to the exclusion of any other analyses or factors. Accordingly, Evercore believes that its analysis and views must be considered as a whole and that selecting portions of its analysis and factors could create a misleading or incomplete view of the processes underlying the preparation of the valuation. Reliance on only one of these methodologies used or portions of the analysis performed could create a misleading or incomplete conclusion.

The following is a summary of analyses performed by Evercore to arrive at its recommended range of estimated Total Enterprise Value.

2

A. *Discounted Cash Flow Analysis*

The discounted cash flow ("**DCF**") analysis estimates the value of the Reorganized Debtors by calculating the present value of expected future cash flows to be generated by the assets of such entities. Under this methodology, projected future cash flows are discounted by a range of discount rates above and below the Reorganized Debtors' estimated weighted average cost of capital (the "**Discount Rate**"). The Total Enterprise Value is determined by calculating the present value of the Reorganized Debtors unlevered after-tax free cash flows over the course of the projection period plus an estimate for the value of the Reorganized Debtors beyond the projection period, known as the terminal value plus the value of any other cash flow streams, such as certain amortization fees associated with the Debtors' Lancaster System (the "**Lancaster Facility Amortization Fees**"). The terminal values are calculated using: (a) a range of EBITDA multiples based on public company trading and (b) a range of perpetuity growth rates. The value of the Lancaster Facility Amortization Fees are calculated based on discounting such projected fees by a range of discount rates based on the long-term borrowing rates of the customers that owe such fees (the "**Lancaster Facility Amortization Fees Value**").

B. *Peer Group Trading Analysis*

The peer group trading analysis estimates the value of a company based on a relative comparison with other publicly traded companies with similar operating and financial characteristics. Under this methodology, the enterprise value for each selected public company is determined by examining the trading prices for the equity securities of such company in the public markets and adding the aggregate amount of outstanding net debt for such company. Such enterprise values are commonly expressed as multiples of various measures of financial and operating statistics, such as earnings before interest, taxes, depreciation and amortization expenses ("**EBITDA**"). The Total Enterprise Value is then calculated by applying these multiples to the Reorganized Debtors' actual and projected financial metrics and adding the Lancaster Facility Amortization Fees Value. The selection of public comparable companies for this purpose was based upon the asset base and business risk profile as well as other characteristics that were deemed relevant.

C. *Precedent M&A Transaction Analysis*

Precedent M&A transaction analysis estimates the value of a company by examining public and private transactions on an asset-level basis. Under this methodology, transaction values are commonly expressed as multiples of EBITDA. The selection of asset-level transactions for this purpose was based upon the asset type, asset growth profile, and other characteristics that were deemed relevant. The Total Enterprise Value in this case is calculated by applying multiples of EBITDA to the Reorganized Debtors' projected financial results, adjusting for projected growth capital expenditures, discounting such value to the assumed Effective Date, and adding the Lancaster Facility Amortization Fees Value.

D. *Total Distributable Value, Total Enterprise Value and Implied Equity Value*

The assumed range of the reorganization value, as of an assumed Effective Date of January 31, 2020, reflects work performed by Evercore on the basis of information with respect to the business and assets of the Debtors available to Evercore as of the date of the Disclosure Statement Supplement. It should be understood that, although subsequent developments may affect Evercore's conclusions, Evercore does not have any obligation to update, revise, or reaffirm its estimate.

As a result of the analysis described herein, Evercore estimates the Total Enterprise Value of the Reorganized Debtors to be approximately $150.0 million to $210.0 million, with a midpoint of $180.0 million as of the assumed Effective Date of January 31, 2020. Based on assumed *pro forma* net debt of

-$25.4 million as of the Effective Date[5], the Total Enterprise Value implies an Equity Value[6] range of $175.4 million to $235.4 million, with a midpoint of $205.4 million.  This estimate is based in part on information provided by the Debtors, solely for purposes of the Amended Plan.  For purposes of this analysis, Evercore assumes that no material changes will occur that would affect value as stipulated in the Amended Plan between the date of the Disclosure Statement Supplement and the Effective Date. With the Amended Plan contemplating the sale of the MS/AL Assets for $31.5 million and the CCPN Assets for $76.0 million, this implies a total distributable value (the "**Total Distributable Value**") of approximately $282.9 million to $342.9 million, with a midpoint of $312.9 million.[7,8]

The estimate of Total Distributable Value set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein depending on the results of the Reorganized Debtors' operations or changes in the financial markets.  Additionally, these estimates of value represent hypothetical enterprise and equity values of the Reorganized Debtors as the continuing operator of the Debtors' businesses and assets, and do not purport to reflect or constitute appraisals, liquidation values, or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Amended Plan, which may be significantly different than the amounts set forth herein.  Such estimates were developed solely for purposes of formulation and negotiation of the Amended Plan and analysis of implied relative recoveries to creditors thereunder.  The value of an operating business such as the Debtors' businesses is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such businesses.

Evercore's estimated valuation range of the Reorganized Debtors does not constitute a recommendation to any holder of Claims or Interests as to how such holder should vote or otherwise act with respect to the Amended Plan.  The estimated value of the Reorganized Debtors set forth herein does not constitute an opinion as to the fairness from a financial point of view to any holder of the consideration to be received by such holder under the Amended Plan or of the terms and provisions of the Amended Plan. Because valuation estimates are inherently subject to uncertainties, none of the Debtors, Evercore, or any other person assumes responsibility for their accuracy or any differences between the estimated valuation ranges herein and any actual outcome.

Evercore is acting as investment banker to the Debtors, and will not be responsible for, and will not provide, any tax, accounting, actuarial, legal, or other specialist advice.

---

[5] The Exit Facility as of the assumed Effective Date currently contemplates (i) an undrawn revolving credit facility and (ii) a single-draw term loan facility to cash collateralize letters of credit. The projections assume $25.4 million of cash on balance sheet as of the Effective Date.

[6] Consisting of aggregate preferred and common equity value.

[7] Estimated values prior to certain payments related to applicable taxes, severance and other items.

[8] All proceeds have already been distributed on account of CCPN.

Document comparison by Workshare 9.5 on Tuesday, January 7, 2020 3:53:01 PM

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://WIL-DMS/WILM/13410906/1 |
| Description | #13410906v1<WILM> - SXE - Disclosure Statement Supplement (AS FILED) (1.6.2020) |
| Document 2 ID | interwovenSite://WIL-DMS/WILM/13417099/1 |
| Description | #13417099v1<WILM> - SXE - Disclosure Statement Supplement (SOLICITATION VERSION) (AS FILED) (1.7.20) |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 24 |
| Deletions | 22 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 46 |